# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

CALIFORNIA RESTAURANT ASSOCIATION,

*Plaintiff-Appellant,*

v.

CITY OF BERKELEY,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Northern District of California
No. 4:19-cv-07668-YGR
Hon. Yvonne Gonzalez Rogers, District Judge

## PLAINTIFF-APPELLANT'S EXCERPTS OF RECORD

Kylie Chiseul Kim
KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK, PLLC
1615 M St. NW #400
Washington, DC 20036
(202) 326-7924
kkim@kellogghansen.com

Courtland L. Reichman
Laura Carwile
Ariel C. Green
REICHMAN JORGENSEN
LEHMAN & FELDBERG LLP
100 Marine Parkway, Suite 300
Redwood Shores, CA 94065
(650) 623-1401
creichman@reichmanjorgensen.com

Sarah Jorgensen
REICHMAN JORGENSEN
LEHMAN & FELDBERG LLP
1201 West Peachtree Street, Suite 2300
Atlanta, GA 30309
(404) 609-1040
sjorgensen@reichmanjorgensen.com

*Attorneys for Plaintiff-Appellant
California Restaurant Association*

# INDEX

| ECF | Description | Date | ER No. |
|---|---|---|---|
| **76** | Judgment | 2021-07-06 | 4 |
| **75** | Order Granting in Part and Denying in Part Motion to Dismiss | 2021-07-06 | 5 – 23 |
| **72** | Transcript from Proceedings re Berkeley's Motion to Dismiss the CRA's Amended Complaint | 2021-02-02 | 24 – 50 |
| **58** | Excerpts from the Berkeley's Reply ISO its Motion to Dismiss the CRA's Amended Complaint | 2020-10-27 | 51 – 62 |
| **52** | Excerpts from the CRA's Opposition to Berkeley's Motion to Dismiss the CRA's Amended Complaint | 2020-10-13 | 63 – 64 |
| **47** | Excerpts from Berkeley's Motion to Dismiss the CRA's Amended Complaint | 2020-09-14 | 65 – 80 |
| **46** | Appellant CRA's Amended Complaint | 2020-08-14 | 81 – 111 |
| **41** | Order Dismissing CRA's Complaint and Granting Leave to Amend | 2020-07-20 | 112 |
| **43** | Excerpts from the Transcript from Proceedings re Berkeley's Motion to Dismiss the CRA's Complaint | 2020-07-14 | 113 – 140 |

| ECF | Description | Date | ER No. |
|---|---|---|---|
| **18** | Excerpts from Berkeley's Motion to Dismiss the CRA's Complaint | 2020-01-13 | 141 – 144 |
| **47-2** | Berkeley Municipal Code § 12.80 | 2019-08-06 | 145 – 149 |
| **87** | The CRA's Notice of Appeal | 2021-08-04 | 150 – 152 |
| | District Court Docket Sheet | | 153 – 167 |

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CALIFORNIA RESTAURANT ASSOCIATION, | Case No.: 4:19-cv-07668-YGR |
| Plaintiff, | **JUDGMENT** |
| vs. | |
| CITY OF BERKELEY, | |
| Defendants. | |

The Court having granted defendant the City of Berkeley's motion to dismiss, it is **ORDERED, ADJUDGED AND DECREED** that, in compliance with the Court's prior Order:

(1) the claim of federal law preemption by the Energy Policy and Conservation Act asserted against defendant the City of Berkeley is **DISMISSED WITH PREJUDICE**; and

(2) the remaining claims of California state law preemption asserted against the City of Berkeley are **DISMISSED WITHOUT PREJUDICE**.

Judgment is entered in favor of defendant the City of Berkeley and against plaintiff California Restaurant Association. Plaintiff California Restaurant Association shall take nothing by the complaint herein.

The Clerk of the Court shall enter this judgment and close this matter.

**IT IS SO ORDERED.**

Dated: July 6, 2021

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT JUDGE**

ER-4

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **CALIFORNIA RESTAURANT ASSOCIATION,** | Case No.  4:19-cv-07668-YGR |
| Plaintiff**,** | **ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS** |
| vs. | |
| **CITY OF BERKELEY,** | Re: Dkt. No. 47 |
| Defendant**.** | |

Plaintiff California Restaurant Association ("CRA") brings this action challenging defendant City of Berkeley's ("Berkeley") recently enacted and now in effect ordinance (the "Berkeley Ordinance" or the "Ordinance") that affects the availability of natural gas in new construction within Berkeley.  CRA brings four causes of action against Berkeley: (1) federal preemption by the Energy Policy and Conservation Act ("EPCA"); (2) preemption by California law as a void and unenforceable exercise of police power; (3) preemption by California law as conflicting with California Building Standards Code ("CBSC"); and (4) preemption by California law as conflicting with the California Energy Code ("CEC").

Now before the Court is Berkeley's motion to dismiss the operative first amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and (b)(6). (*See* Dkt. Nos. 46 (first amended complaint), 47 (motion to dismiss).)  CRA opposes the motion.  (Dkt. No. 52; *see also* Dkt. No. 58 (reply).)   The Court further received an amici curiae brief from: (i) the National Association of Home Builders; (ii) the National Association of Manufacturers; (iii) the Air Conditioning, Heating, and Refrigeration Institute; and (iv) the Hearth, Patio, & Barbecue Association (collectively, the "amici").  (Dkt. No. 66.)  The Court heard oral argument on February 2, 2021.  (Dkt. No. 70.)  For the reasons stated below, the Court **GRANTS IN PART AND DENIES IN PART** the motion to dismiss, and **GRANTS IN PART** the request for judicial notice.

United States District Court
Northern District of California

United States District Court
Northern District of California

## I.   BACKGROUND[1]

### A.   Factual Background

The dispute in this litigation centers on a recent ordinance adopted by Berkeley, referred to by the parties as the "Berkeley Ordinance" or the "Ordinance" (Berkeley Ordinance No. 7,672-N.S.).[2]  The Court summarizes the allegations from the operative first amended complaint that are relevant to the disposition of the pending motion. The Court further includes in its summaries the documents and materials for which it has taken judicial notice.  Thus:

CRA:  Plaintiff CRA is a nonprofit mutual benefit corporation organized under the laws of California with its principal office in the County of Sacramento, California.  As alleged, CRA is an association of members in the restaurant industry, and has a substantial interest in having the laws relating to building standards executed and the duties at issue here enforced.  CRA's members include both restaurant owners and chefs.  CRA has members that do business in Berkeley, California, or who seek to do business in Berkeley, and whose interests will be directly affected by this ordinance.  Specifically, the CRA has one or more members who are interested in

---

[1] Berkeley requests the Court to take judicial notice of several related documents. (*See* Dkt. No. 47-1.)  With the exception of Exhibit 1 (the Berkeley Ordinance) and parts of Exhibit 18 (excerpts of the 2019 Building Energy Standards for Residential and Nonresidential Buildings), CRA opposes the request for judicial notice. (Dkt. No. 52-1.)  CRA further concedes that Exhibit 1 is properly considered under the doctrine of reference by incorporation, as the first amended complaint references the Ordinance. (*Id.*)  The Court agrees.  The Court **GRANTS IN PART** judicial notice of Exhibits 1, 3, 6, and 8 through 18 to the request for judicial notice but does not take judicial notice of the adjudicative facts that are incorporated therein.  *See Corrie v. Caterpillar, Inc.*, 503 F.3d 974, 978 (9th Cir. 2007) (taking judicial notice of guidelines published by the Defense Security Cooperation Agency of the U.S. Department of Defense); *Agua Caliente Band of Cahuilla Indians v. Coachella Valley Water Dist.*, Case No. 13-cv-0883(JGB), 2019 WL 2610965, at *5 (C.D. Cal. Apr. 19, 2019) (taking judicial notice of a decree "for the existence of the document").  With respect to Exhibits 2, 4, 5, and 7, the Court declines takes to take judicial notice of these documents, which are not relevant to the disposition of the pending motion.  *See Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1025 n.2 (9th Cir. 2006) ("We decline to take judicial notice of the two Staff Reports, as they are not relevant to the resolution of this appeal.").  Finally, the Court declines to consider additional declarations submitted by Berkeley, which are outside the scope of this *facial* 12(b)(1) motion to dismiss.  *See infra* Sections II, and III.A.

[2] *See* Dkt. No. 47-2 (RJN Exh. 1, Berkeley Ordinance).

opening a new restaurant or in relocating a restaurant to a new building in Berkeley after January 1, 2020, but who cannot do so because of the Ordinance's ban on natural gas.  In other words, one or more of its members would seek to open or relocate a restaurant in a new building in Berkeley but for the ban on natural gas.  As alleged, its members will be irreparably harmed by the Berkeley Ordinance through the loss of the ability to use natural gas appliances in newly constructed buildings.

Berkeley:  Defendant Berkeley is a California city located within the boundaries of the United States District Court for the Northern District of California.

The Ordinance:  The Berkeley City Council passed the Berkeley Ordinance on July 23, 2019, and was later signed into law by the Berkeley Mayor, Jesse Arreguin, on August 6, 2019.

The Berkeley Ordinance amends the Berkeley Municipal Code ("BMC"), adding a new Chapter 12.80 ("Prohibition of Natural Gas Infrastructure in New Buildings") prohibiting natural gas infrastructure in new buildings effective January 1, 2020.  The Ordinance prohibits "Natural Gas Infrastructure" in "Newly Constructed Buildings." Berkeley Ordinance § 12.80.040.A.  Natural Gas Infrastructure is defined as "fuel gas piping, other than service pipe, in or in connection with a building, structure or within the property lines of premises, extending from the point of delivery at the gas meter." *Id.* § 12.80.030.E.

The Berkeley Ordinance provides that its requirements "shall apply to Use Permit or Zoning Certificate applications submitted on or after the effective date of this Chapter for all Newly Constructed Buildings proposed to be located in whole or in part within the City," *id.* § 12.80.020.A, and accordingly relies on Berkeley's general police power as the source of its authority.  Significantly, the Ordinance is part of Title 12 of the Berkeley Municipal Code, which concerns "Health and Safety."  This is separate from Title 19, regarding "Buildings and Construction," which contains Berkeley's building code and energy code.

The Berkeley Ordinance contains two exemptions.  The first exemption, in section 12.80.040.A.1, provides that "Natural Gas Infrastructure may be permitted in a Newly Constructed Building if the Applicant establishes that it is not physically feasible to construct the building without Natural Gas Infrastructure." *Id.* § 12.80.040.A.1.  The definition of "physically feasible"

allows for an exemption from the ban on natural gas infrastructure where compliance with the California Energy Code ("CEC") would be impossible for all-electric construction. *Id.*[3] CRA alleges that this merely represents a "phasing in" of the ban as the CEC models all-electric construction for additional building types – *i.e.*, there is no "exemption" for the types of buildings already covered by the ban.

The second exception allows for an exemption from the ban on natural gas infrastructure when it is established that the use of natural gas "serves the public interest." *Id.* § 12.80.050.A. This exemption allows for a discretionary determination made by the City's Zoning Adjustments Board or, in some cases at the staff level, as part of the entitlement process for new construction. *Id.* § 12.80.020.D. In reviewing requests for a public interest exemption, the Zoning Adjustment Board or City staff must consider (1) "[t]he availability of alternative technologies or systems that do not use natural gas" and (2) "[a]ny other impacts that the decision to allow Natural Gas Infrastructure may have on the health, safety, or welfare of the public." *Id.* § 12.80.050.A.

With regards to EPCA, CRA alleges that the Berkeley Ordinance's standards concern the energy efficiency and energy use of appliances covered by the EPCA insofar as the Ordinance requires all appliances in newly constructed buildings to use only electric power and not natural gas. In other words, by cutting off the gas pipeline, the Ordinance makes impossible and therefore effectively prohibits the use of gas appliances. This action, according to CRA, is preempted by the EPCA, which CRA contends has been progressively amended to include binding federal energy efficiency standards. In short, CRA asserts and alleges that the United States Congress, through the EPCA and the subsequent statutes, meant to preempt the entire field of energy use by covered appliances, and replace it with detailed conditions that must be met for such state or local laws to avoid preemption.

---

[3] Consistent with these provisions to ensure compliance with the CEC, the Berkeley Ordinance expressly disavows any intention to amend the Energy Code or to set standards regulating the use of appliances. *Id.* § 12.80.020.C. ("This chapter [in the Ordinance] shall in no way be construed as amending California Energy Code requirements under California Code of Regulations, Title 24, Part 6, nor as requiring the use or installation of any specific appliance or system as a condition of approval.").

Despite the foregoing, the Ordinance expressly provides that it "shall in no way be construed as amending California Energy Code requirements under California Code of Regulations, Title 24, Part 6, nor as requiring the use or installation of any specific appliance or system as a condition of approval." *Id.* § 12.80.020.C.  According to the express terms of the Ordinance, the Ordinance attempts to address the global impacts caused by the combustion of natural gas.  *Id.* §§ 12.80.010.A, 12.80.010.D.

The EPCA:  The EPCA regulates the energy efficiency of consumer products including air conditioners, water heaters, furnaces, clothes washers and dryers, and stoves.  *See* 42 U.S.C. §§ 6292, 6295.  As relevant here, the EPCA's consumer standards explicitly preempt state and local regulations "concerning the energy efficiency" and "energy use" of the products for which the EPCA sets its own energy efficiency standards. *Id.* § 6297(c).  Section 6297(c) expressly provides:

> [E]ffective on the effective date of an energy conservation standard established in or prescribed under section 6295 of this title for any covered product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product . . . .

*Id.*  The term "covered product" includes various categories of consumer products mentioned above, including appliances and lighting.  *Id.* §§ 6291(2), 6292.

The EPCA contains only limited exceptions to this general rule of preemption for consumer appliances.  Specifically, a regulation is not preempted if it "is in a building code for new construction" and must further meet seven specific explicit requirements.  *Id.* §§ 6297(c)(3), (f)(3).

The EPCA also governs the energy efficiency of certain commercial appliances, including air conditioners, furnaces, water heaters, and clothes washers. *Id.* § 6313. These standards also explicitly "supersede any State or local regulation concerning the energy efficiency or energy use of a product for which a standard is prescribed or established" in the federal statute. *Id.* § 6316(b)(2)(A).  "Covered" industrial equipment is defined in *Id.* § 6311(1) and includes "commercial package air conditioning and heating equipment," "warm air furnaces," and several types of water heaters, but notably does not include ovens for commercial kitchens.

As with the consumer standards, there are only limited exceptions to the rule of preemption

United States District Court
Northern District of California

for commercial appliances. In particular, a local regulation "contained in a State or local building code for new construction" is not preempted if it does "not require that the energy efficiency of" a product covered in the federal statute "exceed[s] the applicable minimum energy efficiency requirement." *Id.* § 6316(b)(2)(B).

In total, each of these preemption provisions turns on whether a state law or local ordinance regulates the "energy efficiency" or "energy use" of a covered product, which are defined, respectively, as "the ratio of the useful output of services from a consumer product to the energy use of such product," and "the quantity of energy directly consumed by a consumer product at point of use." *Id.* § 6291(4)-(5).

### B.    Procedural Background

CRA commenced this lawsuit on November 21, 2019.  (Dkt. No. 1.)  Berkeley moved to dismiss the then operative complaint on January 13, 2020.  (Dkt. No. 18.)  While set for hearing in April 2020 by the parties' stipulation, the hearing on this matter was vacated in March 2020 due to the initial outbreak of the Coronavirus (COVID-19) pandemic.  (Dkt. No. 31.)  The Court thereafter permitted supplemental briefing on discrete issues (Dkt. No. 32), before resetting a hearing via the Zoom platform for July 14, 2020.  (Dkt. No. 36.)

The Court heard the prior motion to dismiss on July 14, 2020.  (Dkt. Nos. 40 (minutes), 43 (transcript).)  On the record at the hearing, and later confirmed in a written Order, the Court granted in part Berkeley's motion on the grounds of both ripeness and standing for the reasons stated on the record.  (*See* Dkt. No. 41 (Order).)  The Court otherwise denied without prejudice the remaining grounds of the motion, permitting Berkeley to re-raise these arguments in response to the filing of any subsequent amended complaint.  (*Id.*)  The Court later denied Berkeley's request to conduct pre-answer discovery as to the identity of the member or members that would open a restaurant but for the Berkeley Ordinance.  (Dkt. Nos. 44 (joint discovery letter brief), 45 (Order).)

On August 14, 2020, CRA filed the now operative first amended complaint.  (Dkt. No. 46.) Berkeley moved to dismiss the first amended complaint on substantively identical grounds as its prior motion.  (Dkt. No. 47.)  The parties fully briefed the motion on an extended briefing schedule stipulated by the parties.  (Dkt. Nos. 51 (Order granting stipulation re: briefing schedule),

*United States District Court*
*Northern District of California*

52 (opposition), 58 (reply), 59 (Order granting stipulation re: continuing motion hearing date).) The Court further received an unopposed motion for leave to file an amici curiae brief from the amici, which the Court granted.  (*See* Dkt. Nos. 56 (motion for leave to file amici curiae brief), 65 (Order granting motion), 66 (amici curiae brief).)

Due to conflicts with the Court's calendar for the month of December 2020, the Court vacated the December 8, 2020 hearing date (Dkt. No. 67), before later resetting the hearing for February 2, 2021.  (Dkt. No. 68.)  The Court heard oral arguments on the motion on February 2, 2021. (Dkt. Nos. 70 (minutes), 72 (transcript).)  The matter is now ripe for resolution.

Finally, subject matter jurisdiction in this action is grounded upon federal question jurisdiction.   28 U.S.C. § 1331. Specifically, subject matter jurisdiction is premised on CRA's first cause of action, which seeks declaratory relief and to enjoin state action as preempted by federal law (the EPCA).  The Court would otherwise have supplemental jurisdiction over the remaining causes of action, which assert preemption of the Berkeley Ordinance under California law.

## II.   LEGAL STANDARDS

Berkeley brings this motion under Rules 12(b)(1) and (b)(6).  The legal standards under both subsections for this motion are well known and not in dispute. Thus:

First, Rule 12(b)(1) provides that an action may be dismissed for lack of subject matter jurisdiction.  Federal courts are of "limited jurisdiction" and plaintiff bears the burden to prove the requisite federal subject matter jurisdiction. *Kokkonen v. Guardian Life Ins. of Am.*, 511 U.S. 375, 377 (1994).  A challenge pursuant to Rule 12(b)(1) may be facial or factual.  *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).  A facial 12(b)(1) motion involves an inquiry confined to the allegations in the complaint, whereas a factual 12(b)(1) motion permits the court to look beyond the complaint to extrinsic evidence. *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004).   In other words, "[i]n a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction[,]" while in a factual challenge, the challenger "disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th

United States District Court
Northern District of California

Cir. 2004).

Second, Rule 12(b)(6) provides that a complaint may be dismissed for failure to state a claim upon which relief may be granted.  Dismissal for failure to state a claim under Rule 12(b)(6) is proper if there is a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988)).  The complaint must plead "enough facts to state a claim [for] relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

**III.   ANALYSIS**

Berkeley raises three grounds for dismissal: First, under Rule 12(b)(1), Berkeley avers that CRA lacks standing and that the first amended complaint should further be dismissed because it is unripe.  Second, under Rule 12(b)(6), Berkeley asserts that the Ordinance is not preempted by the EPCA.  Third, under the same rule, Berkeley further asserts that the Ordinance is not preempted by California state laws.  Finally, and alternatively, Berkeley contends that, should the Court decide to dismiss the EPCA claim, the Court should decline to exercise jurisdiction over the remaining state law preemption claims.  The Court considers each of these arguments in turn.

**A.   Rule 12(b)(1)**

*1.   Standing*

Berkeley renews its arguments relating to standing from the prior motion to dismiss.  Here, the parties agree that CRA brings a facial challenge, as opposed to as-applied challenge, to the Berkeley Ordinance.  Berkeley, however, asserts that the injury is speculative and hypothetical, and further cites to additional declarations to demonstrate the lack of standing where no CRA member has applied for an exemption from the Ordinance's natural gas ban in new construction.

Article III of the United States Constitution provides that federal courts may only adjudicate "cases" and "controversies." U.S. Const. art. III, § 2. To establish standing under Article III, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins,* ___ U.S. ___, 136 S.Ct. 1540, 1547 (2016) (citing *Lujan v. Defs.*

United States District Court
Northern District of California

*of Wildlife,* 504 U.S. 555, 560-561 (1992)).  Injury in fact is "the 'first and foremost' of standing's three elements.  *Id.*  (original alterations omitted) (quoting *Steel Co. v. Citizens for Better Env't.*, 523 U.S. 83, 103 (1998)).

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Id.* at 1548 (quoting *Lujan*, 504 U.S. at 560).  The "mere existence of a statute," which may or may not ever be applied to a plaintiff, is insufficient to establish standing.  *Jensen v. Nat'l Marine Fisheries Serv. (NOAA)*, 512 F.2d 1189, 1191 (9th Cir. 1975) (possibility that fishing boat owners and operators could be prosecuted for violating federal regulation does not give rise to case or controversy under Article III); *see also Stoianoff v. State of Mont.* 695 F.2d 1214, 1223 (9th Cir. 1983) (operator of "head shop" had no standing to challenge statute restricting advertisements of drug paraphernalia, in the absence of any actual or pending threat of prosecution).

The Supreme Court further requires that plaintiff-organizations like CRA to "make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009).  Such an organization must show that at least one of its members has "standing to sue in [his] own right."  *Ecological Rts. Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000).  In deciding the issue of standing at the pleadings stage, the Court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the" plaintiff.  *Desert Citizens Against Pollution v. Bisson*, 231 F.3d 1172, 1178 (9th Cir. 2000) (quotation marks omitted).

Having reviewed the additional allegations in the first amended complaint, Berkeley does not persuade.  The allegations added to the first amended complaint, that (i) CRA has at least one member who would operate a new restaurant in a new construction in Berkeley using natural gas appliances *but for* the Ordinance and (ii) that its members use both appliances under the "consumer" and "industrial" categories under the EPCA, are legally sufficient to establish standing to bring this action.  These allegations plainly satisfy the standing requirements articulated above.

Berkeley's citation to additional submitted declarations are without merit.  In short, the parties quibble over whether the Court can or should consider the declarations submitted by Berkeley, demonstrating that no CRA member has applied for an exemption from the Ordinance, at this stage of the litigation.  Even considering these declarations, however, these declarations do not question the truth of the allegations in the first amended complaint.  Said differently, the declarations do contradict the allegations that CRA has a member that would open a restaurant in Berkeley *but for* the Ordinance.[4]  At face value, these declarations merely confirmed that no individual has sought an exemption from the mandates of the Ordinance.  These declarations therefore fail to raise a factual challenge under Rule 12(b)(1), and the Court is therefore left to consider this motion as a facial challenge to CRA's standing.  In such circumstances, "[t]he district court resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6)[,]" based on the allegations in the complaint.  *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014); *Am. Fed'n of Tchrs. v. Devos*, 484 F.Supp.3d 731, 741-42 (N.D. Cal. 2020); *see also Desert*, 231 F.3d at 1178.  Here, the Court concludes that CRA has adequately demonstrated standing based on the allegations in the complaint.

Accordingly, because CRA has appropriately included allegations demonstrating sufficient standing, the Court **DENIES** the motion to dismiss on this ground.

### 2. Ripeness

Relatedly, Berkeley renews its ripeness arguments from the prior motion to dismiss.  Specifically, Berkeley contends that the facial challenge as to the Ordinance is not yet ripe, and that CRA fails to otherwise so demonstrate.

In general, the doctrines of standing and ripeness are "closely related," but ripeness "requires an additional inquiry into 'whether the harm asserted has matured sufficiently to warrant judicial intervention.'"  *Pac. Legal Found. v. State Energy Res. Conservation & Dev. Comm'n*,

---

[4] As noted in the Order denying early discovery: "Ninth Circuit authority is clear that CRA need not provide the name of an affected member in its complaint."  (Dkt. No. 45 at 2 (citing *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015) (holding that a plaintiff association need not name an affected member in the complaint).)

659 F.2d 903, 915 (9th Cir. 1981) (citing *Warth v. Seldin*, 422 U.S. 490, 499 n.10 (1975)). "For a case to be ripe, it must present issues that are 'definite and concrete, not hypothetical or abstract.'" *Bishop Paiute Tribe v. Inyo County*, 863 F.3d 1144, 1153 (9th Cir. 2017) (quoting *Thomas v. Anchorage Equal Rts. Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000)). The ripeness doctrine applies to challenges to legislation or regulations, and courts have held that if the issues raised by such a challenge "would be illuminated by the development of a better factual record, the challenged statute or regulation is generally not considered fit for adjudication until it has actually been applied." *Pac. Legal Found.*, 659 F.2d at 915 (citations omitted).

Here, having considered the allegations in the complaint, and the parties' briefing, Berkeley again does not persuade. With regards to subject matter jurisdiction generally, the United States Supreme Court has recognized "in some cases . . . a person subject to a scheme of federal regulation may sue in federal court to enjoin application to him of conflicting state regulations." *Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 20 n.20 (1983). Indeed, in *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983), the Supreme Court found it "beyond dispute that federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights." *Id.* (citing *Ex parte Young,* 209 U.S. 123, 160-62 (1908)). The Ninth Circuit has likewise held that federal courts have jurisdiction to hear suits to enjoin the enforcement of preempted state laws: "when a plaintiff seeks to enjoin state action because federal law preempts it, jurisdiction is proper." *S. Pac. Transp. Co. v. Pub. Utils. Comm'n of Cal.*, 716 F.2d 1285, 1288 (9th Cir. 1983); *see also Pac. Merch. Shipping Ass'n v. Aubry*, 918 F.2d 1409, 1414 (9th Cir. 1990); *S. Cal. Gas Co. v. County. of Los Angeles.*, Case No. 17-cv-5140(DSF), 2017 WL 8793753, at *4 (C.D. Cal. Dec. 4, 2017).

Here again, because the CRA is seeking to enjoin Berkeley from enforcing the Ordinance on the basis of federal preemption by the EPCA, the Court has jurisdiction to review the matter. Berkeley's cited authorities do not apply in this context.

Indeed, regarding ripeness, a facial challenge does not depend on the particular application of the Ordinance. *See Harris v. Mex. Specialty Foods, Inc.*, 564 F.3d 1301, 1308 (11th Cir. 2009); *Roe No. 2 v. Ogden*, 253 F.3d 1225, 1232 (10th Cir. 2001) ("[W]e will not benefit from further

factual development because the Students' action is a facial challenge."); *L.A. Cty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992) ("Further factual development will not assist our consideration of" a facial challenge where the "relevant facts are clear"). Indeed, courts have routinely allowed facial challenges for preemption claims. *See, e.g.*, *Cal. Tow Truck Ass'n v. City & County of San Francisco.*, 693 F.3d 847, 865 (9th Cir. 2012); *Yakima Valley Mem'l Hosp. v. Wash. State Dep't of Health*, 654 F.3d 919, 926 (9th Cir. 2011); *Knox v. Brnovich*, 907 F.3d 1167, 1173 (9th Cir. 2018). In this context, "a purely legal claim is *presumptively ripe* for judicial review because it does not require a developed factual record." *Harris*, 564 F.3d at 1308 (emphasis supplied); *see also id.* (noting that ripeness "applies differently to facial and as-applied challenges"). Berkeley fails to show, and the Court cannot otherwise determine, that any developed factual record would be required to review of the facial challenge of the Ordinance. Thus, in light of the foregoing, the Court concludes that the facial challenge of the Ordinance is now ripe for the Court to consider.

Accordingly, the Court **DENIES** the motion to dismiss on this ground.

### B.     Rule 12(b)(6)

#### 1.     Preemption by Federal Law

Berkeley moves to dismiss the first cause of action, preemption by the EPCA, under Rule 12(b)(6). Specifically, Berkeley contends that CRA cannot state a cause of action for federal preemption because, even under a generous reading of the allegations, the statutory language, and the legislative history, the EPCA simply does not preempt the Ordinance. Therefore, CRA cannot state a claim for federal preemption of the Ordinance.

In general, "[f]ederal preemption occurs when: (1) Congress enacts a statute that explicitly preempts state law; (2) state law actually conflicts with federal law; or (3) federal law occupies a legislative field to such an extent that it is reasonable to conclude that Congress left no room for state regulation in that field." *Hendricks v. StarKist Co.*, 30 F. Supp. 3d 917, 925 (N.D. Cal. 2014) (quoting *Chae v. SLM Corp.*, 593 F.3d 936, 941 (9th Cir. 2010)).

Here, as reflected in the first amended complaint, the parties' briefing, and confirmed at oral argument, CRA's federal preemption claim is an express preemption claim. (*See, e.g.*, Dkt.

Nos. 52 at 20-28 (argument regarding express preemption), *id.* at 28 ("Here, the CRA is not asserting a conflict preemption claim—only an express preemption claim."), 72 at 5 ("Well, to be precise about it, we are not arguing field preemption. . . . We're arguing express preemption.").) "Express preemption results from a Congressional expression of intent to displace state law." *Hendricks*, 30 F. Supp. 3d at 925 (citing *Chae*, 593 F.3d at 942). "Since pre-emption claims turn on Congress's intent, we begin as we do in any exercise of statutory construction with the text of the provision in question, and move on, as need be, to the structure and purpose of the Act in which it occurs." *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 495 (9th Cir. 2005) (internal quotation marks omitted).

The Ninth Circuit has instructed that the "interpretation of the federal statute is informed by two presumptions about the nature of preemption." *Id.* at 496. First, courts "address claims of preemption with the starting presumption that Congress did not intend to supplant state law." *Id.* Indeed, where federal law intrudes on the historic police powers of state and local governments, the federal statute should not supersede state law "unless a 'clear and manifest purpose of Congress' exists." *Hendricks*, 30 F. Supp. 3d at 925 (citing *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)). "This presumption against preemption leads us to the principle that express preemption statutory provisions should be given a *narrow* interpretation." *Air Conditioning & Refrigeration Inst.*, 410 F.3d at 496 (emphasis supplied).

Second, "the scope of the statute's preemption is guided by the Supreme Court's oft-stated comment that the purpose of Congress is the ultimate touchstone in every pre-emption case." *Id.* (internal quotation marks omitted). "As a result, any understanding of the scope of a pre-emption statute must rest primarily on a fair understanding of congressional purpose." *Id.* (internal quotation marks omitted).

"Parties seeking to invalidate a state law based on preemption bear the considerable burden of overcoming the starting presumption that Congress does not intend to supplant state law." *Stengel v. Medtronic*, 704 F.3d 1224, 1227–28 (9th Cir. 2013) (en banc) (citation and internal quotation marks omitted). Further, "[t]he words of this statute must be interpreted to mean what they say." *In re MacIntyre*, 74 F.3d 186, 188 (9th Cir. 1996) (citing *Nesovic v. United States*, 71

United States District Court
Northern District of California

F.3d 776 (9th Cir. 1995)) ("Courts must presume that a legislature says in a statute what it means and means in a statute what it says.").

Here, CRA argues that the express language of the EPCA and the legislative history demonstrate that CRA has appropriately pled a claim of preemption of the Berkeley Ordinance. Specifically, CRA avers that the preemption provision is broad, and that the legislative history confirms an expansive preemption of local laws that would otherwise lead to a nationwide patchwork of local varying laws that would affect energy use or energy efficiency of certain covered commercial and consumer appliances.

Having considered the totality of the parties' briefing and the cited authority therein, CRA does not persuade on its expansive interpretation of the EPCA's express preemption provision. The Court concludes therefore that CRA fails to and cannot state a claim for relief for federal preemption by the EPCA.

First, CRA fails to demonstrate that the express terms of the EPCA sweep so broad as to implicate the Ordinance. CRA asserts that the "plain language of the [EPCA] preemption statute makes clear that Congress intended the preemption to be broad in scope." *Air Conditioning, Heating & Refrigeration Inst. v. City of Albuquerque*, 835 F. Supp. 2d 1133, 1136 (D.N.M. 2010). Specifically, CRA bases this broad reading on the use of the word "concerning," as "'[c]oncerning' is defined as 'relating to,'" which "express[es] a broad pre-emptive purpose." *Air Conditioning, Heating and Refrigeration Inst. v. City of Albuquerque*, Case No. 08-cv-633 (MV/RLP), 2008 WL 5586316, at *7 (D.N.M. Oct. 3, 2008) (quoting Black's Law Dictionary 289 (6th ed. 1990)).

CRA further points out that "energy use" is defined as "the quantity of energy directly consumed by a consumer product at point of use[,]" 42 U.S.C. § 6291(4), and "energy" is defined as "electricity, or fossil fuels." 42 U.S.C. § 6291(3).   Thus, taking these discussed provisions together, CRA contends that any ordinance is, by default, preempted if it relates to the quantity of electricity or fossil fuels directly consumed by a covered consumer or commercial product.

The crux of the CRA's argument is that the Ordinance concerns the quantity of natural gas consumed by appliances in the buildings it regulates because, by barring the connection to gas

United States District Court
Northern District of California

pipes required to use natural gas, the Ordinance requires that *no* natural gas is used. In other words, the Ordinance requires that *zero* quantum of natural gas be used in new construction. In some ways, this argument has some logic. Indeed, the Court has previously recognized that the number "'zero' . . . has quantitative relevance." *Doe v. United Behavioral Health*, --- F. Supp. 3d ---, 2021 WL 842577, at *8 (N.D. Cal. Mar. 5, 2021) (citing Charles Seife, *Zero: The Biography of a Dangerous Idea* (2000) (explaining the value of zero)).

These arguments, however, ultimately do not persuade. The Court agrees that the language employed by the EPCA is broad. The EPCA preempts, subject to numerous exceptions, any state regulation "concerning the energy efficiency, energy use, or water use of [a] covered product." 42 U.S.C. § 6297(c). As outlined *supra*, these covered products are consumer related (*id.* §§ 6291(2), 6292) and certain commercial products (*id.* § 6313) which do not include stoves or ranges. Moreover, each of these provisions turns on whether a state or local regulation regulates the "energy efficiency" or "energy use" of a covered product. *Id.* § 6291(4)-(5).

