No. 21-16278

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CALIFORNIA RESTAURANT ASSOCIATION,
Plaintiff-Appellant,

v.

CITY OF BERKELEY,

Defendant-Appellee.

-------------------------------------------------

On Appeal from the United States District Court
for the Northern District of California
(Hon. Yvonne Gonzales Rogers, Presiding)
District Court Case No. 4:19-cv-07668-YGR

-------------------------------------------------

## APPELLEE'S BRIEF

-------------------------------------------------

Tony Francois
Peter S. Prows
BRISCOE IVESTER & BAZEL LLP
235 Montgomery Street, Suite 935
San Francisco, CA 94104
Phone: 415.402.2700

*Attorneys for Defendant-Appellee*
CITY OF BERKELEY

# TABLE OF CONTENTS

**Introduction** _____ **1**

**Jurisdictional Statement** _____ **1**

**Issues Presented For Review** _____ **5**

**Statement of the Case** _____ **5**

    Facts _____ **5**

    Procedural History _____ **8**

**Summary of Argument** _____ **8**

**Argument** _____ **9**

   **I.    This Court's De Novo Review Seeks the "Fair Understanding of Congressional Purpose" of the Domain of EPCA's Preemption Clause (From its Text and History) and Then Proceeds to the Ordinance** _____ **9**

      A.   Standard of Review _____ 9

      B.   Applicable Preemption Principles _____ 10

   **II.  EPCA's Congressional Purpose is to Allow Appliance Makers to Design Real Products To Meet A Single Federal Standard  For Actual Energy Use, Not to Require All Cities to Provide All Types or Any Amount of Energy** _____ **12**

      A.   EPCA's History Shows Its Purpose Is To Protect Appliance Makers From Having To Redesign Products That Meet Federal Standards _____ 15

      B.   EPCA's Text Only Addresses How Appliances Use What Energy Is Supplied To Them, And Does Not Extend To Making All Energy Available In All Places _____ 18

1.    The Definition Of "Energy Use" Shows That EPCA Only Regulates How Appliances Are Designed To Use Affirmative Quantities of Energy, And That CRA's "Zero Energy" – Whether As A "Standard" Or A "Use" - Is An Absurdity ................................................................................... 19

   a.    The Text Defining "Energy Use" Excludes Zero as A "Quantity" Of Energy From The Ambit Of The Preemption Clause ..................... 20

      1.    Contrary to The Association's Unsupported Assertion, "Quantity of Energy" Does Not Include Zero ............................................ 20

      (a) Each Phrase Defining Energy Use Shows That "Quantity" Is Affirmative ........................................................................ 21

         (i) "Consumed By a Product" Requires an Affirmative Amount of Energy to Be "Consumed" ................................................ 21

         (ii) "Determined By a Test Method" Requires Some Energy to Be Used Before A "Quantity" Is Concerned .............................. 23

      (b) Reading A "Quantity" Of Energy "Use" To Include Zero Produces The Absurd Result That The Department Could Set "Zero Energy Use" As A National Standard ........................................ 25

      (c) Reading "Quantity" As Only Including Affirmative Amounts Is Required by Properly Reading "Ratio" Under The "Energy Efficiency" Definition ................................................................ 26

   2.    Taken Together the Text Shows That The "Quantity" Of Energy That Real Appliances Are Designed to Use Does not Include Availability Of Energy In Locales All Over The Country ....................................... 27

C.   The City's Narrower Reading of EPCA Is Required By Air Conditioning, Which Is Reinforced Rather Than Superseded By Franklin California ..................................................................................... 28

**III.  The Ordinance Does Not "Concern" Any Affirmative Quantity of Energy Which Real Appliances Are Designed To Consume, And Is Not Preempted .................................................................................. 35**

iii

**IV.  The District Court's Dismissal of the Association's State Law Claims Should Not Be Disturbed** _____**38**

**Conclusion** _____**38**

iv

# TABLE OF AUTHORITIES

### Cases

*Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492 (9th Cir. 2005) ........................................................ passim

*Air Conditioning, Heating, and Refrigeration Institute v. City of Albuquerque (City of Albuquerque)*, 2008 WL 5586316 ...................................................36

*Block v. North Dakota*, 461 U.S. 273 (1983) ................................................... 33, 34

*Cal. Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316 (1997) ....................................................................................29

*Californians For Safe & Competitive Dump Truck Transp. v. Mendonca*, 152 F.3d 1184 (9th Cir.1998) ..........................................................................29

*Cassirer v. Thyssen-Bornemisza Collection Found.*, 862 F.3d 951 (9th Cir. 2017) .9

*Chamber of Commerce of United States of America v. Whiting*, 563 U.S. 582 (2011) ..........................................................................................................31

*Cigna Property and Cas. Ins. Co. v. Polaris Pictures Corp.*, 159 F.3d 412 (9th Cir. 1998) ...........................................................................................................10

*Cipollone v. Liggett Group*, 505 U.S. 504, 517 (1992) .................................... 10, 36

*Commissioner of Internal Revenue v. Lundy*, 516 U.S. 235 (1996) ......................27

*Connell v. Lima Corp.*, 988 F.3d 1089 (9th Cir. 2021) ............................. 10, 31, 34

*Dougherty v. City of Covina*, 654 F.3d 892 (9th Cir. 2011) ....................................9

*Egelhoff v. Egelhoff*, 532 U.S. 141, 146 (2001) ....................................................29

*Floyd v. American Honda Motor Co., Inc.*, 966 F.3d 1027 (9th Cir. 2020) ............37

*Franklin California. Cf. U.S. v. Walker*, 953 F.3d 577 (9th Cir. 2020) ...................32

*FTC v. Consumer Def., LLC*, 926 F.3d 1208 (9th Cir. 2019) .................................32

*Gade v. National Solid Wastes Management Ass'n*, 505 U.S. 88 (1992) ...............10

v

*Hickcox-Huffman v. US Airways, Inc.*, 855 F.3d 1057 (9th Cir. 2017)....................9

*Holy Trinity Church v. U.S.*, 143 U.S. 457 (1892) ...................................................25

*Int'l Bhd. of Teamsters, Local 2785 v. Fed. Motor Carrier Safety Admin.*, 986 F.3d 841 (9th Cir. 2021)................................................................................. 11, 22, 31

*Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89 (1990)...........................................33

*Jackson v. City and County of San Francisco*, 829 F.Supp.2d 867 (N.D. Cal. 2011) ....................................................................................................................................4

*Kingman Reef Atoll Invs. LLC v. U.S.*, 541 F.3d 1189 (9th Cir. 2008) ...................33

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992). ................................. 1, 2, 3, 4

*Malone v. White Motor Corp.*, 435 U.SA. 497 (1978) ...........................................10

*Medtronic v. Lohr*, 518 U.S. 470 (1996) .......................................................... passim

*Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003) ........................................ 11, 32, 33

*Muniz v. United Parcel Serv., Inc.*, 738 F.3d 214 (9th Cir. 2013).........................10

*Natural Res. Def. Council v. Herrington*, 768 F.2d 1355 (D.C. Cir. 1985) 12, 15, 16

*Nielsen v. Preap*, 139 S.Ct. 954 (2019) .................................................................20

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115 (2016) ................... 30, 31

*Rapanos v. U.S.*, 547 US. 715 (2006) .....................................................................22

*Retail Clerks v. Schermerhorn*, 375 U.S. 96, 103 (1963)......................................10

*Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947) ..........................................30

*Rodriguez v. AT & T Mobility Servs. LLC*, 728 F.3d 975 (9th Cir. 2013)..............32

*San Diego Gun Rights Committee v. Reno*, 98 F.3d 1121 (9th Cir. 1996)............3, 4

*San Luis & Delta-Mendota Water Auth. v. United States*, 672 F.3d 676 (9th Cir. 2012).........................................................................................................................9

*U.S. v. Hayes*, 231 F.3d 663 (2000) .......................................................................34

*U.S. v. Kwai Fun Wong*, 575 U.S. 402 (2015) ........................................... 33