Here, even with an admittedly broad provision, the Court cannot determine how the EPCA expressly preempts the Berkeley Ordinance where the Berkeley Ordinance does not directly regulate either the energy use or energy efficiency of covered appliances. In short, CRA attempts to bootstrap the EPCA's principles of the "energy efficiency" or "energy use" of covered products to the Ordinance. CRA cannot. The Ordinance facially does not address any of those standards, let alone mandate or require any particular energy use of a covered product. Instead, the Ordinance "prohibit[s]" all "Natural Gas Infrastructure" in new buildings. *See* §§ 12.80.040(A), 12.80.030(E) (defining Natural Gas Infrastructure to include "fuel gas piping" from the gas meter into the property). This is clearly outside the preemption provision of the EPCA.[5]

Moreover, even the most notoriously extensive statutory regimes enacted by Congress

---

[5] Further, while "zero" has some qualitative meaning, the Ordinance does not facially and directly require "zero" use of natural gas appliances in Berkeley. Berkeley residents and property owners are free to purchase and use natural gas appliances in those properties and residences that maintain natural gas connections. CRA has not shown the EPCA can and does sweep into areas of natural gas connections. This is especially so where large swaths of the United States similarly lack natural gas access.

have limits.  Indeed, in *California Division of Labor Standards Enforcement v. Dillingham Construction, N.A., Inc.*, 519 U.S. 316 (1997), the United States Supreme Court, when confronted with similar "related to" and "connection with" language, held that the Employment Retirement Income Security Act of 1974 ("ERISA") "could not preempt state law in an area of traditional state regulation based on so tenuous a relation" to ERISA plans. *Id.* at 334.  The Court observed that it looks to both "the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive, as well as to the nature of the effect of the state law on ERISA plans." *Id.* at 325 (citation omitted).  The Court reached this conclusion despite well-established law attesting to the "broad scope" and "expansive sweep" of ERISA preemption, based on "relate to" language in the statute. *See id* at 324.

The EPCA must be similarly interpreted in a limited manner, and not sweep into areas that are historically the province of state and local regulation.  Indeed, CRA's expansive interpretation of the EPCA is remarkable for its sweeping breadth, which would extend the EPCA far beyond the express terms of the EPCA dealing with appliances.  In short, CRA's interpretation would compel localities to continue to provide natural gas in all but the rarest of circumstances.  Nothing in the EPCA requires that localities provide let alone continue to maintain natural gas connections.  Indeed, as discussed *infra*, Congress has historically and explicitly deferred local natural gas infrastructure to states and localities. Thus, the Court concludes that the statutory language of the EPCA does not support preemption of the Berkeley Ordinance.

Second, the legislative history further does not support such an expansive interpretation of the EPCA.  The original EPCA, enacted during the oil crisis in the 1970s, focused on labeling the energy efficiency of consumer appliances so that consumers could choose more efficient options. *Air Conditioning & Refrigeration Inst.*, 410 F.3d at 499.  Congress in later legislation narrowed the path for a state to avoid preemption, purposefully making it "difficult" to "achiev[e] the waiver."  S. Rep. No. 100-6, at 2 (1987).  Congress intended to allow only "performance-based codes" that "authorize builders to adjust or trade off the efficiencies of the various building components so long as an energy objective is met." *Id.* at 10-11.  Congress wanted to avoid state policies that were "unfairly weighted resulting in undue pressure on builders to install covered

products exceeding Federal standards." *Id.* at 11.  While the legislative history does not refer to natural gas in particular, the Senate emphasized the need for "even-handed" standards that were not "unfairly weighted" to particular products. *Id*. at 10-11.   The legislation was designed to avoid "the unavailability in the State of a product type or of products of a particular performance class," *id.* at 2, and to institute "performance-based codes" with energy objectives, *id.* at 10-11.

Despite the foregoing authority and legislative history confirming the breadth of preemption relating to appliances under the EPCA, states and localities expressly maintain control over the local distribution of natural gas under related federal statutes.  The relevant scope of federal authority is governed by the Natural Gas Act, 15 U.S.C. § 717 *et seq.*, enacted in 1938 to provide "a comprehensive scheme of federal regulation of 'all wholesales of natural gas in interstate commerce.'" *S. Coast Air Quality Mgmt. Dist. v. F.E.R.C.*, 621 F.3d 1085, 1090 (9th Cir. 2010) (quoting *Northern Natural Gas Co. v. State Corp. Comm'n*, 372 U.S. 84, 91 (1963)). The Natural Gas Act "specifically exempted from federal regulation the 'local distribution of natural gas.'" *Id.* at 1091 (quoting *Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*, 365 U.S. 1, 21 (1961)). "Congress meant to draw a bright line easily ascertained, between state and federal jurisdiction." *Fed. Power Comm'n v. S. Cal. Edison Co.*, 376 U.S. 205, 215 (1964).  Thus, "the history and judicial construction of the Natural Gas Act suggest that *all aspects related to the direct consumption of gas . . . remain within the exclusive purview of the states*." *S. Coast Air Quality Mgmt. Dist.*, 621 F.3d at 1092 (emphasis supplied).

Here, under the foregoing legislative history, the Court cannot determine how the Berkeley Ordinance is preempted by the EPCA, where the Ordinance is exercising authority expressly deferred to states and localities.  The Berkeley Ordinance does not facially regulate or mandate any particular type of product or appliance.  Instead, the Ordinance focuses on regulating the underlying natural gas infrastructure.  This *at best* indirectly has an impact on the products available to consumers.  This narrow focus on the indirect impacts resulting from the Ordinance, however, ignores that Berkeley has exercised its expressly carved out authority to regulate the local distribution of natural gas.  Thus, the legislative history further fails to demonstrate that the EPCA should so sweep beyond the preemption of state and local statutes directly regulating the

energy use and energy efficiency of certain appliances.

In sum, for preemption purposes, the fact that an ordinance focused on natural gas *piping* for new buildings may have some downstream impact on commercial appliances is insufficient.[6] The plain meaning of EPCA does not requires a city to extend natural gas infrastructure, nor does the statute preclude a city's exercise of its power to regulate building infrastructure to protect public health and safety.  The EPCA was and is designed to avoid a patchwork of state efficiency standards for certain covered appliances; nothing in the statute evinces legislative intent to require local jurisdictions to permit the extension of natural gas service.  To hold otherwise would be to misapprehend the scope of the EPCA and extend it impermissibly extend beyond what Congress intended, and infringe on historic and recognized powers held by states and localities.

Accordingly, for the above reasons, CRA's first cause of action, federal preemption of the Berkeley Ordinance by the EPCA, is **DISMISSED WITH PREJUDICE**.

### 2.   *Preemption by California State Laws*

Given that the first cause of action is the only federal claim in this action, and the Court has now determined that it is appropriately dismissed,  the Court declines to exercise supplemental jurisdiction as to the remaining state law claims in this action.  Without a federal claim, principles of federalism counsel that supplemental jurisdiction on the state claims should not be taken.  *See Shanaghan v. Cahill*, 58 F.3d 106, 109 (4th Cir. 1995) (district court has "discretion to retain or dismiss state law claims when the federal basis for an action drops away" (citing 28 U.S.C. § 1367) (emphasis omitted); *Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1000 (9th Cir. 1997) (en banc)).  Indeed, these claims implicate questions of California state law that are appropriately decided by California state courts in the absence of any federal causes of action.

Accordingly, the motion to dismiss is **GRANTED** as to these claims. The remaining claims asserting preemption by various California state laws are **DISMISSED WITHOUT PREJUDICE**.

---

[6]  Indeed, the Ordinance has *zero* effect on existing buildings or infrastructure, which individuals and entities in these properties remain free to choose whatever appliances (e.g. natural gas, electric, or otherwise) they want under existing state and federal law.

United States District Court
Northern District of California

**IV. CONCLUSION**

For the foregoing reasons, the Court **HEREBY ORDERS** as follows:

- The motion to dismiss the first amended complaint is **GRANTED IN PART AND DENIED IN PART**;

- The first cause of action for federal preemption by the EPCA, is **DISMISSED WITH PREJUDICE**; and

- As discussed above, given that the first cause of action is the only federal claim, the Court declines to exercise supplemental jurisdiction as to the remaining state claims.  Accordingly, the remaining claims asserting preemption by various California state laws are **DISMISSED WITHOUT PREJUDICE**.

The Clerk of the Court is directed to issue form judgment consistent with the disposition of this motion and to close out this matter.

This Order terminates Docket Number 47.

**IT IS SO ORDERED.**

Dated: July 6, 2021

**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT JUDGE**

United States District Court
Northern District of California

Pages 1 – 26

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**Before The Honorable YVONNE GONZALEZ ROGERS, Judge**

| | | |
|---|---|---|
| CALIFORNIA RESTAURANT ASSOCIATION, | ) ) ) | |
| Plaintiff, | ) ) | NO. C-19-7668 YGR |
| vs. | ) ) | Tuesday, February 2, 2021 |
| CITY OF BERKELEY, | ) ) | Oakland, California |
| | ) ) | MOTION TO DISMISS |
| Defendant. | ) ) ) | |

**REPORTER'S TRANSCRIPT OF ZOOM PROCEEDINGS**

**APPEARANCES VIA ZOOM:**

For Plaintiff:          REICHMAN JORGENSEN LLP
                        100 Marine Parkway, Suite 300
                        Redwood Shores, California 94065
                   BY:  **COURTLAND REICHMAN, ESQUIRE**


For Defendant:          BERKELEY CITY ATTORNEY'S OFFICE
                        2180 Milvia Street, Fourth Floor
                        Berkeley, California 94704
                   BY:  **CHRISTOPHER D. JENSEN, ESQUIRE**



Reported By:            Diane E. Skillman, CSR 4909, RPR, FCRR
                        Official Court Reporter

      TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

Tuesday, February 2, 2021                           1:59 p.m.

P R O C E E D I N G S

o0o

**THE COURT:**  Okay, counsel.  Good afternoon.  Let's go ahead and call your case.

**THE CLERK:**  Calling Civil action 19-7668 California Restaurant Association versus City of Berkeley.

Counsel, please state your appearances.

**MR. REICHMAN:**  Good afternoon, Your Honor.  Courtland Reichman here for the California Restaurant Association.

**MR. JENSEN:**  Chris Jensen on behalf of defendant, the City of Berkeley.

**THE COURT:**  Good afternoon.  Welcome back.

We're here again on the City's Motion to Dismiss.  This was originally scheduled for argument in December, but I was in the middle of a Zoom trial and just could not add yet another thing to the calendar.

So, the City's motion is based on three primary grounds: Standing, ripeness, failure to state a claim.  I can say I'm still not convinced, really, on the standing and ripeness arguments.  I think the complaint added a number of things which certainly addressed that.

But, in terms of the failure to state a claim, Mr. Reichman, I can say that I don't think that the federal preemption argument works.

So, that's where we stand as a preliminary matter.  I will allow you to go ahead and address the arguments that you would like to address.

Mr. Reichman, ultimately this would mean, if my tentative goes forward, that the Motion to Dismiss would be granted so I will let you start.

Go ahead, sir.

**MR. REICHMAN:**  Okay.  Thank you, Your Honor. May it please the Court.

I'm going to turn then, I think, based on the comments especially to the EPCA statute first.  I thought I would start, Your Honor, by highlighting what this case is about. It came up briefly in the last argument.

And that is that this is a test case; this is a case to decide whether the City has come up with a viable means to work around EPCA as well as the State issues.  This is a significant change in the regulatory framework.  Berkeley is the first city in the country to try and get around EPCA in this manner, and it's part of what you might consider to be a localization of energy policy, that is --

**THE COURT:**  Can I ask -- I'm going to interrupt you for a minute.

I read in your brief that there were other cities in California that had gone through the State process with similar regulations and received approval.  I think that

was --

**MR. REICHMAN:**  City of Santa Rosa.

**THE COURT:**  So why is this the test case if those counties or cities are doing it as well just in a different format?

**MR. REICHMAN:**  Well, the glib answer is, this is the first city to do it and this is the case that we brought. Those cities' ordinances, we think, although they are not at issue here today, would be similarly preempted by EPCA.  And that's part of why this is a significant consideration.

Berkeley announced itself to be the first, and to my knowledge was the first trying to get around EPCA in this way. That's why this becomes a test case; is it viable to get around EPCA in the way that the City is attempting to do it, and they were the first, to my knowledge.

Focusing then, Your Honor, on the EPCA preemption argument and EPCA statute itself, I guess there's three arguments or three points I would like to emphasize just to roadmap where I'm going.

The first is that the statute itself addresses state or local regulations concerning, which means relating to energy use.  And the cases tell us that this is a broad and expansive term, we say, concerning or relating to.

**THE COURT:**  There aren't that many cases that are -- I mean you cited to the *City of Albuquerque* case which didn't

deal with the same kind of product.  In fact, the product there was a product that was explicitly referenced in the statute.

**MR. REICHMAN:**  Right.

**THE COURT:**  And, you know, there are -- it's clearly not an area of complete preemption.  States across the nation have their own regulatory schemes.  And so to suggest that the federal government has somehow totally occupied this field is just not accurate.

**MR. REICHMAN:**  Well, to be precise about it, we are not arguing field preemption.  I don't think that's what the Court was suggesting.

We're arguing express preemption.  So what we have to show is that the preemption is within the words of the statute. The words of the statute are regulations concerning the energy use of covered appliances.

And what the cases tell us, and I'm not referring to the *Albuquerque* case, just a broader tranche of cases, Your Honor, is that the word "concerning" means relating to.  And the Supreme Court and the Ninth Circuit have plenty of cases in a variety of context that talk about what is the phrase "relating to" mean.

And it means does it have an impact on or a connection with.  Or when you get out at the extremes, are you frustrating Congress' intent.  To be sure, cities across the

country have building codes that regulate related things, but that is, Your Honor, precisely what EPCA is about.

When you boil EPCA down between the different preemption provisions, what its focus is on is building codes and they are permitted to regulate the aggregate amount of energy used by a building as a whole.  It permits building codes to regulate this overall energy consumption, but then you have to allow builders' choice within that overall target of how to meet those overall targets.

Precisely what Congress was intending to prevent in the history that we cited in the brief and in the cases talks about this, is the localization of energy policy.  And that EPCA's primary purpose is to permit choice among builders, and you cannot effectively prohibit a covered product or favor particular products.

So if I turn to the statute itself, we start with that, which is the Section 6297(c), it says that EPCA preempts state regulation concerning the energy use of covered products.

So the question here is whether -- and this is the only question -- is whether the city ordinance concerns the energy use of covered products.

Now, the City's briefs really focus on energy efficiency, and they use energy efficiency and energy use interchangeably. To be clear, this case -- or the decision before the Court today anyway -- is not about energy efficiency in any regard.

It's about energy use.  Those are two different terms in the statute.  They've got two different definitions, and they substantively mean two different things.

The question here is not whether the city ordinance concerns the energy efficiency of covered products, it's whether it concerns the energy use of covered products.

As I mentioned a moment ago, "concerning" means relating to.  In the cases where there's Ninth Circuit cases or Supreme Court cases are very clear that "relating to" means would it have a significant impact on, or does it have an effect on.

**THE COURT:**  Energy use precedes the term "covered products."

**MR. REICHMAN:**  Yes, Your Honor.

**THE COURT:**  They are not regulating the product.

**MR. REICHMAN:**  Well, let me put the definitions together.

Does the ordinance have a connection with or an impact on the quantity of gas used by covered products?  Absolutely.  It says you can't use any gas in connection with the covered products.

All of the -- all of those terms of the definition come either from the cases or from the statute itself; whether the ordinance has a connection with or an impact on the quantity of gas used by the covered products.

The main fault lines here of this argument are, as Your

Honor just pointed out -- fault line is whether the city ordinance has to regulate directly, that is, the product itself, the innards of the product, the efficiency of the product, what's happening inside of the product. And there's no indication that that's the case.

In fact, when you look at the other provisions of the statute, you consider it as a whole; what you see is that Congress very expressly intended to regulate building codes. So there's this broad preemption provision that takes out a whole swath of things; anything that is connected with or has an impact on the energy use of a covered product.

But then there's a very significant giveback in Section 6297(f)(3); (f)(3) is the giveback provision. In that specific giveback provision, EPCA says that cities can regulate -- pass ordinances that have an impact on or a connection with the energy use for a covered product if they do it this way.

And I'm being general about it. I can get into the specifics: If they pass a building code that sets an aggregate energy target for a building as a whole, and then permits builders' choice of which products they want to use to fulfill that.

That only makes sense in the context of EPCA when you look at the purposes that this was passed. Remember, this whole area came out of the oil embargo. EPCA began its roots in

1975 when President Ford called for the strongest and the most far reaching energy conservation program we've ever had.

The point was to address -- one of the points, there's many, serious economic and national security problems associated with reliance on foreign energy sources.  And when you look through the legislative history, you see a whole range of considerations that were balanced; from reducing energy consumption to permitting choice, to encouraging competition, to reducing reliance on foreign energy, environmental concerns, consumer concerns, and importantly industry concerns around both competition and permitting choice and not having a patchwork of regulations around the country.

When you think of it in that context, that's what --

**THE COURT:**  That's where I have some trouble with your argument.

We aren't talking about a patchwork of regulations regarding the products themselves; we're talking about community choice in terms of energy products with respect to products for that particular community.

There's still choice, it's just the choice is more limited.  There are plenty of communities throughout the nation that don't have access to natural gas.  So it's not as if this is any different from many of those communities.

And the United States Supreme Court has taken those same

words and reached vastly different conclusions than you did in the *California Division of Labor Standards Enforcement versus Dillingham Construction*.  So there are plenty of cases on both sides.

You'll find this in the patent industry frequently.  It doesn't matter what term comes in front of me.  I can find you cases on both sides that go the opposite ways.

So the real question is the fundamental -- the fundamental purpose of that statute and how you are trying to expand it for your client's own economic benefit, really.

**MR. REICHMAN:**  Well, Your Honor, I think -- first of all, just briefly on the last point, I think there is a broader public purpose here, but I would say candidly that it's not us that are trying to expand the statute.  It is the City that, for the first time, is trying to legislate in an area that has never been done before.  This is the first time anybody's tried to do this interpretation.

Because we would all agree that if the City said we are going to ban gas appliances, that that would absolutely be forbidden by EPCA.  In the City's own memos and its own internal information says their intent here in doing this is to ban gas appliances.

And our point is, EPCA, by its very terms of its express preemption, does not allow the cities or states to do through the backdoor what they are not allowed to do through the front

door.

THE COURT: That's your strongest argument, so let's move over to you, Mr. Jensen, and address that specifically.

In some ways it does, in fact, seem like you are trying to use a backdoor approach to do something that you cannot do through the front door.

Respond.

MR. JENSEN: So I respectfully disagree with that characterization. For one thing this is not --

THE COURT: What is the purpose of the legislation but for to ban all natural gas appliances? What other purpose could it be?

MR. JENSEN: The purpose of the legislation, which will result in no natural gas appliances in newly constructed buildings that are not exempt, is to transition the City infrastructure away from natural gas.

And, you know, I think it's timely that we are seeing that there's a realistic possibility that there will be no natural gas utilities in 14 years. And it seems like an eminently reasonable policy for a city to pursue to at least --

THE COURT: Why do you say that?

MR. JENSEN: Well, I -- I apologize. I'm getting outside of the record a bit. But Biden's administration has announced its intention to try to eliminate fossil fuels from electric power generation by 2035.

**THE COURT:** That's -- campaign promises don't carry a lot of weight in federal court, Mr. Jensen, but go ahead.

**MR. JENSEN:** I understand, Your Honor.

So -- but the City can reasonably attempt to shape its infrastructure in a way that recognizes that, you know, in the near future, natural gas service will be obsolete.

The other thing I think to remember is -- I don't think it's quite fair to characterize this as an area where cities have not traditionally had the ability to regulate. Our papers discuss the Natural Gas Act which clearly delineates the line between federal and state and local regulation of natural gas distribution in this country. And that delineation, the demarcation between federal, state, and local control, is well upstream of a connection to an individual household.

And that legislation was in place when EPCA was enacted. It didn't -- you know, Congress had an opportunity to address it, but Congress was not addressing this issue at all when it enacted these provisions of EPCA.

As your comment suggests, Your Honor, what Congress was addressing was the energy efficiency and energy use of covered appliances, so setting energy efficiency standards for covered appliances, and that's not what these regulations are doing here.

Counsel for plaintiff cited the exception in 42 U.S.C.

6297(f)(3), and that -- those relate to state building standard codes.  And those exceptions are there because building standard codes actually specify criteria for appliances that can be installed in newly constructed buildings.

THE COURT:  Explain this to me, Mr. Jensen.

You keep making reference to building codes and yet, again, it seems like Berkeley didn't -- this seems to be a building code.  And, yet, you've avoided the requirements of the building codes by claiming or by putting this in a health ordinance as opposed to a building ordinance, which has distinctly separate requirements.

Now, that's really a state court issue, and if I don't -- if I don't maintain jurisdiction on the federal issue, it's not -- I'm not sure I would get to that, but it seems to me that you've got some issues with respect to the state regulatory structure by, again, backdooring the approach that you're trying to force these things through with.

MR. JENSEN:  So, Your Honor, I think -- so just to preface this, this ordinance was filed with the Building Standards Commission, you know, as building code amendments have to be, but the ordinance is really implemented through the entitlement process as a land use regulation.  And with discretionary provisions for -- prohibiting natural gas in most instances but allowing certain exemptions.

That's an area where local jurisdictions traditionally have a lot of control.  And you can have control over the form of buildings, the height of buildings, other aspects of construction.  The Building Standards Code really regulate how a building is built.  So if there is natural gas infrastructure, it specifies how that's going to be built, you know, the manner of connections, materials used, that sort of thing.

But as far as specifying what can be built, that's an area that's really an area of land use regulation.  And that is why the City acted through the entitlement process.  And that also gives the City discretion to allow exemptions where it is either necessary for energy code compliance or where it's in the public interest.

**THE COURT:**  Mr. Reichman.

**MR. REICHMAN:**  A couple of responses to focus on.

First is the cases in particular -- well, let me say, Your Honor, there are cases on both sides of the issue about "related to," but I think that this case falls comfortably within that.  I think the line of cases gives us tools to analyze what "related to" means.

And one of the primary tools it gives to figure out the outer bounds of "related to" is the *Mendonca* case which says, is it frustrating Congress' purpose?  And if we start just at a very high level, if the -- if it has the effect of

forbidding gas appliances, if its stated intent is to eliminate gas appliances, and if EPCA forbids that type of regulation, then it is very much frustrating the purpose.  It can hardly be disputed that this has a connection with the gas used by covered appliances.

So the question is, what is the outer bounds of that.  The outer bounds is whether it frustrates Congress' intent.  And beyond allowing choice, beyond not being allowed, permitted to forbid a gas appliance, we see cases in particular, Ninth Circuit's *Building Association of Washington* case, which is cited in the materials.

Now, that dealt with the exemptions, but it has a great discussion of the legislative purposes behind this EPCA preemption provision, which is to prevent building codes from discriminating between building methods.  It recognizes that there are a variety of methods that can be used from electricity to gas to thermal energy.

What it says is, you have to permit choice.  The legislative intent is not to favor particular products or method -- to prevent discrimination between products and methods.  Prevent the building code from discriminating between products and methods.

The very purpose here, and the reason I started with the proposition that you have to read Section (c) in connection with Section (f)(3) is because what you see is a broad

takeaway, which is anything connected with the energy use of an appliance and a very specific giveback, which is in relation to a building code and how the building code must work, which is, frankly, where most of the cases are.  Because it is not hard to conclude that this has a connection with an appliance.

The outer bounds of that, again, are we frustrating Congress' purpose?  I think that's what Your Honor's questions are really getting at, are we bending and contorting a statute to cover something it was never intended to cover or is this something more in the heartland?

And I think, in a very real way, this is in the heartland of what it's intended to cover.  States are permitted to regulate energy used in connection with appliances to the extent it's in the building code and it says aggregate targets and it allows builders' choice.  You are not allowed to forbid gas appliances.

In fact, the City's stated intent in the materials that were submitted is that they intended to forbid gas appliances. If you are not allowed to forbid gas appliances, it is hard to see how you can call it another name and it's not the same thing.

**THE COURT:**  All right.

So, Mr. Jensen, what is the point of the federal statute if not what Mr. Reichman said?

MR. JENSEN: Your Honor, the point of the federal statute is to set uniform standards for the energy efficiency of covered products, which are appliances. And this city ordinance does not affect that uniformity at all.

As Your Honor has recognized, there are jurisdictions throughout the United States that don't have access to natural gas services. And obviously you can't install a natural gas powered appliance in those jurisdictions.

Many cities across the country have ordinances that require a franchise to allow natural gas service. The implication of the argument that plaintiff is making is that local jurisdictions would have to be compelled to grant the franchise to anybody who asked for service, for natural gas service. And that is not the law. That is not consistent with the Natural Gas Act, and it just shows just how far plaintiff is trying to stretch the meaning of a law that was really intended to regulate the efficiency of appliances.

*Dillingham*, the case that you cited, makes clear that a tenuous connection to a federal purpose is not enough to achieve -- to preempt a local or state ordinance. And *Dillingham*, in particular, involved ERISA, which has very broad preemptive provisions. And the Supreme Court in that case made clear that you have to -- you have to draw a line somewhere because everything relates to everything else, and you have to look at the intent of what Congress was trying to

do here, which is to set uniform natural energy efficiency standards for appliances.

I would also point out that these kind of health and safety regulations, which is what this is, has traditionally been allowed.  That's even true when they affect the ability to install a particular product at a particular location.

As we point out in our papers, local air districts in California routinely limit the installation of hot water heaters based on the nitrogen oxide emissions of those hot water heaters.  So that hot water heater could be compliant with EPCA in every way, but there would be a health and safety reason for not allowing installation in a newly constructed building.

And that's the same situation we have here; there is no meaningful distinction.  So, plaintiff's suggestion that EPCA expansion -- excuse me, EPCA preemption should be read so broadly would imply that those regulations were unlawful, they would fall into question the ability to -- for local jurisdictions to exercise discretion over whether to grant or deny natural gas franchises.  And I would say that that result is well outside of anything that could be beyond congressional intent either in the words of the statute or in the legislative history.

**MR. REICHMAN:**  I would like to address that, Your Honor, if I may --

**THE COURT:**  You may.

**MR. REICHMAN:**  -- this parade of horribles.

The easiest answer to the parade of horribles is counsel is arguing another case.  It's not this case.  We are not talking about denying a franchise.  We are not talking about these other types of regulations.

The tools that the Supreme Court and the Ninth Circuit give us are precisely intended to address this type of parade of horribles argument.  Because, indeed, the word "related to," we all have to agree because the Supreme Court tells us this, that pretty much everything is related to everything else.  The way you -- the limiting principle is to ask whether it has a connection with, an impact on, or whether it frustrates the congressional purpose.

Now, we have tools to address the question of whether this -- what about people who don't have natural gas in their community.  Well, that's not this case.  And your ruling in this case, the ruling that we've requested denying the Motion to Dismiss for a plausible claim, has nothing to do with that other case and would have no impact on it whatsoever.

It's not about whether a state has to put in a natural gas infrastructure.  The question is whether a city can ban gas appliances; in effect, that's what's going on.

So if we are talking about -- you can imagine something as related to the energy use if, for example, the plumbers have

to abide by a minimum wage; the plumbers who put in the pipe and that increases the cost and that has an effect on the plumbing.  That would be in the *Dillingham* line of cases that is way too remote and tenuous.

You are not frustrating the purpose of Congress by charging more for pipes.  You are frustrating the purpose of Congress when you ban the very thing that you are not allowed to ban.

So these cases don't stand broadly for the proposition that just because it says "related to" means you ignore those words.  It is quite the opposite.  "Related to" means the three things I said:  Impact on, connection with, and whether it frustrates Congress' purpose.  The Supreme Court mandates that those are broad, expansive words.  And the limiting principles are those three things that I just stated.

So it all comes back to what are the purposes here, and I want to say, there's a subtle difference.  We keep talking about, oh, the purposes are energy efficiency.  Yes, that is a purpose.  That's not the purpose we are here to talk about today.  EPCA governs energy efficiency separately.  Energy efficiency is a separately defined term.  We are talking about the legislative purpose of regulating energy use, and in particular, permitting builders' choice --

THE COURT:  Do I have -- look, you clearly both disagree on what the legislative history is that led to the

statute.

Do I have all of the legislative history in front of me to make that decision?

**MR. REICHMAN:**  I believe you do --

**THE COURT:**  Have you given me all that exists?

**MR. REICHMAN:**  I believe that we have.

**THE COURT:**  I want to make sure that I'm doing it, you know, based upon a complete record.

**MR. REICHMAN:**  I believe we have, Your Honor.  It's in our complaint.  We've referenced it in the brief.  You asked us to put it in the complaint last time, so we did. It's referenced in the brief.

And I'll draw your particular attention to both the --

**THE COURT:**  I'm not talking about references.  I'm really asking about judicially-noticeable documents that I can read for myself.

**MR. REICHMAN:**  Yes.  We've given you those documents. I'm just saying that the Ninth Circuit discusses those documents and says what it has concluded those documents mean, which is exactly what I'm saying.  It's the *Washington* case in the Ninth Circuit.  So that is a useful way to see what the Ninth Circuit has already determined is the purpose.

**THE COURT:**  All right.  The response on *Washington*, Mr. Jensen?

**MR. JENSEN:**  The *Washington* case, again, that was a

case about a building code where the state was actually regulating energy efficiency standards for appliances. And, again, that's not what the City is doing here.

All the appliances are still going to have to comply with the same federal energy efficiency standards.

**THE COURT:** No, but the effect of this -- hold on, Mr. Jensen.

The effect is to eliminate all natural gas appliances. You can't run a natural gas appliance if you don't have natural gas lines.

**MR. JENSEN:** That's correct. But the federal government never intended to regulate where natural gas appliances were installed.

If I could just sort of chime in --

**THE COURT:** But the effect of this is people can only have electric. So you've chosen electric as the only option as opposed to electric versus natural gas, right?

**MR. JENSEN:** That's -- that's correct. Just like cities can choose whether to have natural gas franchises or not have natural gas franchises. There's no meaningful distinction there.

I think the legislative history -- you characterized us disagreeing on the legislative history, but I'm not really sure that's the case. What plaintiff's cite is that, you know, the purpose of the energy efficiency standards for

appliances and EPCA was to avoid a patchwork of regulation that would quote, "complicate appliance manufacturers' design, production, and marketing plans."

That's taken directly from plaintiff's brief.  And I think that statement is a correct statement of the intent of Congress.  The legislative history -- legislative history makes very clear that this is about regulating appliance manufacturers, and the standards that appliance manufacturers need to comply with, and not about where appliances are installed.

**MR. REICHMAN:**  That was one of the statements. That's not our only statement of the legislative history. There's many others that are in there.  And they come out of the *State of Washington* case and of the original source material, which is in there, and in *Albuquerque*, and the point is to permit choice.

If we all agree, and I think we do, it's not about -- this is about banning gas appliances, not about encouraging them or saying you have to put them in.  The question is about banning.  And if we all agree that you cannot, under EPCA, ban gas appliances, then a fortiori you can't ban the connections to them for the purpose of banning --

**MR. JENSEN:**  The City is not banning or regulating natural gas appliances in any way.

And, again, you're -- I think plaintiff is conflating the

ability to regulate where and what is built in a city with the design of appliances. And those are just two very different things with very different regulatory frameworks.

(Simultaneous colloquy.)

**MR. REICHMAN:** I'm sorry. Go ahead, Mr. Jensen. I didn't mean to interrupt.

**MR. JENSEN:** Go ahead.

**MR. REICHMAN:** I was going to say, I agree those are two very different things. That is kind of my point.

I agree that if what EPCA says is that it's about manufacturers building appliances and how they are built, that that's a problem for our case. My point is, that's not this case. That's not what EPCA says.

EPCA says in substance that you can't have a state or local regulation that has a connection with or an impact on the energy use of a covered appliance. And if this doesn't have a connection with or an impact on the energy use of a covered appliance, then I don't know what does.

**THE COURT:** I think -- look, I think what I'm going to do here is that I'm going to bifurcate this.

We haven't dealt at all with the state overlay because in my view the federal preemption issues come first. If there is no federal preemption, then the motion is granted, and I send it to State Court. If there is federal preemption, then there's still arguments that are being made by the City and,

frankly, I haven't focused on those.

So, I understand your arguments.  I want to get into the legislative history myself because it's not clear to me that preemption exists.  On the other hand, I think that Mr. Reichman has made some pretty strong arguments, and I would like to fully consider those.  But I really -- but your arguments at this point is just kind of going back and forth. So the ping pong is not helping at this point.  I just need to dive into the legislative history myself.

Mr. Reichman.

**MR. REICHMAN:**  I have one thing to add that may be helpful to guide the Court's review of this.

I believe that at this stage the question is whether the plaintiff has stated a plausible claim for relief.  It's not the final ruling in the case.  So I just wanted to offer that up.  The case cites are in our brief.  That comes out of *Iqbal* and *Twombly* --

**THE COURT:**  But issues of preemption -- I mean, you're not going to be able to develop a factual record that is much different from what I have now.

So, yes, plausibility is -- I mean, what do you think -- what do you think that you're going to develop that's going to give me any more ability to decide a preemption issue other than what I have in the record now?  I've got the legislation, I've got the legislative history.  I understand your theory.

That issue can be decided.

**MR. REICHMAN:** Right. And I agree. And that's generally the way I approach 12(b)(6) motions.

I just wanted -- if the Court were to rule in the plaintiff's favor in this case, I just wanted to give you comfort that upon further briefing and summary judgment and a further dive into the analysis, what the Court is determining at this stage is the plausibility standard, not the ultimate merits of the case.

I don't disagree with what Your Honor said. I just wanted to point that out.

**THE COURT:** Okay.

I'll try to get to this quickly, but at least I've now had the arguments and you are on the list of the things I need to decide. Okay?

**MR. JENSEN:** Thank you, Your Honor.

**MR. REICHMAN:** Thank you very much for your time, Your Honor.

**THE COURT:** I'll take it under submission.

(Proceedings concluded at 2:37 p.m.)