*U.S. v. Locke*, 529 U.S. 89 (2000) ........................................................... 30

*U.S. v. Olson*, 988 F.3d 1158 (9th Cir. 2021) .......................................... 34

*U.S. v. Pacheco*, 977 F.3d 764 (9th Cir. 2020) ........................................ 20

*Whitman v. American Trucking Association*, 531 U.S. 457 (2001) ........................ 37

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) ................................................. 2

*Wilkins v. United States*, 13 F.4th 791 (9th Cir. 2021) ...................................... 33, 34

*Zircon Corp. v. Stanley Works*, 713 F.Supp.2d 881 (N.D. Cal. 2010) ................... 26

**Statutes**

42 U.S. Code § 6201 ...................................................................... 12

42 U.S. Code § 6201(4) .................................................................. 12

42 U.S. Code § 6201(5) .............................................................. 12, 14

42 U.S. Code § 6291 ................................................................. 13, 16

42 U.S. Code § 6291(11)(A) ............................................................ 25

42 U.S. Code § 6291(2) .................................................................. 14

42 U.S. Code § 6291(4) ........................................................... passim

42 U.S. Code § 6291(5) .................................................................. 27

42 U.S. Code § 6291(6) .................................................................. 25

42 U.S. Code § 6293 .................................................................... 23

42 U.S. Code § 6295(a)(2) .............................................................. 25

42 U.S. Code § 6297 ............................................................... 11, 16

42 U.S. Code § 6297(c) ........................................................... passim

vii

42 U.S. Code § 6311(1) .............................................................. 14

42 U.S. Code § 6311(3) .............................................................. 14

42 U.S. Code § 6311(4) .............................................................. 19

42 U.S. Code § 6317 .................................................................. 13

42 U.S. Code § 6321 .................................................................. 13

42 U.S. Code § 6326 .................................................................. 13

42 U.S. Code § 6341 .................................................................. 13

42 U.S. Code § 6351 .................................................................. 13

42 U.S. Code § 6361 .................................................................. 13

42 U.S. Code § 6364 .................................................................. 13

BMC, § 12.80.010.B-C, E.R. 145-146 ...................................... 7

BMC, § 12.80.010.H, E.R. 146 ................................................. 6

BMC, § 12.80.020.C, E.R. 146 ................................................. 7

BMC, § 12.80.020.D, E.R. 146 ................................................. 7

BMC, § 12.80.030.E, E.R. 147 ................................................. 6

BMC, § 12.80.040.A, E.R. 147 ................................................. 5

BMC, § 12.80.040.A.1, E.R. 147 .............................................. 6

BMC, § 12.80.050.A, E.R. 147-148 .......................................... 7

BMC, § 12.80.080, E.R. 148 ..................................................... 6

**Rules**

Federal Rules of Civil Procedure 12(b)(6) ..................................................1

Federal Rules of Appellate Procedure 28(b)(1) ..........................................1

Federal Rules of Appellate Procedure 28(b)(3) ..........................................8

**Regulations**

10 C.F.R. Part 430 .......................................................................24

10 Code of Federal Regulations § 430.2 .................................................22

California Code of Regulations, Title 24, Part 6 ....................................7

**Other Authorities**

Hamilton, A.G., *Numbers, Sets and Axioms, The Apparatus of Mathematics*, Cambridge University Press, 1982, at 21……………………………………26

# INTRODUCTION

In this appeal, Appellant California Restaurant Association (the Association) argues that an ordinance (Ordinance) adopted by Appellee City of Berkeley is preempted by 42 U.S.C. § 6297(c). The district court below properly ruled that the Ordinance is not preempted and dismissed the Association's complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). This Court should affirm.

# JURISDICTIONAL STATEMENT

Other than as to the subject matter jurisdiction of the district court below, City of Berkeley is satisfied with the Association's Jurisdictional Statement. *See* Fed. Rule App. Proc. 28(b)(1).

As to the district court's subject matter jurisdiction, plaintiffs in federal court must plead and prove standing in order to meet the Constitutional Article III requirement that federal courts only hear "cases and controversies." The leading case is the Supreme Court's decision in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992). Among the three elements to establish standing (injury in fact, traceability, and redressability), this brief addresses a defect in the Association's allegations of injury in fact. This element is broken down into two requirements: that the injury be "concrete and particular" and that it be "actual or imminent."

1

*Lujan*, 504 U.S. at 560. The problem with the Association's allegations is that they do not establish that the alleged future harms to its members are "imminent."

The allegation is as follows:

> The CRA[] … has members that do business in Berkeley, or who seek to do business in Berkeley, whose interests will be directly affected by this Ordinance. The CRA has one or more members who are interested in opening a new restaurant or in relocating a restaurant to a new building in Berkeley after January 1, 2020, but who cannot do so because of the Ordinance's ban on natural gas. One or more members would seek to open or relocate a restaurant in a new building in Berkeley but for the ban on natural gas.

First Amended Complaint, ¶ 15 at 4:27-5:6; E.R. 85-86.

This allegation does not say anything about *how soon* in the future any Association member intends or seeks to open any alleged new or relocated restaurant. *Lujan* says the following about the temporal pleading requirements to establish imminent injury:

> Although "imminence" is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is "'"*certainly* impending,"'" *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (emphasis added). It has been stretched beyond the breaking point when, as here, the plaintiff alleges an injury at some indefinite future time, and the acts necessary to make the injury happen are at least partly within the plaintiff's own control. In such cases we have insisted that the injury proceed with a high degree of immediacy[.]

504 U.S. at 564-65 n.2 (citing cases). Applying this temporal pleading requirement for alleged future injuries, any allegation of future injury that provides no limit to

how far in the future the injury may happen, as is the case with the Association's "after January 1, 2020" allegation, is inadequate to plead imminent injury.

The conclusory nature – and even some of the words used in the Association's pleading – also fall afoul of Ninth Circuit case law. Where "plaintiffs seek declaratory and injunctive relief only, there is a further requirement that they show a very significant possibility of future harm[.]" *San Diego Gun Rights Committee v. Reno*, 98 F.3d 1121, 1126 (9th Cir. 1996) (citing *Bras v. CPUC*, 59 F.3d 869, 873 (9th Cir. 1995)). In *San Diego Gun Rights Committee*, the Ninth Circuit held that the plaintiffs had failed to show a serious threat of prosecution (as an element of demonstrating injury in fact) for violation of the Crime Control Act of 1994 in part because "they have not articulated concrete plans to violate the []Act." *Id*. at 1127. "Instead, plaintiffs merely assert that they "wish and intend to engage in activities prohibited by Section 922(v)(1).'" *Id*. This Court continued: "The Complaint does not specify any particular time or date on which plaintiffs intend to violate the Act. As the Supreme Court has observed, "[s]uch 'some day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent injury that our cases require.'" *Id*. (quoting *Lujan*, 504 U.S. at 564). Further relying on *Lujan*, this Court said that plaintiffs whose injury from a law is "almost entirely within plaintiffs' own control" must show a "high degree of immediacy" to establish standing. *Id.* (citing *Lujan*, 504 U.S. at 564-65 n.2).

3

*San Diego Gun Rights Committee*'s holding that the Second Amendment does not afford an individual right to bear arms is abrogated by *Heller*, as noted in *Jackson v. City and County of San Francisco*, 829 F.Supp.2d 867, 871-72 (N.D. Cal. 2011). However, *Jackson* distinguished the portion of *San Diego Gun Rights Committee* dealing with the specificity of allegations necessary to establish injury in fact, by contrasting the non-temporally bound and skeletal allegations of the *San Diego Gun Rights Committee* plaintiffs with the far more specific and current alleged actions of the *Jackson* plaintiffs. *Id*.