## CERTIFICATE OF REPORTER

I, Diane E. Skillman, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*Diane E. Skillman*

DIANE E. SKILLMAN, CSR 4909, RPR, FCRR

Monday, February 22,2021

Farimah F. Brown, City Attorney, SBN 201227
Christopher D. Jensen, Deputy City Attorney, SBN 235108
BERKELEY CITY ATTORNEY'S OFFICE
2180 Milvia Street, Fourth Floor
Berkeley, CA 94704
Telephone:  (510) 981-6998
Facsimile:  (510) 981-6960
cjensen@cityofberkeley.info

Attorneys for Defendant CITY OF BERKELEY

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| CALIFORNIA RESTAURANT ASSOCIATION,<br><br>          Plaintiff,<br><br>     v.<br><br>CITY OF BERKELEY,<br><br>          Defendant. | No.  4:19-CV-07668-YGR<br><br>**REPLY IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(1) AND 12(B)(6)**<br><br>Judge:     Hon. Yvonne Gonzalez Rogers<br>Date:      November 17, 2020<br>Time:      2:00 p.m.<br>Location:  Courtroom 1, Fourth Floor |

REPLY IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(1) AND 12(B)(6), Case No. 4:19-CV-07668-YGR

ER-51

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   ARGUMENT ..................................................................................................... 2

     A.    Plaintiff Has Not Met Its Burden of Proving Standing. ............................... 2

     B.    Plaintiff Has Not Met Its Burden of Showing That Its Claims Are Ripe. .................... 3

     C.    Plaintiff's Jurisdictional Arguments Demonstrate Why Plaintiff Cannot Prevail on the Merits. ............................................................................................................. 6

     D.    Plaintiff's Facial Challenge Under EPCA Fails as a Matter of Law. ............................ 7

     E.    The Natural Gas Infrastructure Ordinance Does Not Conflict with the California Energy Code. ............................................................................................. 12

     F.    The Natural Gas Infrastructure Ordinance Does Not Conflict with the California Building Standards Code. ................................................................... 14

III.  CONCLUSION ............................................................................................... 15

ER 52

i

## TABLE OF AUTHORITIES

**Federal Cases**                                                                                        **Page(s)`**

*Air Conditioning & Refrigeration Instit. v. Energy Resource Conserv. &
   Development Comm'n*,
   410 F.3d 492 (9th Cir. 2005) ................................................................................................9

*Air Conditioning, Heating & Refrigeration Intit. v. City of Albuquerque*,
   2008 WL 5586316 (D.N.M. Oct. 3, 2008) ............................................................................5

*Algonquin Gas Transmission, LLC v. Town of Weymouth*,
   365 F. Supp. 3d 147 (D. Mass. 2019)....................................................................................5

*Blumenkron v. Eberwein*
   715 Fed. Appx. 633 (9th Cir. 2017) ......................................................................................3

*Building Industry Ass'n of Wash. v. Washington State Building Code Council*,
   683 F.3d 1144 (9th Cir. 1151)........................................................................................10, 11

*California Div. of Labor Stds. Enforcement v. Dillingham Constr., N.A., Inc.*,
   519 U.S. 316 (1997) ..............................................................................................8, 9, 10

*Californians for Safe & Competitive Dump Truck Transp. v. Mendonca*,
   152 F.3d 1184 (9th Cir. 1998)..........................................................................................9, 10

*Fed. Power Comm'n v. S. Cal. Edison Co.*,
   376 U.S. 205 (1964) .............................................................................................................12

*In re MacIntyre*,
   74 F.3d 186 (9th Cir. 1996)....................................................................................................7

*Medtronic, Inc. v. Lohr*,
   518 U.S. 470 (1996) .........................................................................................................9, 12

*Morrison v. Peterson*,
   809 F.3d 1059 (9th Cir. 2015)................................................................................................6

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
   461 U.S. 190 (1983) ...............................................................................................................5

*Pac. Legal Found. v. State Energy Res. Conservation & Dev. Comm'n*,
   659 F.2d 903 (9th Cir. 1981)...............................................................................................4, 5

*Prof'l Bus. Bank v. Fed. Deposit Ins. Corp.*,
   2011 WL 13152586 (C.D. Cal. Feb. 18, 2011) .....................................................................6

*Safe Air for Everyone v. Meyer*,
   373 F.3d 1035 (9th Cir. 2004)................................................................................................2

REPLY IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT PURSUANT TO FED. R.
CIV. P. 12(B)(1) AND 12(B)(6), Case No. 4:19-CV-07668-YGR

ER-53

*Sierra Forest Legacy v. Sherman*
    646 F.3d 1161 (9th Cir. 2011) .................................................................................3, 4

*Steel Co. v. Citizens for a Better Environment*
    523 U.S. 83 (1998) ..................................................................................................3

*Stengel v. Medtronic Inc.*,
    704 F.3d 1224 (9th Cir. 2013) .................................................................................12

*Thomas v. Anchorage Equal Rights Comm'n*,
    220 F.3d 1134 (9th Cir. 2000) ..............................................................................3, 4

*United States v. United States Bd. of Water Commissioners*,
    893 F.3d 578 (9th Cir. 2018) ..................................................................................13

**State Cases**

*Augustus v. ABM Sec. Servs., Inc.*,
    2 Cal. 5th 257 (2016)...............................................................................................13

*Yamaha Corp. of Am. v. State Bd. of Equalization*,
    19 Cal. 4th 1 (1998)..................................................................................................13

**Federal Statutes**

15 U.S.C. § 717 .................................................................................................................8

42 U.S.C. § 6291 ..............................................................................................................10

42 U.S.C. § 6292 ..............................................................................................................10

42 U.S.C. § 6297 ......................................................................................................7, 9, 11

**State Statutes**

Health & Safety Code § 17958.7.....................................................................................15

Health & Safety Code § 18909.........................................................................................14

Pub. Res. Code § 25402 ...................................................................................................13

Pub. Res. Code § 25402.1 ................................................................................................13

**Other Authorities**

24 Cal. Code Regs. § 10-106............................................................................................13

iii

REPLY IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT PURSUANT TO FED. R.
CIV. P. 12(B)(1) AND 12(B)(6), Case No. 4:19-CV-07668-YGR

ER-54

Fed. R. Civ. P. 12 ............................................................................................................2, 3, 6

H.R. Rep. 100-11 (1987) ........................................................................................................10

S. Rep. 100-6 (1987) .........................................................................................................10, 11

REPLY IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(1) AND 12(B)(6), Case No. 4:19-CV-07668-YGR

**D.  Plaintiff's Facial Challenge Under EPCA Fails as a Matter of Law.**

Even setting aside the jurisdictional flaws and hypothetical and speculative nature of Plaintiff's claims, Plaintiff cannot state a claim under EPCA. The City's argument regarding Plaintiff's EPCA preemption claim is straightforward: the Natural Gas Infrastructure Ordinance does not regulate energy efficiency of covered appliances and therefore it is not preempted. Plaintiff's main response to this simple argument is to complain that it is too easy to understand, and to invite the Court to follow a convoluted path that equates regulating natural gas connections with imposing energy efficiency standards on consumer and industrial appliances.

The Court should decline that invitation. "The words of this statute must be interpreted to mean what they say." *In re MacIntyre*, 74 F.3d 186, 188 (9th Cir. 1996) (citing *Nesovic v. United States*, 71 F.3d 776 (9th Cir. 1995)) ("Courts must presume that a legislature says in a statute what it means and means in a statute what it says."). EPCA preempts state or local regulations concerning the "energy efficiency" or "energy use" of covered products and certain commercial appliances. 42 U.S.C. §§ 6297(c), 6316(b)(2)(A). The challenged provision of the Natural Gas Infrastructure Ordinance provides, subject to certain exceptions, that "Natural Gas Infrastructure shall be prohibited in Newly Constructed Buildings." RJN, Exh. 1 § 12.80.040.A. The Ordinance does not regulate the energy use or energy efficiency of appliances, and therefore the Ordinance is not preempted under a common sense, plain meaning interpretation of EPCA's preemption provisions.

Plaintiff's argument to the contrary incorrectly conflates the regulation of when and where an appliance can be installed with the energy that an appliance uses. Many local land use regulations incidentally impact energy use, including but not limited to the consumption of natural gas. For example, when a local government reserves land for open space or agricultural use, it curtails or eliminates the ability of property owners to install EPCA-regulated appliances on the property. (After all, there is no need to put a hot water heater in an open field.) These land use regulations reduce the energy use and may reduce the natural gas consumption on the property, but they do not regulate the energy use or energy efficiency of appliances.

Even more to the point, there are local jurisdictions throughout the United States where

7

natural gas use is effectively prohibited because the jurisdiction lacks a local natural gas distribution franchise.[1] As discussed in the City's Memorandum, the Natural Gas Act expressly delegates decisions about "the local distribution of natural gas" to state and local authorities. 15 U.S.C. § 717(b). It would be absurd for Plaintiff to argue that a state or local decision to deny approval of a natural gas franchise is preempted by EPCA because such a decision "ensures that appliances cannot use natural gas." *See* Opp. at 17. Plaintiff appears blind to the fact that the argument is equally absurd when applied to the Natural Gas Infrastructure Ordinance. That alone requires the dismissal of Plaintiff's EPCA preemption claim.

Moreover, while Plaintiff makes much of the "broad" preemptive scope of EPCA, the type of attenuated connection that Plaintiff is attempting to draw between energy efficiency and natural gas connections has been routinely rejected as a basis for federal preemption. For example, in *California Division of Labor Standards Enforcement v. Dillingham Construction, N.A., Inc.,* 519 U.S. 316 (1997), the Supreme Court reviewed an ERISA preemption challenge to a state prevailing wage law based on the contention that the state law "related to" and had a "connection with" ERISA plans, on the theory that the state law increased the cost of providing certain benefits and thus affected the choices made by ERISA plans. *Id.* at 328, 335.  The Court unanimously rejected this argument, holding that a federal statute "could not preempt state law in an area of traditional state regulation based on so tenuous a relation" to ERISA plans. *Id.* at 334. The Court observed that "the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive, as well as to the nature of the effect of the state law on ERISA plans." *Id.* at 325.

Notably, the Court reached this conclusion despite well-established law attesting to the "broad scope" and "expansive breadth" of ERISA preemption, based on "relate to" language in the statute that is parallel to the use of "concerning" in EPCA in which Plaintiff places so much stock. *See id* at 324. In his concurrence, Justice Scalia noted the flaw in relying on such language, observing that "applying the 'relate to' provision according to its terms was a project

---

[1] *See* https://hifld-geoplatform.opendata.arcgis.com/datasets/natural-gas-service-territories?geometry=-88.913%2C41.669%2C-68.094%2C44.477.

ER-157

doomed to failure, since, as many a curbstone philosopher has observed, everything is related to everything else. *Id.* at 325 (citation omitted). Thus, "the statutory text provides an illusory test, unless the Court is willing to decree a degree of pre-emption that no sensible person could have intended—which it is not." *Id.*

Ninth Circuit law supports the same conclusion. In *Californians for Safe & Competitive Dump Truck Transp. v. Mendonca*, 152 F.3d 1184 (9th Cir. 1998), the Ninth Circuit rejected an argument that the same prevailing wage law was preempted because it was "related to" the prices, routes, and services regulated under the Federal Aviation Administration Authorization Act. *Id.* at 1188–89. The court observed that any arguable effect on the federally regulated subject matter was too "indirect, remote, and tenuous" to support a clear congressional intent to preempt the prevailing wage legislation. *Id.*

In *Air Conditioning & Refrigeration Institute v. Energy Resource Conservation & Development Commission*, 410 F.3d 492 (9th Cir. 2005) ("*ACRI*"), the court considered a provision of EPCA (not at issue in this case) that preempts state information disclosure requirements for covered appliances, including any state law or regulation that "provides at any time for the disclosure of information with respect to any measure of energy consumption or water use of any covered product." 42 U.S.C. § 6297(a)(1)(B). The plaintiff argued that a California regulation requiring the submission of data to the California Energy Commission violated the prohibition against state "disclosure" requirements. *ACRI*, 410 F.3d at 497. The court interpreted the statutory term "disclose of information" narrowly, noting that "[a] narrow interpretation is consistent with our direction to find preemption when preemption is the 'clear and manifest purpose of Congress.'" *Id.* (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). The court also observed that the legislative history of EPCA and its amendments "demonstrates that Congress intended to preempt state energy efficiency standards, testing procedures, and consumer labeling requirements," but not the submission of data to a state regulator. *Id.* at 501.

Plaintiff's attempt to equate "energy use" with "the installation of natural gas appliances" cannot be reconciled with these Ninth Circuit and Supreme Court authorities. *ACRI* stands for

9

REPLY IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(1) AND 12(B)(6), Case No. 4:19-CV-07668-YGR

the proposition that the preemption provisions in EPCA must be interpreted narrowly and consistent with congressional intent, which includes an intent to preempt state energy efficiency standards, but not to displace other state health and safety regulations that impact when and where covered appliances may be installed. And complimenting *ACRI*'s holding, the *Dillingham* and *Mendonca* cases make clear that even "expansive" federal preemption provisions should not be read to intrude into traditional areas of state regulation that bear only a tenuous relationship to the sphere of federal preemption. Plaintiff's argument that local restrictions on natural gas connections are preempted because gas stoves that would otherwise be installed in new buildings use energy runs afoul of the principles that: (1) preemption provisions should be narrowly interpreted, (2) the interpretation of the scope of federal preemption should be informed by the intent of Congress in enacting the statute, and (3) an "indirect, remote, and tenuous" effect on federally regulated subject matter does not establish preemption. *Mendonca*, 152 F.3d at 1188.

Nor is there any reasonable dispute that the provisions of the statute at issue here are directed at regulating the energy efficiency of appliances, not regulating natural gas connections. *See* 42 U.S.C. §§ 6291(2), 6292. Plaintiff concedes those provisions were intended to establish uniform natural energy efficiency standards for the benefit of appliance manufacturers. Opp. at 21. Indeed, Plaintiff notes that the purpose of enacting uniform energy efficiency standards was to avoid a "patchwork" of regulations that would "complicate appliance manufacturers' design, production and marketing plans." *Id.* at 5 (citing S. Rep. No. 100-6, at (1987), and H.R. Rep. No. 100-11, at 24 (1987)) (original alteration omitted). The fact that appliances cannot use natural gas in certain Newly Constructed Buildings in Berkeley will have no effect on those design, production, and marketing plans, given that appliance manufacturers are already limited to selling only electric appliances in the large swaths of the county where natural gas service is not available. Thus, the legislative history of EPCA, as well as its plain meaning, shows that Congress intended to regulate appliance energy efficiency, not natural gas connections.

Plaintiff fails to cite any authority that would support a different interpretation. *Building Industry Association of Washington v. Washington State Building Code Council*, 683 F.3d 1144 (9th Cir. 1151), arose from a challenge to state building standards that established "energy

10

efficiency objectives." The Ninth Circuit held that the Washington State code was consistent with 42 U.S.C. § 6297(f)(3), which allows state and local building codes that, among other requirements, "permit a builder to meet an energy consumption or conservation objective for a building by selecting items whose combined energy efficiencies meet the objective." 42 U.S.C. § 6297(f)(3)(A). But where a local ordinance does not regulate energy efficiency—as is the case here—it is a non sequitur to ask whether the ordinance "favor[s] certain options over others" to achieve energy efficiency objectives. Opp. at 20. The *Washington* case is not relevant to a local ordinance that does not regulate energy efficiency or energy use.

Similarly, the passages of legislative history cited by Plaintiff provide no evidence that EPCA's appliance energy efficiency standards were intended to dictate when and where EPCA-regulated appliances could be installed. The Senate Energy and Natural Resources Committee observed that state *energy efficiency* standards should be "even handed" so as not to put "undue pressure on builders to install covered products exceeding Federal standards." S. Rep. 100-6, at 11. But again, the Natural Gas Infrastructure Ordinance does not regulate energy efficiency and has exemptions that prevent any conflict with federal energy efficiency standards—which of course would only be relevant if Plaintiff were asserting a conflict preemption argument.[2] The Committee also noted that federal standards should not be set "so as to result in the unavailability in the United States in any covered product type (or class) of *performance characteristics*, such as size or capacity." *Id.* at 8 (emphasis added). The Commission was agnostic to the availability of natural gas-fueled products, to the extent that the Commission's views have any relevance on the regulation of natural gas connections.

It is also noteworthy that these decisions were made decades after the passage of the Natural Gas Act, a critical fact that Plaintiff's opposition fails to persuasively address. The question is not, as Plaintiff appears to suggest, whether another federal statute could

---

[2] In deciding the City's motion to dismiss the initial Complaint, the Court was understandably confused by Plaintiff's EPCA arguments. Given that confusion, the City assumed that Plaintiff's only conceivably plausible preemption argument would rely on the doctrine of conflict preemption. But Plaintiff disclaims any intent to assert a conflict preemption claim. Opp. at 22. Plaintiff is left with an express preemption argument based on a statute that does not expressly preempt the Natural Gas Infrastructure Ordinance.

11

REPLY IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(1) AND 12(B)(6), Case No. 4:19-CV-07668-YGR

ER-60

hypothetically preempt the regulation of natural gas connections to individual structures even through the Natural Gas Act does not. Rather, the question is whether EPCA contains sufficiently clear language to preempt well-settled law that draws a "bright line" between federal regulations of interstate transmission of natural gas and state and local regulation of other natural distribution infrastructure. *See Fed. Power Comm'n v. S. Cal. Edison Co.*, 376 U.S. 205, 215 (1964). EPCA provisions directed at energy efficiency fall well short of this standard.

For all of these reasons, Plaintiff cannot establish a congressional intent to preempt state and local regulations of natural gas connections for health and safety reasons—a field that the has traditionally been occupied by state and local law. *See Medtronic*, 518 U.S. at 475 (noting that states "traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons"). The Ninth Circuit and Supreme Court have made clear that "[i]n all preemption cases, and particularly those in which Congress has legislated in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Stengel v. Medtronic Inc.*, 704 F.3d 1224, 1227 (9th Cir. 2013) (citing *Medtronic*, 518 U.S. at 485) (original alterations and quotation marks omitted). Under any even remotely fair reading of the statute, EPCA's preemption provisions do not regulate natural gas connections, and Plaintiff does not even come close to establishing a "clear and manifest" intent to preempt a local ordinance regulating an area of law traditionally given over to state control.

In sum, there is no hidden meaning in the words "energy efficiency" or "energy use"— the words that Congress chose in defining the preemptive scope of EPCA's appliance standards. The words mean what they say, and as a matter of law, they don't mean "natural gas connections." For this simple reason, Plaintiff fails to state a claim under EPCA.

### E. The Natural Gas Infrastructure Ordinance Does Not Conflict with the California Energy Code.

Just as the Natural Gas Infrastructure Ordinance does not set energy efficiency or energy use standards under federal law, it does not set "energy conservation" or "energy insulation"

12

REPLY IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(1) AND 12(B)(6), Case No. 4:19-CV-07668-YGR

standards under state law. The California Energy Code requires the Energy Commission to set "energy conservation" and "energy insulation" standards for Newly Constructed Buildings, as well as additions, alterations, or repairs to existing buildings. Pub. Res. Code §§ 25402, 25402.1(h)(2); 24 Cal. Code Regs. § 10-106. Under Public Resources Code § 25402.1(h)(2), a local jurisdiction may modify the state standards if it "files the basis of its determination that the standards are cost effective with the commission and the commission finds that the standards will require the diminution of energy consumption levels permitted by the rules and regulations adopted pursuant to those sections." Pub. Res. Code § 25402.1(h)(2). The City followed that process in the adoption of its local "reach code" amendments to the Energy Code, which were approved by the Energy Commission on February 20, 2020. RJN, Exh. 6. In contrast, the City did not submit the Natural Gas Infrastructure Ordinance to the Energy Commission because the Ordinance regulates Natural Gas Infrastructure, not energy conservation or energy insulation. As such, the Ordinance does not amend the Energy Code, does need to be submitted to the Energy Commission for review, and is not preempted under state law.

The Energy Commission's February 6, 2020 letter confirms this common sense conclusion. *See* RJN, Exh. 7. The Commission's determination is entitled to "considerable judicial deference" under applicable federal law. *United States v. United States Bd. of Water Commissioners*, 893 F.3d 578, 596 (9th Cir. 2018); *Augustus v. ABM Sec. Servs., Inc.*, 2 Cal. 5th 257, 262–63 (2016); *see also Yamaha Corp. of Am. v. State Bd. of Equalization*, 19 Cal. 4th 1, 11 (1998) (noting role of agency "expertise" in deference given to state agency). There is no reason for a federal court to second guess the Energy Commission's reasonable, common sense interpretation of state law.

Plaintiff attempts to mislead the Court into believing that the Energy Commission's decision is "contradicted by the CEC's own treatment of other natural gas bans." Opp. at 25. This is the same false story Plaintiff told the Court in its Surreply to the City's first motion to dismiss. *See* Dkt. #33 at 2. As the City has previously explained, a local reach code amendment to the state Energy Code is fundamentally different process than adopting a local regulation that does not regulate "energy conservation" or set energy efficiency standards. *See* Dkt #35 at 1-2.

13

Courtland L. Reichman (CA Bar No. 268873)
Laura Carwile (CA Bar No. 291906)
**REICHMAN JORGENSEN LLP**
100 Marine Parkway, Suite 300
Redwood Shores, CA 94065
Telephone: (650) 623-1401
Facsimile: (650) 623-1449
creichman@reichmanjorgensen.com
lcarwile@reichmanjorgensen.com

Sarah Jorgensen (*Pro Hac Vice*)
**REICHMAN JORGENSEN LLP**
1201 West Peachtree Street, Suite 2300
Atlanta, GA 30309
Telephone: (404) 609-1040
Facsimile: (650) 623-1449
sjorgensen@reichmanjorgensen.com

Gary J. Toman (*Pro Hac Vice*)
**WEINBERG, WHEELER, HUDGINS, GUNN
& DIAL LLP**
3344 Peachtree Road NE, Suite 2400
Atlanta, GA 30326
Telephone: (404) 876-2700
Facsimile: (404) 875-9433
gtoman@wwhgd.com

Kylie Chiseul Kim (*Pro Hac Vice*)
**KELLOGG, HANSEN, TODD, EVANS,
FIGEL & FREDERICK LLP**
1615 M St NW #400
Washington, DC 20036
Telephone: (202) 326-7924
Facsimile: (202) 326-7999
kkim@kellogghansen.com

*Attorneys for Plaintiff*
*California Restaurant Association*

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION**

| | |
|---|---|
| CALIFORNIA RESTAURANT ASSOCIATION, a California nonprofit mutual benefit corporation,<br><br>     Plaintiff,<br>  v.<br><br><br>CITY OF BERKELEY,<br><br>     Defendant. | Case No. 4:19-cv-07668-YGR<br><br>**CALIFORNIA RESTAURANT ASSOCIATION'S OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT**<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br>Action Filed: Nov. 21, 2019 |

### D.  **The Exemptions In The Ordinance Have No Bearing On Express Preemption.**

Berkeley next argues that the exceptions in the Ordinance save it from preemption. Motion at 15 (Section IV(B)(3)). Berkeley's underlying logic seems to be that the Ordinance necessarily ensures compliance with state law (because it offers an exception if compliance with state law is not feasible); state law complies with federal law; and therefore the Ordinance also complies with federal law. But that conclusion does not follow. Even if Berkeley's exception guarantees compliance with state law, it does not guarantee compliance with federal law. If the City merely *adopted* state law, without any amendment, then it would make more sense to claim, as Berkeley does here, that the legitimacy of the city law rises or falls with state law. But that is not what Berkeley has done. Berkeley changed state law (and Berkeley failed to comply with state procedures for doing so, *infra* pp. 23-25) — and it therefore cannot shelter under the presumed validity of state law.

But in all events, compliance is not the issue: if the local law is a regulation concerning energy use of appliances, the EPCA directly applies to and preempts that local regulation, and the regulation must stand on its own footing. Thus, although it may be true that the California standards comply with federal law (although that is not at issue here), Berkeley's Ordinance adds a new restriction above and beyond California's standards that must be separately evaluated for compliance with federal law.

Further, Berkeley's argument addresses a hypothetical conflict preemption claim that the CRA has not even asserted. Berkeley's logic is that the Ordinance does not conflict with federal law. But that has no bearing on an express preemption claim: express preemption is based on statutory language, not an inquiry into whether the state and federal statutes conflict. *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993); *see also Gobeille v. Liberty Mut. Ins. Co.*, 136 S. Ct. 936, 946 (2016) (explaining that the "perceived difference . . . in the objectives" between state and federal law" does not shield" the state law from preemption). Here, the CRA is not asserting a conflict preemption claim — only an express preemption claim. *See* Am. Compl. ¶ 50.[11]

_____

[11] Berkeley's argument that it is hard to prove conflict preemption in a facial challenge similarly is flawed. Motion at 16-17. The question for express preemption, under the EPCA, is whether the Ordinance concerns the energy use of covered appliances. No matter how it is *applied*, the Ordinance still concerns energy use and is preempted. Am. Compl. ¶ 4 ("There are no circumstances under which Berkeley's

Farimah F. Brown, City Attorney, SBN 201227
Christopher D. Jensen, Deputy City Attorney, SBN 235108
BERKELEY CITY ATTORNEY'S OFFICE
2180 Milvia Street, Fourth Floor
Berkeley, CA 94704
Telephone:  (510) 981-6998
Facsimile:  (510) 981-6960
cjensen@cityofberkeley.info

Attorneys for Defendant CITY OF BERKELEY

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| CALIFORNIA RESTAURANT ASSOCIATION,<br><br>       Plaintiff,<br><br>    v.<br><br>CITY OF BERKELEY,<br><br>       Defendant. | No.  4:19-CV-07668-YGR<br><br>**NOTICE OF MOTION AND MOTION TO DISMISS FIRST AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(1) AND 12(B)(6); MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Judge:     Hon. Yvonne Gonzalez Rogers<br>Date:      October 20, 2020<br>Time:      2:00 p.m.<br>Location:  Courtroom 1, Fourth Floor |

NOTICE OF MOT. & MOT. TO DISMISS FIRST AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(1) AND 12(B)(6); MEMORANDUM OF POINTS AND AUTHORITIES, Case No. 4:19-CV-07668-YGR

**TABLE OF CONTENTS**

STATEMENT OF ISSUES TO BE DECIDED .................................................................................. 1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................................... 1

I.   INTRODUCTION .................................................................................................................. 1

II.  BACKGROUND ................................................................................................................... 2

    A.   The City's Natural Gas Infrastructure Ordinance ......................................................... 2

    B.   Local Amendments to the Building Standards and Energy Codes ............................... 4

    C.   Plaintiff's Facial Challenge to the Natural Gas Infrastructure Ordinance ................... 5

III. LEGAL STANDARDS .......................................................................................................... 7

IV.  ARGUMENT ......................................................................................................................... 7

    A.   The Court Should Dismiss the FAC for Lack of Subject Matter Jursidiction. ............ 7

        1.   Plaintiff Lacks Standing. ..................................................................................... 7

        2.   The FAC Should Be Dismissed Because It Is Unripe. ...................................... 10

    B.   The Natural Gas Infrastructure Ordinance Is Not Preempted by EPCA. .................... 12

        1.   EPCA's Preemption Provisions Are Narrowly Construed and Contemplate Concurrent State and Federal Regulation of Energy Efficiency. ...................... 12

        2.   EPCA Does Not Regulate the Installation of Natural Gas Infrastructure and Does Not Expressly Preempt State or Local Laws That Do So. ....................... 14

        3.   The Natural Gas Infrastructure Does Not Conflict with Federal Energy Efficiency Standards .......................................................................................... 14

        4.   Federal Regulation of Natural Gas Infrastructure Does Not Extend to Natural Gas Connections in Homes and Businesses. ..................................................... 17

        5.   The Natural Gas Infrastructure Ordinance Is a Permissible Health and Safety Regulation That Does Regulate Energy Efficiency. ........................................ 18

        6.   The Legislative History of EPCA Does Not Support Plaintiff's Preemption Claim. ................................................................................................................ 20

    C.   The Natural Gas Infrastructure Ordinance Is Not Preempted by State Law. ............. 22

        1.   The Ordinance Is a Lawful Exercise of the City's Police Power. ..................... 22

        2.   The Ordinance Is Not Preempted by State Law Because It Was Filed with the California Building Standards Commission. ...................................................... 23

        3.   The Ordinance Does Not Conflict with the California Energy Code ............... 24

ER-66

D.   The Court Should Decline to Exercise Jurisdiction Under 28 U.S.C. § 1367(c) If Plaintiff's EPCA Claim Is Dismissed. ....................................................................... 25

V.   CONCLUSION ................................................................................................................. 25

ii

NOTICE OF MOT. & MOT. TO DISMISS FIRST AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(1) AND 12(B)(6); MEMORANDUM OF POINTS AND AUTHORITIES, Case No. 4:19-CV-07668-YGR

ER-67

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Acri v. Varian Assocs., Inc.*,
 114 F.3d 999 (9th Cir. 1997) ................................................................................................25

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) .............................................................................................................7

*Bank of Am. v. City & Cnty. of San Francisco*,
 309 F.3d 551 (9th Cir. 2002) ...............................................................................................13

*Bell Atlantic Corp. v. Twombly*,
 550 U.S. 544 (2007) .............................................................................................................7

*Bishop Paiute Tribe v. Inyo Cnty*,
 863 F.3d 1144 (9th Cir. 2017) .............................................................................................10

*Bldg. Indus. Ass'n of Washington v. Washington State Bldg. Code Council*,
 683 F.3d 1144 (9th Cir. 2012) .............................................................................................13

*Calvary Chapel Bible Fellowship v. County of Riverside*,
 2017 WL 6883866 (C.D. Cal. Aug. 18, 2017) .....................................................................10

*Clark v. City of Seattle*,
 899 F.3d. 802 (9th Cir 2018) ..........................................................................................10, 11

*Coto Settlement v. Eisenberg*,
 593 F.3d 1031 (9th Cir. 2010) ...............................................................................................7

*Crazy Eddie, Inc. v. Cotter*,
 666 F. Supp. 503 (S.D.N.Y. 1987) ......................................................................................13

*Fed. Power Comm'n v. S. Cal. Edison Co.*,
 376 U.S. 205 (1964) ...........................................................................................................17

*Floyd v. Am. Honda Motor Co.*,
 966 F.3d 1027 (9th Cir. 2020) .............................................................................................20

*Hendricks v. StarKist Co.*,
 30 F. Supp. 3d 917 (N.D. Cal. 2014) ..............................................................................12, 13

*Jackson v. City & Cty. of San Francisco*,
 746 F.3d 953 (9th Cir. 2014) ...............................................................................................16

*Jensen v. National Marine Fisheries Service (NOAA)*,
 512 F.2d 1189 (9th Cir.1975) ................................................................................................8

*Kokkonen v. Guardian Life Ins. Co. of America*,
 511 U.S. 375 (1994) .............................................................................................................7

*Kwai Fun Wong v. Beebe*,
 732 F.3d 1030 (9th Cir. 2013) .............................................................................................20

iii

ER-68

*Morrison v. Peterson*,
809 F.3d 1059 (9th Cir. 2015) ............................................................................................................16

*Murphy v. New Milford Zoning Commission*,
402 F.3d 342 (2d Cir. 2005) ...............................................................................................................11

*Oregon Barter Fair v. Jackson County, Oregon*,
372 F.3d 1128 (9th Cir. 2004) ............................................................................................................10

*Pacific Legal Found. v. State Energy Res. Conservation & Dev. Comm'n*,
659 F.2d 903 (9th Cir. 1981) .........................................................................................................10, 12

*Puente Arizona v. Arpaio*,
821 F.3d 1098 (9th Cir. 2016) ......................................................................................................16, 17

*Roberts v. Corrothers*,
812 F.2d 1173 (9th Cir. 1987) ..............................................................................................................7

*S. Coast Air Quality Mgmt. Dist. v. F.E.R.C.*,
621 F.3d 1085 (9th Cir. 2010) ......................................................................................................17, 18

*Safe Air for Everyone v. Meyer*,
373 F.3d 1035 (9th Cir. 2004) ..............................................................................................................7

*Shanaghan v. Cahill*,
58 F.3d 106 (4th Cir. 1995) ................................................................................................................25

*Spokeo, Inc. v. Robins*,
__U.S.__, 136 S.Ct. 1540 (2016) .....................................................................................................7, 8

*Sprint Telephony PCS, L.P. v. Cty. of San Diego*,
543 F.3d 571 (9th Cir. 2008) ..............................................................................................................16

*Stengel v. Medtronic*,
704 F.3d 1224 (9th Cir. 2013) ............................................................................................................13

*Stoianoff v. State of Mont.*
695 F.2d 1214 (9th Cir. 1983) ..............................................................................................................8

*Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc.*,
368 F.3d 1053 (9th Cir. 2004) ..............................................................................................................7

*Valentine v. NebuAd, Inc.*,
804 F. Supp. 2d 1022 (N.D. Cal. 2011) .............................................................................................13

*Washington Envtl. Council v. Bellon*,
732 F.3d 1131 (9th Cir. 2013) ..............................................................................................................8

*Washington State Grange v. Washington State Republican Party*,
552 U.S. 442 (2008) ............................................................................................................................16

*Wyeth v. Levine*,
555 U.S. 555 (2009) ............................................................................................................................17

iv

**State Cases**

*ABS Inst. v. City of Lancaster*,
    24 Cal. App. 4th 285 (1994) ................................................................................................23

*Big Creek Lumber Co. v. Cty. of Santa Cruz*,
    38 Cal. 4th 1139 (2006) .....................................................................................................22

*Massingill v. Dept. of Food & Agric.*,
    102 Cal. App. 4th 498 (2002) .......................................................................................18, 22

**Federal Statutes**

15 U.S.C. § 717 ...........................................................................................................................17

28 U.S.C. § 1367 .....................................................................................................................2, 25

42 U.S.C. § 6291 .........................................................................................................................14

42 U.S.C. § 6292 ...............................................................................................................9, 14, 19

42 U.S.C. § 6297 .....................................................................................................12, 14, 15, 20

42 U.S.C. § 6311 .............................................................................................................10, 14, 19

42 U.S.C. § 6313 .........................................................................................................................14

42 U.S.C. § 6316 .........................................................................................................................14

**State Statutes**

Cal. Health & Safety Code § 17958 ............................................................................................24

Cal. Health & Safety Code § 17958.5 .........................................................................................23

Cal. Health & Safety Code §17958.7 ................................................................................4, 23, 24

Cal. Health & Safety Code § 18909 ............................................................................................22

Cal. Health & Safety Code § 18941.5 .........................................................................................23

Cal. Health & Safety Code § 113700 ............................................................................................9

Cal. Health & Safety Code § 114301 ......................................................................................9, 12

**Other Authorities**

U.S. Constit., Art. III, § 2 .............................................................................................................7

Cal. Constit, Art. XI, § 7 .............................................................................................................22

Berkeley Municipal Code Chapter 12.80 ........................................................................... *passim*

8 Cal. Code Regs. § 2395.45 .......................................................................................................19

ER-70

8 Cal. Code Regs. § 3250 ..................................................................................................................19

24 Cal. Code Regs. Pt. 6, § 10-106 ...................................................................................................24

H.R. Rep No. 101-11 (1987). ......................................................................................................20, 21

Fed. R. Civ. P. 12(b)..................................................................................................................1, 6, 7

K. Kennedy, *The Role of Energy Efficiency in Deep Decarbonization*, 48 Envtl.
L. Rep. News & Analysis 10030 (2018) ...............................................................................13

S. Conf. Rep. 94-516 (1975) ..........................................................................................................21

S. Rep. 100-6 (1987) ..................................................................................................................20, 21

ER-71

Ordinance in all circumstances, as applied to all Newly Constructed Buildings in Berkeley.