The Association's allegation of future harm here has the same "bare bones" level of detail as that of plaintiffs in *San Diego Gun Rights Committee*. Compare First Amended Complaint, ¶ 15, E.R. 86 ("The CRA has one or more members who are interested in" and "One or more members would seek to") with *San Diego Gun Rights Committee*, 98 F.3d at 1127 ("plaintiffs merely assert that they "wish and intend to engage in"). The Association's allegations also have the open ended "some time in this lifetime" temporal quality proscribed by footnote 2 of *Lujan*. See First Amended Complaint, ¶ 15 ("after January 1, 2020"), E.R. 86.

The Association failed to allege that its members' plans bear *any* temporal proximity to the filing date of the complaint, let alone the "high degree of immediacy" required by *Lujan*. The Association also filed the kind of aspirational allegations ("interested in" "seek to") condemned by *San Diego Gun Rights Committee*. Having failed to allege an actual or imminent injury, the Association lacks standing and the district court did not have subject matter jurisdiction.

## ISSUES PRESENTED FOR REVIEW

Whether the Association has standing without alleging any temporal connection between the filing of the complaint and its members' putative desire to operate in Berkeley.

Whether the domain of a federal preemption clause that prevents states from regulating how appliances are designed and built extends also to whether and where natural gas or any other type of energy is available in any particular locale.

## STATEMENT OF THE CASE

### *Facts*

On July 23, 2019, the Berkeley City Council adopted Ordinance No. 7,672-N.S. ("the Ordinance"). *See* E.R. at 145-49 (copy of the Ordinance).[1] The Ordinance, codified in Chapter 12.80 of the Berkeley Municipal Code ("BMC"), provides, subject to certain exceptions, that "Natural Gas Infrastructure shall be prohibited in Newly Constructed Buildings." BMC, § 12.80.040.A, E.R. 147.

"Natural Gas Infrastructure" is defined as "fuel gas piping, other than service pipe, in or in connection with a building, structure or within the property

---

[1] The Association's description of the Ordinance in its Statement of the Case cites almost exclusively to its characterization of the Ordinance in its own First Amended Complaint. Opening Brief at 7-8, Dkt # 13.1. The City's description here cites to the Ordinance itself, a copy of which is included in the Association's Excerpts of Record ("E.R.") at pages 145-149.

lines of premises, extending from the point of delivery at the gas meter as specified in the California Mechanical Code and Plumbing Code." BMC, § 12.80.030.E, E.R. 147. "Newly Constructed Building" is defined as "a building that has never before been used or occupied for any purpose." BMC, § 12.80.030.F, E.R. 147.

The Ordinance is intended to "eliminate obsolete natural gas infrastructure and associated greenhouse gas emissions in new buildings where all-electric infrastructure can be most practicably integrated, thereby reducing the environmental and health hazards produced by the consumption and transportation of natural gas." BMC, § 12.80.010.H, E.R. 146. The Ordinance took effect on January 1, 2020. BMC, § 12.80.080, E.R. 148.

The Ordinance contains two exceptions to the general ban on new Natural Gas Infrastructure to ensure that compliance with the California Energy Code is feasible and to allow for the installation of Natural Gas Infrastructure where specific uses require natural gas. The first exemption, in BMC § 12.80.040.A.1, provides that "Natural Gas Infrastructure may be permitted in a Newly Constructed Building if the Applicant establishes that it is not physically feasible to construct the building without Natural Gas Infrastructure." BMC, § 12.80.040.A.1, E.R. 147. The definition of "physically feasible" allows for an exemption from the ban on natural gas infrastructure where compliance with the California Energy Code would be impossible for all-electric construction. *Id.*

Consistent with these provisions to ensure compliance with the Energy Code, the Ordinance expressly disavows any intention to amend the Energy Code

or to set standards regulating the use of appliances. BMC, § 12.80.020.C, E.R. 146 ("This chapter [the Ordinance] shall in no way be construed as amending California Energy Code requirements under California Code of Regulations, Title 24, Part 6, nor as requiring the use or installation of any specific appliance or system as a condition of approval.").

The second exception allows for an exemption from the ban on Natural Gas Infrastructure when it is established that the use of natural gas "serves the public interest." BMC, § 12.80.050.A, E.R. 147-148. This exemption allows for a discretionary determination made by the City's Zoning Adjustments Board or, in some cases at the staff level, as part of the entitlement process for new construction. BMC, § 12.80.020.D, E.R. 146. In reviewing requests for a public interest exemption, the Zoning Adjustments Board or City staff must consider (1) "[t]he availability of alternative technologies or systems that do not use natural gas" and (2) "[a]ny other impacts that the decision to allow Natural Gas Infrastructure may have on the health, safety, or welfare of the public." BMC, § 12.80.050.A, E.R. 147.

The purposes of the Ordinance also include avoidance of harms associated with sea level rise caused by greenhouse gas emissions from fossil fuels, reduction of public safety hazards associated with fire and seismic risk, and public health risks associated with indoor and outdoor air pollution caused by the combustion of natural gas. BMC, § 12.80.010.B-C, E.R. 145-146.

7

*Procedural History*

The City is satisfied with the Association's recitation of this case's procedural history, in the Association's Opening Brief at 14-17, Dkt. # 13.1. *See* Fed. Rule App. Proc. 28(b)(3).

## SUMMARY OF ARGUMENT

EPCA energy use standards are about designing and making appliances, not distributing or making natural gas available in locales around the country. The history and text of EPCA's appliance energy conservation and related preemption provisions show that the domain of EPCA preemption is designing and making appliances, and not the local distribution of natural gas. Controlling Ninth Circuit authority holds that this domain should be read consistently with a careful textual interpretation, not broadly.

The Ordinance doesn't require appliance makers to design or make a natural gas appliance that operates on zero gas: "gas water heaters may only use zero natural gas" is not an energy use standard in any real world and EPCA doesn't allow the Department to set such a fanciful "standard" for energy "use." Rather, the Ordinance regulates the distribution and availability of natural gas. Because the Ordinance has no effect on how actual appliances in the real world are designed or made (a point unargued by the Association and tacitly conceded by amicus National Association of Manufacturers), it does not "concern" energy use

8

(however broadly one might read "concerning") under EPCA's appliance energy efficiency provisions.

EPCA does not preempt the Ordinance.

## ARGUMENT

I.  **This Court's De Novo Review Seeks the "Fair Understanding of Congressional Purpose" of the Domain of EPCA's Preemption Clause (From its Text and History) and *Then* Proceeds to the Ordinance**

### A. Standard of Review

A district court's decision regarding preemption is reviewed de novo. *Hickcox-Huffman v. US Airways, Inc.*, 855 F.3d 1057 (9th Cir. 2017). So too are general matters of interpretation of federal statutes. *San Luis & Delta-Mendota Water Auth. v. United States*, 672 F.3d 676 (9th Cir. 2012).

This Court also reviews dismissals based on failure to state a claim pursuant to Rule 12(b)(6) de novo. *See Dougherty v. City of Covina*, 654 F.3d 892, 897 (9th Cir. 2011).

The district court's decision may be affirmed on any ground supported by the record, even if not relied upon by the district court. *Cassirer v. Thyssen-Bornemisza Collection Found.*, 862 F.3d 951 (9th Cir. 2017). Accordingly, a correct decision below will be affirmed "even if the district court relied on the wrong grounds or wrong reasoning." *Muniz v. United Parcel Serv., Inc.*, 738 F.3d

214, 219 (9th Cir. 2013) (quoting *Cigna Property and Cas. Ins. Co. v. Polaris Pictures Corp.*, 159 F.3d 412, 418 (9th Cir. 1998) (citation omitted)).

### B. Applicable Preemption Principles

Claims of express preemption are determined according to well established rules laid out by the Supreme Court and consistently applied by the Ninth Circuit. First, the reviewing court is to "identify the domain expressly preempted" by the federal statute. *Medtronic v. Lohr*, 518 U.S. 470, 484 (1996) (quoting *Cipollone v. Liggett Group*, 505 U.S. 504, 517 (1992)). In doing so, the court is to determine the "fair understanding of congressional purpose" "as the ultimate touchstone," expressed in language, structure, and purpose of the act found in text and legislative history. *Id.* at 485-86 (citing *Retail Clerks v. Schermerhorn*, 375 U.S. 96, 103 (1963); *Cipollone*, 505 U.S. at 516, 530 n.27; *Gade v. National Solid Wastes Management Ass'n,* 505 U.S. 88, 96, 98, 111 (1992); *Malone v. White Motor Corp.*, 435 U.SA. 497, 504 (1978)); *accord Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 495 (9th Cir. 2005) ("*Air Conditioning*") (citing *Medtronic*, 518 U.S. at 485; *accord Connell v. Lima Corp.*, 988 F.3d 1089, 1097 (9th Cir. 2021) (also citing *Medtronic*, 518 U.S. at 485-86).