Moreover, with respect to Plaintiff's EPCA preemption claim, it is unclear whether any of Plaintiff's members would be in a position to raise the objections to the Ordinance asserted in this case. Plaintiff's EPCA claim alleges preemption based on the regulation of consumer appliances ("covered products" under 42 U.S.C. § 6297(c)), but as previously discussed, the California Retail Food Code prohibits the installation of non-commercially rated appliances in a commercial kitchen. Ogden Decl. ¶¶ 3-4; Health and Safety Code § 114301(d). And with respect to "industrial equipment," it is unclear when and if a restaurant owner would have any need to install commercial air conditioning, heating, or water heating equipment that is covered by EPCA in a Newly Constructed Building in Berkeley. Ogden Decl. ¶ 5; *see discussion* at Section IV.A.1, *supra*. The uncertain impact of the Ordinance on Plaintiff's members is particularly concerning in the context of attempting to establish ripeness in a case brought as a facial challenge. *See Pacific Legal Found.*, 659 F.2d at 915.

At very least, the speculative nature of Plaintiff's alleged injury makes clear that this case is not ready for adjudication in the absence of the "development of a better factual record," *see id.*, and therefore this action, and in particular, Petitioner's EPCA claim, is not ripe.

**B.      The Natural Gas Infrastructure Ordinance Is Not Preempted by EPCA.**

**1.      EPCA's Preemption Provisions Are Narrowly Construed and Contemplate Concurrent State and Federal Regulation of Energy Efficiency.**

"Federal preemption occurs when: (1) Congress enacts a statute that explicitly preempts state law; (2) state law actually conflicts with federal law; or (3) federal law occupies a legislative field to such an extent that it is reasonable to conclude that Congress left no room for state regulation in that field." *Hendricks v. StarKist Co.*, 30 F. Supp. 3d 917, 925 (N.D. Cal. 2014) (quoting *Chae v. SLM Corp.*, 593 F.3d 936, 941 (9th Cir. 2010)). Where federal law intrudes on the historic police powers of state and local governments, the federal statute should not supersede state law "unless a 'clear and manifest purpose of Congress' exists." *Id.* (citing *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)). "Parties seeking to invalidate a state law based on preemption bear the considerable burden of overcoming the starting presumption that Congress

12

ER 72

does not intend to supplant state law." *Stengel v. Medtronic*, 704 F.3d 1224, 1227–28 (9th Cir. 2013) (en banc) (citation and internal quotation marks omitted).

"Express preemption results from a Congressional expression of intent to displace state law." *Hendricks*, 30 F. Supp. 3d at 925 (citing *Chae*, 593 F.3d at 942). Conflict preemption arises when "compliance with both federal and state regulations is a physical impossibility." *Bank of Am. v. City & Cnty. of San Francisco*, 309 F.3d 551, 558 (9th Cir. 2002) (citing *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963)). Conflict preemption may also exist where "state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* (citing *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). Showing conflict preemption is a "demanding defense." *Hendricks*, 30 F. Supp. 3d at 926 (quoting *Wyeth*, 555 U.S. at 573).

Field preemption occurs "where the scheme of federal regulation is 'so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it.'" *Valentine v. NebuAd, Inc.*, 804 F. Supp. 2d 1022, 1028 (N.D. Cal. 2011) (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992)). The concurrent system of state and federal regulation of appliance energy efficiency undermines any argument that field preemption could conceivably apply in this case. *See Crazy Eddie, Inc. v. Cotter*, 666 F. Supp. 503, 509–10 (S.D.N.Y. 1987) (noting that Congress has "specifically contemplated concurrent state regulation" of energy efficiency and characterizing the plaintiff's field preemption argument as implausible); *Bldg. Indus. Ass'n of Washington v. Washington State Bldg. Code Council*, 683 F.3d 1144, 1154 (9th Cir. 2012) (rejecting express EPCA preemption claim); *see also* K. Kennedy, *The Role of Energy Efficiency in Deep Decarbonization*, 48 Envtl. L. Rep. News & Analysis 10030, 10035–38 (2018) (summarizing complementary systems of federal and state energy efficiency regulations). In addition, for the reasons set forth below, neither express preemption nor conflict preemption provides a basis for injunctive or declaratory relief in this case.

13

NOTICE OF MOT. & MOT. TO DISMISS FIRST AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(1) AND 12(B)(6); MEMORANDUM OF POINTS AND AUTHORITIES, Case No. 4:19-CV-07668-YGR

**2.    EPCA Does Not Regulate the Installation of Natural Gas Infrastructure and Does Not Expressly Preempt State or Local Laws That Do So.**

Petitioner cites 42 U.S.C. § 6297(c), which preempts—subject to numerous exceptions—any state regulation "concerning the energy efficiency, energy use, or water use of [a] covered product." 42 U.S.C. § 6297(c). "Covered product" includes various categories of consumer products, including appliances and lighting. *Id.* §§ 6291(2), 6292. The FAC also cites EPCA standards for commercial appliances, which generally "supersede any State or local regulations concerning energy efficiency or energy use of a product for which a standard is prescribed or established." *Id.* §§ 6313, 6316(b)(2)(A). "Covered" industrial equipment is defined in 42 U.S.C. § 6311(1) and includes "commercial package air conditioning and heating equipment," "warm air furnaces," and several types of water heaters, but does not include ovens for commercial kitchens. *See* FAC ¶ 60. Each of these provisions turns on whether a state law or local ordinance regulates the "energy efficiency" or "energy use" of a covered product, which are defined, respectively, as "the ratio of the useful output of services from a consumer product to the energy use of such product," and "the quantity of energy directly consumed by a consumer product at point of use." *Id.* § 6291(4)-(5).

The Natural Gas Infrastructure Ordinance simply does not regulate "energy efficiency" or "energy use" of covered products. Instead, the Ordinance limits the installation of Natural Gas Infrastructure in Newly Constructed buildings by establishing restrictions on new natural gas connections. The Ordinance does not in any way regulate the efficiency of consumer or industrial products or the amount of energy consumed by those products and is therefore not expressly preempted by EPCA.

**3.    The Natural Gas Infrastructure Does Not Conflict with Federal Energy Efficiency Standards.**

The Natural Gas Infrastructure Ordinance also ensures that a land use permit applicant will not be required to install appliances that exceed federal energy efficiency standards, thereby foreclosing any conflict preemption argument. As noted above, the Ordinance allows new Natural Gas Infrastructure where all-electric construction cannot demonstrate compliance with

14

ER-74

California Energy Code efficiency standards. RJN, Exh. 1 § 12.80.040.A.1. Consistent with this exemption, the Ordinance provides that it "shall in no way be construed as amending California Energy Code requirements under California Code of Regulations, Title 24, Part 6, nor as requiring the use or installation of any specific appliance or system as a condition of approval." *Id.* § 12.80.020.C. Thus, the Ordinance allows for a mixed-fuel (*e.g.*, gas and electric) compliance pathway and the installation of new natural gas connections where compliance with state energy efficiency standards is not feasible for all-electric construction. *See* RJN, Exh. 2 (July 9, 2019 Report to Berkeley City Council) at 19 (noting that the Natural Gas Infrastructure Ordinance will be implemented for certain "building types and systems as the California Energy Commission creates [computer] models that allow developers to have their buildings approved").

This provision, which ensures compliance with the state Energy Code, also ensures compliance with federal law. State building codes concerning energy efficiency or energy use, including the California Energy Code, are expressly excluded from the scope of EPCA preemption so long as, among other conditions, the codes do not "require that [a] covered product have an energy efficiency exceeding the applicable [federal] energy conservation standard" without a waiver. 42 U.S.C. § 6297(f)(3)(B). Consistent with this provision of EPCA, the Energy Commission assumes that appliances meet but *do not exceed* minimum federal standards in modeling the energy efficiency of Newly Constructed Buildings for purpose of developing the Energy Code. *See, e.g.*, RJN, Exh. 8 (Energy Commission 2019 Residential Compliance Manual) at 5-9 to 5-12 (noting, for example, that Energy Commission regulations for water heaters "align with federal efficiency standards"); RJN, Exh. 9 (Energy Commission 2019 Nonresidential Compliance Manual), Appendix B (referencing federal standards for appliance energy efficiency). Plaintiff does not, and cannot reasonably allege, that the California Energy Code is inconsistent with the EPCA. The validity of building energy efficiency standards adopted by the Energy Commission is simply not a disputed issue in this case.

The City's Ordinance incorporates the same standards, since it allows mixed-fuel construction when all-electric construction cannot comply with the California Energy Code and

15

NOTICE OF MOT. & MOT. TO DISMISS FIRST AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(1) AND 12(B)(6); MEMORANDUM OF POINTS AND AUTHORITIES, Case No. 4:19-CV-07668-YGR

ER-75

otherwise requires compliance with the Energy Code. RJN, Exh. 1 § 12.80.040.A.1. This exemption forecloses any possible argument that the Natural Gas Infrastructure Ordinance interferes with federal energy efficiency standards.

Moreover, such an implied preemption argument is impossible to credibly assert in this case because Plaintiff concedes that this action is a facial challenge to the Ordinance's validity. Facial challenges to legislation "often rest on speculation" and for that reason are disfavored. *See, e.g.*, *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 962 (9th Cir. 2014). To prevail on a facial challenge, the plaintiff "must establish that no set of circumstances exists under which the Act would be valid." *Morrison v. Peterson*, 809 F.3d 1059, 1064 (9th Cir. 2015) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). In other words, the plaintiff must prove that "the law is unconstitutional [or otherwise unlawful] in all of its applications." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 (2008) (quoting *Salerno*, 481 U.S. at 745). The Ninth Circuit applies this standard to facial challenges based on federal preemption. *Puente Arizona v. Arpaio*, 821 F.3d 1098, 1104 (9th Cir. 2016); *Sprint Telephony PCS, L.P. v. Cty. of San Diego*, 543 F.3d 571, 579 (9th Cir. 2008).

*Sprint* is illustrative of the "unique burdens imposed on facial challenges." *See Puente Arizona*, 821 F.3d at 1103. The case involved a San Diego County ordinance regulating the placement of cellular sites based on aesthetics, feasibility, and other considerations. *Sprint*, 543 F.3d at 574-75. The plaintiff brought a facial challenge to the ordinance, arguing that it was preempted by the Federal Telecommunications Act because it "effectively prohibited" the provision of cellular service. *Id.* at 580. The court rejected the facial challenge, concluding that the availability of a discretionary permitting process prevented the plaintiff from "meet[ing] its high burden of proving that no set of circumstances exists under which the Ordinance would be valid." *Id.* (citation, original alteration, and quotation marks omitted). The court contrasted the ordinance in question with a hypothetical ordinance that required wireless antennas to be located underground, which would render their operation infeasible in *all circumstances*. *Id.*

Plaintiff's speculation as to how the City may or may not apply provisions of the Ordinance that allow new natural gas connections is irrelevant in determining whether Plaintiff

16

NOTICE OF MOT. & MOT. TO DISMISS FIRST AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(1) AND 12(B)(6); MEMORANDUM OF POINTS AND AUTHORITIES, Case No. 4:19-CV-07668-YGR

ER-76

may maintain a facial challenge to the Ordinance. As in *Sprint*, the Ordinance at issue in this case is implemented through a discretionary permitting process that provides the ability to ensure compliance with federal law. Plaintiff's facial challenge must show that the exemptions in the Ordinance are *incapable of ensuring compliance with federal law in all circumstances* (like a requirement to place wireless antennas underground). Any allegation to this effect would be implausible and must be rejected as a matter of law.

Ultimately, any conflict preemption argument in this case faces two high hurdles: first, Plaintiff must satisfy the "demanding" standard for establishing conflict preemption (*Wyeth*, 555 U.S. at 573); and second, Plaintiff must carry the "unique burdens" of maintaining a facial challenge to the Ordinance (*Puente Arizona*, 821 F.3d at 1103). Plaintiff's allegations, even if true, fall far short of meeting the "demanding" standard for establishing that every single application of the Ordinance would result in a conflict with federal law. Accordingly, Plaintiff has not stated a claim for relief based on conflict preemption.

### 4. Federal Regulation of Natural Gas Infrastructure Does Not Extend to Natural Gas Connections in Homes and Businesses.

Apart from the fact that EPCA on its face does not regulate natural gas connections to individual dwellings and business, the body of federal law that actually regulates natural gas infrastructure makes clear that those connections are regulated at the state and local level, and not by the federal government. The scope of federal authority is governed by the Natural Gas Act, 15 U.S.C. § 717 *et seq.*, which was enacted in 1938 to provide "a comprehensive scheme of federal regulation of 'all wholesales of natural gas in interstate commerce.'" *S. Coast Air Quality Mgmt. Dist. v. F.E.R.C.*, 621 F.3d 1085, 1090 (9th Cir. 2010) (quoting *Northern Natural Gas Co. v. State Corp. Comm'n*, 372 U.S. 84, 91 (1963)).[5] "Notably however, the Natural Gas Act specifically exempted from federal regulation the 'local distribution of natural gas." *Id.* Reviewing these provisions of the Natural Gas Act, the Supreme Court has observed that

---

[5] Congress vested FERC with authority over: (1) the "transportation of natural gas in interstate commerce"; (2) the "sale in interstate commerce of natural gas for resale"; and (3) "natural-gas companies engaged in such transportation or sale." 15 U.S.C. § 717(b).

17

ER 77

"Congress meant to draw a bright line easily ascertained, between state and federal jurisdiction." *Fed. Power Comm'n v. S. Cal. Edison Co.*, 376 U.S. 205, 215 (1964). Thus, "the history and judicial construction of the Natural Gas Act suggest that *all aspects related to the direct consumption of gas . . . remain within the exclusive purview of the states*." *S. Coast Air Quality Mgmt. Dist.*, 621 F.3d at 1092 (emphasis added).

The Natural Gas Act and the Supreme Court precedent set forth above predate the enactment of EPCA in 1975. In adopting (and subsequently amending) EPCA, Congress had the opportunity to extend federal authority to regulate natural gas connections to individual buildings and appliances. Congress did not do that, and instead adopted regulation that sets federal standards for "energy use" and "energy efficiency." In contrast, where Congress and the Supreme Court have actually addressed federal regulation of natural gas infrastructure, they have made it absolutely clear that the regulation of natural gas connections to individual buildings is not preempted by federal law. Plaintiff's strained attempt to find hidden meaning in EPCA provisions related to appliance energy efficiency cannot overcome Congress' clearly stated intent to allow state and local regulation of natural gas infrastructure.

### 5.   The Natural Gas Infrastructure Ordinance Is a Permissible Health and Safety Regulation That Does Regulate Energy Efficiency.

The Natural Gas Infrastructure Ordinance is also indistinguishable from routinely adopted state and local health and safety regulations that limit when and where EPCA-covered appliances may be used. The Ordinance responds to specific short- and long-term health concerns. In the short-term, the Ordinance responds to serious indoor air quality concerns raised by the combustion of natural gas in cooking. RJN, Exh. 1 § 12.80.010.C. In the longer term, the Ordinance attempts to address the global impacts caused by the combustion of natural gas. *Id.* §§ 12.80.010.A, 12.80.010.D. Legislation to mitigate these public health impacts is well within the scope of the City's power to address "legislative objectives in furtherance of public peace, safety, morals, health and welfare." *Massingill v. Dep't of Food & Agric.*, 102 Cal. App. 4th 498, 504 (2002) (citing *Birkenfeld v. City of Berkeley*, 17 Cal. 3d 129, 160 (1976).)

Nothing in EPCA prohibits the exercise of a local government's police power to address

18

NOTICE OF MOT. & MOT. TO DISMISS FIRST AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(1) AND 12(B)(6); MEMORANDUM OF POINTS AND AUTHORITIES, Case No. 4:19-CV-07668-YGR

legitimate, urgent health and safety concerns, even if doing so has an indirect effect on the sale of an EPCA-regulated appliance. State or local air quality regulations routinely limit the sale of EPCA-regulated appliances to limit nitrogen oxide emissions. *See, e.g.*, RJN, Exh. 10 (regulating natural gas-fired boilers and water heaters); RJN, Exh. 11 (regulating large water heaters and small boilers and process heaters). In fact, local air districts certify and publish lists of appliances that comply with nitrogen oxide emissions standards. *See, e.g.*, RJN, Exh. 12 (table of certified large water heaters and small boilers and process heaters); RJN, Exh. 13 (list of certified residential natural gas-fired water heaters). EPCA covered-appliances not on these lists cannot be installed within the air district, regardless of whether or not they meet federal energy efficiency standards.

State and local governments also routinely adopt safety regulations for industrial equipment that qualifies as "covered equipment" under EPCA. *See* 42 U.S.C. § 6311(1). For example, California Department of Industrial Relations ("DIR") regulations require walk-in coolers or freezers to be equipped with two exits and impose other requirements on emergency egress from cold-storage units. 8 Cal. Code Regs. § 3250. DIR regulations also regulate "clothes-washing, clothes-drying and dishwashing machines," despite the fact that those appliances are subject to EPCA industrial and/or consumer appliance energy efficiency standards. 8 Cal. Code Regs. § 2395.45(a) (imposing grounding requirements on equipment); 42 U.S.C. § 6311(1)(H) (listing commercial clothes dryers); 42 U.S.C. § 6292(a)(6)-(8) (listing dishwashers, clothes washers, and clothes dryers). Plaintiff cannot credibly take the position that these routine health and safety regulations are preempted by EPCA.

Similarly, while EPCA preempts state and local regulations concerning the energy efficiency of pool heaters (42 U.S.C. § 6292(a)(11)), it would be absurd to interpret the law to compel local jurisdictions to allow the construction and filling of swimming pools. In fact, local jurisdictions have acted to prevent the filling of newly constructed swimming pools in response to drought conditions. *See, e.g.*, RJN, Exh. 14 (City of Morgan Hill Resolution 15-0170); RJN, Exh. 15 (City of Buda, Tex. Ordinance No. 2012-01). Like the City of Berkeley here, these jurisdictions adopted legislation in response public health and safety emergency that had the

19

NOTICE OF MOT. & MOT. TO DISMISS FIRST AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(1) AND 12(B)(6); MEMORANDUM OF POINTS AND AUTHORITIES, Case No. 4:19-CV-07668-YGR

ER-79

effect of limiting the installation and/or use of a covered appliance, without regard to federal energy efficiency standards. Plaintiff asks the Court to adopt an interpretation of EPCA that would prevent cities like Morgan Hill and Buda from adopting legislation that does not regulate energy efficiency or use to address water shortages, just as it would prevent the City of Berkeley from adopting legislation that does not regulate the energy efficiency or use to address indoor air pollution and climate change. Neither the plain language of EPCA nor common sense supports Plaintiff's novel and expansive interpretation of the statute. EPCA does not preempt local laws and regulations unless the law or regulation concerns energy use or energy efficiency. The Natural Gas Infrastructure Ordinance does not do so, and it is not preempted. [6]

### 6. The Legislative History of EPCA Does Not Support Plaintiff's Preemption Claim.

The Court need not consider the legislative history of EPCA to decide this case. In construing the provisions of a statute, the Court must "begin by looking at the language of the statute to determine whether it has a plain meaning." *Floyd v. Am. Honda Motor Co.*, 966 F.3d 1027 (9th Cir. 2020) (citation omitted). As the Ninth Circuit recently stated: "If the language has a plain meaning or is unambiguous, the statutory interpretation inquiry ends there, and the court do not consider the legislative history or any other extrinsic material." *Id.* (quotation marks omitted); *see also Kwai Fun Wong v. Beebe*, 732 F.3d 1030, 1042 (9th Cir. 2013) (en banc).

Here, the Court need not look beyond the plain meaning of EPCA (and the Natural Gas Act) to determine that "energy efficiency" and "energy use" do not mean "natural gas infrastructure." But if the Court chooses to consider the legislative history of EPCA, its review will simply confirm that the Natural Gas Infrastructure Ordinance is not preempted. The regulation of natural gas connections does not conflict with Congress' stated intent to provide

---

[6] EPCA, as amended, also regulates and generally preempts the "water use" of covered products. 42 U.S.C. § 6297(c). Plaintiff's argument also implies that state and local water conservation measures that limit the supply of water to covered products, as opposed to the efficiency of the products' water use, are preempted by EPCA. It would be absurd to interpret provisions intended to promote uniform national water conservation standards for appliances to hamstring local communities' ability to respond to drought conditions such as those that prompted the Morgan Hill and Buda, Texas legislation. The absurdity of this result further demonstrates why Plaintiff's argument must be rejected.

NOTICE OF MOT. & MOT. TO DISMISS FIRST AMENDED COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(1) AND 12(B)(6); MEMORANDUM OF POINTS AND AUTHORITIES, Case No. 4:19-CV-07668-YGR

Courtland L. Reichman (CA Bar No. 268873)
Laura Carwile (CA Bar No. 291906)
**REICHMAN JORGENSEN LLP**
100 Marine Parkway, Suite 300
Redwood Shores, CA 94065
Telephone: (650) 623-1401
Facsimile: (650) 623-1449
creichman@reichmanjorgensen.com

Sarah Jorgensen (*Pro Hac Vice*)
**REICHMAN JORGENSEN LLP**
1201 West Peachtree Street, Suite 2300
Atlanta, GA 30309
Telephone: (404) 609-1040
Facsimile: (650) 623-1449
sjorgensen@reichmanjorgensen.com

Gary J. Toman (*Pro Hac Vice*)
**WEINBERG, WHEELER, HUDGINS, GUNN
& DIAL LLP**
3344 Peachtree Road NE, Suite 2400
Atlanta, GA 30326
Telephone: (404) 876-2700
Facsimile: (404) 875-9433
gtoman@wwhgd.com

Kylie Chiseul Kim (*Pro Hac Vice*)
**KELLOGG, HANSEN, TODD, EVANS,
FIGEL & FREDERICK LLP**
1615 M St. NW, #400
Washington, DC 20036
Telephone: (202) 326-7924
Facsimile: (202) 326-7999
kkim@kellogghansen.com

*Attorneys for Plaintiff
California Restaurant Association*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA RESTAURANTASSOCIATION, a California nonprofit mutual benefit corporation, <br><br> Plaintiff, <br><br> v. <br><br> CITY OF BERKELEY, <br><br> Defendant. | Case No.  4:19-cv-7668-YGR <br><br> **CALIFORNIA RESTAURANT ASSOCIATION'S FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiff California Restaurant Association ("CRA" or "Plaintiff") brings this Complaint for Declaratory and Injunctive Relief ("Complaint") against the City of Berkeley ("Berkeley" or "Defendant"), alleging as follows:

## INTRODUCTION

1. Berkeley banned natural gas infrastructure in newly constructed buildings beginning in 2020. With millions of Californians sitting in the dark to avoid wildfires, and California's energy grid under historic strain, banning the use of natural gas in buildings is irresponsible and does little to advance climate goals. The large-scale blackouts in 2019 bring into sharp focus the need for a workable approach to California's energy infrastructure and energy needs. Banning natural gas altogether in new construction is not the solution, and is at odds with citizens' needs for reliable, resilient, and affordable energy, and taking such action locally conflicts with the federal and state energy regulatory structure. Prohibiting natural gas cooking ranges, water heaters, fireplaces, space heaters, and backup generation is fundamentally inconsistent with the public interest, and is a violation of both federal and state law.

2. In its rush to be the first all-electric city in California, Berkeley bypassed clear federal and state law. Federal energy law was expressly intended to preempt conflicting state and local regulation and to impose a uniform, national energy conservation and use policy, including regulation of the energy use and energy efficiency of appliances. State building laws and the state building standards and energy code likewise are designed to promote uniform standards regarding energy use in appliances and buildings, and must work within the confines of federal law. Both federal and state law require a practical approach to energy regulation, maintaining neutrality and recognizing the need for a diverse energy supply. This is for good reason: a patchwork approach is unworkable, undercuts national energy policy and California's need for reliable and resilient energy, increases the cost of housing in California, and denies consumers choice. Taking away the ability to use natural gas cooking ranges, water heaters, heat, and fireplaces, as well as backup electric supply during power outages, is contrary to the state and federal legislative schemes.

3. If a municipality chooses to enact more stringent energy use standards, it is required to

1

follow state and federal statutes and regulations governing such mandates. The federal Energy Policy and Conservation Act ("EPCA") implements a national energy policy aimed at energy conservation that, among other things, regulates the energy use and energy efficiency of appliances. The EPCA expressly preempts state and local regulations concerning the energy efficiency and energy use of products for which the EPCA sets energy efficiency standards. The default rule is federal preemption; Congress intended for national policy to control. The EPCA leaves narrow room for concurrent state and local regulation, as long as the state or local regulations meet certain stringent statutory conditions. While the EPCA regulates both consumer and commercial appliances, the regulation is focused on the appliance, not on the actual purchaser of an appliance; thus, commercial entities may purchase "consumer" appliances, and vice versa. For both commercial and consumer appliances, however, the default rule is one of preemption, and state and local regulation is only permissible if it meets the stated criteria. Notably, the thrust of the EPCA is that federal energy use and efficiency standards are sufficient for conservation goals and cannot be exceeded, and also that one type of energy should not be favored over another in the areas it regulates.

4. The Berkeley Ordinance as a whole is preempted by the EPCA. There are no circumstances under which Berkeley's ordinance could be validly applied without violating EPCA; whether a permit application is granted or denied does not change the fact that the Ordinance's provisions violate the EPCA. Likewise, the fact that Berkeley's Ordinance has a discretionary "public interest" exception to the natural gas ban does not save the ordinance from invalidity; its requirement that a permit applicant go through an exemption process is itself preempted.

5. Similarly, state law has occupied the field of building standards, including the Building Standards Code and the Energy Code, and therefore preempts the Berkeley Ordinance. State law requires specific procedures to be followed if a city seeks to impose more stringent regulations on building standards and energy usage. Berkeley bypassed these state procedures in its rush to mandate all-electric new buildings. And in violation of state precedent, Defendant adopted the Berkeley Ordinance under Berkeley's general police powers. Because it failed to comply with State procedures, the Berkeley Ordinance is preempted by California law and is void and

2

unenforceable.

6.     These federal and state laws operate concurrently, creating a consistent and carefully calibrated regulatory system for local ordinances relating to energy use.  Federal law under the EPCA allows state and local regulations only when they are contained in a building code and meet specific statutory prerequisites, and state law then restricts cities' power to adopt local building codes that diverge from the state building and energy standards.  These complementary provisions ensure that any local ordinance affecting energy use is properly governed by both federal and state preemption policies.   Together, they leave only a narrow band of regulatory authority for local governments.

7.     Berkeley's Ordinance is premised on the conclusory assertion that use of electricity is better for the environment than use of alternative forms of energy, such as gas.  Such a policy decision should be based on reliable studies — the actual facts as opposed to assumptions.  Berkeley in substance assumes its conclusion about the environmental impacts of gas versus electric without credible scientific support.  This is part and parcel of why the federal and state regulatory frameworks impose specific requirements on the regulation of energy use — requirements that were completely ignored by Berkeley.  The CRA welcomes a legitimate public debate on environmental impacts, reliability and resilience of the energy grid, affordability, and other policy considerations.

8.     The CRA nevertheless is compelled to bring this action on behalf of its members because the Berkeley Ordinance's unlawful natural gas ban impacts its members.  Restaurants rely on natural gas for such things as food preparation and heating space and water, and even providing backup power during electrical outages.  Many of these restaurants rely on gas for cooking particular types of food, whether it be flame-seared meats, charred vegetables, or the use of intense heat from a flame under a wok. Indeed, restaurants specializing in international foods so prized in the Bay Area will be unable to prepare many of their specialties without natural gas.  Many chefs are trained using natural gas stoves, and losing natural gas will slow down the process of cooking, reduce a chef's control over the amount and intensity of heat, and affect the manner and flavor of food preparation. Restaurant owners and employees as well as restaurant customers will be denied the use of gas appliances to prepare food, to heat space, to heat water, or to use gas fireplaces in newly constructed

3

buildings.  And banning the use of natural gas also will impose greater costs on Berkeley businesses and consumers, in the midst of an affordable housing crisis.

9.  In short, Berkeley's natural gas ban will do little to advance environmental goals but will cause substantial adverse consequences for the CRA's members and the public.  While the CRA supports the State's climate goals, it must speak out against the harm to its members from this one-sided ban.

10.  Berkeley's effort to establish at a local level far-reaching energy policy and building standards conflicts with federal and state law, is contrary to the public interest, and imposes irreparable harm on the CRA and its members.  The CRA, on behalf of its members, thus brings this action seeking a declaration that the Berkeley Ordinance is void and unenforceable and to enjoin its enforcement.

## PARTIES

11.  Plaintiff California Restaurant Association ("CRA") is a nonprofit mutual benefit corporation organized under the laws of California with its principal office in the County of Sacramento, California.

12.  Defendant City of Berkeley is, and was at all relevant times, a municipal corporation existing under the laws of the State of California.

## STANDING AND RIPENESS

13.  As an association of members in the restaurant industry, the CRA has a substantial interest in having the laws relating to building standards executed and the duties at issue here enforced.

14.  The CRA has standing to bring this action because some of its members would have independent standing as they are denied constitutional and statutory rights, the interests that the CRA seeks to address by this action are germane to its fundamental purpose, and the claims asserted seek only declaratory and injunctive relief and therefore do not require participation of individual members.

15.  The CRA's members include both restaurant owners and chefs.  It has members that

4

do business in Berkeley, California, or who seek to do business in Berkeley, whose interests will be directly affected by this Ordinance.  The CRA has one or more members who are interested in opening a new restaurant or in relocating a restaurant to a new building in Berkeley after January 1, 2020, but who cannot do so because of the Ordinance's ban on natural gas.  One or more members would seek to open or relocate a restaurant in a new building in Berkeley but for the ban on natural gas.  The CRA's members will be irreparably harmed by the Berkeley Ordinance through the loss of the ability to use natural gas appliances in newly constructed buildings.

16.     There is no set of circumstances under which the Ordinance would be valid under state and federal law.

17.     An actual controversy has arisen and now exists between Plaintiff and Defendant concerning the validity of the Berkeley Ordinance. Plaintiff contends that the Berkeley Ordinance is an unlawful regulation of building standards using the City of Berkeley's general police powers and is preempted by California law.  Plaintiff also contends that the Berkeley Ordinance conflicts with and is preempted by the California Building Standards Code and the California Energy Code. Plaintiff further contends that the Berkeley Ordinance is preempted by federal law and does not satisfy the requirements of any exception to preemption. Plaintiff is informed and believes, and on that basis alleges, that Defendant disagrees with Plaintiff's contentions and asserts that the Berkeley Ordinance is lawful and enforceable.

18.     Enforcement of the Berkeley Ordinance will injure Plaintiff and is likely to be redressed by a favorable ruling from this Court.

## JURISDICTION AND VENUE

19.     This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 as the CRA asserts claims under federal law and under 28 U.S.C. § 2201(a) to the extent that it seeks declaratory relief and to enjoin state action as preempted by federal law.  To the extent that this Complaint asserts claims under California law, this court has supplemental jurisdiction over such claims pursuant to 28 U.S.C. § 1367(a) as such claims are part of the same case or controversy as the federal claims.

20.     Venue is proper under 28 U.S.C. § 1391 in this Court as Berkeley is located within

5

this district within the County of Alameda and the acts and events giving rise to the claims occurred at least in part in this district.

## BACKGROUND

**The Berkeley Ordinance**

21.     Berkeley originally considered adopting a formal "reach code" to ban gas appliances. A reach code would officially modify the default state building standards code.  Berkeley concluded that adopting an official reach code would require CEC approval, a process Berkeley found too "laborious," "cumbersome," and "complex."  Berkeley also feared the CEC might not grant the necessary approvals, so it "abandon[ed] the reach code strategy." *See* City of Berkeley Action Calendar (July 9, 2019).  Demonstrating its awareness that state policy did not permit it to ban natural gas appliances, in summer 2018, Berkeley complained to the CEC that its "policies as [sic] the state level are impeding our ability to encourage or require []electric technology when natural gas is available."  *See* Billi Romain on Behalf of City of Berkeley, "Berkeley Support to Phase Out Fossil Fuels with Clean Electrification," CEC Docket 18- IEPR-09 (June 28, 2018).