In determining the domain of preemption, "Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted." *Cipollone*, 505 U.S at 517 (applying interpretive

10

canon *expression unius est exclusion alterius*, i.e. where a specific domain is expressly preempted, state law outside the domain is not preempted).

A preemption plaintiff bears the burden of showing that its proffered reading of the purportedly preempting federal statute is compelled. Where a statute "does not unambiguously require [the plaintiff's] reading" then the plaintiff has "not shown that [its argument] compels their preferred interpretation of the statutory text." *Int'l Bhd. of Teamsters, Local 2785 v. Fed. Motor Carrier Safety Admin.*, 986 F.3d 841, 852 (9th Cir. 2021).

*Air Conditioning* is the leading Ninth Circuit case interpreting the domain of EPCA's preemption clause, 42 U.S.C. § 6297. While *Air Conditioning* addresses section 6297(b) and this case is about subdivision (c) of that section, some identical terms are important in both *Air Conditioning* and this one, and *Air Conditioning*'s interpretive methodology of EPCA preemption is controlling in this case. *Air Conditioning* reads the domain of EPCA preemption narrowly, and this Court must do the same in line with controlling Ninth Circuit precedent. *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003) (en banc).

There is no need to address whether any presumption applies against preemption of state police power regulations. While *Medtronic* and *Air Conditioning* both state this presumption, their use of the "fair understanding of congressional purpose" rule is an independent rationale for the results in each case and, as discussed in detail below, *Medtronic* remains good Supreme Court law on this rule and *Air Conditioning* remains good Ninth Circuit law on its application to

EPCA, as confirmed last year by *Connell v. Lima Corp.*, 988 F.3d at 1097 (citing *Medtronic*, 518 U.S. at 485-86).

## II. EPCA's Congressional Purpose is to Allow Appliance Makers to Design Real Products To Meet A Single Federal Standard For Actual Energy Use, *Not* to Require All Cities to Provide All Types or Any Amount of Energy

Congress first enacted the Energy Policy and Conservation Act (EPCA), 42 U.S.C. §§ 6201 et seq., in 1975 in the wake of several foreign nations' embargo of oil exports to the United States. *Air Conditioning*, 410 F.3d at 498 (citing *Natural Res. Def. Council v. Herrington*, 768 F.2d 1355, 1364 (D.C. Cir. 1985). Among its purposes are "to provide for improved energy efficiency of … major appliances, and certain other consumer products." 42 U.S.C. § 6201(5). And while the original version of the Act expressed congressional purposes to increase the availability of fossil fuels generally and a preference for coal fired electrical generation over other fossil fuels, see P.L. 94-163, § 2, Dec 22, 1975, 89 Stat. 874, these statements of purpose were repealed by the Energy Act of 2000, P.L. 106-469, November 9, 2000, 114 Stat. 2029.

The Act does retain a purpose statement, separate from that of improving appliance energy efficiency, of conserving energy supplies "through energy conservation programs, and, where necessary, the regulation of certain energy uses." 42 U.S.C. § 6201(4). So at the outset, appliance energy efficiency - and energy efficiency more generally - are distinct congressional purposes of the Act.

The Association's basic argument is that EPCA requires the City of Berkeley to extend the availability of natural gas wherever the Association's members would like it to go. To say the least, arguing that EPCA impliedly requires expanded energy use runs counter to one of the Act's explicit purposes, that being to conserve energy supplies.

From these distinct statements of purpose, the Act then adopts two distinct sets of programs: Parts A and A-1 of Subchapter III, 42 U.S.C. §§ 6291-6317, address appliance energy efficiency in furtherance of section 6201(5)'s purpose of improving efficiency of major appliances. These are the provisions at issue in this case.

Separately, Parts B through H contain distinct federal programs aimed at conserving energy supplies more generally. *See*, *e.g.*, 42 U.S.C. §§ 6321-6326 (state energy efficiency plans); *id*. at §§ 6341-6351 (industrial energy efficiency); *id*. at §§ 6361-6364 (other federal energy conservation measures).

The statutory definitions of terms that are dispositive to this appeal are found in Part A and A-1 of Subchapter III, 42 U.S.C. §§ 6291, 6311, and their effect is limited to "th[ese] part[s,]" i.e. to the regulation of appliance energy efficiency at the design level in sections 6291-6309 and 6311-6317.

The Association contends that parallel preemption provisions in Part A (42 U.S.C. § 6297(c)) and Part A-1 (42 U.S.C. § 6316(a)(10)) preempt the Ordinance. The second preemption clause, in section 6316, applies the preemption clause of section 6297(c) (which applies to appliances defined as "consumer products," *see*

13

42 U.S.C. §§ 6297(c), 6291(2)), to another class of appliances defined as "industrial equipment," *see* 42 U.S.C. § 6311(1)(L).

The Association's Opening Brief elaborates extensively on the distinction between "consumer products" and "industrial equipment." It is not clear what that distinction contributes to the Association's argument. Section 6316(a)(10) applies the exact preemption clause from section 6297 to a different category of regulated appliances. Further, the terms "energy use" and "energy efficiency" are defined for relevant purposes the same way in both Part A (consumer products) and Part A-1 (certain industrial equipment). *Compare* 42 U.S.C. §§ 6291(4) and (5) *with id.* §§ 6311(3) and (4).

City of Berkeley's argument focuses on the operative preemption clause in section 6297(c). That argument extends equally to the effect of section 6316(a)(10)'s extension of that clause to "certain industrial equipment." *See Air Conditioning*, 410 F.3d at 496 n.2 (preemption provisions in sections 6297 and 6316 treated identically).

Thus, the structure of EPCA shows immediately that its provisions regulating appliance design and manufacturing do not extend more broadly to *energy* availability, conservation, supply, or use generally, but are limited to how specific *machines* are designed and built by manufacturing companies, in pursuit of EPCA's discrete and expressly stated goal of "improved energy efficiency of … major appliances, and certain other consumer products." 42 U.S. Code § 6201(5)."

Parts A and A-1 of Subchapter III do not address themselves in any way to the amount or mix of energy available in locales around the country.

The preemption clause at issue, 42 U.S.C. § 6297(c) (Section 6297(c)), just like the appliance energy standards which are it's domain, is about designing and making machines in factories, not about whether and where natural gas gets piped in cities.

### A. EPCA's History Shows Its Purpose Is To Protect Appliance Makers From Having To Redesign Products That Meet Federal Standards

*Air Conditioning* provides an excellent history of EPCA's history, especially the various versions of the relevant preemption provision. *See generally* 410 F.3d at 498-500. The original approach to appliance efficiency in EPCA was labelling products to inform purchasers of their relative energy use, under the assumption that federal standards would be unnecessary. *Id.* at 499 (citing H.Rep.No. 94-340, at 95 (1975)). To ensure that appliance makers could do so without different test methods and labelling regimes for 50 states, the initial EPCA preemption provision included only labelling and testing in its domain. *Id.* (citing Pub. Law No. 94-163, § 327, 89 Stat. 871, 926-27).

Then Congress amended EPCA through the National Energy Conservation and Policy Act (NEPCA) in 1978. *Air Conditioning*, 410 F.3d at 499. That Act "created a nationwide conservation program for appliances and required [the Department of Energy ("Department")] to prescribe minimum energy efficiency standards for thirteen covered products." *Id.* (citing *Herrington*, 768 F.2d at 1367;

H.R.Rep. 95-1751, at 114-15 (1978)). EPCA's preemption clause was also amended to allow more stringent state efficiency standards subject to Department approval. 410 F.3d at 499 (citing NECPA, § 424(a), 92 Stat. 3264).