22.     Thus, unwilling or unable to obtain state approval, Berkeley pivoted to "a new approach" that would "avoid[] CEC regulations associated with asking permission to amend energy efficiency standards."  *See* City of Berkeley Action Calendar (July 9, 2019).  Under this new approach, Berkeley would adopt a city policy of refusing to grant permits for buildings that use natural gas.  Through this workaround, Berkeley hoped to ban natural gas appliances — as it had originally intended — while avoiding state and federal regulations.  As Berkeley acknowledged, "[t]he effect of this legislation will be that builders will be prohibited from applying for permits for land uses that include gas infrastructure[.]" *Id.*  "Instead of waiting for CEC" to agree to policies Berkeley wanted, Berkeley's "ordinance provides the City with an immediate pathway to fossil free new buildings[.]" *Id.*

23.     Berkeley recognized that this policy was at odds with the existing state and federal regulatory approach.  As Councilwoman Harrison wrote in her memorandum recommending the ordinance, "[t]o date, the federal, state and local approach to energy use in new buildings has largely

been to mandate greater building efficiency and energy conservation, which indirectly results in lower emissions, but does not directly phase out fossil fuel consumption in new buildings." *Id.* But Berkeley was unsatisfied with the state and federal approach of allowing builders to choose how to achieve greater energy efficiency. It wanted an outright ban on natural gas.

24. Berkeley's new approach ultimately took the form of Berkeley Ordinance No. 7,672-N.S. (the "Ordinance"), which the City Council passed on July 23, 2019. It was signed into law by the Berkeley Mayor, Jesse Arreguín, on August 6, 2019.

25. The Berkeley Ordinance amends the Berkeley Municipal Code, adding a new Chapter 12.80 prohibiting natural gas infrastructure in new buildings effective January 1, 2020. The Ordinance prohibits "Natural Gas Infrastructure" in "Newly Constructed Buildings." Natural Gas Infrastructure is defined as "fuel gas piping, other than service pipe, in or in connection with a building, structure or within the property lines of premises, extending from the point of delivery at the gas meter[.]"

26. The Berkeley Ordinance was enacted as part of Berkeley's Municipal Code and provides that its requirements "shall apply to Use Permit or Zoning Certificate applications submitted on or after the effective date of this Chapter for all Newly Constructed Buildings proposed to be located in whole or in part within the City," and relies on Berkeley's general police power as the source of its authority. The supporting documentation in the administrative record asserts that Berkeley may rely on its general police power for the ordinance.

27. The Berkeley Ordinance is part of Title 12 of the Berkeley Municipal Code, which concerns "Health and Safety." The Berkeley Municipal Code contains a separate section, Title 19, regarding "Buildings and Construction" and containing Berkeley's building code and energy code.

28. Berkeley's Ordinance has two purported "exemptions." The first allows gas where all-electric is "not physically feasible," Berkeley Ordinance § 12.80.040.A.1, which, on information and belief, merely represents a "phasing in" of the ban as the CEC models all-electric construction for additional building types — i.e., there is no "exemption" available for the types of buildings already covered by the ban. The second exemption gives the City discretion to allow the use of gas upon an

7

application for an exception from the ban, if the City finds using gas to be in the "public interest" based on consideration of (a) other alternatives that are available (e.g., electric), and (b) issues of safety, health, and/or public welfare. Berkeley Ordinance § 12.80.050.A.

29.     The Berkeley Ordinance's standards concern the energy efficiency and energy use of appliances covered in the federal EPCA insofar as the Ordinance requires all appliances in newly constructed buildings to use only electric power and not natural gas.  In other words, by cutting off the gas pipeline, the Ordinance makes impossible and therefore effectively prohibits the use of gas appliances.

30.     The Berkeley Ordinance establishes building standards as defined by the California Building Standards Law, to wit, "any rule, regulation, order, or other requirement . . . that specifically regulates, requires, or forbids the method of use, properties, performance, or types of materials used in the construction . . . of a building." California Building Standards Law, Cal. Health & Safety Code § 18909(a).

31.     The Berkeley Ordinance does not identify any provision of the California Building Standards Code that it is amending or modifying for the City of Berkeley and in fact provides that it should not be construed as amending the California Energy Code.

32.     In particular, while the Berkeley Ordinance makes certain general findings on local conditions, the Ordinance does not identify the provisions of the California Building Standards Code and the California Energy Code that it is amending in the Ordinance. While, on information and belief, Berkeley submitted its Ordinance to the California Building Standards Commission after this suit was filed, Berkeley did not expressly identify the provisions of the Code that it was amending nor did it "file the amendments, additions or deletions expressly marked and identified as to the applicable [local] findings."

33.     On information and belief, Berkeley did not submit its Ordinance to the California Energy Commission ("CEC") for approval as an amendment to the California Energy Code, nor does it intend to do so.

34.     In fact, the Berkeley Ordinance conflicts with and effectively amends the California

8

Building Standards Code and the California Energy Code.

### The History Of Federal Regulation Of Appliance Energy Use

35.     The federal government regulates the energy efficiency and energy use of appliances through the Energy Policy and Conservation Act ("EPCA").  42 U.S.C. § 6201 *et seq.*

36.     The EPCA was first passed in 1975.  It was designed to address the oil crisis the United States faced in the early 1970s.  While the federal government had little role in regulating energy use before the oil crisis, the EPCA was passed to create a "comprehensive energy policy" to address "the serious economic and national security problems associated with our nation's continued reliance on foreign energy resources." *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 498 (9th Cir. 2005).

37.     The original EPCA was designed to "(1) maximize domestic production of energy and provide for strategic storage reserves of crude oil, residual fuel oil and refined petroleum products; (2) . . . minimize the impact of disruptions in energy supplies by providing for emergency standing measures; (3) provide for domestic crude oil prices that will encourage domestic production in a manner consistent with economic recovery; and (4) reduce domestic energy consumption through the operation of specific voluntary and mandatory energy conservation programs."  S. Rep. No. 94-516, at 116-17 (1975).

38.     Since 1975, Congress has amended the EPCA several times, progressively moving away from a laissez faire approach to appliance efficiency that relied upon consumers to choose more efficient appliances, and towards binding federal energy efficiency standards.  Each amendment to the EPCA further emphasized the federal government's intent to regulate appliance energy use and efficiency, and further limited states' abilities to set their own standards.

39.     In its original form in 1975, the EPCA's provisions regarding consumer appliances focused on requiring labeling of appliances, reasoning that consumers would choose more efficient appliances if they had access to accurate information about efficiency.  Thus, the statute "required manufacturers to label their appliances and provided that the Secretary of the Federal Energy Administration should utilize energy efficiency standards if the labeling program proved ineffective."

9

*Air Conditioning & Refrigeration Inst.*, 410 F.3d at 499.  The Congressional record makes clear Congress's intent at the time: "it is the Committee's hope that voluntary efforts by manufacturers and better consumer information will make energy efficiency standards unnecessary; however, should the labeling program not suffice, energy efficiency standards should be utilized to achieve the goals of the legislation."  H.R. Rep. No. 94-340, at 95 (1975).

40.     The EPCA permitted significant state involvement in appliance regulation.  It "allowed state regulations that differed from the federal regulations if the state regulations were justified by a substantial state or local need, did not interfere with interstate commerce, and were more stringent than the federal standard." *Air Conditioning & Refrigeration Inst.*, 410 F.3d at 499.

41.     In 1978, Congress passed a range of statutes known as the National Energy Act ("NEA"), which gave the federal government broader authority over energy policy, to ensure national security, decrease energy consumption, reduce dependency on energy imports, generate a strategic petroleum reserve, and broadly develop reliable sources of energy for sustained economic growth. *See* Julia Richardson and Robert Nordhaus, The National Energy Act of 1978, 10-SUM Nat. Res. & Env't 62, 62-63 (1995). President Carter also created the federal Department of Energy in 1977, to coordinate a federal response to the nation's energy problems.

42.     One of these 1978 statutes passed as part of the NEA was the National Energy Conservation and Policy Act ("NECPA").  NECPA amended the 1975 EPCA.  Rather than relying exclusively on labeling, NECPA "required the DOE to prescribe minimum energy efficiency standards" for certain products. *Air Conditioning & Refrigeration Inst.*, 410 F.3d at 499.  NECPA also strengthened the preemption provisions in the EPCA, allowing state regulations "more stringent than federal regulations — or, if there was no federal regulation, a state could implement its own standard — *only* if the Secretary found there was a significant state or local interest to justify the state's regulation and the regulation would not unduly burden interstate commerce." *Id.* (emphasis in original).

43.     In spite of these new requirements in NECPA, the Department of Energy did not adopt federal minimum energy standards.  Instead, it "initiated a general policy of granting petitions from

10

States requesting waivers from preemption. As a result, a system of separate State appliance standards ha[d] begun to emerge and the trend [was] growing." S. Rep. No. 100-6, at 4 (1987).

44. In 1987, Congress responded by passing the National Appliance Energy Conservation Act ("NAECA").  The purpose of the NAECA amendment was "to reduce the regulatory and economic burdens on the appliance manufacturing industry through the establishment of national energy conservation standards for major residential appliances." S. Rep. No. 100-6, at 1 (1987).

45. As the Senate recognized, varying state standards created "the problem of a growing patchwork of differing state regulations which would increasingly complicate [appliance manufacturers'] design, production and marketing plans." S. Rep. No. 100-6, at 4 (1987). Similarly, the reports about NAECA in the House of Representatives make clear that the bill was "designed to protect the appliance industry from having to comply with a patchwork of numerous conflicting State requirements."  H.R. Rep. No. 100-11, at 24 (1987).

46. Thus, NAECA contained "two basic provisions:" "[t]he establishment of Federal standards and the preemption of State standards."  S. Rep. No. 100-6 at 2 (1987).  "In general, these national standards would preempt all State standards."  *Id.*

47. While states could seek permission to establish their own standards, "achieving the waiver is difficult." S. Rep. No. 100-6, at 2 (1987). It would require showing an unusual and compelling local interest, and the waiver could not be granted if the "State regulation is likely to result in the unavailability in the State of a product type or of products of a particular performance class, such as frost-free refrigerators." *Id.*  Congress intended to allow only "performance-based codes" that "authorize builders to adjust or trade off the efficiencies of the various building components so long as an energy objective is met." *Id.* at 10-11.  To avoid preemption, a state building code provision must "establish 'credits' for various conservation measures, to provide, to the greatest degree possible, one-for-one equivalency between the energy efficiency of these differing measures and the credits provided for such energy efficiency."  *Id.* at 11.  The Senate chose this requirement "to assure that the credits for exceeding Federal standards are even-handed and are not unfairly weighted resulting in undue pressure on builders to install covered products exceeding

11

Federal standards." *Id.*

48.     In 1992, Congress amended the EPCA once more through the Energy Policy Act of 1992.  That amendment "expanded the federal appliance program to include energy efficiency standards for commercial and industrial appliances" as well as consumer appliances.  *Air Conditioning & Refrigeration Inst.*, 410 F.3d at 500.

49.     Thus, in its present form, the EPCA covers both commercial/industrial and consumer appliances, and it sets federal standards for the energy use and efficiency of those products.  Rather than allowing joint regulation by states and the federal government, Congress has chosen to broadly preempt state regulation of appliance energy use and efficiency, with only narrow exceptions.

**The EPCA's Present Regulation Of Consumer And Industrial Appliances**

50.     The EPCA broadly preempts state regulations concerning the energy use of appliances, through express preemption provisions.  The statute then sets out specific requirements that must be met to be *excepted* from the general rule of preemption.  In other words, Congress meant to preempt the entire field of energy use by covered appliances, and replace it with detailed conditions that must be met for such state or local laws to avoid preemption.  This statutory structure manifests Congress's broad intent to preempt, with only narrow exceptions.

51.     Express preemption is a matter of statutory interpretation, focusing on the text of the provision and additionally taking into account the purpose of the statute if need be.

52.     The current version of the EPCA regulates both consumer and industrial appliances. The express preemption in the EPCA's consumer regulations states that "effective on the effective date of an energy conservation standard established in or prescribed under section 6295 of this title for any covered product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product unless the regulation" falls within certain enumerated exceptions.  42 U.S.C. § 6297(c).

53.     "Energy use" is defined as "the quantity of energy directly consumed by a consumer product at point of use . . . ."  42 U.S.C. § § 6291(4).  "Energy" is defined as "electricity, or fossil fuels."  *Id.* § 6291(3).

12

54.     The EPCA's energy efficiency and use regulations affect certain categories of "covered products."  The EPCA defines "covered products" for consumers as the types of products listed in Section 6292 of the Act.  42 U.S.C. § 6291(2).  Section 6292 in turn lists 19 types of defined covered products, including "water heaters," "furnaces," "dishwashers," and "kitchen ranges and ovens."  *Id.* § 6292(a).  Section 6295 sets out the energy conservation standards for these covered products.

55.     The EPCA defines a "consumer product" as one "(A) which in operation consumes, or is designed to consume, energy or, with respect to showerheads, faucets, water closets, and urinals, water; and (B) which, to any significant extent, is distributed in commerce for personal use or consumption by individuals[.]" 42 U.S.C. § 6291(1). The definition of a consumer product is "without regard to whether such article of such type is in fact distributed in commerce for personal use or consumption by an individual . . . ." *Id.*  In other words, products which are regularly sold to individuals may be classified as consumer products, regardless of whether a particular *unit* of the product has been purchased by an individual or by a business.

56.     Thus, taking these definitions together, the EPCA's consumer standards preempt state and local regulations concerning the quantity of electricity or fossil fuels consumed by appliances (including water heaters, furnaces, dishwashers, and stoves/ovens) which are regularly sold to individuals.

57.     Similarly, the EPCA also governs the energy efficiency and energy use of certain commercial and industrial appliances, in Subchapter 3, Part A-1. 42 U.S.C. § 6311-17.

58.     Like the EPCA's consumer standards, the industrial standards explicitly "supersede any State or local regulation concerning the energy efficiency or energy use of a product for which a standard is prescribed or established" in the federal statute.  *Id.* § 6316(b)(2)(A).

59.     "Energy use," for the purposes of the industrial standards, is defined as "the quantity of energy directly consumed by an article of industrial equipment at the point of use. . . ." *Id.* § 6311(4).  The definition of "energy" refers back to the definition in the consumer standards in Section 6291: energy is "electricity, or fossil fuels." *Id.* §§ 6311(7), 6291(3).

13

60.     The EPCA prescribes standards for various types of "industrial equipment," including "commercial package air conditioning and heating equipment," "warm air furnaces," and several types of water heaters. 42 U.S.C. § 6311(2)(B).  Those products are "industrial" rather than "consumer" if they are "distributed in commerce for industrial or commercial use" to "any significant extent," and do not qualify as consumer products under that portion of the statute.  42 U.S.C. § 6311(2)(A).

61.     Thus, taking these definitions together, the EPCA's industrial standards preempt state and local regulations concerning the quantity of electricity or fossil fuels consumed by heating equipment, water heaters, and furnaces which are regularly sold for industrial or commercial use.

62.     The Ordinance falls within these general rules of preemption.  Natural gas is a fossil fuel.  The Ordinance concerns the quantity of natural gas consumed by appliances in the buildings it regulates, because, by barring the connection to gas pipes required to use natural gas, it requires that *no* natural gas is used.  This prohibition necessarily affects *all* appliances in the buildings regulated by the Ordinance, including appliances covered by the EPCA (such as consumer water heaters, furnaces, dishwashers, and stoves/ovens, and industrial heating equipment, water heaters, and furnaces), because under the Ordinance, *no* appliance can connect to a gas line and use natural gas.

63.     The CRA's members use appliances that qualify as "consumer products" and as "industrial / commercial products" under the EPCA.  Although the CRA's members are businesses, when they purchase or use consumer products — *i.e.,* a product distributed in commerce to individuals "to any significant extent" — those products are still consumer products.  Smaller restaurants may buy or use the same types of water heaters, furnaces, space heating, stoves, and ovens that are also sold to individuals.  The CRA's members also purchase or use appliances that qualify as "industrial equipment" under the EPCA.  Larger restaurants, especially those renting space in larger commercial buildings, may use large-scale furnaces and water heaters that are regularly sold for commercial or industrial (rather than consumer) use.

**Berkeley Does Not Meet The Conditions For Exemption From Preemption for Consumer Appliances**

64.     The EPCA contains only limited exceptions to the general rule of preemption for

14

---

CAL. RESTAURANT ASS'N FIRST AMENDED COMPL.                    4:19-cv-7668-YGR

**ER-95**

consumer appliances. In particular, a state or local regulation is not preempted if it "is in a building code for new construction" and meets seven specific requirements. 42 U.S.C. §§ 6297(c)(3), (f)(3). The regulation must meet *all seven* of these requirements to avoid preemption. The seven requirements, taken together, are intended to allow only performance-based codes that give builders choice about how to meet overall efficiency or conservation objectives, ensuring an even-handed policy that does not pressure builders to choose one type of appliance over another. *See* S. Rep. 100-6, at 10-11 (1987).

65.     As an initial matter, the Ordinance is not eligible for exemption from preemption under Section 6297(f)(3) because it is not in a building code for new construction. The Ordinance is instead part of Title 12 of the Berkeley Municipal Code, which concerns "Health and Safety." The Berkeley Municipal Code contains a separate section, Title 19, regarding "Buildings and Construction" and containing Berkeley's building code and energy code. The Ordinance is not part of that building code.

66.     The Ordinance also does not meet all seven requirements listed in Section 6297(f)(3), and it must meet *all seven* in order to avoid preemption. In particular, the first requirement is that "[t]he code permits a builder to meet an energy consumption or conservation objective for a building by selecting items whose combined energy efficiencies meet the objective." 42 U.S.C. § 6297(f)(3)(A). The Ordinance does not meet this requirement, because it does not set an "energy consumption or conservation objective for a building" that allows a builder to select items that, in combination, meet the objective. Instead, the builder cannot select *any* appliances that use natural gas, no matter the energy use or efficiency of those particular appliances, because the building cannot connect to natural gas piping.

67.     The second requirement is that "[t]he code does not require that the covered product have an energy efficiency exceeding the" federal EPCA standards in section 6295, absent a state waiver. 42 U.S.C. § 6297(f)(3)(B). The Ordinance does not meet this requirement, because it precludes the use of gas appliances that meet the federal standards in Section 6295. By banning all gas appliances, it necessarily bans those that meet the federal standards.

15

68. The third requirement is that "[t]he credit to the energy consumption or conservation objective allowed by the code for installing covered products having energy efficiencies exceeding [the federal EPCA standards in section 6295] is on a one-for-one equivalent energy use or equivalent cost basis."  42 U.S.C. § 6297(f)(3)(C).  The Ordinance does not meet this requirement, because it does not give credit "on a one-for-one equivalent energy use . . . basis" for products that are more efficient than required by the federal standards.  The Ordinance gives *no* credit for installing natural gas appliances that are more efficient than required by the federal standards; to the contrary, it bars *all* natural gas appliances, without regard to their energy efficiency.  Instead of giving credit based on the efficiency of each covered product, the Ordinance sets out blanket rules about the use of *any* natural gas product.

69. The sixth requirement is that "[t]he energy consumption or conservation objective is specified in terms of an estimated total consumption of energy (which may be calculated from energy loss- or gain-based codes) utilizing an equivalent amount of energy (which may be specified in units of energy or its equivalent cost)." 42 U.S.C. § 6297(f)(3)(F).  The Ordinance does not meet this requirement, because it is not specified in terms of *total* consumption of energy for a building that then allows builders to decide how to meet that consumption objective; it says nothing about a consumption or conservation objective or equivalent amounts of energy, but instead allows all electric and bans all natural gas. *Id.*

**Berkeley Does Not Meet The Conditions For Exemption From Preemption for Industrial Appliances.**

70. As with the consumer standards, there are only limited exceptions to the default rule of preemption of local regulations concerning the energy use or efficiency of industrial appliances. 42 U.S.C. § 6316(2)(B).

71. As an initial matter, the Ordinance is not eligible for an exception to preemption because it is not "contained in a State or local building code for new construction[.]" 42 U.S.C. § 6316(2)(B). The Ordinance is instead part of Title 12 of the Berkeley Municipal Code, which concerns "Health and Safety."  The Berkeley Municipal Code contains a separate section, Title 19, regarding "Buildings and Construction" and containing Berkeley's building code and energy code.

16

The Ordinance is not part of that building code.

72. Regardless, the Ordinance also does not meet the statutory requirements for the exception to preemption. To avoid preemption, a local regulation in a building code must "not require that the energy efficiency of such product exceed the applicable minimum energy efficiency requirement in amended ASHRAE/IES Standard 90.1." 42 U.S.C. § 6316(2)(B)(i).

73. The Ordinance does not meet this requirement, because it bans all natural gas appliances, even when they meet the efficiency standards in ASHRAE/IES Standard 90.1.

**The California Building Standards Law**

74. The California Building Standards Law, Sections 18901 *et seq.* of the California Health and Safety Code ("HSC"), provides for the adoption of statewide building standards in California.

75. Section 18949.31 of the California Health and Safety Code grants authority to the California Building Standards Commission ("CBSC") to oversee processes related to the California building codes.

76. By adopting the 1970 amendments to the Building Standards Law, the Legislature demonstrated its intent to occupy the field of building standards.

77. HSC § 18915 defines a "local agency" as "a city, county, and city and county, whether general law or chartered, district agency, authority, board, bureau, department, commission, or other governmental entity of less than statewide jurisdiction."

78. HSC § 18919 defines a "regulation" as "any rule, regulation, ordinance, or order promulgated by a state or local agency, including rules, regulations, or orders relating to occupancy or the use of land," including, specifically, "building standards."

79. HSC § 18909(a) defines a "building standard" as "any rule, regulation, order, or other requirement, including any amendment or repeal of that requirement, that specifically regulates, requires, or forbids the method of use, properties, performance, or types of materials used in the construction, alteration, improvement, repair, or rehabilitation of a building, structure, factory-built housing, or other improvement to real property, including fixtures therein, and as determined by the

17

commission."

80.     These provisions, taken together, have been interpreted as precluding any local regulation in the field of building standards pursuant to the local jurisdiction's police powers, and as requiring that local governments only make any amendment or modification of the state building standards code in accord with a specific statutory grant of authority.

81.     Insofar as building standards concern energy use, the intent of the California legislature was "to establish and consolidate the state's responsibility for energy resources, for encouraging, developing, and coordinating research and development into energy supply and demand problems, and for regulating electrical generating and related transmission facilities."  Cal. Pub. Res. Code § 25006.  To do so, California passed the Warren-Alquist Act in 1974, establishing the CEC, to respond to the energy crisis of the early 1970s and the state's unsustainable growing demand for energy resources.

**The California Building Standards Code**

82.     The California Building Standards Code is set forth in Title 24 of the California Code of Regulations and provides for a statewide building standards code.

83.     Part 2.5 of the Building Standards Code is known as the California Residential Code.

84.     Section R1003.11.3 of the Residential Code allows natural gas appliances for fireplaces consistent with the California Mechanical Code.

85.     Part 4 of the Building Standards Code is known as the California Mechanical Code.

86.     The California Mechanical Code contains a number of standards relating to the use of natural gas in structures.  These include:

    a.   Section 1301.1 regulating the maximum pressure for natural gas in piping in a structure;

    b.   Section 1308.4 regulating the sizing of gas piping in the structure;

    c.   Section 1308.4.1 regulating the volumetric flow rate for gas in a structure;

    d.   Section 1308.7 regulating requirements for gas pressure regulators in a structure;

    e.   Section 1310.2.3 specifying prohibited locations for gas piping in a structure;

18

f.   Section 1312 regulating appliance connections to gas piping in a structure;

g.   Section 1314.1 regulating general requirements for natural gas supply to structures;

h.   Section 1314.2 regulating the required volume of gas at each piping outlet within a structure; and

i.   Section 1314.4 regulating the size of supply piping outlets for gas appliances within a structure.

87.   Part 5 of the Building Standards Code is known as the California Plumbing Code.

88.   The California Plumbing Code contains a number of standards relating to the use of natural gas in structures.  These include:

a.   Section 507.7 requiring that water heaters be connected to the type of fuel gas for which it was designed;

b.   Section 1201.1 regulating the gas pressure within piping systems in connection with a building or structure;

c.   Section 1202.0 regulating the coverage of gas piping systems in a structure;

d.   Section 1202.2 regulating gas piping system requirements in a structure;

e.   Section 1208.1 regulating the installation of gas piping in a structure;

f.   Section 1208.4 regulating the sizing of gas piping systems in a structure;

g.   Section 1208.6 regulating acceptable piping materials and joining methods for gas piping systems;

h.   Section 1210.1.7 regulating the use of plastic piping for gas;

i.   Section 1210.2.2.1 regulating gas piping in ceiling locations; and

j.   Section 1210.2.3 regulating prohibited locations for gas piping inside a building.

89.   Part 6 of the Building Standards Code is known as the California Energy Code.

90.   The California Energy Code establishes certain energy standards and includes requirements applicable to natural gas devices and appliances.  These include:

a.   Section 110.1 establishing mandatory requirements for appliances in newly constructed buildings;

19

b. Section 110.2(a) and Tables 110.2-C, 110.2-D and 110.2-J establishing efficiency standards for gas engine heat pumps, water-cooled gas engine driven chillers, and gas-fired warm air furnaces, respectively;

c. Section 110.2(d) regulating gas-fired furnace standby loss controls;

d. Section 110.4 establishing requirements where gas pool heaters are used;

e. Section 110.5 regulating gas central furnace and cooking appliance pilot lights;

f. Section 120.9 regulating gas commercial boilers;

g. Section 140.4 establishing prescriptive requirements for space conditioning systems;

h. Section 140.4(g) permitting certain back-up systems for gas heating equipment;

i. Section 150.0(e) requiring standards for fireplaces, decorative gas appliances, and gas logs;

j. Section 150.0(n) requiring standards for gas water heaters;

k. Section 150.1(c)(8) specifying requirements for gas water heating systems.

**Requirements for Local Amendments to State Building Standards Code**

91. HSC §§ 17958, 17958.5, and 17958.7 permit cities and counties to make local amendments or modifications to the Building Standards Code under specified circumstances.

92. HSC § 17958.7 requires that before making any such modifications or changes, the governing body of the city or county must "make an express finding that such modifications or changes are reasonably necessary because of local climatic, geological or topographical conditions" and the modifications or changes must be "expressly marked and identified to which each finding refers" and must be submitted to the CBSC.

93. HSC § 17958.7(b) provides that the CBSC "may" reject a modification or change if no finding is submitted.

94. Consistent with these provisions, the various parts the Building Standards Code have procedural requirements for more restrictive local amendments or modifications to the Building Standards Code. The California Residential Code, Title 24, Part 2.5, § 1.1.8 and § 1.1.8.1 require compliance with HSC § 17958 and that the municipality "make express findings for each

20

amendment, addition or deletion based upon climatic, topographical, or geological conditions" and "file the amendments, additions or deletions expressly marked and identified as to the applicable findings" with the CBSC.

95.     The California Mechanical Code, Title 24, Part 4, § 1.1.8 and § 1.1.8.1, and the California Plumbing Code, Title 24, Part 5, § 1.1.8 and § 1.1.8.1, likewise require compliance with HSC § 17958 and that the municipality "make express findings for each amendment, addition or deletion based upon climatic, topographical, or geological conditions" and "file the amendments, additions or deletions expressly marked and identified as to the applicable findings" with the CBSC.

96.     In order for local governmental agencies to amend or modify the state energy standards, they must meet additional, more burdensome requirements and the CEC must then vote to approve the amendments.  Pursuant to Title 24, Part 1, § 10-106, the local government must submit an application to the CEC for approval including the "proposed energy standards;  [t]he local governmental agency's findings and supporting analyses on the energy savings and cost effectiveness of the proposed energy standards; [a] statement or finding by the local governmental agency that the proposed energy standards will require buildings to be designed to consume less energy than permitted by [the Energy Code]; and [a]ny findings, determinations, declarations or reports, including any negative declaration or environmental impact report, required pursuant to the California Environmental Quality Act, Pub. Resources Code Section 21000 et seq." *Id.* § 10-106(b).  The CEC must find that the proposed standards will require buildings to be designed to consume less energy than permitted by the Building Standards Code and must approve the standards before they are effective. *Id.* § 10-106.

97.     The CEC itself has recognized that bans on natural gas constitute modifications to the energy code that require its approval.  Indeed, the CEC recently reviewed and approved several other city's ordinances banning natural gas infrastructure, including in Los Gatos, Mountain View, Santa Rosa, and Windsor. The CEC issued resolutions approving these "locally adopted building energy efficiency standards," and finding that they met the state code requirements for amending the Energy Code.  All four of these cities' ordinances require that "new construction" "shall" be "all-electric"

21

and prohibit the use of natural gas infrastructure. Unlike these four cities, however, Berkeley has not submitted its Ordinance for the CEC's review and approval.

## FIRST CAUSE OF ACTION

### FEDERAL PREEMPTION BY THE ENERGY POLICY AND CONSERVATION ACT

98. Plaintiff re-alleges the preceding paragraphs as though set forth fully herein.

99. The Berkeley Ordinance in its entirety is preempted by the federal EPCA.

100. There is no set of circumstances under which the Ordinance would be valid.

101. The Berkeley Ordinance concerns the energy efficiency and energy use of all appliances in newly constructed buildings, including appliances covered by the EPCA.

102. The Berkeley Ordinance does not fall within the exceptions to preemption in the EPCA because:

    a. It is not included in Berkeley's building code;

    b. It does not set its objectives in terms of total consumption of energy;

    c. It does not permit builders to select items whose combined energy efficiencies meet an objective for total energy consumption but rather requires a particular category of items (i.e., electric appliances);

    d. It does not give credit on a one-for-one basis for all appliances whose energy efficiency exceeds the federal standards, insofar as it gives no credit for (and indeed bans) the use of natural gas appliances no matter their efficiency; and/or

    e. It bans all natural gas appliances, even when they meet the federal efficiency standards.

103. There is no plain, speedy, and adequate remedy at law to protect the rights of Plaintiff and its members. Plaintiff and its members will be irreparably harmed if the Berkeley Ordinance becomes effective and is enforced because restaurants will not be able to prepare their foods in the same manner, speed, and style and will face higher costs.

104. Plaintiff accordingly requests that the Court declare that the Berkeley Ordinance is preempted by the EPCA and enjoin Defendant from enforcement of the preempted Berkeley

Ordinance.

## SECOND CAUSE OF ACTION

## PREEMPTION OF BERKELEY ORDINANCE BY CALIFORNIA LAW AS A VOID AND UNENFORCEABLE EXERCISE OF POLICE POWER

105.    Plaintiff re-alleges the preceding paragraphs as though set forth fully herein.

106.    Defendant has a clear, present, and ministerial duty to comply with the laws of the State of California, which prohibit a municipality from exercising its police powers to establish building code requirements and preempt all ordinances that establish building code requirements under the police power of the municipality.

107.    Plaintiff and its members have a clear, present, and beneficial interest in the performance of Defendant's duties under California law.

108.    Article XI, section 7 of the California Constitution provides that municipalities may enact and enforce ordinances "not in conflict with general laws."

109.    Under this provision, any ordinance that conflicts with state law or enters an area fully occupied by state general law is preempted and void.

110.    Under the California Building Standards Law and Building Standards Code, the State of California has occupied the field of building standards.

111.    Because the state has occupied the field of building standards, local governments may not use their general police powers to regulate in the area of building standards and may only exercise those powers in accord with a specific statutory grant of authority. *Building Indus. Ass'n v. City of Livermore*, 45 Cal. App. 4th 719, 726 (1996).

112.    A building standard adopted by a municipality under general police power is preempted by state law and is unenforceable and void.

113.    The Berkeley Ordinance establishes building standards as defined in the Building Standards Law and was adopted under Berkeley's general police power.  The Berkeley Ordinance is therefore preempted by state law and void and unenforceable.

114.    There is no plain, speedy, and adequate remedy at law to protect the rights of Plaintiff

and its members.  Plaintiff and its members will be irreparably harmed if the Berkeley Ordinance becomes effective and is enforced because restaurants will not be able to prepare their foods in the same manner, speed, and style and will face higher costs.

115.    Plaintiff accordingly requests that the Court declare that the Berkeley Ordinance is preempted by California law and enjoin Defendant from enforcement of the preempted Berkeley Ordinance.

## THIRD CAUSE OF ACTION

### PREEMPTION OF BERKELEY ORDINANCE BY CALIFORNIA LAW AS CONFLICTING WITH CALIFORNIA BUILDING STANDARDS CODE

116.    Plaintiff re-alleges the preceding paragraphs as though set forth fully herein.

117.    Under California law, local amendments or modifications to the California Building Standards Code are preempted unless the amendments or modifications are adopted under a specific statutory grant of authority.

118.    HSC § 17958.7 and California Mechanical Code, Title 24, Part 4, § 1.1.8 and § 1.1.8.1, and California Plumbing Code, Title 24, Part 5, § 1.1.8 and § 1.1.8.1, require that to make any such amendment or modification to the California Building Standards Code, the municipality must "make express findings for each amendment, addition or deletion based upon climatic, topographical, or geological conditions" and "file the amendments, additions or deletions expressly marked and identified as to the applicable findings" with the CBSC.

119.    The Berkeley Ordinance establishes building standards as defined by HSC § 18909 and conflicts with, amends, and modifies provisions of the California Building Code, including:

    a.   California Mechanical Code § 1301.1 regulating the maximum pressure for natural gas in piping in a structure; § 1308.4 regulating the sizing of gas piping in the structure; § 1308.4.1 regulating the volumetric flow rate for gas in a structure; § 1308.7 regulating requirements for gas pressure regulators in a structure; § 1310.2.3 specifying prohibited locations for gas piping in a structure; § 1312 regulating appliance connections to gas piping in a structure; § 1314.1 regulating general requirements for

24

natural gas supply to structures; § 1314.2 regulating the required volume of gas at each piping outlet within a structure; and § 1314.4 regulating the size of supply piping outlets for gas appliances within a structure; and

    b.   California Plumbing Code § 507.7 requiring that water heaters be connected to the type of fuel gas for which it was designed; § 1201.1 regulating the gas pressure within piping systems in connection with a building or structure; § 1202.0 regulating the coverage of gas piping systems in a structure; § 1202.2 regulating gas piping system requirements in a structure; § 1208.1 regulating the installation of gas piping in a structure; § 1208.4 regulating the sizing of gas piping systems in a structure; § 1208.6 regulating acceptable piping materials and joining methods for gas piping systems; § 1210.1.7 regulating the use of plastic piping for gas; § 1210.2.2.1 regulating gas piping in ceiling locations; and § 1210.2.3 regulating prohibited locations for gas piping inside a building.