In 1982 the Department defaulted on its duty to set national appliance standards, and instead permitted many states to set their own efficiency standards. *Air Conditioning*, 410 F.3d at 499 (citing H.R.Rep. 100-11, at 27; S.Rep. No. 100-6, at 4). "As a result, a system of separate State appliance standards ha[d] begun to emerge and the trend [was] growing." 410 F.3d at 499 (citing S.Rep. No. 100-6, at 4) (alterations in original).

Three years later, the D.C. Circuit ordered the Department to adopt federal standards. *Herrington*, 768 F.2d at 1433. To get some standards in place sooner than the Department could act, several manufacturing trade associations agreed with the Natural Resources Defense Council on a compromise set of initial standards and procedures for adopting new and updated standards. *Air Conditioning*, 410 F.3d at 499. Congress then enacted this compromise in 1987 as the National Appliance Energy Conservation Act (NAECA), codified at 42 U.S.C. §§ 6291-6309. 410 F.3d at 499-500 (citing H.R.Rep. 100-11, at 27-28; S.Rep. No. 100-6, at 4-5).

In the same act, Congress revised EPCA's preemption clause, 42 U.S.C. section 6297, so that its domain includes all state energy efficiency and use standards for federally regulated appliances, and narrowed the availability of exemptions to this preemptive effect. 42 U.S.C. §6297(c); *see Air Conditioning*,

16

410 F.3d at 500 (citing S.Rep. No. 100-6, at 6). "The reason for the broader preemption standards was to counteract the systems of separate state appliance standards that had emerged … which caused *appliance manufacturers* to be confronted with "a growing patchwork of differing state regulations which would increasingly complicate their *design, production, and marketing plans*."" *Air Conditioning*, 410 F.3d at 500 (quoting S.Rep. No. 100-6, at 4) (emphasis added).[2]

So it is clear from the history of the text of EPCA's preemption clause that the "fair understanding of Congressional purpose" must focus on appliance manufacturers' design and production of regulated appliances. The Association's only argument on this point is that the Ordinance requires the manufacturers to design appliances which operate on zero gas.

---

[2] Oddly, the Association relies on a number of the same legislative history materials. See, e.g., Association's Opening Brief at 12 (preemption provision "is designed to protect the *appliance industry*"), (citing H.R. Rep. No. 100-11, at 24 (1987) (emphasis added), Dkt. # 13.1; *see also* Dkt # 13.2, Association's Statutory Addendum, at 50 (excerpting S. Rep. No. 100-6 (1987): "*appliance manufacturers* were confronted with the problem of a growing patchwork of differing state regulations which would increasingly complicate *their design, production*, and marketing plans. … In an effort to resolve *this problem* the major *appliance manufacturer associations* began negotiations with the Natural Resources Defense Council[.]") (emphasis added). These materials do not help the Association, because they demonstrate that the Congressional purpose of the EPCA preemption clause is to allow *appliance makers* to design appliances to meet one federal standard for energy use or efficiency. As discussed in detail below, the Ordinance does nothing to interfere with appliance makers' design or manufacture of real appliances and does not "concern" "energy use" as that term is properly interpreted in EPCA.

But for this argument to work at all, it would have to be true that a gas appliance that works on zero gas is a real thing – that "producing a natural gas flame without any natural gas" is a design parameter that any manufacturing company would take seriously and try to (or could) accomplish. It is not, and the Association's amici appliance manufacturers do not pretend otherwise.

A "zero gas" gas appliance is an absurdity.

Once that absurdity is dispelled, it is clear that the Ordinance in no way significantly impacts the design or manufacture of real natural gas appliances by engineers working at real manufacturing companies, in this universe. There being no such thing as a "no gas" gas appliance, the Ordinance exerts no influence at all on how appliance makers design and build their real products.

### B. EPCA's Text Only Addresses How Appliances Use What Energy Is Supplied To Them, And Does Not Extend To Making All Energy Available In All Places

The relevant domain of EPCA's preemption clause, 42 U.S.C. § 6297(c), is "State regulation concerning … energy use." The Association's claim is that the Ordinance "concerns" "energy use." The following discussion examines the textual meaning of the term "energy use" as used in the preemption clause.

18

1. **The Definition Of "Energy Use" Shows That EPCA Only Regulates How Appliances Are Designed To Use Affirmative Quantities of Energy, And That CRA's "Zero Energy" – Whether As A "Standard" Or A "Use" - Is An Absurdity**

Part A of Subchapter III of EPCA defines "energy use" as "the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293 of this title." 42 U.S.C. § 6291(4).[3] This term thus defines the domain of federal regulation which the Association must show that the Ordinance "concerns." *Medtronic*, 518 U.S. at 484. As shown below, the terms "quantity," "consumed," and "test procedure" work together to make clear that "energy use" is only an affirmative amount of energy which a real appliance is designed to use.

That is to say, a state regulation only "concerns" "energy use" if it has a significant impact on the affirmative amount of energy a real appliance is designed to consume. Since "gas appliances that consume no gas" is an absurd fiction, so is the Association's argument that conditions in which zero gas is available "concern" the affirmative quantity of energy which real appliances are designed to consume. In no way does the absence of natural gas service in any given locale impact how appliance makers design or build their products.

_____

[3] Part A-1's parallel and, to the extent germane, identical definition is "the quantity of energy directly consumed by an article of industrial equipment at the point of use, determined in accordance with test procedures established under section 6314 of this title." 42 U.S.C. § 6311(4).

Put more simply, the Association is wrong that "zero gas" is "a quantity" a real appliance will "consume," as those terms are used in EPCA's appliance efficiency provisions.

### a.   The Text Defining "Energy Use" Excludes Zero as A "Quantity" Of Energy From The Ambit Of The Preemption Clause

"Energy use" is "the quantity of energy" "directly consumed" "by a consumer product" at point of use, determined "in accordance with test procedures" under section 6293 of this title." 42 U.S.C. § 6291(4). Each of these terms is given its ordinary meaning, absent a definition in the text of the statute. *U.S. v. Pacheco*, 977 F.3d 764, 767 (9th Cir. 2020). And, the meaning of the text is drawn from its context, meaning the surrounding words and grammar. *Nielsen v. Preap*, 139 S.Ct. 954 965 (2019).

### 1.   Contrary to The Association's Unsupported Assertion, "Quantity of Energy" Does Not Include Zero

The Association's argument amounts to little more than "zero is a quantity" and therefore the Ordinance "concerns" "energy use" because "energy use" is defined as a "quantity." But in its context, "quantity" in EPCA's appliance energy standard provisions refers only to affirmative amounts of energy which appliance makers design their products to use. The preemption clause's domain does not include "zero energy conditions" in fictional zero-energy appliances as "energy use" of any real "consumer product" or "industrial equipment."

20

### (a) Each Phrase Defining Energy Use Shows That "Quantity" Is Affirmative

"Energy use" is defined as "the quantity of energy," with "the quantity" further qualified by the following terms: "directly consumed by a consumer product," and "determined in accordance with test procedures." 42 U.S.C. § 6291(4).

### (i) "Consumed By a Product" Requires an Affirmative Amount of Energy to Be "Consumed"

"Consumed" is not defined in the statute. Its ordinary meaning in Black's Law Dictionary (Rev. 4th Ed. 1968) is the "[a]ct or process of … using up anything, as food, heat, or time." Black's Rev. 4th at 389. Webster offers "to destroy, as by fire" as perhaps the best applicable definition of "consume." Webster's New World Dictionary (College Ed. 1957) at 317. So "consumed" requires *some* fuel for a "quantity of energy" to be involved.[4]

As a transitive verb, "consumed" requires a direct object, and that object would be the affirmative quantity of fuel being "destroy[ed], as by fire" by the subject, i.e. the "consumer product" in question. The particular word "consumed"

---

[4] Exodus 3:2 (flame persists without consuming fuel through miraculous intervention) notwithstanding.