120. The Berkeley Ordinance does not provide that it is relying on any specific statutory exception to preemption.

121. The Berkeley Ordinance does not expressly mark or identify any provisions of the California Building Code, including the provisions of the Mechanical Code and Plumbing Code cited above, that it is amending or modifying. Nor does Berkeley "make express findings for each amendment, addition or deletion based upon climatic, topographical, or geological conditions."

122. On information and belief, Berkeley filed its Ordinance with the CBSC after the initial Complaint in this case had been filed.

123. Because the Berkeley Ordinance was not adopted in compliance with any specific statutory grant of authority, it is preempted and void and unenforceable.

124. Defendant has a clear, present, and ministerial duty to comply with the laws of the State of California, which preempt all ordinances that establish building code requirements except where the building code requirements are adopted in compliance with specific statutory grants of authority.

25

125.    Plaintiff and its members have a clear, present, and beneficial interest in the performance of Defendant's duties under California law.

126.    There is no plain, speedy, and adequate remedy at law to protect the rights of Plaintiff and its members.  Plaintiff and its members will be irreparably harmed if the Berkeley Ordinance becomes effective and is enforced because restaurants will not be able to prepare their foods in the same manner, speed, and style and will face higher costs.

127.    Plaintiff accordingly requests that the Court declare that the Berkeley Ordinance is preempted by California law and enjoin Defendant from enforcement of the preempted Berkeley Ordinance.

### FOURTH CAUSE OF ACTION

**PREEMPTION OF BERKELEY ORDINANCE BY CALIFORNIA LAW AS CONFLICTING WITH CALIFORNIA ENERGY CODE**

128.    Plaintiff re-alleges the preceding paragraphs as though set forth fully herein.

129.    Under California law, local amendments or modifications to the California Energy Code are preempted unless the amendments or modifications are adopted under a specific statutory grant of authority.

130.    The California Energy Code requires that in order for local governmental agencies to adopt energy standards amending or modifying the Energy Code, a local governmental agency must submit to the CEC an application including the proposed energy standards; findings and supporting analyses on energy savings and cost-effectiveness; a statement or finding that the local energy standards will require buildings to be designed to consume less energy than permitted by Part 6; and any findings required pursuant to CEQA.  Title 24, Part 1, § 10-106(b).

131.    In order for such local amendments to be effective, the CEC must find that the standards will require buildings to be designed to consume less energy than permitted by Title 24, Part 6, and must vote to approve the local standards. Title 24, Part 1, § 10-106.

132.    The Berkeley Ordinance conflicts with, amends, and modifies provisions of the California Energy Code establishing energy standards and requirements applicable to natural gas

26

CAL. RESTAURANT ASS'N FIRST AMENDED COMPL.                    4:19-cv-7668-YGR

**ER-107**

devices and appliances, including: § 110.0 establishing mandatory requirements for appliances in newly constructed buildings; § 110.2(a) and Tables 110.2-C, 110.2-D and 110.2-J establishing efficiency standards for gas engine heat pumps, water-cooled gas engine driven chillers and gas-fired warm air furnaces, respectively; § 110.2(c) regulating thermostats for fireplaces and decorative gas appliances; § 110.2(d) regulating gas-fired furnace standby loss controls; § 110.4 establishing requirements where gas pool heaters are used; § 110.2(d) regulating gas-fired furnace standby loss; § 110.5 regulating gas central furnace, cooking appliance pilot lights; § 120.9 regulating gas commercial boilers; § 140.4(c) establishing prescriptive requirements for space conditioning systems; § 140.4(g) permitting certain back-up systems for gas heating equipment; § 150.0(e) setting standards for fireplaces, decorative gas appliances, and gas logs; § 150.0(n) setting standards for gas water heaters; § 150.1(b)(8) specifying requirements for gas water heating systems.

133. The Berkeley Ordinance did not identify the provisions of the Energy Code it was amending; make findings or provide supporting analyses on energy savings and cost-effectiveness; make a finding that the proposed standards will require less energy than permitted by Part 6; or make findings or declarations pursuant to CEQA. On information and belief, Defendant has not submitted an application to the CEC for the Berkeley Ordinance as of the date of this Amended Complaint and does not intend to do so.

134. The Berkeley Ordinance is accordingly preempted by the CEC and is void and unenforceable.

135. Plaintiff and its members have a clear, present, and beneficial interest in the performance of Defendant's duties under California law.

136. There is no plain, speedy, and adequate remedy at law to protect the rights of Plaintiff and its members. Plaintiff and its members will be irreparably harmed if the Berkeley Ordinance becomes effective and is enforced because restaurants will not be able to prepare their foods in the same manner, speed, and style and will face higher costs.

137. Plaintiff accordingly requests that the Court declare that the Berkeley Ordinance is preempted by California law and enjoin Defendant from enforcement of the preempted Berkeley

27

Ordinance.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as follows:

1. For a permanent injunction enjoining Defendant from enforcing or attempting to enforce Berkeley Ordinance No. 7,672-N.S. as that Ordinance is preempted by California law and federal law and does not satisfy any exception to such preemption, and is accordingly void and unenforceable;

    a.  The Berkeley Ordinance has caused and threatens to cause Plaintiff and its members irreparable and substantial harm;

    b.  No amount of monetary damages or other legal remedy can adequately compensate Plaintiff and its members for the irreparable harm that they will suffer from the violations described herein, and Plaintiff has no plain, speedy, and adequate remedy at law, in that unless Defendant is enjoined by this Court from effectuating the Berkeley Ordinance, Plaintiff and its members will be subject to the Berkeley Ordinance and will continue to be denied their legal rights;

    c.  There will be no significant harm to Defendant from an injunction, because Defendant has no legitimate interest in enforcing an invalid ordinance.  Moreover, the Ordinance's stated goals are primarily global, relating to issues of global warming and climate change. Ordinance 12.80.010.A.  In light of the incremental effect, if any, that an Ordinance in one city would have on global warming or climate change, there is little likelihood that an injunction would cause substantial harm to the Defendant.  The balance of harms thus favors injunctive relief; and

    d.  An injunction is also in the public interest.  The public interest is not served by enforcing invalid ordinances.  Moreover, the EPCA embodies a strong public interest in the uniform, *national* regulation of energy conservation and use policy, which is undermined by conflicting local regulation of these matters found in the Berkeley Ordinance.  California law likewise embodies a strong public interest in the uniform state-wide regulation of building standards and energy conservation and use policy, which is also undermined by

28

local regulation not exercised pursuant to specific statutory grants of authority.

2. For a declaratory judgment, pursuant to 28 U.S.C. § 2201(a) and § 1331, that Berkeley Ordinance No. 7,672-N.S.

    a. Is preempted by federal law because it concerns the energy use of appliances covered in the federal Energy Policy and Conservation Act and is therefore void and unenforceable;

    b. Is preempted by California law as an unlawful attempt to use the City of Berkeley's general police power to regulate building standards and is therefore void and unenforceable;

    c. Is preempted by California law as it attempts to regulate building standards and does not satisfy the limited specific statutory exception for municipal building standards and is therefore void and unenforceable; and

    d. Is preempted by California law as it has the effect of amending the state Energy Code and does not satisfy the limited specific statutory exception for municipal amendments to the Energy Code and is therefore void and unenforceable.

3. For costs of this suit, including reasonable attorney's fees; and

4. For such other and further relief as the Court may deem just and proper.

29

CAL. RESTAURANT ASS'N FIRST AMENDED COMPL.                                    4:19-cv-7668-YGR

**ER-110**

Dated:  August 14, 2020

Respectfully submitted,

**REICHMAN JORGENSEN LLP**

*/s/ Courtland L. Reichman*
Courtland L. Reichman (CA Bar No. 268873)
Laura Carwile (CA Bar No. 291906)
creichman@reichmanjorgensen.com
REICHMAN JORGENSEN LLP
100 Marine Parkway, Suite 300
Redwood Shores, CA 94065
Telephone: (650) 623-1401
Facsimile: (650) 623-1449

Sarah Jorgensen (*Pro Hac Vice*)
sjorgensen@reichmanjorgensen.com
REICHMAN JORGENSEN LLP
1201 West Peachtree Street, Suite 2300
Atlanta, GA 30309
Telephone: (404) 609-1040
Facsimile: (650) 623-1449

Gary J. Toman (*Pro Hac Vice*)
gtoman@wwhgd.com
WEINBERG, WHEELER, HUDGINS, GUNN &
DIAL LLP
3344 Peachtree Road NE, Suite 2400
Atlanta, GA 30326
Telephone: (404) 876-2700
Facsimile: (404) 875-9433

Kylie Chiseul Kim (*Pro Hac Vice*)
kkim@kellogghansen.com
KELLOGG, HANSEN, TODD, EVANS, FIGEL
& FREDERICK LLP
1615 M St. NW, #400
Washington, DC 20036
Telephone: (202) 326-7924
Facsimile: (202) 326-7999

*Attorneys for Plaintiff*
*California Restaurant Association*

30

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

|  |  |
|---|---|
| **CALIFORNIA RESTAURANT ASSOCIATION,**<br><br>Plaintiff,<br><br>vs.<br><br>**CITY OF BERKELEY,**<br><br>Defendant. | CASE NO. 4:19-cv-07668-YGR<br><br>**ORDER: (1) GRANTING-IN-PART AND DENYING-IN-PART DEFENDANT CITY OF BERKELEY'S MOTION TO DISMISS; AND (2) GRANTING LEAVE TO AMEND**<br><br>Re: Dkt. No. 18 |

On July 14, 2020, the parties appeared for oral arguments via the Zoom platform. Having carefully considered the briefing and arguments submitted on defendant City of Berkeley's ("Berkeley") motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and (b)(6), as well as the parties' arguments raised at the motion hearing, the Court **GRANTS IN PART** Berkeley's motion on the grounds of both ripeness and standing for the reasons stated on the record. (Dkt. No. 18 (motion).) The Court otherwise **DENIES WITHOUT PREJUDICE** the remaining grounds of the motion: Berkeley may re-raise these arguments in any response to the filing of an amended complaint.

Further, California Restaurant Association ("CRA") is **GRANTED** leave to amend in the filing of an amended complaint adding new allegations as to both of these grounds. CRA's amended complaint shall be filed **on or before August 14, 2020**. Berkeley's response to the amended complaint shall be filed on or before **September 14, 2020**. Any filed motion from Berkeley shall follow the regular 35-day briefing schedule unless otherwise stipulated by the parties and approved by the Court.

This Order terminates Docket Number 18.

**IT IS SO ORDERED.**

Dated: July 22, 2020

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT JUDGE**

**ER-112**

UNITED STATES DISTRICT COURT **ORIGINAL**

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable YVONNE GONZALEZ ROGERS, Judge

| | | |
|---|---|---|
| CALIFORNIA RESTAURANT ASSOCIATION, a California nonprofit mutual benefit corporation, | ) ) ) ) ) | **Motion to Dismiss** |
| Plaintiff, | ) ) | |
| vs. | ) ) | NO. C 19-07668 YGR |
| CITY OF BERKELEY, | ) ) | Pages 1 - 47 |
| Defendant. | ) ) ) | Oakland, California Tuesday, July 14, 2020 |

**REPORTER'S TRANSCRIPT OF ZOOM WEBINAR PROCEEDINGS**

APPEARANCES (Via Zoom Webinar):

For Plaintiff:      Reichman Jorgensen LLP
                    100 Marine Parkway, Suite 300
                    Redwood Shores, California  94065
                BY: COURTLAND REICHMAN,
                    SARAH JORGENSEN,  ATTORNEYS AT LAW


                    Weinberg, Wheeler, Hudgins, Gunn &
                    Dial LLP
                    3344 Peachtree Road NE, Suite 2400
                    Atlanta, Georgia  39326
                BY: GARY J. TOMAN, ATTORNEY AT LAW


            (Appearances continued next page)

Reported By:        Raynee H. Mercado, CSR No. 8258


    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

**ER-113**

**A P P E A R A N C E S (CONT'D.)**

```
For Plaintiff:          Kellog, Hansen, Todd, Evans, Figel &
                        Frederick LLP
                        1615 M Street NW #400
                        Washington, D.C.  20036
                   BY:  KYLIE C. KIM, ATTORNEY AT LAW


For Defendant:          Berkeley City Attorney's Office
                        2180 Milvia Street, Fourth Floor
                        Berkeley, California  94704
                   BY:  CHRISTOPHER D. JENSEN,
                        DEPUTY CITY ATTORNEY



                        --o0o--
```

fairness for that allegation 'cause I think it's more of a question of the statute or the -- I should say the ordinance itself. And so I am not able to sit here and say -- but I think we have allegations in there that, you know, construed in our favor, say that the -- facially, the ordinance as a whole, is preempted by EPCA. And that's what we're getting at.

There's no set of circumstances in which this can be applied without violating EPCA. If required, Your Honor, to amend to add that specific allegation, we certainly can, and would be happy to.

**THE COURT:** All right. Let's move to the federal preemption question.

Assuming I have jurisdiction, the Energy Policy Conservation -- and Conservation Act seems to me, as I read it, to address issues concerning energy efficiency, energy use with respect to particular types of covered products. And look as I might, I don't see gas stoves in a commercial context to be covered.

This ordinance appears to be dealing with gas lines, not energy efficient or energy use of appliances which are identified. If that's the case and I'm right in my reading of the -- the statute, the statute does not preempt.

Mr. Reichman?

**MR. REICHMAN:** Thank you, Your Honor.

I think we would have a different point of view as to what the statute says.

**THE COURT:**  I need you to focus on the language of the statute because the plain language of the statute doesn't seem to apply though this particular case.

**MR. REICHMAN:**  All right.  I'll focus on the plain language.  Absolutely.

Section 62 -- 6297 says that EPCA preempts state regulation, quote -- I'm using ellipses here, but concerning --

**THE COURT:**  What subsection?

**MR. REICHMAN:**  6297 -- I believe it's H.  Let me find it to be specific, Your Honor.

**THE COURT:**  There is no H.

**MR. JENSEN:**  I believe it's paragraph C.

**MR. REICHMAN:**  C.  Excuse me.

6297(C), the last two lines, at least on my draft, no state regulation concerning --

**THE COURT:**  Hold on.  Subsection C -- before we get to the subsubparagraphs.  All right.

It says that except as provided in another sub -- a number of sub subsections and effective on the effective date an energy conservation standard established in or prescribed under Section 325 for any covered product, no state regulation concerning blah, blah, blah; that is, concerning the energy

efficiency, energy use, or water use of such covered product --

MR. REICHMAN:  Yes, Your Honor.

THE COURT:  -- shall being affected.  So "covered product" is used twice and is critical to the plain language.  So where does the covered product, as defined in the statute, relate to or state that it concerns commercial stoves?

MR. REICHMAN:  Well, let me tell you how we get there, Your Honor.

This says "concerning the energy use of a covered product."  And the energy --

THE COURT:  "Of such covered product."

MR. REICHMAN:  "Such covered product."  I wasn't trying to eliminate that.  "Of such covered product."  "Energy use" in turn is defined as the quantity of energy consumed by a consumer product.

And while I realize it's out of circuit.  It's the only case, I think, out there interpreting this, the *Albuquerque* case said that "concerning" is broad preemption, and it means "relating to."  And when looking at "relating to" --

THE COURT:  I need you to give me -- I take it it was a -- it was a district court opinion?

MR. REICHMAN:  Yes, Judge.

THE COURT:  Who was the judge?

MR. REICHMAN:  I don't recall.  I can --

**THE COURT:** All right. I can figure that out.

**MR. REICHMAN:** Okay.

Putting the statute --

**THE COURT:** I'm not bound by any other district court judge, and that's why I'm focused on the language.

**MR. REICHMAN:** This is the language. I'm telling you how I get there on the actual language.

**THE COURT:** Do you -- do you concede that there is no definition of "covered product" that concerns your covered product -- your product at issue?

**MR. REICHMAN:** No, I do not concede that, Your Honor.

**THE COURT:** All right. So tell me where commercial stoves or ranges exist.

**MR. REICHMAN:** Okay. The way the statute works is it defines certain products that are typically consumer, and certain -- and some --

**THE COURT:** And this is not a commercial -- this is not consumer, correct? It's commercial.

**MR. REICHMAN:** No, that's not correct. That's what I was getting to.

**THE COURT:** How is a commercial restaurant a consumer product?

**MR. REICHMAN:** It does --

**THE COURT:** Or --

**MR. REICHMAN:** The statutory definitions look at the

products themselves, not its characterization as a consumer product. So as long as we can fairly plead that one of those covered consumer products is used here, then, it -- you know, could be by one of our restaurant owners, say, a water heater or -- or the like, then it -- then the consumer part applies.

Now, the commercial part could apply as well, but it's preemption requirement. But we're not conceding that consumer products are out. Consumer products is a label that we use, but the way the statute defines it is by the actual physical product itself.

So, for example, a water heater of a certain size. If a restaurant uses a water heater of that size, it doesn't much matter whether it's classified as a consumer or a commercial other than for which provisions of the statute apply.

A restaurant can absolutely use a consumer product and fall within this provision.

THE COURT: You do agree that the statute makes a distinction between commercial appliances and consumer products including appliances.

MR. REICHMAN: I do. And it defines the consumer products by virtue of the products themselves, not by their use. So if an individual, a homeowner, puts a commercial product in their home, it's not transformed into a commercial product. It's not classified by purchaser. It's classified by the product itself, Your Honor.

And our point with the statutory language, putting it together, is that, you know, the Supreme Court has said, at least until connection -- in a ERISA case, that the use of the term "relates to" which is how "concerns" is defined, is that it has a connection with.  And so here's my plain language argument, just to boil it down.  If you put these different definitions together, as they're laid out in the *Albuquerque* case -- and I realize it's a district court case, but I'm just saying that this -- we're not making this up.  This comes from somewhere legitimate.

**MR. REICHMAN:**  The question is whether the ordinance has a connection with the quantity of gas consumed by the covered products.

And our fundamental point in this case is you couldn't ban a gas product, so you can't do indirectly what you can't do directly on --

**THE COURT:**  There are places all across the United States where you do not have natural gas lines.

**MR. REICHMAN:**  Correct.

**THE COURT:**  You're saying that all of those places across the United States are in violation of the EPCA and that somehow the EPCA is -- has preemptive -- preemptive regulatory authority over all of those things across the United States?

**MR. REICHMAN:**  Only if they're prohibiting the use or quantity of gas used by an appliance.  And that's what's going

on here by cutting the pipe.  It's in connection -- the use of gas in connection with an appliance.

So if -- the federal statute at bottom requires choice. And if there's a choice available, you cannot prohibit the use of gas in an appliance any more -- and we don't think that indirectly just cutting the pipe that is connected to the appliance passes muster.

And that's the fundamental question here, can you do indirectly what you're forbidden from doing directly?  So those other cities that -- that Your Honor mentioned, unless they're prohibiting the use of gas appliances directly or indirectly, then no, they wouldn't be affected.

THE COURT:  Which administrative department implements this statute?

MR. REICHMAN:  I believe it's the Department of Energy, but I can't say it's every single provision, but as I understand generally, it's Department of Energy.

THE COURT:  Anything else?

MR. REICHMAN:  The -- our fundamental argument putting together these definitions is that the -- in terms of pleading a plausible claim is that -- the question is whether the ordinance has a connection with the quantity of gasoline or natural gas directly consumed by a covered product.

We think that we've pled that it does, and if it does, then it's preempted.

And our basic point is you can't do indirectly what the statute preempts you from doing directly.  Instead of --

**THE COURT:**  -- government has never really been very shy about managing and regulating when they want to.  Here, it doesn't seem as if they want to regulate gas lines.  They're talking about labeling.  They're talking about energy efficiency.

When we all go to the store and buy our washer and dryer and they've got those big yellow labels on them that talk about energy efficiencies.  That's -- that's what the Department of Energy is doing.

But where in here does it suggest that they are trying to manage gas lines -- you know, it's -- it's not the pipeline across states where those, we know, they try to manage.  Those, we know, they're trying to implement.

Where does it in any way suggested the gas intra-structure in a building is being regulated such that preemption should exist?  Because the point of preemption is that we get to, the federal government, tell you how to do something.

So where in here does it say that the federal government has taken such a stand on micromanaging states and communities that you, a state, and you, a community, cannot manage your own issues with respect to gas lines and buildings?  Where is big brother here?

**MR. REICHMAN:**  Okay.  Well, I think the way that I

read the statutory scheme to work is that -- and the cases will say -- is that there's a broad preemptive intent in Section C, the part that we read.  But then it's subject to an exception.  And the -- you have to meet the requirements -- think it's a seven-part requirement for the statutory conditions for an exception.  And many of those are around the construction of the building or the way that the appliance is used.

Now we have -- there's no allegation here at least fleshed out for the pleadings where the city is arguing about those exemptions, but I'm giving you the statutory structure.

THE COURT:  I'm looking at Subsection F that talks about those building code requirements.

MR. REICHMAN:  Yeah.

THE COURT:  And it's your burden not the city's with respect to the application here, so --

MR. REICHMAN:  Yes.

THE COURT:  -- where in your complaint do you address Subsection F?

MR. REICHMAN:  Well, we can over --

THE COURT:  -- and all the requirements?

MR. REICHMAN:  I'm not sure that Subsection F needs to be applied here, because there is no -- we can -- we can allege it, but it would just be alleging the negative.  The allegation is -- and it might actually be in the complaint.

I -- I didn't anticipate this question, but we can certainly plead that none of F3 have been satisfied.  So it's the negative.

But my point was about the statutory structure in answering Your Honor's question where you said where is it in the statute where they are micromanaging, you know, the energy consumption or the different parts of the building, the building designs, you know, which these pipes are parts, it's in this exception.

So the way I read the statute is that you've got this broad preemption that sits on top in the Section C you read, unless you fit within the exceptions, and those exceptions get into the satisfying these different building construction standards, et cetera.

Those exceptions are not applicable here.  And what those exceptions get to often is you can't favor one type of energy source over another.

And what -- if we were to get to that, we would be litigating that question.  But for these purposes, the purposes of pleading, we would say, there's no dispute that F3 has not been satisfied here.  And so we're under the broad preemption argument under Subsection C, which is whether this is in connection with the -- the use of gas by a covered appliance, which we believe it is.

THE COURT:  All right.  A response.

MR. JENSEN:  So, Your Honor, so I believe plaintiff's counsel has add -- added or attempted to add some language into -- the statute that's not there.

EPCA does not talk about regulating energy sources.  It does not talk about regulating the use and gas -- of gas in connection with a covered product.  Instead, what -- what EPCA regulates requires two things.  First, it requires it to be covered product, which, as you pointed out, is a -- a -- is -- is a house -- really, a household appliance, right?  That's the -- that's the gist of the statutory definition.  And that --

THE COURT:  So can either of you point me to the definition of "covered appliance" and the distinction between commercial versus house in the statutory language itself or in some regulation that would have binding effect?

MR. JENSEN:  Your Honor, consumer products is designed -- defined in 42 U.S.C. section 6292(A).  And -- and there is no distinction between consumer products and -- and -- and other products.  But consumer products are what's covered by -- by the statute.

So may I continue, Your Honor?  Or are you reviewing the --

THE COURT:  You may.

MR. JENSEN:  Okay.

In addition to being a covered product, that -- that the

scope of preemption is -- is -- is explicitly limited to -- to preempting state or local -- ordinances or statutes that regulate energy efficiency or energy use.  And -- and so both of those requirements have to be satisfied.  And -- and here, neither of them are.  The -- the natural gas infrastructure ordin- -- ordinance regulates, as you point out, natural gas connections to newly constructed buildings.

It doesn't regulate covered products.  It doesn't regulate energy use.  The language that plaintiff's counsel is -- is proposing regarding regulating energy sources or regulating use of gas in connection with a product is not the language that Congress has used in -- in this ordinance.

With respect to the -- the various exemptions from preemption, which I agree that you do not need to reach to decide this case, one of those exemptions is made for -- for state and local building code.

And here, as -- as is -- as is discussed in the city's briefs, this ordinance was submitted to the California building standards commission in -- in compliance with the California --

THE COURT:  I'm not --

MR. JENSEN:  -- building --

THE COURT:  -- concerned right now with anything that California is doing.

MR. JENSEN:  Okay.

**THE COURT:**  Until I resolve the federal issues, California's entirely separate and distinct.

**MR. JENSEN:**  Yeah, I was just making that point to point out that that is one of the exemptions that was -- that was raised in your discussion with -- with plaintiff's counsel, but I understand the distinction you're making.

And -- and regarding the scope of preemption, it's -- it's -- it's incorrect to describe EPCA as broad -- as broadly preempting the field.  In fact, this is an area where there is joint control over -- over -- energy efficiency between state and federal -- federal governments.  And the *Crazy Eddie v. Cotter* case, which is cited in the city's brief, is a Southern District of New York case, so -- a persuasive authority, but that discusses the -- that the nature of EPCA preemption and -- and that's very different than, for example, ERISA where there's complete field preemption, so -- so, you know, cases citing ERISA are not apposite here.

With -- with respect to the issues of local control you -- you were discussing, I think that that's -- that's very much on point.  Taking plaintiff's argument at face value, it would suggest that -- that local governments would be unable to refuse to grant natural gas franchises -- requests.  And -- and that we would be ceding local control over that.

And there are also many examples of state and local regulations that do regulate covered products.  For example,

one -- one example that's -- that's cited in the city's paper are -- are various regulations of -- of nitrogen dioxide emissions from water heaters.  Well, water heaters are covered products.  They're subject to EPCA, but -- but local air quality management districts in California have -- routinely regulate the NOx emissions from those products, and that's the same type of health and safety regulation that's at issue in the -- the city's ordinance, so --

So the argument that plaintiff is making is just inconsistent with the plain meaning of EPCA and just inconsistent with the way that it's been applied in a variety of contexts.

**THE COURT:**  All right.  Anything else?

**MR. JENSEN:**  Not from me, Your Honor.

**THE COURT:**  Mr. Reichman?

**MR. REICHMAN:**  In Judge -- I looked it up, Your Honor, Judge Vasquez.

**THE COURT:**  Vasquez.

**MR. REICHMAN:**  Excuse me?

**THE COURT:**  Vasquez.

**MR. REICHMAN:**  Vasquez in the *Albuquerque* -- is the judge in the *Albuquerque* case.  And she points out that it is the use of the word "concerning" and she cites cases about how that indicates broad preemption.  And what "concerning" means when you look through the definitions in all of the analysises

[phonetic] in that case, it means "related to" or "has a connection with."

And so the ultimate question in our point of view is whether the ordinance has a connection with the quantity of gas directly consumed by covered products.

And these -- the point about the broad preemption followed by the exceptions is not that the federal government gets involved in all of those things necessarily because typically in the delicate balance between the federal government and the state government around setting energy policy and energy requirements, the states do comply with the exceptions in F3.

And if Your Honor -- the court goes through them, many of them are looking -- are very much targeting building standards and have -- giving the builder choice about whether -- or what source of energy or type of energy to use.

And that's the balance between the federal and state, which I agree with counsel, absolutely exists as part of what we're getting at here, is that histor- -- this is a first case. It's a case of first impression, and it was extended as such by the city, and they have every right to do.

But it -- this is a way of trying to do indirectly. You can't bend the compliance, so the question is can you cut the pipe. And that's never been held in this country that you can do that. And we think it violates the broad preemptive preemption in EPCA, unless these exceptions are followed,

which there's no argument that they are here.  And if we need to plead that, we do.

It's not that the states aren't involved in this all the time.  They absolutely are.  And we think that the implications of this -- counsel mentioned it so I want to talk about the other implications why I think it warrants a fuller consideration than a plausibility standard on a motion to dismiss is that if you're -- EPCA covers a wild [sic] range of things, so it's really surprising to me when I look at it from nuclear power plants to electricity and gas.

And if the rule is that local governments are permitted to do indirectly what is preempted by the federal statute, that -- I'm not sure what the limiting principle is.  If they're not allowed to regulate, for example, where a nuclear power plant goes, if they can just forbid cars from traveling there and that wasn't part of the preemption, it is changing balance of how energy policy in the United States is regulated.

Right now, it's regulated between the federal government and the state government.  And we're not challenging the state government's regulations of it at this point.  We're saying that this is new for a city to come in and say that they're permitted to do indirectly what is forbidden directly.

And that's why I do cite the *Albuquerque* case, because it's right on point.  And, again, I just want to bring it

back, I guess in conclusion, that I think this is a plausibility standard.  And before we give cities across the country permission to do indirectly what is prohibited from being done directly through EPCA, I think it requires fuller consideration than the plausibility standard, Your Honor.

**THE COURT:**  Any response?

**MR. JENSEN:**  Yes, Your Honor.

So the -- this is not about doing the -- what's -- what they think that preempts EPCA, either directly or indirectly.  Again, the question is -- is what the -- the statute says.

And the statute doesn't regu- -- regulate the quantity of gas consumed by covered products.  The statute regulates energy efficiency of covered products.  And there's nothing in the city's ordinance that disturbs energy efficiency requirements under -- under EPCA.

All appliances installed in the city of Berkeley will continue to have to comply with EPCA requirements.  Nothing about this ordinance is going -- is going to change that.  And -- and this is a -- a -- and -- it clearly, you know, no -- no court has ever held that you can't do that because no court has ever addressed this issue.

And so I believe you can be guided by the plain language of the statute here.  I believe that is a sufficient basis to rule on a 12(b)(6) motion.  And I would suggest that further factual development is -- is not going to change the plain

language of the statute.

MR. REICHMAN:  Your Honor, may I address one very discrete point briefly in -- directly in response?

THE COURT:  You may.

MR. REICHMAN:  Counsel says that this is about energy efficiency and not energy use.  That's just incorrect.  The statute says energy use, and he says it's not about the quantity of energy directly consumed by a consumer product, but the definition in Section 6293 of, quote, energy use is, quote, the quantity of energy directly consumed by a consumer product.

It is absolutely what is being preempted here.

THE COURT:  So let me say this: Interesting argument with -- on these last issues regarding statutory interpretation.

I actually don't think that the briefing in this matter, especially if it's a -- if it's a case of first impression, has done a very good job at focusing on these particular issues.  And it could be because the city was so focused on standing and -- and ripeness, among other things, with respect to the state causes of action.

I can tell you that if I don't have jurisdiction over a federal claim, I'm not taking supplemental jurisdiction on the state claims.  I -- I believe in principles of federalism, and the state courts can decide state court issues.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

**ER-132**

Now, if I have a federal issue, that -- that would be different.  If I have a federal cause of action.  So it seems to me that we would be better served to, one, have the complaint amended to do a better job of explicitly alleging standing and -- and ripeness; and, two, to do a better job in terms of its argument with respect to the federal preemption because you don't lay out how you get from here to there in -- in terms of your statutory -- your statutory conclusions.  And we can do that in -- in briefing.  You could do that in -- in a complaint.

I haven't gone back to look at the legislative history to determine whether or not I think it's dealt with.

You haven't addressed issues of -- of joint control and whether there should be total preemption versus -- versus not.  All of those issues have actually not been briefed, at least not -- not adequately in -- in my mind.

And if I've got to decide this in terms of a -- issue of first impression, I think you owe it to the process to get these things briefed appropriately on the first round because you may be going to some circuit court if one or both of you don't like my decision, which is entirely appropriate 'cause then you get three judges to weigh in.

But I don't think that we're there.  And I -- and I can go and I can figure it out on -- on my own without further help from you other than the -- the oral argument, but I think that

it merits a more full explanation from both of you on these critical provisions, including Subsection F, which does, in fact, deal with the building code exceptions and how that fits into the statutory scheme.

You know, this argument of state control versus local control, that's -- in my mind, that's a bit new, but maybe it's because I did not get as much into the state versus local when I did the analysis.

I will say that both an injunction and a declaratory relief allegation, those are remedies. They are not causes of action independently. They are a remedy for something else. I think you can have them in there, but I don't -- and I usually don't, you know, there -- there were motions brought to eliminate those. But they're remedies, so they usually stay in the complaint. But they're not really causes of action so you can't have an injunction without an underlying cause of action. You can't have declaratory relief without an underlying cause of action. So you may want to just change the phraseology of that going forward.

I'm going to grant the motion with leave to amend so that you can go back and do some of this based upon the arguments today. And I -- and I'm expecting a renewed motion to dismiss.

But you should spend less time, Mr. Jensen, on ripeness and standing. You can put it in a footnote and

cross-reference -- if you want to preserve the argument, put it in a footnote and say you're preserving it.  But I'm not -- I think that this kind of facial attack is -- well, I guess we didn't go through and they didn't really deal with all of various possibilities so I guess you could -- you could make that argument again.

I would just like you to get to the meat of the issues that I think I'm going to ultimately decide and not waste pages or too many pages on that topic.

I don't think that the law says that people and businesses have to spend thousands and thousands and thousands of dollars to attack on a facial basis a statute which they believe is as a matter of law preempted.  That's why we do these things.

So that said, you know, a court of appeal might disagree with me so you want to make sure that you preserved that argument if it's -- if you have some need to make it again in the future.

But rather than you wait for me to issue a written order, I think it's better to just rule on this here.

Mr. Reichman, you can redo your complaint and -- and just to move us through the process, you might -- you might put more of your legal analysis in there and deal with Subsection F, deal with 6292(A), which has the references to what a covered product or an appliance is, I believe when I went back and -- and looked at it.

MR. REICHMAN:  Yes, I know what you're referring to, Your Honor.

THE COURT:  And -- and I think we have to deal with this issue of joint control and whether there should be complete, you know, preemption or not.

Those are very sticky areas of the law, and we really haven't gotten, I think, briefing on those topics yet.

So how much time do you want to pull together a new complaint?

MR. REICHMAN:  Is 30 days acceptable, Your Honor?

THE COURT:  Thirty days is fine.

All right.  So that would be, looking at my calendar, you'll file on August 14th.

And then, Mr. Jensen, when do you want to respond?

MR. JENSEN:  Can I also --

MR. REICHMAN:  Your Honor, are we talking about, then, a new motion?  Is that what we're talking about?

THE COURT:  Yes, I'm expecting a new motion.