21

would not be used to characterize a "quantity" if "zero energy" could be a relevant "quantity" under these provisions of EPCA.[5]

Further, "consumer product" is the grammatical subject of the expression "quantity consumed by a consumer product." As the subject (i.e. the "do-er") of that expression, the congressional choice of the singular "product" over a plural "products" is significant. *Rapanos v. U.S.*, 547 US. 715, 733 (2006) (the use of singular or plural, and choice of preceding article, indicate different meanings). Particularly next to the phrase "determined in accordance with a test method" (discussed below), the singular "product" focuses the meaning on specific appliances *as they are designed* (and then tested for efficiency) by appliance makers, and not on the energy use of appliances more generally post sale and "in the field." If Congress had instead used the plural "products" then that might lean more in the direction of looking at the energy use of installed appliances throughout the country ("quantity of energy consumed by products"). This potentially broader reading of "products" supports the design-focused reading of the singular "product."

---

[5] The Department's regulations defining "energy use" define that term in terms of amount of energy "consumed" by the product and dispense with the word "quantity" entirely. 10 C.F.R. Part 430, § 430.2 (definition of "energy use"). The Department's regulations are due some deference in their de-emphasis of the word "quantity." *See Teamsters, Local 2785*, 986 F.3d at 849-50.

And, the preemption clause in section 6297 also uses the singular "product": "no State regulation concerning the … energy use … of such covered product shall be effective with respect to such covered product." 42 U.S.C. § 6297(c). So the definition of "energy use" and the preemption clause dealing with "energy use" both speak to the actual "consumption" of affirmative amounts of energy by real products, determined based on their design and manufacture, not their use "in the field." That is to say, to encroach on the preempted domain, a state regulation would have to interfere in some way with how products are designed to use energy.

### (ii) "Determined By a Test Method" Requires Some Energy to Be Used Before A "Quantity" Is Concerned

The definition of "energy use" also specifies how the "quantity" "consumed" by a "product" is measured: "by a test method." 42 U.S.C. § 6291(4). 42 U.S.C. section 6293 elaborately describes how test methods are to be designed by the Department and provides highly technical criteria for the measurement of how much energy an appliance is designed and built to use. 42 U.S.C. § 6293.

One example suffices to show that the complexity of the test methods requires that "energy use" (i.e. the relevant domain of the preemption clause) is limited to the design of appliances in factories and testing labs long before they are sold, and not how much energy is used "in the field" after they are sold.

For example, the test method for natural gas water heaters requires that the power input to the main burners be determined after 15 minutes of operation. 10

23

C.F.R. Part 430, Subpart B, Appendix B (test method for water heaters), ¶ 2.7. That is to say, "the quantity of energy consumed by the product" cannot be "determined" without supplying natural gas to the appliance for a quarter of an hour. The domain of the statute is solely the affirmative quantities of energy that are actually consumed by products while being tested.

Two conclusions flow from this. First, this reinforces the above discussion that so far as the domain of EPCA's preemption clause is concerned, "quantity" only means affirmative amounts of natural gas and "zero gas" conditions don't "concern" "energy use" as that term is used in the statute.

Second, a brief perusal of the test method described at 10 C.F.R. Part 430, Subpart B, Appendix B for water heaters shows that this is not done "after the sale" on installed water heaters in homes or businesses anywhere. It is done in testing labs before the model of appliance is sold. The entire EPCA appliance energy standards provisions are about how real appliances and designed, tested, and then built, all at factories or similar facilities, and is not concerned with whether there is any amount or type of energy in any particular locale. If a state regulation does not interfere with how appliance makers design real products, it does not "concern" "energy use."

24

**(b) Reading A "Quantity" Of Energy "Use" To Include Zero Produces The Absurd Result That The Department Could Set "Zero Energy Use" As A National Standard**

Another means of showing that the domain of EPCA's preemption clause does not include "zero energy" conditions "in the field" is to assume that, as the Association asserts, "quantity of energy" *can* include "zero" and then see how that affects other provisions that rely on the same definition.

This analysis leads to "energy conservation standard" which is defined at 42 U.S.C. section 6291(6) as, among other things, "a performance standard which prescribes a … *maximum quantity* of energy use[.]" 42 U.S.C. § 6291(11)(A) (emphasis added). Of course, energy conservation standards are what EPCA requires the Department to establish. 42 U.S.C. § 6295(a)(2). If the Association is correct that under EPCA's appliance energy conservation provisions, "zero" can be a "quantity of energy," then the necessary implication is that the Department could set an energy conservation standard, expressed in terms of a maximum *quantity* of energy use, at zero.

Whatever the prowess of human ingenuity in advancing the efficiency of how our machines use energy, it is far beyond the reasonable bounds of statutory interpretation to read EPCA's appliance energy conservation provisions as allowing the federal government to forbid the sale of water heaters that require "more than zero" energy to heat water. Reading EPCA to allow such an action is absurd, and should be rejected. *See Holy Trinity Church v. U.S.*, 143 U.S. 457, 459 (1892) ("a consideration of … the absurd results which follow from giving such

25

broad meaning to words, makes it unreasonable to believe that the legislator intended to include the particular act.").

**(c) Reading "Quantity" As Only Including Affirmative Amounts Is Required by Properly Reading "Ratio" Under The "Energy Efficiency" Definition**

Reading "quantity of energy" in section 6291(4) as only affirmative amounts is also required by a proper reading of "ratio" in EPCA's related definition of "energy efficiency." See 42 U.S.C. § 6311(5). "Energy efficiency" is defined as a "ratio of … output … to … energy use." A ratio is a fraction. *Zircon Corp. v. Stanley Works*, 713 F.Supp.2d 881, 889-91 (N.D. Cal. 2010) (ordinary meaning of the word "ratio" is "dividing two values" based on dictionary definition and "basic mathematical concept[s]"). And while in other contexts "quantity" could be reasonably interpreted to include zero, a fraction cannot have zero in its denominator. *See* Hamilton, A.G., *Numbers, Sets and Axioms, The Apparatus of Mathematics*, Cambridge University Press, 1982, at 21 ("Division by a/b is defined to be the same as multiplying by b/a. Note, of course, that we can only do this if b/a is a rational number, i.e. only if a ≠0. Hence, the restriction (required by intuition, of course) that *we can divide only by non-zero numbers*.") (emphasis added).

So an energy efficiency standard under EPCA is expressed as a ratio, or fraction, which represents dividing the "useful output" of the appliance by the "energy use" of the appliance. 42 U.S.C. § 6311(5). Since there is no such thing as

26

dividing by zero, the "energy efficiency" fraction (or ratio) may not have a zero in the bottom term (the denominator). Since the denominator in an energy efficiency ratio under EPCA is "energy use", then "energy use" can never be zero within the context of EPCA. *Air Conditioning*, 410 F.3d at 497 (identical words used in different parts of a statute to be given the same meaning) (quoting *Commissioner of Internal Revenue v. Lundy*, 516 U.S. 235, 250 (1996).

And, since "energy use" is both defined as a "quantity" in section 6291(4), and used as the denominator in a "ratio" in the definition of "energy efficiency" in section 6291(5), the "quantity" of energy use with which EPCA concerns itself cannot be zero, and so called "zero energy conditions" as raised by the Association do not "concern" "energy use" as that term is precisely defined and limited in EPCA and used in that statute's preemption clause.

### 2. Taken Together the Text Shows That The "Quantity" Of Energy That Real Appliances Are Designed to Use Does not Include Availability Of Energy In Locales All Over The Country

Taking the above textual analyses together, the conclusion is that "energy use" as that term is used in the statute only refers to affirmative amounts of energy used by real appliances, as determined "pre-sale" in test conditions in a laboratory or similar setting, in which energy is actually supplied to and consumed by the appliance. And so, the domain preempted by section 6297(c), defined as "energy use" (as properly interpreted), is limited to state regulations which have a

significant impact on what affirmative amounts (or "quantities") of energy appliances may be designed to use. Since "energy use" in this specific context does not address conservation of energy generally in society, or even have anything to do with how much energy regulated appliances may consume in post-sale "field conditions," regulations like the Ordinance (which leave appliance design undisturbed entirely, speculative fiction aside) cannot "concern" "energy use" under EPCA.