MR. REICHMAN:  Yes.

MR. JENSEN:  May I -- may I ask for 30 days from August 14th, Your Honor.

THE COURT:  That would be a Sunday, but I'll give you 31 days, so --

MR. JENSEN:  Thank you.

THE COURT:  -- September 14th.

**MR. JENSEN:**  Thank you, Your Honor.

**THE COURT:**  A response, Mr. Reichman?

**MR. REICHMAN:**  Can we just follow the local rules on those, Your Honor?  Or do you --

**THE COURT:**  That's fine.  35 days if you can -- that's fine.

**MR. REICHMAN:**  Okay.

**THE COURT:**  So just set it on a 35-day schedule, Mr. Jensen.

Now that I've -- and I apologize for the delay in -- in getting back to you.  This hit my calendar, I think, right as COVID hit.  I think originally, I was supposed to have oral argument on -- was it April?  I think I got a brief from you --

**MR. REICHMAN:**  March or April, yeah.

**THE COURT:**   -- in April.

I have kept my calendar on March 12th because that was the last day I was in the courtroom.  Last Thursday was the first day I was back, but we are all -- I get to only be in the courtroom one day a week, complete with masks and barriers.  And we only do it for criminal sentencings and pleas.  And I am limited to the number of even those proceedings I can have.  So --

**MR. REICHMAN:**  I can ask --

(Simultaneous colloquy.)

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

**ER-137**

THE COURT:  -- on this platform for a while.  But I can tell you, I was -- I was in a key group of task force judges who were trying to get everything working and -- back in our court.  And I just -- all my civil cases were obviously put to the side.

So I don't like it to be this long before I -- I respond, but we're in extraordinary times, so --

MR. JENSEN:  That's certainly true, Your Honor.

MR. REICHMAN:  And we appreciate you doing this by Zoom.  It seems to work fairly well, so thank you.

THE COURT:  Yeah, I think so.  As long as we've got everybody's mics working and we can see you and you can see me -- my hand saying stop, then I'm fine.

I don't like the telephone because you don't get the -- you don't get the visual cues that I want you to stop talking, so -- and I can mute you, which I can't do on the telephone.

All right.  Anything else?

If not, I will likely see you, I guess, in the early fall.

MR. REICHMAN:  Okay.  And I understand there's a transcript available so we can be particular about your rulings?

THE COURT:  We will -- we'll do a very -- well, yes. But it's -- it's in a sense, it's going to start from the beginning here.  If I can do something quick, I will.

MR. REICHMAN:  Okay.

THE COURT:  The courtroom deputy, if you'll send her an email, she can get you in touch with the courtroom -- the reporter who's been transcribing all of this.

MR. REICHMAN:  Your Honor, and I guess I have one more point of clarification, really just for efficiency sake 'cause I don't want to lose the thread.  We don't intend to name the name of the member in our amended complaint.  We'll make the allegations about the member.  We don't mind providing it, but we would do it separately under seal.  And I just want to make sure that wasn't an expectation of the court.

THE COURT:  So the pleadings do not require that you identify the person in the pleading itself.  The city is entitled to have that information --

MR. REICHMAN:  Right.

THE COURT:  -- for purposes of standing in these kinds of cases and -- because they're also entitled, if this -- if this ever went anywhere -- I mean, I've had cases where organizations have brought suits and, actually, they didn't have a member who -- who was promoting the allegations that were in the complaint, and, ultimately, the case gets thrown out.

MR. REICHMAN:  Right.

THE COURT:  But you do, in fact, have to have a member.  And you do have to actually allege it.  And the

city's entitled to have that information, but it doesn't have to be in the pleading itself.

MR. REICHMAN:  Okay.  Thank you.  That was my understanding.  And I appreciate the guidance, so thank you, Your Honor.

THE COURT:  Mr. Jensen, anything from your side?

MR. JENSEN:  Nothing further, Your Honor.  Thank you.

THE COURT:  Okay.  All right.  Well, everybody stay safe, and we're adjourned.  Thank you.

(Proceedings were concluded at 3:20 P.M.)

--o0o--

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken, and further that I am not financially nor otherwise interested in the outcome of the action.

_____

Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

Wednesday, July 22, 2020

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

**ER-140**

Farimah F. Brown, City Attorney, SBN 201227
Christopher D. Jensen, Deputy City Attorney, SBN 235108
BERKELEY CITY ATTORNEY'S OFFICE
2180 Milvia Street, Fourth Floor
Berkeley, CA 94704
Telephone:  (510) 981-6998
Facsimile:  (510) 981-6960
cjensen@cityofberkeley.info

Attorneys for Defendant CITY OF BERKELEY

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| CALIFORNIA RESTAURANT ASSOCIATION,<br><br>        Plaintiff,<br><br>    v.<br><br>CITY OF BERKELEY,<br><br>        Defendant. | No.  4:19-CV-07668-YGR<br><br>**NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(1) AND 12(B)(6); MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>Judge:     Hon. Yvonne Gonzalez Rogers<br>Date:      March 10, 2020<br>Time:      2:00 p.m.<br>Location:  Courtroom 1, Fourth Floor |

NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(1) AND 12(B)(6); MEMORANDUM OF POINTS AND AUTHORITIES, Case No. 4:19-CV-07668-YGR

any State or local regulations concerning energy efficiency or energy use of a product for which a standard is prescribed or established." *Id.* §§ 6313, 6316(b)(2)(A). Each of these provisions turns on whether a state or local regulation regulates the "energy efficiency" or "energy use" of a covered product, which are defined, respectively, as "the ratio of the useful output of services from a consumer product to the energy use of such product," and "the quantity of energy directly consumed by a consumer product at point of use." *Id.* § 6291(4)-(5).

The Natural Gas Infrastructure Ordinance simply does not regulate "energy efficiency" or "energy use" of covered products. Instead, the Ordinance limits the installation of Natural Gas Infrastructure in Newly Constructed buildings by establishing a general prohibition on new natural gas connections, subject to exceptions where all-electric construction is not feasible or where allowing the construction of new Natural Gas Infrastructure is in the public interest. RJN, Exh. 1 §§ 12.80.040.A.1, 12.80.050.A. The Ordinance does not in any way regulate the efficiency of consumer products or the amount of energy consumed by the products and is therefore not preempted by the EPA.

The Complaint does not explain the discrepancy between the plain meaning of the Ordinance and the allegation that the Ordinance regulates energy efficiency or energy use. The Complaint's apparent suggestion that any local ordinance that may indirectly affect energy efficiency or energy use is preempted by the EPCA is without precedential support, and would upend vast areas of law that are universally understood to be the proper subject of local regulation. For example, it is well-understood that dense, multifamily construction is more energy efficient that single-family homes, but it would be absurd to suggest that local zoning ordinances that establish single-family residential zoning are preempted by the EPCA. Even more to the point, Plaintiff's argument would imply that a local or state decision to allow or disallow a natural gas franchise would be subject to EPCA preemption. Finally, to take another example, there are well-established local regulations restricting the emissions of nitrogen oxide (NO$_x$) and carbon monoxide from hot water heaters—a "covered product" under the EPCA.[7]

---

[7] EPCA energy efficiency standards for water heaters can be found at 10 C.F.R. Part 430, Appendix E.

18

NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(1) AND 12(B)(6); MEMORANDUM OF POINTS AND AUTHORITIES, Case No. 4:19-CV-07668-YGR

ER-142

*See, e.g.*, RJN, Exh. 8 (Sacramento Metropolitan AQMD Rule 414). These air quality regulations limit the ability of builders and homeowners to install certain models of EPCA-compliant water heaters because the appliances do not meet air emissions standards, but no one would suggest that these types of routine, local health and safety regulations are preempted by the EPCA.

These examples show just how far-fetched Plaintiff's preemption argument is. In each of these examples, as in this case, state or local jurisdictions are able to make decisions regarding land use or infrastructure deployment without displacing federal energy efficiency standards. The federal standards apply, and are applied to the types of consumer products that may be installed in a local jurisdiction, given constraints imposed by local land use and infrastructure restrictions. The City's Natural Gas Infrastructure Ordinance is not distinguishable in any meaningful way from these long-recognized spheres of local and state control.

Nor is there any concern that the Ordinance would directly or indirectly require the installation of consumer products that exceed federal energy efficiency standards. As noted above, the Ordinance expressly exempts from the prohibition on new Natural Gas Infrastructure where all-electric construction cannot demonstrate compliance with California Energy Code efficiency standards. RJN, Exh. 1 § 12.80.040.A.1. Consistent with this exemption, the Ordinance also expressly provides it "shall in no way be construed as amending California Energy Code requirements under California Code of Regulations, Title 24, Part 6, nor as requiring the use or installation of any specific appliance or system as a condition of approval." *Id.* § 12.80.020.C. Thus, the Ordinance allows for a mixed-fuel compliance pathway in any instance where compliance with state energy efficiency standards is not feasible for all-electric construction.

This provision, which ensures compliance with the state Energy Code, also ensures compliance with federal law. State building codes concerning energy efficiency or energy use, including the California Energy Code, are expressly excluded from the scope of EPCA preemption so long as, among other conditions, the codes do not "require that [a] covered product have an energy efficiency exceeding the applicable [federal] energy conservation

19

NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(1) AND 12(B)(6); MEMORANDUM OF POINTS AND AUTHORITIES, Case No. 4:19-CV-07668-YGR

ER 143

standard" without a waiver. 42 U.S.C. § 6297(f)(3)(B). Plaintiff does not, and cannot reasonably allege, that the California Energy Code is inconsistent with the EPCA, and in fact, the Energy Commission assumes that appliances meet but *do not exceed* minimum federal standards in modeling the energy efficiency of Newly Constructed Buildings for purpose of developing the Energy Code. *See, e.g.*, RJN, Exh. 9 (Energy Commission 2019 Residential Compliance Manual) at 5-9 to 5-12 (noting, for example, that Energy Commission regulations for water heaters "align with federal efficiency standards").

The City's Ordinance incorporates the same standard, as it requires compliance with the California Energy Code and exempts Newly Constructed Buildings from restrictions on Natural Gas Infrastructure where Energy Code compliance is not feasible for all-electric construction. RJN, Exh. 1 § 12.80.040.A.1. This exemption forecloses any possible argument that the Natural Gas Infrastructure Ordinance interferes with federal energy efficiency standards. For this reason and the reasons stated above, the Court should dismiss Plaintiff's first claim for relief seeking a declaration of Plaintiff's hypothetical future right to assert a defense under the EPCA.

**2.      The Ordinance Is a Lawful Exercise of the City's Police Power.**

The City's Natural Gas Infrastructure Ordinance is within the scope of the City's police power because it is not a "building standard" and is therefore not preempted by state law. *See* Complaint ¶ 64. Article XI, § 7 of the California Constitution provides that municipalities may enact ordinances "not in conflict with general laws" of the state. Cal. Constit., Art. XI, § 7. In the absence of a conflict with the general state law, local jurisdictions retain "inherent police power" to control their own land use decisions. *Big Creek Lumber Co. v. Cty. of Santa Cruz*, 38 Cal. 4th 1139, 1151 (2006). "The police power extends to legislative objectives in furtherance of public peace, safety, morals, health and welfare." *Massingill v. Dep't of Food & Agric.*, 102 Cal. App. 4th 498, 504 (2002) (citing *Birkenfeld v. City of Berkeley* 17 Cal. 3d 129, 160 (1976).)

The City's enactment of legislation to address climate change and to reduce the eventual costs that will be incurred due to obsolete Natural Gas Infrastructure falls within the City's broad authority to enact legislation "in furtherance of public peace, safety, morals, health and welfare." *See id.* Plaintiff's argument to the contrary rests on the erroneous proposition that the Natural

20

ER 144

ORDINANCE NO. 7,672–N.S.

ADDING A NEW CHAPTER 12.80 TO THE BERKELEY MUNICIPAL CODE PROHIBITING NATURAL GAS INFRASTRUCTURE IN NEW BUILDINGS EFFECTIVE JANUARY 1, 2020

BE IT ORDAINED by the Council of the City of Berkeley as follows:

Section 1. That Chapter 12.80 of the Berkeley Municipal Code is added to read as follows:

## Chapter 12.80

## PROHIBITION OF NATURAL GAS INFRASTRUCTURE IN NEW BUILDINGS

**Sections:**
**12.80.010 Findings and Purpose.**
**12.80.020 Applicability.**
**12.80.030 Definitions.**
**12.80.040 Prohibited Natural Gas Infrastructure in Newly Constructed Buildings.**
**12.80.050 Public Interest Exemption.**
**12.80.060 Periodic Review of the Ordinance.**
**12.80.070 Severability.**
**12.80.080 Effective Date.**

### 12.80.010 Findings and Purpose.
In addition to the findings set forth in Resolution No. 67,736-N.S., the Council finds and expressly declares as follows:

A.  Scientific evidence has established that natural gas combustion, procurement and transportation produce significant greenhouse gas emissions that contribute to global warming and climate change.
B.  The following addition to the Berkeley Municipal Code is reasonably necessary because of local climatic, geologic and topographical conditions as listed below:
    (1) As a coastal city located on the San Francisco Bay, Berkeley is vulnerable to sea level rise, and human activities releasing greenhouse gases into the atmosphere cause increases in worldwide average temperature, which contribute to melting of glaciers and thermal expansion of ocean water—resulting in rising sea levels.
    (2) Berkeley is already experiencing the repercussions of excessive greenhouse gas emissions as rising sea levels threaten the City's shoreline and infrastructure, have caused significant erosion, have increased impacts to infrastructure during extreme tides, and have caused the City to expend funds to modify the sewer system.
    (3) Berkeley is situated along a wildland-urban interface and is extremely vulnerable to wildfires and firestorms, and human activities releasing greenhouse gases into the atmosphere cause increases in worldwide average temperature, drought conditions, vegetative fuel, and length of fire seasons.

(4) Structures in Berkeley are located along or near the Hayward fault, which is likely to produce a large earthquake in the Bay Area.

C. The following addition to the Berkeley Municipal Code is also reasonably necessary because of health and safety concerns as Berkeley residents suffer from asthma and other health conditions associated with poor indoor and outdoor air quality exacerbated by the combustion of natural gas.

D. The people of Berkeley, as codified through Measure G (Resolution No. 63,518-N.S.), the City of Berkeley Climate Action Plan (Resolution No. 64,480-N.S.), and Berkeley Climate Emergency Declaration (Resolution No. 68,486-N.S.) all recognize that rapid, far-reaching and unprecedented changes in all aspects of society are required to limit global warming and the resulting environmental threat posed by climate change, including the prompt phasing out of natural gas as a fuel for heating and cooling infrastructure in new buildings.

E. Substitute electric heating and cooling infrastructure in new buildings fueled by less greenhouse gas intensive electricity is linked to significantly lower greenhouse gas emissions and is cost competitive because of the cost savings associated with all-electric designs that avoid new gas infrastructure.

F. All-electric building design benefits the health, welfare, and resiliency of Berkeley and its residents.

G. The most cost-effective time to integrate electrical infrastructure is in the design phase of a building project because building systems and spaces can be designed to optimize the performance of electrical systems and the project can take full advantage of avoided costs and space requirements from the elimination of natural gas piping and venting for combustion air safety.

H. It is the intent of the council to eliminate obsolete natural gas infrastructure and associated greenhouse gas emissions in new buildings where all-electric infrastructure can be most practicably integrated, thereby reducing the environmental and health hazards produced by the consumption and transportation of natural gas.

## 12.80.020 Applicability.

A. The requirements of this Chapter shall apply to Use Permit or Zoning Certificate applications submitted on or after the effective date of this Chapter for all Newly Constructed Buildings proposed to be located in whole or in part within the City.

B. The requirements of this Chapter shall not apply to the use of portable propane appliances for outdoor cooking and heating.

C. This chapter shall in no way be construed as amending California Energy Code requirements under California Code of Regulations, Title 24, Part 6, nor as requiring the use or installation of any specific appliance or system as a condition of approval.

D. The requirements of this Chapter shall be incorporated into conditions of approval for Use Permits or Zoning Certificates under BMC Chapter 23.B.

## 12.80.030 Definitions.

A. "Applicant" shall mean an applicant for a Use Permit or Zoning Certification under Chapter 23B,

B. "Energy Code" shall mean the California Energy Code as amended and adopted in BMC Chapter 19.36.

C. "Greenhouse Gas Emissions" mean gases that trap heat in the atmosphere.
D. "Natural Gas" shall have the same meaning as "Fuel Gas" as defined in California Plumbing Code and Mechanical Code.
E. "Natural Gas Infrastructure" shall be defined as fuel gas piping, other than service pipe, in or in connection with a building, structure or within the property lines of premises, extending from the point of delivery at the gas meter as specified in the California Mechanical Code and Plumbing Code.
F. "Newly Constructed Building" shall be defined as a building that has never before been used or occupied for any purpose.
G. "Use Permit" shall have the same meaning as specified in Chapter 23B.32.
H. "Zoning Certificate" shall have the same meaning as specified in Chapter 23B.20.

## 12.80.040 Prohibited Natural Gas Infrastructure in Newly Constructed Buildings.

A. Natural Gas Infrastructure shall be prohibited in Newly Constructed Buildings.
   1. Exception: Natural Gas Infrastructure may be permitted in a Newly Constructed Building if the Applicant establishes that it is not physically feasible to construct the building without Natural Gas Infrastructure. For purposes of this exception, "physically feasible" to construct the building means either an all-electric prescriptive compliance approach is available for the building under the Energy Code or the building is able to achieve the performance compliance standards under the Energy Code using commercially available technology and an approved calculation method.
B. To the extent that Natural Gas Infrastructure is permitted, it shall be permitted to extend to any system, device, or appliance within a building for which an equivalent all-electric system or design is not available.
C. Newly Constructed Buildings shall nonetheless be required at a minimum to have sufficient electric capacity, wiring and conduit to facilitate future full building electrification.
D. The requirements of this section shall be deemed objective planning standards under Government Code section 65913.4 and objective development standards under Government Code section 65589.5.

## 12.80.050 Public Interest Exemption.

A. Notwithstanding the requirements of this Chapter and the Greenhouse Gas Emissions and other public health and safety hazards associated with Natural Gas Infrastructure, minimally necessary and specifically tailored Natural Gas Infrastructure may be allowed in a Newly Constructed Building provided that the entitling body establishes that the use serves the public interest. In determining whether the construction of Natural Gas Infrastructure is in the public interest, the City may consider:
   1. The availability of alternative technologies or systems that do not use natural gas;
   2. Any other impacts that the decision to allow Natural Gas Infrastructure may have on the health, safety, or welfare of the public.
B. If the installation of Natural Gas Infrastructure is granted under a public interest exemption, the Newly Constructed Buildings shall nonetheless be required at the

minimum to have sufficient electric capacity, wiring and conduit to facilitate future full building electrification.

### 12.80.060 Periodic Review of Ordinance.
The City shall review the requirements of this ordinance every 18 months for consistency with the California Energy Code and the Energy Commission's mid-cycle amendments and triennial code adoption cycle as applicable.

### 12.80.070 Severability.
If any word, phrase, sentence, part, section, subsection, or other portion of this Chapter, or any application thereof to any person or circumstance is declared void, unconstitutional, or invalid for any reason, then such word, phrase, sentence, part, section, subsection, or other portion, or the prescribed application thereof, shall be severable, and the remaining provisions of this Chapter, and all applications thereof, not having been declared void, unconstitutional or invalid, shall remain in full force and effect. The City Council hereby declares that it would have passed this title, and each section, subsection, sentence, clause and phrase of this Chapter, irrespective of the fact that any one or more sections, subsections, sentences, clauses or phrases is declared invalid or unconstitutional.

### 12.80.080 Effective Date.
The provisions of this chapter shall become effective on January 1, 2020.

Section 2. This Ordinance shall be submitted to the California Building Standards Commission following adoption as consistent with state law.

Section 3. Copies of this Ordinance shall be posted for two days prior to adoption in the display case located near the walkway in front of the Maudelle Shirek Building, 2134 Martin Luther King Jr. Way. Within 15 days of adoption, copies of this Ordinance shall be filed at each branch of the Berkeley Public Library and the title shall be published in a newspaper of general circulation.

At a regular meeting of the Council of the City of Berkeley held on July 16, 2019, this Ordinance was passed to print and ordered published by posting by the following vote:

Ayes:       Bartlett, Davila, Droste, Hahn, Harrison, Kesarwani, Robinson, Wengraf, and Arreguin.

Noes:       None.

Absent:     None.

At a regular meeting of the Council of the City of Berkeley held on July 23, 2019, this Ordinance was adopted by the following vote:

Ayes:  Bartlett, Davila, Droste, Hahn, Harrison, Kesarwani, Robinson, Wengraf, and Arreguin.

Noes:  None.

Absent: None.

Jesse Arreguin, Mayor

ATTEST: _Mark Numainville_
Mark Numainville, City Clerk

Date signed: _August 6, 2019_

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT
### Form 1. Notice of Appeal from a Judgment or Order of a
### United States District Court

Name of U.S. District Court: | California Northern District Court

U.S. District Court case number: | 4:19-cv-7668-YGR

Date case was first filed in U.S. District Court: | 11/21/2019

Date of judgment or order you are appealing: | 07/06/2021

Fee paid for appeal? *(appeal fees are paid at the U.S. District Court)*

⊙ Yes   ○ No   ○ IFP was granted by U.S. District Court

**List all Appellants** *(List **each** party filing the appeal. Do not use "et al." or other abbreviations.)*

California Restaurant Association

Is this a cross-appeal?   ○ Yes   ⊙ No

If Yes, what is the first appeal case number?

Was there a previous appeal in this case?   ○ Yes   ⊙ No

If Yes, what is the prior appeal case number?

Your mailing address:

Reichman Jorgensen Lehman & Feldberg, LLP

100 Marine Parkway, Suite 300

City: Redwood Shores   State: CA   Zip Code: 94065

Prisoner Inmate or A Number (if applicable):

**Signature** | /s/ Courtland L. Reichman   **Date** | Aug 4, 2021

*Complete and file with the attached representation statement in the U.S. District Court*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 1**   **ER-150**   *Rev. 12/01/2018*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 6. Representation Statement

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form06instructions.pdf*

**Appellant(s)** *(List **each** party filing the appeal, do not use "et al." or other abbreviations.)*
Name(s) of party/parties:

California Restaurant Association

Name(s) of counsel (if any):

Courtland L. Reichman
Laura E. Carwile (admission pending)

Address: 100 Marine Parkway, Suite 300, Redwood Shores, CA 94065

Telephone number(s): 650-623-1401

Email(s): creichman@reichmanjorgensen.com, lcarwile@reichmanjorgensen.com

Is counsel registered for Electronic Filing in the 9th Circuit?  ⦿ Yes  ○ No

**Appellee(s)** *(List only the names of parties and counsel who will oppose you on appeal. List separately represented parties separately.)*
Name(s) of party/parties:

City of Berkeley

Name(s) of counsel (if any):

Brendan O. Darrow
Farimah Faiz Brown

Address: 2180 Milvia Street, 4th Floor, Berkeley, CA 94704

Telephone number(s): 510-981-6998

Email(s): bdarrow@cityofberkeley.info, fbrown@cityofberkeley.info

*To list additional parties and/or counsel, use next page.*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 6**              ER-151              *New 12/01/2018*

Continued list of parties and counsel: *(attach additional pages as necessary)*

**Appellants**

Name(s) of party/parties:

California Restaurant Association

Name(s) of counsel (if any):

Sarah Jorgensen (admission pending)

Address: 1201 West Peachtree Street, Suite 2300, Atlanta, GA 30309

Telephone number(s): 404-609-1040

Email(s): sjorgensen@reichmanjorgensen.com

Is counsel registered for Electronic Filing in the 9th Circuit?   ○ Yes   ⊙ No

**Appellees**

Name(s) of party/parties:

City of Berkeley

Name(s) of counsel (if any):

Brendan O. Darrow
Farimah Faiz Brown

Address: 2180 Milvia Street, 4th Floor, Berkeley, CA 94704

Telephone number(s): 510-981-6998

Email(s): bdarrow@cityofberkeley.info, fbrown@cityofberkeley.info

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 6**                                **ER-152**                    *New 12/01/2018*

ADRMOP,APPEAL,CLOSED

# U.S. District Court
## California Northern District (Oakland)
## CIVIL DOCKET FOR CASE #: 4:19-cv-07668-YGR

California Restaurant Association v. City of Berkeley
Assigned to: Judge Yvonne Gonzalez Rogers
Case in other court:  Ninth Circuit Court of Appeals, 21-16278
Cause: 28:1331 Fed. Question

Date Filed: 11/21/2019
Date Terminated: 07/06/2021
Jury Demand: None
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: Federal Question

### Plaintiff

**California Restaurant Association**
*a California nonprofit mutual benefit
corporation*

represented by **Courtland Lewis Reichman**
Reichman Jorgensen Lehman & Feldberg
LLP
100 Marine Parkway, Suite 300
Redwood Shores, CA 94065
650-623-1401
Fax: 650-623-1449
Email: creichman@reichmanjorgensen.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Chiseul Kim**
Kellogg, Hansen, Todd, Figel and Frederick,
P.L.L.C.
1615 M Street, NW
Suite 400
Washington, DC 20036
202-326-7924
Fax: 202-326-7999
Email: kkim@kellogghansen.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Gary J. Toman**
Weinberg Wheeler Hudgins Gunn & Dial
LLP
3340 Peachtree Road NE, Suite 2400
Atlanta, GA 30326
404-876-2700
Fax: 404-875-9433
Email: gtoman@wwhgd.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Laura Elizabeth Carwile**
Reichman Jorgensen Lehman & Feldberg
LLP
100 Marine Parkway, Suite 300
Redwood City, CA 94065

**ER-153**

650-623-1401
Fax: 650-623-1449
Email: lcarwile@reichmanjorgensen.com
*ATTORNEY TO BE NOTICED*

**Sarah O Jorgensen**
Reichman Jorgensen Lehman & Feldberg
LLP
1201 West Peachtree Street, Suite 2300
Atlanta, GA 30309
(404) 609-1040
Email: sjorgensen@reichmanjorgensen.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**City of Berkeley**                    represented by **Brendan Darrow**
City of Berkeley
2180 Milvia Street
Berkeley, CA 94704
(510) 859-6271
Email: bdarrow@cityofberkeley.info
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher D. Jensen**
Berkeley City Attorney's Office
2180 Milvia Street, 4th Floor
Berkeley, CA 94704
510-981-6997
Fax: 510-981-6960
Email: cjensen@cityofberkeley.info
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Anthony Lee Francois**
Briscoe Ivester & Bazel LLP
235 Montgomery Street, Suite 935
San Francisco, CA 94104
415-402-2700
Fax: 415-398-5630
Email: tfrancois@briscoelaw.net
*ATTORNEY TO BE NOTICED*

**Farimah Faiz Brown**
Office of the City Attorney
2180 Milvia Street
4th Floor
Berkeley, CA 94704
510 981 6998
Fax: 510 981 6960
Email: fbrown@cityofberkeley.info

**ER-154**

*ATTORNEY TO BE NOTICED*

**Peter Stanley Prows**
Briscoe Ivester Bazel LLP
235 Montgomery Street
Suite 935
San Francisco, CA 94104
415-402-2708
Email: pprows@briscoelaw.net
*ATTORNEY TO BE NOTICED*

**Amicus**

| National Association of Home Builders | represented by | **Francesca Marie Eick** |
|---|---|---|

98 San Jacinto Blvd.
Suite 1500
Austin, TX 78701
United Sta
(512) 322-2672
Email: francesca.eick@bakerbotts.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Macey Reasoner Stokes**
Baker Botts L.L.P.
910 Louisiana Street
Houston, TX 77002
713-229-1369
Email: macey.stokes@bakerbotts.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lily Niu Chinn**
Baker Botts
101 California Street
Suite 3600
San Francisco, CA 94111
415-291-6200
Fax: 415-291-6300
Email: lily.chinn@bakerbotts.com
*ATTORNEY TO BE NOTICED*

**Megan H. Berge**
Baker Botts L.L.P.
1299 Pennsylvania Avenue, NW
Washington, DC 20004
202-639-1308
Email: megan.berge@bakerbotts.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shamus Sean Flynn**
Baker Botts LLP

**ER-155**

101 California Street, Suite 3600
San Francisco, CA 94111
(415) 291-6200
*TERMINATED: 11/06/2020*
*ATTORNEY TO BE NOTICED*

**Amicus**

| | | |
|---|---|---|
| **National Association of Manufacturers** | represented by | **Francesca Marie Eick** (See above for address) *LEAD ATTORNEY PRO HAC VICE ATTORNEY TO BE NOTICED* |
| | | **Macey Reasoner Stokes** (See above for address) *LEAD ATTORNEY PRO HAC VICE ATTORNEY TO BE NOTICED* |
| | | **Lily Niu Chinn** (See above for address) *ATTORNEY TO BE NOTICED* |
| | | **Megan H. Berge** (See above for address) *PRO HAC VICE ATTORNEY TO BE NOTICED* |
| | | **Shamus Sean Flynn** (See above for address) *ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **Air Conditioning, Heating and Refrigeration Institute** | represented by | **Lily Niu Chinn** (See above for address) *ATTORNEY TO BE NOTICED* |
| | | **Megan H. Berge** (See above for address) *ATTORNEY TO BE NOTICED* |
| | | **Shamus Sean Flynn** (See above for address) *ATTORNEY TO BE NOTICED* |

**Amicus**

| | | |
|---|---|---|
| **Hearth, Patio, & Barbecue Association** | represented by | **Francesca Marie Eick** (See above for address) *LEAD ATTORNEY PRO HAC VICE ATTORNEY TO BE NOTICED* |
| | | **Macey Reasoner Stokes** |

**ER-156**

(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lily Niu Chinn**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Megan H. Berge**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shamus Sean Flynn**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/07/2021 | 83 | Transcript Designation Form for proceedings held on 7/14/2020 and 2/2/2021 before Judge Gonzalez Rogers, *Corrected* (Reichman, Courtland) (Filed on 9/7/2021) (Entered: 09/07/2021) |
| 09/07/2021 | 82 | NOTICE of Appearance by Anthony Lee Francois (Francois, Anthony) (Filed on 9/7/2021) (Entered: 09/07/2021) |
| 09/07/2021 | 81 | Transcript Designation Form (Reichman, Courtland) (Filed on 9/7/2021) (Entered: 09/07/2021) |
| 08/12/2021 | 80 | NOTICE of Appearance by Peter Stanley Prows (Prows, Peter) (Filed on 8/12/2021) (Entered: 08/12/2021) |
| 08/05/2021 | 79 | USCA Case Number 21-16278 Ninth Circuit Court of Appeals for 78 Notice of Appeal to the Ninth Circuit filed by California Restaurant Association. (cjlS, COURT STAFF) (Filed on 8/5/2021) (Entered: 08/05/2021) |
| 08/04/2021 | 78 | NOTICE OF APPEAL to the 9th Circuit Court of Appeals filed by California Restaurant Association. (Appeal fee of $505 receipt number 0971-16251410 paid.) (Reichman, Courtland) (Filed on 8/4/2021) (Entered: 08/04/2021) |
| 07/15/2021 | 77 | NOTICE of Change In Counsel by Farimah Faiz Brown (Brown, Farimah) (Filed on 7/15/2021) (Entered: 07/15/2021) |
| 07/06/2021 | 76 | **JUDGMENT. Signed by Judge Yvonne Gonzalez Rogers on 7/6/2021. ***Civil Case Terminated. (kcS, COURT STAFF) (Filed on 7/6/2021) (Entered: 07/06/2021)** |
| 07/06/2021 | 75 | **ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS by Judge Yvonne Gonzalez Rogers granting in part and denying in part 47 Motion to Dismiss. (kcS, COURT STAFF) (Filed on 7/6/2021) (Entered: 07/06/2021)** |
| 03/10/2021 | 74 | TRANSCRIPT ORDER for proceedings held on 2/2/2021 before Judge Yvonne Gonzalez Rogers for Court Reporter Diane Skillman. (oh, COURT STAFF) (Filed on 3/10/2021) (Entered: 03/10/2021) |
| 03/05/2021 | 73 | Notice of Change of Firm Name by California Restaurant Association. (Reichman, Courtland) (Filed on 3/5/2021) Modified on 3/5/2021 (cjlS, COURT STAFF). (Entered: |

**ER-157**

| | | 03/05/2021) |
|---|---|---|
| 02/22/2021 | 72 | Transcript of Proceedings held on February 2, 2021, before Judge Yvonne Gonzalez Rogers. Court Reporter Diane E. Skillman, telephone number 925-899-2912, Diane_Skillman@cand.uscourts.gov. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re 71 Transcript Order ) Release of Transcript Restriction set for 5/24/2021. (Related documents(s) 71 ) (Skillman, Diane) (Filed on 2/22/2021) (Entered: 02/22/2021) |
| 02/04/2021 | 71 | TRANSCRIPT ORDER for proceedings held on 2/2/2021 before Judge Yvonne Gonzalez Rogers by California Restaurant Association, for Court Reporter Diane Skillman. (Carwile, Laura) (Filed on 2/4/2021) (Entered: 02/04/2021) |
| 02/02/2021 | 70 | **Minute Entry for proceedings held before Judge Yvonne Gonzalez Rogers: Motion Hearing held via Zoom Webinar and submitted on 2/2/2021 re 47 MOTION to Dismiss filed by City of Berkeley.Total Time in Court: 38 minutes. Court Reporter: Diane Skillman. (fs, COURT STAFF) (Date Filed: 2/2/2021) (Entered: 02/02/2021)** |
| 02/01/2021 | 69 | CLERKS NOTICE SETTING ZOOM HEARING FOR THE Motion to Dismiss Hearing set for 2/1/2021 02:00 PM via Zoom Webinar Videoconference before Judge Yvonne Gonzalez Rogers.<br><br>This proceeding will be held via a Zoom webinar.<br><br><br>Please click the link below to join webinar (public hearings). If you are a case participant, you will join as an attendee, then you will be brought into the proceeding by court staff.<br><br>https://cand-uscourts.zoomgov.com/j/1618764848?pwd=bW03Y2NvV0YrK2FQSkxoMXRxOWprQT09<br><br>Webinar ID: 161 876 4848<br>Password: 715550<br><br>Local telephone dial-in:US: +1 (669) 254-5252 or +1 (646) 828-7666<br><br><br>**Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/ygr<br><br>**General Order 58.** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographi ng, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.<br><br>**Zoom Guidance and Setup:** https:// www.cand.uscourts.gov/zoom/.<br><br>Motion to Dismiss Hearing set for 2/1/2021 02:00 PM via Zoom Webinar Videoconference before Judge Yvonne Gonzalez Rogers. (Related documents(s) 47 )<br><br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)* (fs, COURT STAFF) (Filed on 2/1/2021) (Entered: 02/01/2021) |