### C.   The City's Narrower Reading of EPCA Is Required By *Air Conditioning*, Which Is Reinforced Rather Than Superseded By *Franklin California*

All of the above textual analysis is consistent with and in fact compelled by this Court's narrow reading of the domain of EPCA preemption in *Air Conditioning*. 410 F.3d at 500 ("In sum, the legislative history of the relevant Acts supports a narrow interpretation of the preemption provision"). That narrow reading is based on this Court's application of the Supreme Court's rule that courts must first determine the "fair understanding of Congressional purpose." *Id*. at 498 ("the narrow interpretation of "disclosure of information" rests on "a fair understanding of congressional purpose"") (citing *Medtronic*, 518 U.S. at 485-86); *id*. at 498-500 (reviewing history of EPCA preemption provisions). The City discussed above the history of EPCA preemption as elaborated in *Air Conditioning*.

Upon determining that the congressional purpose of EPCA preemption is to ensure that appliances can be designed to one federal standard for energy use or efficiency, this Court concluded that this specific purpose properly informed and constrained its reading of the text to identify the precise domain of EPCA's labelling and information disclosure preemption clause. *Id*. at 497-98 (textual analysis of EPCA information disclosure definitions); *see also id*. at 501-02 (interpreting "measure of energy consumption" textually using EPCA definitions of "energy use" and "energy efficiency").

This Court then looked at whether the California labelling, and data submission requirements were "with respect to" the preempting federal labelling and information disclosure standards, and concluded that they were not. 410 F.3d at 502. In doing so, this Court concluded that while "with respect to" could be read as widely as "relating to," nonetheless there is still some limiting factor to the terms, based on Supreme Court precedent. *Id*. (citing *Egelhoff v. Egelhoff*, 532 U.S. 141, 146 (2001)). Where the California requirements were outside the domain of EPCA's labelling and disclosure preemption clause, this Court concluded that their "relation" to EPCA was indirect, remote, and tenuous. *Id*. at 502 (citing *Cal. Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.,* 519 U.S. 316, 335 (1997) (Scalia, J., concurring) ("[e]verything is related to everything else."); *Californians For Safe & Competitive Dump Truck Transp. v. Mendonca,* 152 F.3d 1184, 1189 (9th Cir.1998)).

29

*Air Conditioning* invokes, as one basis for its narrow reading of EPCA, a presumption against federal preemption of state police power regulations. 410 F.3d at 496 ((citing *U.S. v. Locke*, 529 U.S. 89, 108 (2000) and *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). However, this Court's textual reading of EPCA preemption and narrow application of "with respect to" are independently based on the separate rule limiting preemption based on the "fair understanding of Congressional purpose" rule based on *Medtronic*. See Air Conditioning, 410 F.3d at 496 (describing "two presumptions": presumption against preemption of state police power, and "fair understanding of Congressional purpose" as illuminated by text, purpose, structure, and legislative history); *id*. at 498 ("*In addition*, the narrow interpretation of "disclosure of information" rests on "a fair understanding of congressional purpose" as evidenced by the relevant legislative history.") (emphasis added) (*citing Medtronic*, 518 U.S. at 485-86); *id*. at 499 ("In sum, the legislative history of the relevant Acts supports a narrow interpretation of the preemption provision."); *id*. at 501 ("In accordance with the *presumptions* informing our interpretation of express preemption provisions, we interpret these terms narrowly as such an interpretation is consistent with the statutory text.") (emphasis added).

As a result, the Supreme Court's subsequent statements limiting the use of a presumption against preemption of state police power regulations in express preemption cases, *see Puerto Rico v. Franklin Cal. Tax-Free Tr. ("Franklin California")*, 579 U.S. 115, 125 (2016), *accord Teamsters, Local 2785*, 986 F.3d

at 853, have no limiting effect on *Air Conditioning*'s application of the "fair understanding of Congressional purpose" rule to narrowly read EPCA preemption through a textual analysis of the relevant definitions and domain of the relevant preemption clause. See, e.g., *Connell v. Lima Corp.*, 988 F.3d at 1097 (citing *Medtronic*, 518 U.S. at 485-86).

And in any event, the textual reading of the relevant federal preemption clause called for by *Franklin California* and cases it relies upon, *see*, *e.g.*, *Chamber of Commerce of United States of America v. Whiting*, 563 U.S. 582 (2011), is what this Court did with the text of EPCA's preemption clause in *Air Conditioning*. *Compare Franklin California*, 579 U.S. at 125-127 (textual analysis of definitions in Bankruptcy Code to determine whether Puerto Rico is a "state" for purposes of a preemption clause in that Act) and *Whiting*, 563 U.S. at 594-97 (analyzing definitions of "license" and other terms to resolve question of domain of Immigration Act preemption clause) *with Air Conditioning*, 410 F.3d at 497-498, *id*. at 501-02 (textual analysis of definitions in EPCA to determine domain of preemption clause).

The best way to understand *Air Conditioning*'s use of the term "narrow" in its interpretation of EPCA is that, consistent with long standing and widely understood Ninth Circuit jurisprudence, a textual reading of a statute is the "narrow" reading of it. That is to say, at least for purposes of what impact *Franklin California* has on *Air Conditioning*, the textual approach directed by *Franklin*

*California* for express preemption cases is what this Court did in *Air Conditioning*. For from undermining *Air Conditioning*, *Franklin California* validates it.

The Association argues that *Air Conditioning* may not be relied on by this Court because, in the Association's view, *Franklin California* supersedes *Air Conditioning*. This is false.

Under Ninth Circuit precedent, prior circuit decisions are binding on subsequent panels unless and only unless a subsequent decision of a higher court is "clearly irreconcilable" with the prior precedent. *Miller v. Gammie*, 335 F.3d at 900. "The 'clearly irreconcilable' requirement is 'a high standard.'" *Rodriguez v. AT & T Mobility Servs. LLC*, 728 F.3d 975, 979 (9th Cir. 2013)). "[I]f we can apply our precedent consistently with that of the higher authority, we *must* do so." *FTC v. Consumer Def., LLC*, 926 F.3d 1208, 1213 (9th Cir. 2019) (emphasis added).

As discussed above, *Air Conditioning*'s textual analysis of EPCA's definitions and preemption clause is entirely consistent with *Franklin California*'s textual analysis of the Bankruptcy Code. Far from being "irreconcilable," the two decisions use the same fundamental approach: textual analysis of definitions in context to determine the domain of a federal preemption clause.

The Association provides nothing to argue that the "fair understanding of Congressional purpose" rule applied in *Air Conditioning* is in any way irreconcilable with *Franklin California*. *Cf. U.S. v. Walker*, 953 F.3d 577, 580 (9th Cir. 2020) ("Generic assertions that our precedents are inconsistent with higher

32

authority will not do"). Nor could it, since the "fair understanding of Congressional purpose" rule comes from *Medtronic* (a case not cited by *Franklin California*, much less limited or overruled by it) and cases it relies on. Nor does *Air Conditioning* rely on *Medtronic* for a presumption against preemption of state police power. 410 U.S. at 496. And as discussed above, *Air Conditioning*'s textual reading of EPCA preemption based on the "fair understanding of Congressional purpose" rule is independent of and parallel to its application of the presumption against preemption of state police power.