**ER-158**

| 01/07/2021 | 68 | CLERK'S NOTICE SETTING ORAL HEARING ON MOTION TO DISMISS 47 . The Motion to Dismiss hearing is set for: Set/Reset Deadlines as to 47 MOTION to Dismiss : Motion Hearing set for 2/2/2021 02:00 PM via Zoom Webinar Videoconference before Judge Yvonne Gonzalez Rogers.<br><br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)*, (fs, COURT STAFF) (Filed on 1/7/2021) (Entered: 01/07/2021) |
|---|---|---|
| 12/07/2020 | 67 | **ORDER VACATING DECEMBER 8, 2020 MOTION HEARING.The Court VACATES the December 8, 2020 Motion Hearing. The Court will reset the hearing date at a later date. Signed by Judge Yvonne Gonzalez Rogers on 12/7/2020. (fs, COURT STAFF) (Filed on 12/7/2020) (Entered: 12/07/2020)** |
| 11/13/2020 | 66 | \*\*\*Amicus Curiae Brief \*\*\* filed by Air Conditioning, Heating and Refrigeration Institute, Hearth, Patio, & Barbecue Association, National Association of Home Builders, National Association of Manufacturers. Responses due by 11/27/2020. Replies due by 12/4/2020. (Chinn, Lily) (Filed on 11/13/2020) Modified on 11/13/2020 (fs, COURT STAFF). (Entered: 11/13/2020) |
| 11/12/2020 | 65 | **ORDER by Judge Yvonne Gonzalez Rogers granting 56 Motion to File Amicus Curiae Brief. (fs, COURT STAFF) (Filed on 11/12/2020) (Entered: 11/12/2020)** |
| 11/06/2020 | 64 | NOTICE of Substitution of Counsel by Lily Niu Chinn (Chinn, Lily) (Filed on 11/6/2020) (Entered: 11/06/2020) |
| 11/02/2020 | 63 | **ORDER by Judge Yvonne Gonzalez Rogers granting 53 Motion for Pro Hac Vice as to Megan Berge. Signed by Judge Yvonne Gonzalez Rogers on 10/30/2020. (fs), COURT STAFF) (Filed on 11/2/2020) (Entered: 11/02/2020)** |
| 10/30/2020 | 62 | **ORDER by Judge Yvonne Gonzalez Rogers granting 55 Motion for Pro Hac Vice as to Macey Reasoner Stokes. (fs, COURT STAFF) (Filed on 10/30/2020) (Entered: 10/30/2020)** |
| 10/30/2020 | 61 | **ORDER by Judge Yvonne Gonzalez Rogers granting 54 Motion for Pro Hac Vice as to Francesca Eick. (fs, COURT STAFF) (Filed on 10/30/2020) (Entered: 10/30/2020)** |
| 10/30/2020 | 60 | **\*\*\*ATTACHMENT INCOMPLETE. SEE DKT. NO. 63 FOR CORRECT ENTRY.\*\*\***<br><br>**ORDER by Judge Yvonne Gonzalez Rogers granting 53 Motion for Pro Hac Vice as to Megan Berge. (fs, COURT STAFF) (Filed on 10/30/2020) Modified on 11/2/2020 (fs, COURT STAFF). (Entered: 10/30/2020)** |
| 10/27/2020 | | Set/Reset Deadlines as to 47 MOTION to Dismiss. Motion to Dismiss Hearing set for 12/8/2020 02:00 PM via Zoom Webinar Videoconference before Judge Yvonne Gonzalez Rogers. (fs, COURT STAFF) (Filed on 10/27/2020) (Entered: 10/27/2020) |
| 10/27/2020 | 59 | **ORDER by Judge Yvonne Gonzalez Rogers granting 57 Stipulation. (fs, COURT STAFF) (Filed on 10/27/2020) (Entered: 10/27/2020)** |
| 10/27/2020 | 58 | REPLY (re 47 MOTION to Dismiss ) filed by City of Berkeley. (Attachments: # 1 Response to Opposition to Request for Judicial Notice)(Jensen, Christopher) (Filed on 10/27/2020) Modified on 10/28/2020 (jjbS, COURT STAFF). (Entered: 10/27/2020) |
| 10/27/2020 | 57 | STIPULATION WITH PROPOSED ORDER *to Extend Time for Hearing on Defendants Motion to Dismiss First Amended Complaint* filed by California Restaurant Association and City of Berkeley. (Carwile, Laura) (Filed on 10/27/2020) Modified on 10/28/2020 (jjbS, COURT STAFF). (Entered: 10/27/2020) |

**ER-159**

| 10/20/2020 | 56 | MOTION to File Amicus Curiae Brief filed by Air Conditioning, Heating and Refrigeration Institute, Hearth, Patio, & Barbecue Association, National Association of Home Builders, National Association of Manufacturers. Motion Hearing set for 11/17/2020 02:00 PM in Oakland, Courtroom 1, 4th Floor before Judge Yvonne Gonzalez Rogers. Responses due by 11/3/2020. Replies due by 11/10/2020. (Attachments: # 1 Proposed Order Granting Mot. for Leave to File Amicus Brief)(Flynn, Shamus) (Filed on 10/20/2020) (Entered: 10/20/2020) |
|---|---|---|
| 10/20/2020 | 55 | MOTION for leave to appear in Pro Hac Vice *of Macey Reasoner Stokes* ( Filing fee $ 310, receipt number 0971-15089883.) filed by Air Conditioning, Heating and Refrigeration Institute, Hearth, Patio, & Barbecue Association, National Association of Home Builders, National Association of Manufacturers. (Berge, Megan) (Filed on 10/20/2020) (Entered: 10/20/2020) |
| 10/20/2020 | 54 | MOTION for leave to appear in Pro Hac Vice *of Francesca Eick* ( Filing fee $ 310, receipt number 0971-15089856.) filed by Air Conditioning, Heating and Refrigeration Institute, Hearth, Patio, & Barbecue Association, National Association of Home Builders, National Association of Manufacturers. (Berge, Megan) (Filed on 10/20/2020) (Entered: 10/20/2020) |
| 10/20/2020 | 53 | MOTION for leave to appear in Pro Hac Vice *of Megan Berge* ( Filing fee $ 310, receipt number 0971-15089698.) filed by National Association of Home Builders, National Association of Manufacturers, Air Conditioning, Heating and Refrigeration Institute, Hearth, Patio, & Barbecue Association. (Berge, Megan) (Filed on 10/20/2020) (Entered: 10/20/2020) |
| 10/13/2020 | 52 | OPPOSITION/RESPONSE (re 47 MOTION to Dismiss ) filed by California Restaurant Association. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Proposed Order)(Reichman, Courtland) (Filed on 10/13/2020) Modified on 10/14/2020 (jjbS, COURT STAFF). (Entered: 10/13/2020) |
| 09/18/2020 | | Set/Reset Deadlines as to 47 MOTION to Dismiss. Responses due by 10/13/2020. Replies due by 10/27/2020. Motion Hearing set for 11/17/2020 02:00 PM via Zoom before Judge Yvonne Gonzalez Rogers. (fs, COURT STAFF) (Filed on 9/18/2020) (Entered: 09/18/2020) |
| 09/18/2020 | 51 | **ORDER by Judge Yvonne Gonzalez Rogers granting 50 Stipulation. Responses due by 10/13/2020. Replies due by 10/27/2020. (fs, COURT STAFF) (Filed on 9/18/2020) (Entered: 09/18/2020)** |
| 09/16/2020 | 50 | STIPULATION WITH PROPOSED ORDER *to Extend Time to Respond to Motion to Dismiss, Extend Time to Reply, and Continue Hearing on Motion to Dismiss* filed by California Restaurant Association and City of Berkeley. (Carwile, Laura) (Filed on 9/16/2020) Modified on 9/17/2020 (jjbS, COURT STAFF). (Entered: 09/16/2020) |
| 09/15/2020 | 49 | EXHIBITS re 47 MOTION to Dismiss *First Amended Complaint* filed byCity of Berkeley. (Attachments: # 1 Certificate/Proof of Service Link this Exhibit 5 to Doc 47 - Motion to Dismiss RJN)(Related document(s) 47 ) (Jensen, Christopher) (Filed on 9/15/2020) (Entered: 09/15/2020) |
| 09/15/2020 | | Electronic filing error. No caption Page. Exhibits e-filed separately and not as an attachment, require a title page. Please refer to Civil Local Rules 3-4 re first page requireme nt. Please re-file in its entirety. Re: 48 Exhibits filed by City of Berkeley (jjbS, COURT STAFF) (Filed on 9/15/2020) (Entered: 09/15/2020) |
| 09/15/2020 | | Electronic filing error. Incorrect event used. [err101]. Correct Event it "MOTION to Dismiss." Event can be found under Civil Events > Motions and Related Filings > ; |

**ER-160**

| | | Motions-General > Dismiss. **Corrected by Clerk's Office. No further action is necessary.** Re: [47](#) MOTION to Dismiss filed by City of Berkeley (jjbS, COURT STAFF) (Filed on 9/15/2020) (Entered: 09/15/2020) |
|---|---|---|
| 09/14/2020 | | Set Deadlines as to [47](#) MOTION to Dismiss. Responses due by 9/28/2020. Replies due by 10/5/2020. Motion Hearing set for 10/20/2020 at 02:00 PM in Oakland, Courtroom 1, 4th Floor before Judge Yvonne Gonzalez Rogers. (jjbS, COURT STAFF) (Filed on 9/14/2020) (Entered: 09/15/2020) |
| 09/14/2020 | [48](#) | EXHIBITS re [47](#) Notice (Other),,,,, *Exhibit 5 to Def COB Filed Doc 47* filed byCity of Berkeley. (Related document(s) [47](#) ) (Jensen, Christopher) (Filed on 9/14/2020) (Entered: 09/14/2020) |
| 09/14/2020 | [47](#) | MOTION to Dismiss *First Amended Complaint Pursuant to Fed R Civ P 12 (B)(1) and 12(B)(6); Memorandum of Points and Authorities* by City of Berkeley (Attachments: # [1](#) Request for Judicial Notice ISO Motion to Dismiss FAC, # [2](#) Exhibit RJN Exhibit 1, # [3](#) Exhibit RJN Exhibit 2, # [4](#) Exhibit RJN Exhibit 3, # [5](#) Exhibit RNJ Exhibit 4, # [6](#) Exhibit RJN Exhibit 6, # [7](#) Exhibit RJN Exhibit 7, # [8](#) Exhibit RJN Exhibit 8, # [9](#) Exhibit RJN Exhibit 9, # [10](#) Exhibit RJN Exhibit 10, # [11](#) Exhibit RJN Exhibit 11, # [12](#) Exhibit RJN Exhibit 12, # [13](#) Exhibit RJN Exhibit 13, # [14](#) Exhibit RJN Exhibit 14, # [15](#) Exhibit RJN Exhibit 15, # [16](#) Exhibit RJN Exhibit 16, # [17](#) Exhibit RJN Exhibit 17, # [18](#) Exhibit RJN Exhibit 18, # [19](#) Declaration Declaration of Jordan Klein ISO Motion to Dismiss Amended Complaint, # [20](#) Declaration Declaration of Jay Ogden ISO Motion to Dismiss FAC, # [21](#) Declaration Declaration of Steven Buckley ISO Motion to Dismiss FAC, # [22](#) Proposed Order Proposed Order Granting Motion to Dismiss FAC, # [23](#) Certificate/Proof of Service Certificate of Service)(Jensen, Christopher) (Filed on 9/14/2020) Modified on 9/15/2020 (jjbS, COURT STAFF). (Entered: 09/14/2020) |
| 08/14/2020 | [46](#) | AMENDED COMPLAINT against City of Berkeley. Filed byCalifornia Restaurant Association. (Reichman, Courtland) (Filed on 8/14/2020) (Entered: 08/14/2020) |
| 08/11/2020 | [45](#) | **ORDER by Judge Yvonne Gonzalez Rogers denying [44](#) Discovery Letter Re: Early Discovery. (fs, COURT STAFF) (Filed on 8/11/2020) (Entered: 08/11/2020)** |
| 08/05/2020 | [44](#) | Joint Discovery Letter filed by City of Berkeley. (Jensen, Christopher) (Filed on 8/5/2020) Modified on 8/6/2020 (jjbS, COURT STAFF). (Entered: 08/05/2020) |
| 07/28/2020 | [43](#) | Transcript of Proceedings held on July 14, 2020, before Judge Yvonne Gonzalez Rogers. Court Reporter Raynee H. Mercado, CSR, telephone number 510-565-7228, cacsr8258@granscribermail.com. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re [38](#) Transcript Order ), TRANSCRIPT COPY DELIVERED re [39](#) Transcript Order Release of Transcript Restriction set for 10/26/2020. (Related document(s) [38](#) [39](#) ) (rhm) (Filed on 7/28/2020) (Entered: 07/28/2020) |
| 07/24/2020 | | [Electronic filing error](#). **REMINDER TO COUNSEL:** In the future, please be sure that the case number is correctly reflected on your documents as **4**:19-cv-07668-YGR. Re:[4 2] Notice of Appearance filed by California Restaurant Association (jmlS, COURT STAFF) (Filed on 7/24/2020) (Entered: 07/27/2020) |
| 07/24/2020 | [42](#) | NOTICE of Appearance by Laura Elizabeth Carwile *of Reichman Jorgensen LLP on Behalf of California Restaurant Association* (Carwile, Laura) (Filed on 7/24/2020) (Entered: 07/24/2020) |
| 07/22/2020 | [41](#) | **ORDER : (1) GRANTING-IN-PART AND DENYING-IN-PART DEFENDANT** |

ER-161

|  |  | **CITY OF BERKELEYS MOTION TO DISMISS; AND (2) GRANTING LEAVE TO AMEND by Judge Yvonne Gonzalez Rogers; granting in part and denying in part 18 Motion to Dismiss. (fs, COURT STAFF) (Filed on 7/22/2020) (Entered: 07/22/2020)** |
|---|---|---|
| 07/21/2020 | 39 | TRANSCRIPT ORDER for proceedings held on 7/14/2020 before Judge Yvonne Gonzalez Rogers by California Restaurant Association, for Court Reporter Raynee Mercado. (Jorgensen, Sarah) (Filed on 7/21/2020) (Entered: 07/21/2020) |
| 07/21/2020 | 38 | TRANSCRIPT ORDER for proceedings held on 7/14/2020 before Judge Yvonne Gonzalez Rogers for Court Reporter Raynee Mercado. (oh, COURT STAFF) (Filed on 7/21/2020) (Entered: 07/21/2020) |
| 07/14/2020 | 40 | **Minute Entry for proceedings held before Judge Yvonne Gonzalez Rogers: Motion Hearing held and submitted on 7/14/2020 re 18 MOTION to Dismiss COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(1) AND 12(B)(6); MPA filed by City of Berkeley. Amended Pleadings due by 8/14/2020. Responses due by 9/14/2020.Total Time in Court: 1:04. Court Reporter: Raynee Mercado. (fs, COURT STAFF) (Date Filed: 7/14/2020) (Entered: 07/22/2020)** |
| 07/10/2020 | 37 | CLERKS NOTICE SETTING ZOOM HEARING as to Motion to Dismiss Hearing set for 7/14/2020 02:00 PM before Judge Yvonne Gonzalez Rogers.<br><br>For Zoom connection, see: https://apps.cand.uscourts.gov/telhrg/<br><br>This proceeding will be a Zoom video conferencing webinar.<br><br>PLEASE NOTE: Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited. See General Order 58 at Paragraph III.<br><br>Parties will be instructed to use the "raise hand" function in order to make their appearances known at the hearing.<br><br>All counsel, members of the public and press please click the link or use the information below to join the webinar:<br><br>https://cand-uscourts.zoomgov.com/j/1618764848?pwd=bW03Y2NvV0YrK2FQSkxoMXRxOWprQT09<br><br>Meeting ID: 161 876 4848<br>Password: 715550<br><br>Dial by your location<br>+1 929 205 6099 US (New York)<br>+1 253 215 8782 US<br>+1 301 715 8592 US<br>+1 312 626 6799 US (Chicago)<br>+1 346 248 7799 US (Houston)<br>+1 669 900 6833 US (San Jose)<br>Find your local number: https://zoom.us/u/ac4JkPfcjo |

**ER-162**

For important information and guidance on technical preparation, please see https://www.cand.uscourts.gov/zoom/.

Motion to Dismiss Hearing set for 7/14/2020 02:00 P M before Judge Yvonne Gonzalez Rogers.

*(This is a text-only entry generated by the court. There is no document associated with this entry.)* (fs, COURT STAFF) (Filed on 7/10/2020) (Entered: 07/10/2020)

| 06/30/2020 | 36 | CLERKS NOTICE SETTING ZOOM HEARING REGARDING Motion to Dismiss 18 Hearing set for 7/14/2020 02:00 PM before Judge Yvonne Gonzalez Rogers. |

For Zoom connection, see: https://apps.cand.uscourts.gov/telhrg/

This proceeding will be a Zoom video conferencing webinar.

PLEASE NOTE: Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited. See General Order 58 at Paragraph III.

Parties will be instructed to use the "raise hand" function in order to make their appearance at the hearing.

All counsel, members of the public and press please click the link or use the information below to join the webinar:

https://cand-uscourts.zoomgov.com/j/1618764848?pwd=bW03Y2NvV0YrK2FQSkxoMXRxOWprQT09

Meeting ID: 161 876 4848
Password: 715550

Dial by your location
+1 929 205 6099 US (New York)
+1 253 215 8782 US
+1 301 715 8592 US
+1 312 626 6799 US (Chicago)
+1 346 248 7799 US (Houston)
+1 669 900 6833 US (San Jose)
Find your local number: https://zoom.us/u/ac4JkPfcjo

For important information and guidance on technical preparation, please see https://www.cand.uscourts.gov/zoom/.

Set/Reset Deadlines as to 18 MOTION to Dismis s COMPLAINT PURSUANT TO FED.

**ER-163**

| | | |
|---|---|---|
| | | R. CIV. P. 12(B)(1) AND 12(B)(6); MPA. Motion to Dismiss Hearing set for 7/14/2020 02:00 PM before Judge Yvonne Gonzalez Rogers.<br><br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)* (fs, COURT STAFF) (Filed on 6/30/2020) (Entered: 06/30/2020) |
| 04/03/2020 | 35 | OPPOSITION/RESPONSE to Sur-Reply (re 18 MOTION to Dismiss *COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(1) AND 12(B)(6); MPA* ) filed b yCity of Berkeley. (Jensen, Christopher) (Filed on 4/3/2020) Modified on 4/6/2020 (jjbS, COURT STAFF). (Entered: 04/03/2020) |
| 03/30/2020 | 34 | CLERK'S NOTICE VACATING MOTION HEARING SET APRIL 7, 2020 AT 2:00PM RE ORDER SUSPENDING IN-PERSON APPEARANCES IN RESPONSE TO CORONAVIRUS (COVID-19) DKT. NO. 19 .<br><br>*(This is a text-only entry generated by the court. There is no document associated with this entry.)* (fs, COURT STAFF) (Filed on 3/30/2020) (Entered: 03/30/2020) |
| 03/27/2020 | 33 | Sur-Reply (re 18 MOTION to Dismiss *COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(1) AND 12(B)(6); MPA* ) filed by California Restaurant Association. (Reichman, Courtland) (Filed on 3/27/2020) Modified on 3/30/2020 (jjbS, COURT STAFF). (Entered: 03/27/2020) |
| 03/20/2020 | 32 | **ORDER by Judge Yvonne Gonzalez Rogers granting in part and denying in part 29 Administrative Motion Seeking a Sur-reply to Motion to Dismiss. Plaintiff Sur-reply due 3/27/2020; Defendant response due by 4/3/2020. (fs, COURT STAFF) (Filed on 3/20/2020) (Entered: 03/20/2020)** |
| 03/12/2020 | 31 | **ORDER SUSPENDING IN-PERSON APPEARANCES IN RESPONSE TO CORONAVIRUS (COVID-19).** Signed by Judge Yvonne Gonzalez Rogers on 03/12/2020. (ygrlc2, COURT STAFF) (Filed on 3/12/2020) (Entered: 03/12/2020) |
| 03/10/2020 | 30 | OPPOSITION/RESPONSE (re 29 ADMINISTRATIVE MOTION to File Surreply *in Opposition to Motion to Dismiss* ) filed byCity of Berkeley. (Jensen, Christopher) (Filed on 3/10/2020) (Entered: 03/10/2020) |
| 03/09/2020 | 29 | ADMINISTRATIVE MOTION to File Surreply *in Opposition to Motion to Dismiss* filed by California Restaurant Association. Responses due by 3/13/2020. (Attachments: # 1 Declaration of S. Jorgensen, # 2 Exhibit A, # 3 Proposed Order)(Reichman, Courtland) (Filed on 3/9/2020) (Entered: 03/09/2020) |
| 03/09/2020 | 28 | RESPONSE *to Supplemental Request for Judicial Notice* by California Restaurant Association. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Proposed Order)(Reichman, Courtland) (Filed on 3/9/2020) (Entered: 03/09/2020) |
| 03/03/2020 | 27 | **ORDER by Judge Yvonne Gonzalez Rogers granting 21 Motion for Pro Hac Vice as to Chiseul Kim. (fs, COURT STAFF) (Filed on 3/3/2020) (Entered: 03/03/2020)** |
| 03/02/2020 | 26 | **ORDER TO CONTINUE HEARING ON MOTION TO DISMISS [\*AS MODIFIED BY THE COURT\*] re 25 STIPULATION WITH PROPOSED ORDER To Continue Hearing On Motion To Dismiss filed by California Restaurant Association, City of Berkeley. Set/Reset Deadlines as to : 18 MOTION to Dismiss COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(1) AND 12(B)(6); MPA. Motion Hearing set for 3/10/2020 is CONTINUED to 4/7/2020 02:00 PM in Oakland, Courtroom 1, 4th Floor before Judge Yvonne Gonzalez Rogers. Signed by Judge Yvonne Gonzalez Rogers on 3/2/2020. (fs, COURT STAFF) (Filed on 3/2/2020) (Entered: 03/02/2020)** |

**ER-164**

| | | |
|---|---|---|
| 02/26/2020 | 25 | STIPULATION WITH PROPOSED ORDER *To Continue Hearing On Motion To Dismiss* filed by California Restaurant Association and City of Berkley (Attachments: # 1 Proposed Order Granting Stipulation To Continue Hearing On Motion To Dismiss)(Reichman, Courtland) (Filed on 2/26/2020) Modified on 2/26/2020 (ajsS, COURT STAFF). (Entered: 02/26/2020) |
| 02/24/2020 | 24 | REPLY (re 18 MOTION to Dismiss *COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B) (1) AND 12(B)(6); MPA* ) filed byCity of Berkeley. (Attachments: # 1 Supplement Supplemental Request for RJN ISO Motion to Dismiss Complaint; Response to Opposition to RJN, # 2 Exhibit Exhibit 1, # 3 Exhibit Exhibit 2)(Jensen, Christopher) (Filed on 2/24/2020) (Entered: 02/24/2020) |
| 02/10/2020 | 23 | OPPOSITION to [18-1] Request for Judicial Notice ISO Motion to Dismiss Complaint filed by California Restaurant Association. (Reichman, Courtland) (Filed on 2/10/2020) Modified on 2/11/2020 (ajsS, COURT STAFF). (Entered: 02/10/2020) |
| 02/10/2020 | 22 | OPPOSITION/RESPONSE (re 18 MOTION to Dismiss *COMPLAINT PURSUANT TO FED. CIV. P. 12(B)(1) AND 12(B)(6); MPA* ) filed byCalifornia Restaurant Association. (Reichman, Courtland) (Filed on 2/10/2020) (Entered: 02/10/2020) |
| 02/06/2020 | 21 | MOTION for leave to appear in Pro Hac Vice *re: Chiseul Kim* ( Filing fee $ 310, receipt number 0971-14148361.) Filing fee previously paid on 02/06/2020 filed by California Restaurant Association. (Attachments: # 1 Certificate of Good Standing)(Kim, Chiseul) (Filed on 2/6/2020) Modified on 2/7/2020 (ajsS, COURT STAFF). (Entered: 02/06/2020) |
| 01/24/2020 | 20 | **ORDER VACATING CASE MANAGEMENT CONFERENCE. The Case Management Conference currently set for March 2, 2020 is VACATED. The Court will reset the Case Management Conference upon resolution of the pending motion to dismiss. Signed by Judge Yvonne Gonzalez Rogers on 1/24/2020. (fs, COURT STAFF) (Filed on 1/24/2020) (Entered: 01/24/2020)** |
| 01/13/2020 | 19 | CLERK'S NOTICE CORRECTING RESPONSE AND REPLY DATES RE DKT. NO. 18 MOTION. Responses due by 2/10/2020; Replies due by 2/24/2020 as reflected in theStipulation and Order at Dkt. No. 12 as to the briefing schedule only for the motion. Set/Reset Deadlines as to 18 MOTION to Dismiss COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(1) AND 12(B)(6); MPA. *(This is a text-only entry generated by the court. There is no document associated with this entry.)*,(fs, COURT STAFF) (Filed on 1/13/2020) (Entered: 01/15/2020) |
| 01/13/2020 | 18 | MOTION to Dismiss *COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(1) AND 12(B) (6); MPA* filed by City of Berkeley. Motion Hearing set for 3/10/2020 02:00 PM in Oakland, Courtroom 1, 4th Floor before Judge Yvonne Gonzalez Rogers. Responses due by **2/10/2020 **. Replies due by **2/24/2020**. (Attachments: # 1 REQUEST FOR JUDICIAL NOTICE ISO MOTION TO DISMISS COMPLAINT, # 2 Exhibit RJN EXHIBIT 1, # 3 Exhibit RJN EXHIBIT 2, # 4 Exhibit RJN EXHIBIT 3, # 5 Exhibit RJN EXHIBIT 4, # 6 Exhibit RJN EXHIBIT 5, # 7 Exhibit RJN EXHIBIT 6, # 8 Exhibit RJN EXHIBIT 7, # 9 Exhibit RJN EXHIBIT 8, # 10 Exhibit RJN EXHIBIT 9, # 11 Declaration DECLARATION OF SARAH MOORE IN SUPPORT OF MOTION TO DISMISS COMPLAINTP, # 12 Proposed Order PROPOSED ORDER GRANTING MOTION TO DISMISS COMPLAINT)(Jensen, Christopher) (Filed on 1/13/2020) Modified on 1/15/2020 (fs, COURT STAFF). (Entered: 01/13/2020) |
| 12/27/2019 | 17 | CLERK'S NOTICE SETTING CASE MANAGEMENT CONFERENCE. Case Management Statement due by 2/24/2020. Initial Case Management Conference set for Monday, 3/2/2020 02:00 PM before Hon. Judge Yvonne Gonzalez Rogers in Oakland, |

**ER-165**

| | | |
|---|---|---|
| | | Courtroom 1, 4th Floor. (Attachments: # 1 Standing Order) (fs, COURT STAFF) (Filed on 12/27/2019) (Entered: 12/27/2019) |
| 12/17/2019 | 16 | Certificate of Interested Entities by California Restaurant Association (Reichman, Courtland) (Filed on 12/17/2019) (Entered: 12/17/2019) |
| 12/09/2019 | 15 | **ORDER REASSIGNING CASE. Case reassigned using a proportionate, random, and blind system pursuant to General Order No. 44 to Judge Yvonne Gonzalez Rogers for all further proceedings. Magistrate Judge Sallie Kim no longer assigned to case, Notice: The assigned judge participates in the Cameras in the Courtroom Pilot Project. See General Order No. 65 and http://cand.uscourts.gov/cameras.. Signed by Clerk on 12/9/19. (Attachments: # 1 Notice of Eligibility for Video Recording)(asS, COURT STAFF) (Filed on 12/9/2019) (Entered: 12/09/2019)** |
| 12/06/2019 | 14 | CLERK'S NOTICE OF IMPENDING REASSIGNMENT TO A U.S. DISTRICT COURT JUDGE: The Clerk of this Court will now randomly reassign this case to a District Judge because either (1) a party has not consented to the jurisdiction of a Magistrate Judge, or (2) time is of the essence in deciding a pending judicial action for which the necessary consents to Magistrate Judge jurisdiction have not been secured. You will be informed by separate notice of the district judge to whom this case is reassigned.<br><br>ALL HEARING DATES PRESENTLY SCHEDULED BEFORE THE CURRENT MAGISTRATE JUDGE ARE VACATED AND SHOULD BE RE-NOTICED FOR HEARING BEFORE THE JUDGE TO WHOM THIS CASE IS REASSIGNED.<br><br>*This is a text only docket entry; there is no document associated with this notice.* (mklS, COURT STAFF) (Filed on 12/6/2019) (Entered: 12/06/2019) |
| 12/06/2019 | 13 | CONSENT/DECLINATION to Proceed Before a US Magistrate Judge by California Restaurant Association.. (Reichman, Courtland) (Filed on 12/6/2019) (Entered: 12/06/2019) |
| 12/05/2019 | 12 | **ORDER by Magistrate Judge Sallie Kim granting 11 Stipulation to Extend Time to Respond to Complaint, Extending Briefing Deadlines and Continue Initial Case Management Conference. Case Management Statement due by 4/20/2020. Initial Case Management Conference reset for 4/27/2020 01:30 PM in San Francisco, Courtroom C, 15th Floor. (mklS, COURT STAFF) (Filed on 12/5/2019) (Entered: 12/05/2019)** |
| 12/05/2019 | 11 | STIPULATION AND [PROPOSED] ORDER *to Extend Time to Respond to Complaint, Extending Briefing Deadlines and Continue Initial Case Management Conference* filed by City of Berkeley. (Attachments: #(1) Certificate/Proof of Service Certificate of Service) (Jensen, Christopher) (Filed on 12/5/2019) (Entered: 12/05/2019) |
| 12/02/2019 | 10 | **ORDER by Magistrate Judge Sallie Kim granting 8 Motion for Pro Hac Vice as to Gary Toman. (mklS, COURT STAFF) (Filed on 12/2/2019) (Entered: 12/02/2019)** |
| 12/02/2019 | 9 | SUMMONS Returned Executed by California Restaurant Association. City of Berkeley served on 11/27/2019, answer due 12/18/2019. (Reichman, Courtland) (Filed on 12/2/2019) (Entered: 12/02/2019) |
| 12/02/2019 | 8 | MOTION for Leave to Appear in Pro Hac Vice *of Gary Toman,* (Filing Fee: $310.00, receipt number 0971-13937909) filed by California Restaurant Association. (Attachments: #(1) Certificate of Good Standing)(Reichman, Courtland) (Filed on 12/2/2019) (Entered: 12/02/2019) |
| 11/22/2019 | 7 | Summons Issued as to Defendant City of Berkeley. (tnS, COURT STAFF) (Filed on 11/22/2019) (Entered: 11/22/2019) |

**ER-166**

| | | |
|---|---|---|
| 11/22/2019 | 6 | **Initial Case Management Scheduling Order with ADR Deadlines: Joint Case Management Statement due by 2/17/2020. Initial Case Management Conference set for 2/24/2020 at 1:30 PM in San Francisco, Courtroom C, 15th Floor. (tnS, COURT STAFF) (Filed on 11/22/2019) (Entered: 11/22/2019)** |
| 11/22/2019 | 5 | **ORDER by Judge Sallie Kim granting 3 Motion for Pro Hac Vice. (sklc1S, COURT STAFF) (Filed on 11/22/2019) (Entered: 11/22/2019)** |
| 11/22/2019 | 4 | Proposed Summons. (Reichman, Courtland) (Filed on 11/22/2019) (Entered: 11/22/2019) |
| 11/22/2019 | 3 | MOTION for Leave to Appear in Pro Hac Vice *for Sarah Jorgensen,* (Filing Fee: $310.00, receipt number 0971-13917782) filed by California Restaurant Association. (Attachments: #(1) Certificate of Good Standing)(Reichman, Courtland) (Filed on 11/22/2019) (Entered: 11/22/2019) |
| 11/22/2019 | 2 | Case assigned to Magistrate Judge Sallie Kim.<br><br>Counsel for plaintiff or the removing party is responsible for serving the Complaint or Notice of Removal, Summons and the assigned judge's standing orders and all other new case documents upon the opposing parties. For information, visit *E-Filing A New Civil Case* at http://cand.uscourts.gov/ecf/caseopening.<br><br>Standing orders can be downloaded from the court's web page at www.cand.uscourts.gov/judges. Upon receipt, the summons will be issued and returned electronically. Counsel is required to send chambers a copy of the initiating documents pursuant to L.R. 5-1(e)(7). A scheduling order will be sent by Notice of Electronic Filing (NEF) within two business days. Consent/Declination due by 12/6/2019. (mbcS, COURT STAFF) (Filed on 11/22/2019) (Entered: 11/22/2019) |
| 11/21/2019 | 1 | COMPLAINT *FOR DECLARATORY AND INJUNCTIVE RELIEF* against Defendant City of Berkeley, (Filing Fee: $400.00, receipt number 0971-13914464). Filed by California Restaurant Association. (Attachments: #(1) Civil Cover Sheet)(Reichman, Courtland) (Filed on 11/21/2019) Modified on 11/22/2019 (tnS, COURT STAFF). (Entered: 11/21/2019) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 10/30/2021 09:44:16 | | |
| **PACER Login:** greenariel1005 | **Client Code:** | |
| **Description:** Docket Report | **Search Criteria:** | 4:19-cv-07668-YGR |
| **Billable Pages:** 12 | **Cost:** | 1.20 |

**ER-167**