This Court's recent decisions applying *Miller v. Gammie* show that *Air Conditioning* is not superseded by *Franklin California*. For example, in *Wilkins v. United States*, 13 F.4th 791, 794-95 (9th Cir. 2021), this Court applied *Miller* to whether the Supreme Court's decision in *U.S. v. Kwai Fun Wong*, 575 U.S. 402, 409 (2015) (statute of limitations under Federal Tort Claims Act subject to equitable tolling) had abrogated the Ninth Circuit's holding in *Kingman Reef Atoll Invs. LLC v. U.S.*, 541 F.3d 1189, 1195-96 (9th Cir. 2008), that the statute of limitations under the Quiet Title Act is jurisdictional. *Kingman* relied on the Supreme Court's prior decision in *Block v. North Dakota*, 461 U.S. 273, 292 (1983). The Ninth Circuit had previously held that *Block* was not superseded by *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89 (1990), a Supreme Court decision issued between *Block* in 1983 and *Wong* in 2015. 13 F.4th at 795 (citing *Kingman*, 541 F.3d at 1196). The Ninth Circuit then reasoned that since *Wong* (Supreme Court 2015) relied on *Irwin* (Supreme Court 1990) for its decision, then *Wong*

could not be read in the Ninth Circuit as superseding *Block* or Ninth Circuit precedent applying *Block*. *Wilkins*, 13 F.4th at 795.

Similarly here, *Air Conditioning* (Ninth Circuit 2005) relied on *Medtronic* (Supreme Court 1996), and *Franklin California* (Supreme Court 2017) did not overrule or criticize *Medtronic*, and *Connell* (Ninth Circuit 2021) relied on *Medtronic* for the "fair understanding of Congressional purpose" rule. *Connell*, 988 F.3d at 1097.[6]

The text, purposes, and history of the statute, and the binding precedent of this Court in *Air Conditioning*, require a reading of the domain of EPCA preemption as limited to the design of regulated appliances, and particularly how they are designed to use affirmative amounts of fuel. There is no such thing as a "zero energy" regulated appliance, for all of the reasons stated above, and the domain of EPCA appliance energy standard preemption does not extend to where or whether any type or amount of energy is available.

---

[6] *See also U.S. v. Olson*, 988 F.3d 1158, 1168 (9th Cir. 2021) (Berzon, J., concurring) (while *U.S. v. Hayes*, 231 F.3d 663 (2000) (en banc), draws a brighter line test for when the Sixth Amendment right to counsel attaches than Supreme Court decisions or proper interpretation of Sixth Amendment generally allow for, no Supreme Court precedent is so clearly irreconcilable with *Hayes* as to allow the panel to depart from it).

### III. The Ordinance Does Not "Concern" Any Affirmative Quantity of Energy Which Real Appliances Are Designed To Consume, And Is Not Preempted

As discussed above, the Association's sole argument is that the Ordinance creates a highly localized "zero natural gas" condition, and since "zero" is a "quantity," and the word "quantity" appears in EPCA's definition of "energy use," then the Ordinance must "concern" "energy use" under EPCA. Appellee has demonstrated that the flaws in this argument are twofold. First, "quantity" in EPCA cannot include "zero" and so the Association's evocation of a "zero energy condition" is by definition outside the domain of EPCA preemption. Second, the Association's assertion that the Ordinance requires appliance makers to invent "zero energy" appliances is science fiction.

In fact, as demonstrated above, the absence of any given type of energy in a particular locale does not concern how appliance makers design their products to efficiently use the type of energy they are designed to use. Appliance makers do not need to (indeed, cannot and would never propose to) redesign their natural gas water heaters and space heaters so that they operate on "zero natural gas."

The Ordinance does not impinge on manufacturers' appliance designs in any way, and does not "concern" "energy use" under EPCA's preemption clause.[7]

This is true even if, as the Association argues, "concerning" is synonymous with "related to." *Air Conditioning* holds that, in the context of EPCA, "related to" or "respecting" are not infinitely elastic or to be applied woodenly, and applied the terms by asking if the California labelling and data submission requirements at issue in that case fell within the domain of EPCA's labelling and information disclosure preemption clause. 410 F.3d at 502.[8]

---

[7] The Association also discusses, at some length, the statutory exemptions to Section 6297(c)'s preemption clause. This discussion is entirely beside the point. The parties agree that the Ordinance does not fall within any of the exemptions. See Association's Opening Brief at 9-10; *id*. at n2, Dkt. # 13.1. The exemptions are irrelevant because the Ordinance falls outside the domain of the preemption clause in the first place. The exemptions would only be relevant if the Ordinance was within the domain of the preemption clause. Put another way, since the Ordinance does not "concern" "energy use," it does not need any of EPCA's exemptions to avoid being preempted.

[8] The Association cites the District of New Mexico's unpublished decision in *Air Conditioning, Heating, and Refrigeration Institute v. City of Albuquerque* (*City of Albuquerque*), 2008 WL 5586316 (D. New Mexico, October 3, 2008), in support of its argument that "concerns" should be read broadly. But that opinion also cites *Medtronic* and *Cipollone* for the "fair understanding of Congressional purpose" rule. *City of Albuquerque*, 2008 WL 5586316, *6. And as to *City of Albuquerque*'s discussion of the scope of "concerning," the unpublished district court decision does not discuss or cite this Circuit's binding precedent of *Air Conditioning* and cannot be taken as authority to counter *Air Conditioning*'s precedential reading of "respecting" in EPCA's preemption clause.

Here, directly analogous to *Air Conditioning*, the Ordinance has nothing to do with how appliance manufacturers design the efficiency with which their appliances use the actual energy available to them.

The domain of EPCA preemption cannot extend, as the Association argues, to the length of mandating the provision of natural gas wherever and whenever its members demand. The first problem with implying such a mandate in EPCA is that this would impliedly repeal the provision of the Natural Gas Act, 15 U.S.C. § 717(b), that disclaims federal regulation of "local distribution of natural gas[.]" But implied repeals are disfavored, and will only be found where the two statutes are clearly irreconcilable. *Floyd v. American Honda Motor Co., Inc.*, 966 F.3d 1027, 1034 (9th Cir. 2020) (citations omitted). The Association's only argument to support this claim of implied repeal of the Natural Gas Act is its claim that the domain of EPCA preemption extends to zero energy conditions "in the field." The City has already demonstrated that EPCA cannot be read this way. EPCA does not impliedly the Natural Gas Act.

The other problem with the Association's claim that EPCA obliges the City of Berkeley to make natural gas available to Association members wherever they would like it, is that such a reading of EPCA leads inevitably to every locale in America being obliged (the Natural Gas Act notwithstanding) to make natural gas available everywhere. The Association recognizes that this is a lot of elephant to hide in the mousehole, *Whitman v. American Trucking Association*, 531 U.S. 457, 468 (2001), and tries to salvage the plausibility of this untenable reading of EPCA

37

by offering a self-serving 'limiting principle' that requires Berkeley to accommodate the Association on natural gas availability in the City, but absolves those municipalities that have no natural gas service at all from having to provide it. This line does not work because it cannot be found in EPCA's text, and is simply plucked from the air. If EPCA does oblige the City to make natural gas available to the Association's members in new locations, then it forces this everywhere.

The Ordinance does not "concern" "energy use" and is not preempted by EPCA.

## IV.     The District Court's Dismissal of the Association's State Law Claims Should Not Be Disturbed

The Association's only argument that its state law claims should be revived is that if the dismissal of its federal law claim is reversed, then it should have an opportunity to argue its state law claims in federal court as well. As demonstrated above, the Association's federal preemption claim was properly dismissed, and the district court's dismissal of its state law claims should be affirmed.

## CONCLUSION

If this Court concludes that the Association has standing, then it should affirm the district court's judgment that EPCA does not preempt the Ordinance.

DATED:  February 1, 2022                  BRISCOE IVESTER & BAZEL LLP


                                          By:  /s/ Tony Francois _____
                                               Tony Francois
                                          Attorneys for Defendant-Appellee
                                          CITY OF BERKELEY

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 21-16278

I am the attorney or self-represented party.

**This brief contains** | 9223 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(●) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of Fed. R. App. P.
29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because
*(select only one):*

　( ) it is a joint brief submitted by separately represented parties;

　( ) a party or parties are filing a single brief in response to multiple briefs; or

　( ) a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated [          ].

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Tony Francois | **Date** | Feb 1, 2022

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/2018*