No. 21-16278

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

CALIFORNIA RESTAURANT ASSOCIATION,

Plaintiff-Appellant,

v.

CITY OF BERKELEY,

Defendant-Appellee.

On Appeal from the United States District Court
for the Northern District of California

## BRIEF FOR THE UNITED STATES IN SUPPORT OF APPELLEE

*Of Counsel:*

SAMUEL T. WALSH
*General Counsel*

EMILY HAMMOND
*Deputy General Counsel for Litigation,*
*Regulation, and Enforcement*

*Department of Energy*

BRIAN M. BOYNTON
*Acting Assistant Attorney General*

STEPHANIE HINDS
*Acting United States Attorney*

MICHAEL S. RAAB
H. THOMAS BYRON III
THOMAS PULHAM
*Attorneys, Appellate Staff*
*Civil Division, Room 7323*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-4332*

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY ............................................................................1

STATEMENT OF THE CASE ...................................................................................2

    A.    Statutory Background ...................................................................2

    B.    Factual Background ......................................................................4

    C.    Prior Proceedings ........................................................................5

ARGUMENT ...............................................................................................................6

EPCA Does Not Preempt The Ordinance ................................................................6

    A.    Section 6297(c) Preempts Energy Conservation Standards and Their Equivalents .....................................................................7

        1.    Statutory Text and Context Establish the Meaning of "Regulation Concerning Energy Use" ...............................7

        2.    The Federal Government Has Long Adopted This Construction ......................................................................14

    B.    The Ordinance Regulates Natural Gas Distribution and Does Not Establish an Energy Conservation Standard for Any Covered Product .......................................................................17

    C.    Adopting CRA's Interpretation Would Disrupt the Federal Administration of EPCA ............................................................25

CONCLUSION ......................................................................................... 27

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:**                                                                **Page(s)**

*Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*,
  410 F.3d 492 (9th Cir. 2005) ...................................................................2, 9, 10, 12, 13, 21

*Appert v. Morgan Stanley Dean Witter, Inc.*,
  673 F.3d 608 (7th Cir. 2012) ...........................................................................................18

*Building Indus. Ass'n of Wash. v. Washington State Bldg. Code Council*,
  683 F.3d 1144 (9th Cir. 2012) ........................................................................ 2, 13, 14, 24

*California Trucking Ass'n v. Bonta*,
  996 F.3d 644 (9th Cir. 2021) ...........................................................................................18

*City & Cty. of San Francisco v. U.S. Dep't of Transp.*,
  796 F.3d 993 (9th Cir. 2015) ...........................................................................................23

*City of Columbus v. Ours Garage & Wrecker Serv., Inc.*,
  536 U.S. 424 (2002) ...................................................................................................19-20

*CSX Transp., Inc. v. Easterwood*,
  507 U.S. 658 (1993) ...........................................................................................................6

*Dan's City Used Cars, Inc. v. Pelkey*,
  569 U.S. 251 (2013) .........................................................................................................20

*De Buono v. NYSA ILA Med. & Clinical Servs. Fund*,
  520 U.S. 806 (1997) .............................................................................................18, 20, 22

*Dolan v. U.S. Postal Serv.*,
  546 U.S. 481 (2006) ................................................................................................. 17, 18

*Florida Dep't of Revenue v. Piccadilly Cafeterias, Inc.*,
  554 U.S. 33 (2008) ..............................................................................................................9

*Hillsborough County v. Automated Med. Labs., Inc.*,
  471 U.S. 707 (1985) .........................................................................................................22

*Hines v. Davidowitz,*
    312 U.S. 52 (1941) ...................................................................................14

*Medtronic, Inc. v. Lohr,*
    518 U.S. 470 (1996) .............................................................. 6, 12, 17, 22

*Michigan Consol. Gas Co. v. Panhandle E. Pipe Line Co.,*
    887 F.2d 1295 (6th Cir. 1989) ...............................................................23

*National Credit Union Admin. v. First Nat'l Bank & Tr. Co.,*
    522 U.S. 479 (1998) ...............................................................................11

*Natural Res. Def. Council, Inc. v. Herrington,*
    768 F.2d 1355 (D.C. Cir. 1985) .............................................................12

*New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,*
    514 U.S. 645 (1995) ................................................6, 17, 18, 20, 22, 24

*Porter v. Nussle,*
    534 U.S. 516 (2002) .................................................................................9

*Rice v. Santa Fe Elevator Corp.,*
    331 U.S. 218 (1947) .................................................................................6

*Roberts v. Sea-Land Servs., Inc.,*
    566 U.S. 93 (2012) ...................................................................................7

*South Coast Air Quality Mgmt. Dist. v. FERC,*
    621 F.3d 1085 (9th Cir. 2010) ...............................................................23

*Sturgeon v. Frost,*
    577 U.S. 424 (2016) .................................................................................7

*Virginia Uranium, Inc. v. Warren,*
    139 S. Ct. 1894 (2019) ...........................................................................19

*Washington State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler,*
    537 U.S. 371 (2003) ...............................................................................10

*Wyeth v. Levine,*
    555 U.S. 555 (2009) ........................................................................ 14, 25

**U.S. Constitution:**

Art. VI, cl. 2......................................................................................................6

**Statutes:**

Pub. L. No. 100-12, § 7, 101 Stat. 103, 118 (1987) ...........................................13

15 U.S.C. § 717(b).............................................................................................23

42 U.S.C. ch. 77, subch. III, pt. A ....................................................................8

42 U.S.C. §§ 6291-6309 ....................................................................................2

42 U.S.C. § 6291(4)....................................................................................... 3, 8

42 U.S.C. § 6291(5)............................................................................................3

42 U.S.C. § 6291(6).............................................................................3, 8, 9, 17

42 U.S.C. § 6291(6)(B).......................................................................................3

42 U.S.C. § 6291(8)..........................................................................................11

42 U.S.C. § 6292(a)(1)-(19)..............................................................................26

42 U.S.C. § 6292(b)..........................................................................................26

42 U.S.C. § 6292(b)(1)(A)-(B)..........................................................................26

42 U.S.C. § 6293(3)............................................................................................8

42 U.S.C. § 6295 ................................................................................................3

42 U.S.C. § 6295(a)(2) .......................................................................................8

42 U.S.C. § 6295(h) ...........................................................................................7

42 U.S.C. § 6295(*l*)...........................................................................................26

42 U.S.C. § 6297(a)(2) (1982) ....................................................... 13, 15

42 U.S.C. § 6297(b) .............................................................................9

42 U.S.C. § 6297(c) ............................................................. 1, 3, 7, 8

42 U.S.C. § 6297(c)(7)(A) ..................................................................19

42 U.S.C. § 6297(c)(8)(A) ..................................................................19

42 U.S.C. § 6297(d)(1) .........................................................................4

42 U.S.C. § 6297(d)(1)(A) ..................................................................10

42 U.S.C. § 6297(d)(1)(B) ...................................................... 4, 11, 25

42 U.S.C. § 6297(d)(1)(C) ..................................................................11

42 U.S.C. § 6297(d)(2)-(5) ...................................................................4

42 U.S.C. § 6297(d)(6) ........................................................................18

42 U.S.C. §§ 6311-6317 ........................................................................2

## Regulations:

10 C.F.R. pt. 430, subpt. D ...............................................................25

10 C.F.R. § 430.32(j) .............................................................................7

## Legislative Material:

S. Rep. No. 100-6 (1987) ....................................................................12

## Other Authorities:

47 Fed. Reg. 14,424 (Apr. 2, 1982) ................................... 14, 15, 20, 21

47 Fed. Reg. 57,198 (Dec. 22, 1982) ................................................................ 15, 16

75 Fed. Reg. 20,112 (Apr. 16, 2010) ...................................................................24

75 Fed. Reg. 59,470 (Sept. 27, 2010) ..................................................................16

81 Fed. Reg. 46,768 (July 18, 2016) ....................................................................26

## INTRODUCTION AND SUMMARY

The question presented in this appeal is whether a federal law providing for the creation of energy conservation standards for appliances prevents a municipality from prohibiting the extension of natural gas infrastructure in new construction. The federal law at issue, the Energy Policy and Conservation Act (EPCA), directs the Department of Energy (Department) to establish energy conservation standards for certain consumer and industrial appliances, and it displaces any state or local "regulation concerning . . . energy use" of appliances for which a federal energy conservation standard exists. 42 U.S.C. § 6297(c). The California Restaurant Association (CRA) contends that this provision preempts the natural gas infrastructure ordinance adopted by the City of Berkeley because the ordinance means that no energy can be used by a gas-powered appliance in a new building.

CRA's preemption claim lacks merit. Statutory text, context, and longstanding administrative interpretation all lead to the same straightforward conclusion: The phrase "regulation concerning energy use" in § 6297(c) refers to state and local regulations that impose energy conservation standards or similar performance standards for the efficiency or energy consumption of certain appliances. Put simply, this provision prevents States and localities from attempting to do at their level what the Department does at the federal level. The statute does not preempt the regulation of natural gas distribution, an area traditionally subject to state authority and reserved exclusively to the States by another federal law. Nor does EPCA's express

preemption provision prevent States and localities from adopting health and safety regulations that indirectly affect the quantity of energy or water used by any of the nearly 70 different product categories regulated by the Department. This is true even if the practical effect of such a regulation is to prevent the use of a certain type of appliance in a particular location. "Congress intended to preempt state energy efficiency standards" in order to "counteract . . . systems of separate state appliance standards." *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 500 (9th Cir. 2005). The Berkeley Ordinance challenged here does not implicate that concern and falls outside the preemptive scope of § 6297(c).

## STATEMENT OF THE CASE

### A.    Statutory Background

EPCA establishes "a comprehensive federal regime regulating energy and water conservation standards" for a variety of consumer and industrial appliances. *Building Indus. Ass'n of Wash. v. Washington State Bldg. Code Council*, 683 F.3d 1144, 1146 (9th Cir. 2012).[1] The statute establishes initial energy conservation standards for some covered products and authorizes the Department to issue new or revised standards as

---

[1] EPCA addresses consumer and industrial appliances separately in different statutory provisions. *See* 42 U.S.C. §§ 6291-6309 (consumer); *id.* §§ 6311-6317 (industrial). The provisions are substantially similar, and for present purposes, nothing turns on the specific type of product involved. For convenience, this brief will cite the provisions applicable to consumer products. *See Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 496 n.2 (9th Cir. 2005) (taking a similar approach).

2

appropriate. *See* 42 U.S.C. § 6295. "Energy conservation standard" means, in relevant part, "a performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use" for a covered product. *Id.* § 6291(6).[2] "[E]nergy efficiency" is defined as "the ratio of the useful output of services from a consumer product to the energy use of such product." *Id.* § 6291(5). And "energy use" is defined as "the quantity of energy directly consumed by a consumer product at point of use." *Id.* § 6291(4).

EPCA contains an express preemption provision to displace local standards where a federal standard exists for a covered product. Section 6297(c) sets out a "[g]eneral rule of preemption for energy conservation standards," which provides that "no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product unless the regulation" falls into one of several specific categories. 42 U.S.C. § 6297(c). However, this general rule is subject to waiver in some circumstances. Any State with a regulation that "provides for any energy conservation standard or other requirement with respect to energy use, energy efficiency, or water use for any type (or class) of covered product for which there is a Federal energy conservation standard" may petition the Secretary "requesting a rule that such State regulation become effective with respect

---

[2] In certain cases, for certain covered products authorized by EPCA, DOE may establish a design requirement as an alternate form of energy conservation standard. 42 U.S.C. § 6291(6)(B).

3

to such covered product." *Id.* § 6297(d)(1). EPCA imposes strict procedural and substantive requirements that the Secretary must follow when deciding whether to grant or deny such a waiver. *See id.* § 6297(d)(1)(B), (2)-(5).

### B. Factual Background

In 2019, the City of Berkeley, California, adopted an ordinance prohibiting "[n]atural [g]as [i]nfrastructure" (essentially pipes to carry natural gas) in newly constructed buildings, effective January 1, 2020. Berkeley Municipal Code §§ 12.80.040.A, 12.80.080, ER-147–48 (Ordinance). The stated purpose of the Ordinance is "to eliminate obsolete natural gas infrastructure and associated greenhouse gas emissions in new buildings where all-electric infrastructure can be most practicably integrated, thereby reducing the environmental and health hazards produced by the consumption and transportation of natural gas." *Id.* § 12.80.010.H, ER-146. There are two exceptions to the general ban on natural gas infrastructure. The first applies where it is not "physically feasible" to construct the building without natural gas, including where all-electric construction would not be in compliance with the California Energy Code. *Id.* § 12.80.040.A.1, ER-147. The second exception applies where a discretionary finding is made by the Zoning Adjustment Board or its staff, as part of the approval process for new construction, that the use of natural gas in a particular building would serve the public interest. *Id.* § 12.80.050.A, ER-147.

Plaintiff CRA is an association of members of the restaurant industry, including restaurant owners and chefs. ER-85. It alleges that some "restaurants rely on gas for

4

cooking particular types of food" and that the unavailability of this fuel source "will slow down the process of cooking, reduce a chef's control over the amount and intensity of heat, and affect the manner and flavor of food preparation." ER-84. CRA claims that it has "members who are interested in opening a new restaurant or in relocating a restaurant to a new building in Berkeley," but they "cannot do so because of the Ordinance's ban on natural gas." ER-86.

## C.  Prior Proceedings

CRA sued the City of Berkeley, claiming that the Ordinance was preempted by state and federal law. The district court dismissed the complaint.

"The crux of . . . CRA's argument," the district court explained, "is that the Ordinance concerns the quantity of natural gas consumed by appliances in the buildings it regulated because, by barring the connection to gas pipes required to use natural gas, the Ordinance requires that *no* natural gas is used." ER-18–19. The court rejected this argument because the Ordinance "does not address" either energy efficiency or energy usage, "let alone mandate or require any particular energy use of a covered product." ER-19. "Instead, the Ordinance focuses on regulating the underlying natural gas infrastructure," and has only a "downstream" and "indirec[t]" effect on energy usage (and even then, only in certain locations). ER-21, 22 & n.6.

Because CRA's claim would extend EPCA's preemption clause "beyond what Congress intended and infringe on historic and recognized powers held by states and localities," the district court dismissed the federal preemption claim. ER-22.[3]

## ARGUMENT

### EPCA DOES NOT PREEMPT THE ORDINANCE

The Supremacy Clause of the United States Constitution provides that federal law "shall be the supreme Law of the Land . . . , any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. But while Congress has the undoubted power to preempt state law, courts must "never assum[e] lightly that Congress has derogated state regulation." *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654 (1995). "Thus, pre-emption will not lie unless it is 'the clear and manifest purpose of Congress.'" *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). As with any question of statutory interpretation, Congress's intent with respect to the scope of preemption is "primarily . . . discerned from the language of the pre-emption statute and the 'statutory framework' surrounding it." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486 (1996); *see also CSX Transp.*, 507 U.S. at 664 (explaining that "the task of statutory

---

[3] The court declined to exercise supplemental jurisdiction and dismissed the state law claims as well. ER-22.

6

construction must in the first instance focus on the plain wording of the [pre-emption] clause").

### A. Section 6297(c) Preempts Energy Conservation Standards and Their Equivalents

EPCA has several preemption clauses, but only one is relevant here. Section 6297(c) provides that, once a federal conservation standard becomes effective for a covered product, "no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product," unless the regulation falls into one of several specific categories not implicated by the Ordinance. 42 U.S.C. § 6297(c).[4] CRA does not contend that the Ordinance regulates the energy efficiency or water use of any covered product. This case turns on whether the Ordinance is a "regulation concerning . . . energy use."

### 1. Statutory Text and Context Establish the Meaning of "Regulation Concerning Energy Use"

"It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Sturgeon v. Frost*, 577 U.S. 424, 438 (2016) (quoting *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 101 (2012)). Here, the text and context of § 6297(c) demonstrate that EPCA uses the phrase "regulation concerning energy use" to refer to regulations

---

[4] Federal conservation standards are effective for several types of covered products that CRA's members allege that they wish to use in their restaurants. *See, e.g.*, 42 U.S.C. § 6295(h) (standard for kitchen ranges and ovens); 10 C.F.R. § 430.32(j) (standards for cooking products).

7

that prescribe the equivalent of an energy conservation standard for a covered product.

First, the text of § 6297(c) manifests a congressional intent to preempt only those state actions that *directly* regulate the energy use of covered products. Subsection (c) provides that, if a federal energy conservation standard for a covered product exists, no "State regulation concerning the energy efficiency, energy use, or water use of such covered product *shall be effective with respect to such product*." 42 U.S.C. § 6297(c) (emphasis added). These words have meaning only if the state regulation operates directly on the product itself in the first place. Laws that regulate other activities and have only an indirect effect on the quantity of energy used by a covered product are not "effective with respect to such product[s]" and are therefore not preempted.

The "energy use" of concern here is "the quantity of energy directly consumed" by the product during the course of its operation. 42 U.S.C. § 6291(4). EPCA's "Energy Conservation Program for Consumer Products," 42 U.S.C. ch. 77, subch. III, pt. A, authorizes the Department to issue "performance standard[s]" that prescribe "a minimum level of energy efficiency or a maximum quantity of energy use" for a covered product, "determined in accordance with test procedures" that examine "a representative average use cycle or period of use." 42 U.S.C. §§ 6291(6), 6293(3), 6295(a)(2). These standards prevent a covered appliance from using too much energy in absolute terms, or too much energy relative to its useful output.

8

EPCA's preemption clause, which is intended to displace state efforts to adopt equivalent performance standards, *see Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*, 410 F.3d 492, 500 (9th Cir. 2005), is therefore directed at regulations preventing excessive or inefficient energy use.

The title of the preemption provision confirms that Congress intended to preempt only state regulations that function as energy conservation standards. Section 6297(c) is entitled "General rule of preemption for energy conservation standards when Federal standard becomes effective for product." Section headings (or here, subsection headings) "cannot substitute for the operative text of the statute," but they do provide "tools available for the resolution of a doubt about the meaning of a statute." *Florida Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008) (quoting *Porter v. Nussle*, 534 U.S. 516, 528 (2002)). Here, Congress's use of a title describing the preemption of "energy conservation standards" to label a provision displacing "regulation[s] concerning energy efficiency [or] energy use" indicates that Congress viewed the two phrases as having similar meanings. *See also* 42 U.S.C. § 6297(b) (using a similar title and operative language to preempt state regulations before a federal standard becomes effective). That Congress equated these two phrases should come as no surprise given that EPCA defines "energy conservation standard" to include "a performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use." 42 U.S.C. § 6291(6).

9

EPCA's waiver provision further shows that Congress intended to preempt state energy conservation standards, but not state laws aimed at other objectives that only indirectly affect the quantity of energy consumed by covered products. Immediately following the "[g]eneral rule of preemption" in § 6297(c), Congress provided a means for States to obtain a "[w]aiver of Federal preemption" in § 6297(d). When a federal energy conservation standard for a covered product would displace a state regulation, the State may petition the Department "requesting a rule that such State regulation become effective with respect to such covered product," notwithstanding the preemptive effect of § 6297(c). 42 U.S.C. § 6297(d)(1)(A). The statute further specifies the type of state regulation that may be the subject of such a petition: one that "provides for any energy conservation standard or other requirement with respect to energy use." *Id.*

The phrase "other requirement with respect to energy use" has a specific meaning here. "[U]nder the established interpretative canons of *noscitur a sociis* and *ejusdem generis*, where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Washington State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 384 (2003) (cleaned up). The waiver provision thus uses the category of "other requirement[s] with respect to energy use" to refer to regulations similar in nature to energy conservation standards. *See Air Conditioning & Refrigeration Inst.*, 410 F.3d at 501 ("Under the maxim of

10

statutory interpretation known as *ejusdem generis*, 'or other measure of energy consumption' [in 42 U.S.C. § 6291(8)] embraces only objects similar in nature to those enumerated by the preceding specific words."). And because "similar language contained within the same section of a statute must be accorded a consistent meaning," *National Credit Union Admin. v. First Nat'l Bank & Tr. Co.*, 522 U.S. 479, 501 (1998), the phrase "regulation concerning energy use" in the pre-emption provision would be understood to have the same scope.

The standard that the Department must apply in evaluating preemption waiver petitions also makes clear that Congress understood § 6297(c) to preempt only state and local energy conservation standards and their equivalents. To grant a preemption waiver, the Department must find that the state regulation is "needed to meet unusual and compelling State or local energy or water interests." 42 U.S.C. § 6297(d)(1)(B). The statute further provides that such interests exist when the "energy or water savings resulting from the State regulation" outweigh its overall costs, broadly conceived. *Id.* § 6297(d)(1)(C). But state regulations aimed at health and safety goals (such as fire safety or the avoidance of pollution) may not produce any energy or water savings at all, and they are unlikely to be justified solely on that basis. It is highly implausible that Congress intended to preempt both state energy conservation standards and health and safety laws but created a pathway for waiver that only appears to accommodate the former. The more reasonable interpretation is that Congress tailored the waiver standard to match the universe of preempted regulations.

11

The manifest purpose of the waiver provision is to provide relief in appropriate circumstances from the general rule of preemption set out in § 6297(c). The close relationship between these two provisions makes the former an especially important part of the "'statutory framework' surrounding" the latter and, therefore, a significant source of evidence regarding Congress's preemptive intent. *Medtronic*, 518 U.S. at 486. Thus, the waiver provision provides compelling evidence that Congress understood the phrase "regulation concerning energy use" to comprise regulations equivalent to energy conservation standards.

The specific history surrounding the 1987 EPCA amendments bears this out. Before those amendments, EPCA "order[ed] the Secretary of Energy to prescribe energy efficiency standards" for certain covered products but also provided that no standard should be prescribed if doing so "would not result in significant conservation of energy or would not be technologically feasible or economically justified." *Natural Res. Def. Council, Inc. v. Herrington*, 768 F.2d 1355, 1362-63 (D.C. Cir. 1985). For eight covered products, the Secretary made such findings and terminated the rulemakings without issuing efficiency standards. *Id.* at 1363. "These 'no-standard standards' . . . preempted state regulation without imposing any federal regulation at all." *Id.* At the same time, however, the Secretary adopted "a general policy of granting petitions from States requesting waivers from preemption." *Air Conditioning & Refrigeration Inst.*, 410 F.3d at 499 (quoting S. Rep. No. 100-6, at 4 (1987)).

12

When Congress amended EPCA in 1987, it directly "established federal energy efficiency standards for residential appliances" and "made it more difficult for states to obtain waivers of preemption." *Air Conditioning & Refrigeration Inst.*, 410 F.3d at 500. Congress's purpose on the latter front was to "counteract the systems of separate state appliance standards that had emerged" out of the Secretary's more permissive approach. *Id.* Notably, however, Congress did not substantively change the particular language at issue here. Before the 1987 amendments, the relevant preemption provision covered "any energy efficiency standard or other requirement with respect to energy efficiency or energy use of a covered product." 42 U.S.C. § 6297(a)(2) (1982). After 1987, the provision covered any "regulation concerning the energy efficiency or energy use of [a] covered product" under a subsection heading that referred to "energy conservation standards." Pub. L. No. 100-12, § 7, 101 Stat. 103, 118 (1987).[5] As this Court has explained, the history of the 1987 amendments "demonstrates that Congress intended to preempt state energy efficiency standards." *Air Conditioning & Refrigeration Inst.*, 410 F.3d at 500; *see also Building Indus. Ass'n of Wash. v. Washington State Bldg. Code Council*, 683 F.3d 1144, 1145 (9th Cir. 2012) (explaining that EPCA "establishes nationwide energy efficiency standards for certain

---

[5] Congress generally replaced "energy efficiency standard" with the broader concept of "energy conservation standard" throughout the statute. *See* Pub. L. No. 100-12, § 2, 101 Stat. at 103 (defining "energy conservation standard" to include "a performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use for a covered product").

residential home appliances, and expressly preempts state standards requiring greater efficiency"); *id.* at 1148 ("Federal regulations promulgated under EPCA provide minimum standards for the energy efficiency of such fixtures, and the federal statute preempts state attempts to impose minimum standards greater than the federal law." (citation omitted)).

## 2. The Federal Government Has Long Adopted This Construction

The Supreme Court has recognized that agencies "have a unique understanding of the statutes they administer and an attendant ability to make informed determinations about how state requirements may pose an 'obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *See Wyeth v. Levine*, 555 U.S. 555, 577 (2009) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). As the federal agency charged with administering this part of EPCA, the Department has consistently interpreted the preemption provision in the manner described above.

For example, in 1982, the Department proposed regulations to govern state petitions for waiver of preemption. 47 Fed. Reg. 14,424 (Apr. 2, 1982). The Department announced that it "proposed to review only State regulations that are appliance *efficiency* standards," not "State or local regulations that have only a peripheral effect on the energy efficiency of a covered product." *Id.* at 14,456. The scope of this review, the Department explained, followed from the scope of the

14

preemption provision, which at that time covered "any energy [efficiency] standard or other requirement with respect to energy efficiency or energy use of a covered product." *Id.* (quoting 42 U.S.C. § 6297(a)(2) (1982)). The Department interpreted this provision to mean that "a rule that established the energy efficiency of a particular appliance would be superseded by the Federal rule and would be subject to review upon the petition of the State," but "[a] rule whose purpose is other than energy efficiency such as a law on fire safety, would not appear to be preempted by the Federal rule, even if it has a secondary and incidental effect of improving the efficiency of a covered product." *Id.*

When it adopted the proposed regulations, the Department acknowledged comments expressing uncertainty about exactly what types of state and local regulations were subject to preemption. 47 Fed. Reg. 57,198, 57,215 (Dec. 22, 1982). The Department did not offer definitive guidance on the scope of preempted regulations but did offer a few examples, two of which are especially relevant for present purposes. "Prohibition of hook-ups for appliances with less than a certain efficiency would be subject to preemption," the Department advised. *Id.* In other words, a ban on the connection of certain appliances would be preempted if it directly regulated efficiency by making the availability of a connection contingent on the efficiency of the product. On the other hand, a "[p]rohibition against placing oversized furnaces and air conditioners in new buildings"—a ban that does not directly regulate efficiency or energy use by the appliances themselves—"would not

be subject to preemption." *Id.* Consistent with the interpretation advanced in the notice of proposed rulemaking, the Department took the position that a regulation forbidding certain types of appliances from being installed in new construction would not be preempted if the regulation was not aimed at improving the performance of those appliances.

The Department adhered to this understanding in a 2010 rulemaking when it responded to commenters urging it to incorporate a demand response feature—a control that can adapt product operation in response to signals from utilities—into an energy conservation standard for refrigeration products. 75 Fed. Reg. 59,470, 59,530 (Sept. 27, 2010). The Department determined that a demand response feature would constitute a design requirement, which EPCA does not authorize for refrigeration products. But the Department further opined that a similar state requirement would not be preempted. The Department explained that it "interprets 'regulation concerning energy use'" in the preemption provision "to be equivalent to 'energy conservation standard,'" which in this context would mean a performance-based standard. *Id.* The Department reached this conclusion notwithstanding the fact that a demand response feature has a clear effect on the energy usage of a covered appliance. *See id.* (noting that a demand response feature could "shif[t] portions of the energy use associated with defrost or icemaking to times when the electricity cost is lower").

**B.     The Ordinance Regulates Natural Gas Distribution and
Does Not Establish an Energy Conservation Standard for
Any Covered Product**

**1.**  Having identified the "domain expressly pre-empted" by § 6297(c),

*Medtronic*, 518 U.S. at 484, resolution of this case is straightforward.  The Ordinance

does not establish or approximate a "performance standard which prescribes . . . a

maximum quantity of energy use" for any covered product.  *See* 42 U.S.C. § 6291(6).

It does not even regulate covered products at all; rather, it prohibits installing

infrastructure that would be used for natural gas in newly constructed buildings.  The

Ordinance has the downstream effect of preventing the use of certain covered

products in particular locations, but this is not enough to bring it within the scope of

EPCA's preemption provision.

Emphasizing Congress's use of the word "concerning" in § 6297(c), CRA

argues that "the question is whether the City's ordinance has a connection with, or an

impact on, the quantity of gas used by covered products."  Br. 4, 25-33.  CRA then

answers that question in the affirmative because the Ordinance "requires natural gas

appliances to use zero energy."  Br. 21.

CRA errs at both steps.  First, by focusing so intently on a single word, CRA

misses the bigger picture.  "[P]re-emption claims turn on Congress's intent," *Travelers*,

514 U.S. at 655, and that intent is revealed not by looking at the "definition of words

in isolation" but by "reading the whole statutory text" and "considering the purpose

and context of the statute."  *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006).

17

Further, terms like "concerning" or "relate to" contain an inherent "indeterminacy." *Travelers*, 514 U.S. at 655; *see also California Trucking Ass'n v. Bonta*, 996 F.3d 644, 656 (9th Cir. 2021) (warning that courts "cannot take an uncritically literal reading of 'related to'" in a preemption clause); *Appert v. Morgan Stanley Dean Witter, Inc.*, 673 F.3d 608, 621 (7th Cir. 2012) (relying on statutory text, structure, and purpose to reject a broad reading of "concerning"). The relevant question is not whether the Ordinance "will have some effect" on the energy usage of individual appliances in particular locations, *De Buono v. NYSA ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 815-16 (1997), but whether the Ordinance is a "regulation concerning . . . energy use" as those terms are used in EPCA. As explained above, § 6297(c) reflects an intent to displace energy conservation standards. The use of the word "concerning" does "not extend to the outer limits of its definitional possibilities," *Dolan*, 546 U.S. at 486, to preempt every state and local regulation that might conceivably affect the amount of energy used by a particular appliance.

CRA asserts that "[i]f Congress intended to preempt only direct regulation of appliances," it would have used a word other than "concerning," such as "of" or "covering." Br. 26. But elsewhere in § 6297, Congress used "concerning" in exactly that manner. For example, the waiver provision addresses the situation where a state regulation is waived "and subsequently a Federal energy conservation standard *concerning* such product is amended." 42 U.S.C. § 6297(d)(6) (emphasis added). Similarly, the preemption provision itself provides exceptions for "a regulation

18

*concerning* standards for commercial prerinse spray valves" or "a regulation *concerning* standards for pedestrian modules." *Id.* § 6297(c)(7)(A), (8)(A) (emphases added). These examples both demonstrate a more narrow (though still common) use of the word "concerning" and underscore the connection between preemption and energy conservation standards.

Second, the Ordinance does not prescribe any standard relating to the energy use or efficiency of a covered product, much less "require any particular energy use of a covered product." ER-19. The Ordinance does not attempt to regulate the *quantity* of energy that covered products use during normal operation (either in absolute terms or in relation to their output). Rather, Berkeley has sought to regulate the *kind* of energy distributed within its jurisdiction through a prohibition on the installation of natural gas infrastructure in new construction.

How and where the state law operates matters. "A state law regulating an upstream activity within the State's authority is not preempted simply because a downstream activity falls within a federally occupied field." *Virginia Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1914-15 (2019) (Ginsburg, J., concurring in the judgment). Thus, where Congress "preempts the authority of political subdivisions to regulate 'a price, route, or service of any motor carrier . . . *with respect to the transportation of property*,'" States and localities "remain free to enact and enforce general traffic safety laws, general restrictions on the weight of cars and trucks that may enter highways or pass over bridges." *City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424,

449 (2002) (Scalia, J., dissenting); *see also Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 261 n.4 (2013) (agreeing with Justice Scalia's characterization). And a federal law that supersedes "'any and all State laws insofar as they . . . relate to any employee benefit plan' covered by the statute," leaves States free to adopt "[q]uality standards" and "basic regulation of employment conditions [that] invariably affect the cost and price of services" obtained by covered plans. *Travelers*, 514 U.S. at 651, 660 (omission in original).

The same principle applies here. EPCA prevents States and localities from prescribing energy conservation standards and other regulations that dictate the energy consumption of covered appliances. But EPCA leaves States free to regulate the upstream activity of natural gas distribution or to adopt any other type of regulation that might have "a secondary and incidental effect of improving the efficiency [or energy use] of a covered product." 47 Fed. Reg. at 14,564. Indeed, as explained below, another federal law expressly preserves state authority in this area. The district court correctly concluded that the Ordinance is not "the type of state law that Congress intended [EPCA] to supersede." *De Buono*, 520 U.S. at 814; *see* ER-19 ("CRA has not shown the EPCA can and does sweep into areas of natural gas connections.").

Nor would preemption of the Ordinance further Congress's purpose in adopting § 6297(c). As this Court explained, Congress revised that provision in 1987 "to counteract the systems of separate state appliance standards that had emerged as a

result of the [Department's] general policy of granting petitions from States requesting waivers." *Air Conditioning & Refrigeration Inst.*, 410 F.3d at 500 (quotation marks omitted). The Ordinance does not implicate that concern. Federal energy conservation standards are just as effective after the adoption of the Ordinance as they were before, and no appliance manufacturer is compelled to adjust the efficiency or quantity of energy its products use in order to sell in the Berkeley market.

CRA gains nothing from its repeated efforts to characterize the Ordinance as "banning a type of appliance at a local level." Br. 4. In addition to being inaccurate—gas appliances may be used in any new construction where it would serve the public interest and in any prior construction without limitation—this assertion is irrelevant. Nothing in EPCA disables a State or locality from exercising its police power to prohibit the use of dangerous or unsafe items. *See* 47 Fed. Reg. at 14,456. CRA's discussion of building codes (Br. 13, 39-42) likewise misses the mark. State and local building codes fall within the scope of § 6297(c) if they establish energy conservation standards or similar requirements. But a regulation that does not do so is not preempted simply because it could be characterized as a building code.

**2.** CRA's position, if accepted, would endanger a wide swath of state and local laws. CRA asserts that EPCA preempts any state law that has "an impact on" the quantity of energy or water used by any covered product. Br. 4. Nearly 70 product types are regulated under EPCA, including nearly universal items such as faucets and light bulbs. Were any state law that even indirectly has an impact on the quantity of

21

energy or water consumed by these products to be preempted "then for all practical purposes preemption would never run its course." *Travelers Ins. Co.*, 514 U.S. at 655; *see also De Buono*, 520 U.S. at 816 ("Any state tax, or other law, that increases the cost of providing benefits to covered employees will have some effect on the administration of ERISA plans, but that simply cannot mean that every state law with such an effect is pre-empted by the federal statute.").

States would be disabled from regulating to protect traditional state concerns in areas within their well-established authority. Here, for example, the stated purpose of the Ordinance is to "reduc[e] the environmental and health hazards produced by the consumption and transportation of natural gas." Berkeley Municipal Code § 12.80.010.H, ER-146. With respect to health hazards, Berkeley determined that the Ordinance is "reasonably necessary" to address "health and safety concerns" of its residents with "asthma and other health conditions associated with poor indoor and outdoor air quality exacerbated by the combustion of natural gas." *Id.* § 12.80.010.C, ER-146. The protection of health and safety are "primarily, and historically, . . . matter[s] of local concern." *Medtronic*, 518 U.S. at 475 (alterations in original) (quoting *Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 719 (1985)).

Moreover, Berkeley has sought to advance these interests in an area reserved to local regulation by another federal law. "By 1938, in a series of Commerce Clause cases, the Supreme Court established that states could regulate the intrastate and interstate transportation and sale of natural gas to ultimate consumers" but could not

regulate wholesale interstate transactions.  *South Coast Air Quality Mgmt. Dist. v. FERC*, 621 F.3d 1085, 1090 (9th Cir. 2010) (quoting *Michigan Consol. Gas Co. v. Panhandle E. Pipe Line Co.*, 887 F.2d 1295, 1299 (6th Cir. 1989)).  Congress adopted the Natural Gas Act to fill the regulatory void, but explicitly preserved state authority over "the local distribution of natural gas or the facilities used for such distribution."  15 U.S.C. § 717(b).  Thus, the Act confirmed that "all aspects related to the direct consumption of gas . . . remain within the exclusive purview of the states."  *South Coast*, 621 F.3d at 1092.[6]

CRA's theory would not simply disable the States from acting, however.  It would create a sort of regulatory void.  Because the Ordinance does not regulate the energy use or efficiency of covered products, the Department could not adopt it as an energy conservation standard.  Nor can the Department otherwise regulate under EPCA the type of energy that covered products use.  It makes little sense to construe a "[g]eneral rule of preemption for energy conservation standards when Federal standard becomes effective" to preempt a local regulation unrelated to energy

---

[6] CRA observes that the Natural Gas Act does not permanently "exempt from all federal regulation the local distribution of natural gas."  Br. 48-49.  This is beside the point.  The Act reflects a deliberate recognition and preservation of pre-existing state authority over the local distribution of natural gas.  Nor have subsequent decisions by Congress to establish federal safety regulations for natural gas pipelines completely eliminated all state authority in the area.  Even the Pipeline Safety Act, upon which CRA chiefly relies (Br. 49-50), "provides a strong role for state involvement in intrastate pipeline regulation."  *City & Cty. of San Francisco v. U.S. Dep't of Transp.*, 796 F.3d 993, 996 (9th Cir. 2015).

23

conservation that the Department could not adopt on its own. *See Travelers*, 514 U.S. at 656 (explaining the need to look to "the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive"); *see also Building Indus. Ass'n of Wash. v. Washington State Bldg. Code Council*, 683 F.3d at 1145, 1148 (describing ECPA's preemption provision as preventing States from adopting efficiency standards more rigorous than applicable federal standards).

Health and safety regulations that indirectly affect the energy usage of appliances are neither new nor threatening to the federal regulatory scheme, even when such regulations directly operate on the appliances themselves (unlike the Ordinance here). For example, local governmental bodies in California, Utah, and Texas have for years regulated nitrogen oxide (NOx) emissions from gas-fired water heaters in order to protect the health and safety of their citizens. The Department has acknowledged that the technology required to comply with such emission requirements can "adversely impact the efficiency levels" of the heaters. 75 Fed. Reg. 20,112, 20133 (Apr. 16, 2010). But the Department has never claimed that such requirements are preempted for that reason. Rather, because the local standards regulate emissions to protect health and safety, the Department recognizes that they fall outside the scope of § 6297(c), and the Department has developed its energy conservation standards in a manner that accounts for the secondary effect the local NOx regulations have on efficiency. 75 Fed. Reg. at 20,133. Under CRA's approach,

24

however, the Department and States have been wrong about the scope of § 6297(c) all along.

**C.    Adopting CRA's Interpretation Would Disrupt the Federal Administration of EPCA**

Broadening the preemption provision in the manner advocated by CRA would adversely affect the Department's administration of EPCA's Energy Conservation Program. *Cf. Wyeth*, 555 U.S. at 577 ("[W]e have attended to an agency's explanation of how state law affects the regulatory scheme.").

To take perhaps the most obvious example, an overbroad interpretation of § 6297(c) would put enormous strain on the waiver process under § 6297(d). If any regulation, including a health and safety regulation, that has an indirect effect on the energy use of a covered product in a certain location is subject to preemption, the Department will be inundated with requests for waivers that it must decide using notice-and-comment rulemaking.[7] Moreover, the consideration of such waiver requests would be unusually challenging and invite inquiries that go beyond the scope of the statutory mandate. EPCA permits the Department to waive preemption if "the State . . . has established by a preponderance of the evidence that such State regulation is needed to meet unusual and compelling State or local energy or water interests." 42 U.S.C. § 6297(d)(1)(B). It is not clear how the Department should evaluate a

---

[7] The Department's regulations governing the waiver process are located at 10 C.F.R. pt. 430, subpt. D.

25

regulation aimed at other objectives, such as fire prevention, the avoidance of environmental harms, or other risks to human health and safety. The Department would be drawn into needless disputes with States and localities, and all the while, the harms targeted by those regulations could continue unchecked.

An erroneous interpretation of the preemption provision could also cause problems for the issuance of energy conservation standards for new types of appliances. Section 6297(c) supersedes state regulations concerning "covered product[s]." Some covered products were established by Congress, *see* 42 U.S.C. § 6292(a)(1)-(19), but others can be designated by the Department through a rulemaking, *see id.* §§ 6292(b), 6295(*l*); *see also, e.g.*, 81 Fed. Reg. 46,768 (July 18, 2016) (establishing coverage for miscellaneous refrigeration products). The Department's coverage determinations are based on considerations of the purposes of EPCA and technical considerations relating to the energy consumption of the product at issue. 42 U.S.C. § 6292(b)(1)(A)-(B). But if EPCA's preemption provision were construed in the overbroad manner urged by CRA, the designation of new covered products could quickly be overtaken by debates over interference with state and local policy in areas other than energy conservation (and possibly outside the Department's expertise).

This Court should reject CRA's invitation to destabilize the settled understanding shared by the Department and the States over the allocation of regulatory authority. Instead, the Court should confirm the Department's consistent

26

message that EPCA preempts regulations that establish energy conservation standards and their equivalents, while leaving alone regulations aimed at other matters, such as health and safety, that have only a secondary and incidental effect on the efficiency or energy use of covered products.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

*Of Counsel:*

SAMUEL T. WALSH
    *General Counsel*

EMILY HAMMOND

    *Deputy General Counsel for Litigation,*
    *Regulation, and Enforcement*

    *Department of Energy*

BRIAN M. BOYNTON
    *Acting Assistant Attorney General*

STEPHANIE HINDS
    *Acting United States Attorney*

MICHAEL S. RAAB
H. THOMAS BYRON III

  *s/ Thomas Pulham*
THOMAS PULHAM
    *Attorneys, Appellate Staff*
    *Civil Division, Room 7323*
    *U.S. Department of Justice*
    *950 Pennsylvania Avenue NW*
    *Washington, DC 20530*
    *(202) 514-4332*
    *thomas.pulham@usdoj.gov*

February 2022

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 29(a)(5) because it contains 6,591 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Microsoft Word 2016 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Thomas Pulham*

Thomas Pulham

## CERTIFICATE OF SERVICE

I hereby certify that on February 8, 2022, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

*s/ Thomas Pulham*
Thomas Pulham

**ADDENDUM**

## TABLE OF CONTENTS

42 U.S.C. § 6291 (excerpts) .................................................................A1

42 U.S.C. § 6292 ..............................................................................A3

42 U.S.C. § 6295 (excerpts) .................................................................A5

42 U.S.C. § 6297 ..............................................................................A7

**42 U.S.C. § 6291 (excerpts)**

**§ 6291. Definitions**

For purposes of this part:

(1) The term "consumer product" means any article (other than an automobile, as defined in section 32901(a)(3) of Title 49) of a type—

(A) which in operation consumes, or is designed to consume, energy or, with respect to showerheads, faucets, water closets, and urinals, water; and

(B) which, to any significant extent, is distributed in commerce for personal use or consumption by individuals;

without regard to whether such article of such type is in fact distributed in commerce for personal use or consumption by an individual, except that such term includes fluorescent lamp ballasts, general service fluorescent lamps, incandescent reflector lamps, showerheads, faucets, water closets, and urinals distributed in commerce for personal or commercial use or consumption.

(2) The term "covered product" means a consumer product of a type specified in section 6292 of this title.

(3) The term "energy" means electricity, or fossil fuels. The Secretary may, by rule, include other fuels within the meaning of the term "energy" if he determines that such inclusion is necessary or appropriate to carry out the purposes of this chapter.

(4) The term "energy use" means the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293 of this title.

(5) The term "energy efficiency" means the ratio of the useful output of services from a consumer product to the energy use of such product, determined in accordance with test procedures under section 6293 of this title.

(6) The term "energy conservation standard" means—

(A) a performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use, or, in the case of showerheads, faucets, water closets, and urinals, water use, for a covered product, determined in accordance with test procedures prescribed under section 6293 of this title; or

(B) a design requirement for the products specified in paragraphs (6), (7), (8), (10), (15), (16), (17), and (20) of section 6292(a) of this title; and

A1

includes any other requirements which the Secretary may prescribe under section 6295(r) of this title.

…

**42 U.S.C. § 6292**

**§ 6292. Coverage**

(a) In general

The following consumer products, excluding those consumer products designed solely for use in recreational vehicles and other mobile equipment, are covered products:

(1) Refrigerators, refrigerator-freezers, and freezers which can be operated by alternating current electricity, excluding—

(A) any type designed to be used without doors; and

(B) any type which does not include a compressor and condenser unit as an integral part of the cabinet assembly.

(2) Room air conditioners.

(3) Central air conditioners and central air conditioning heat pumps.

(4) Water heaters.

(5) Furnaces.

(6) Dishwashers.

(7) Clothes washers.

(8) Clothes dryers.

(9) Direct heating equipment.

(10) Kitchen ranges and ovens.

(11) Pool heaters.

(12) Television sets.

(13) Fluorescent lamp ballasts.

(14) General service fluorescent lamps, general service incandescent lamps, and incandescent reflector lamps.

(15) Showerheads, except safety shower showerheads.

(16) Faucets.

(17) Water closets.

(18) Urinals.

(19) Metal halide lamp fixtures.

A3

(20) Any other type of consumer product which the Secretary classifies as a covered product under subsection (b).

(b) Special classification of consumer product

(1) The Secretary may classify a type of consumer product as a covered product if he determines that—

(A) classifying products of such type as covered products is necessary or appropriate to carry out the purposes of this chapter, and

(B) average annual per-household energy use by products of such type is likely to exceed 100 kilowatt-hours (or its Btu equivalent) per year.

(2) For purposes of this subsection:

(A) The term "average annual per-household energy use with respect to a type of product" means the estimated aggregate annual energy use (in kilowatt-hours or the Btu equivalent) of consumer products of such type which are used by households in the United States, divided by the number of such households which use products of such type.

(B) The Btu equivalent of one kilowatt-hour is 3,412 British thermal units.

(C) The term "household" shall be defined under rules of the Secretary.

A4

**42 U.S.C. § 6295 (excerpts)**

**§ 6295. Energy conservation standards**

(a) Purposes

The purposes of this section are to—

(1) provide Federal energy conservation standards applicable to covered products; and

(2) authorize the Secretary to prescribe amended or new energy conservation standards for each type (or class) of covered product.

…

(*l*) Standards for other covered products

(1) The Secretary may prescribe an energy conservation standard for any type (or class) of covered products of a type specified in paragraph (20) of section 6292(a) of this title if the requirements of subsections (o) and (p) are met and the Secretary determines that—

(A) the average per household energy use within the United States by products of such type (or class) exceeded 150 kilowatt-hours (or its Btu equivalent) for any 12-month period ending before such determination;

(B) the aggregate household energy use within the United States by products of such type (or class) exceeded 4,200,000,000 kilowatt-hours (or its Btu equivalent) for any such 12-month period;

(C) substantial improvement in the energy efficiency of products of such type (or class) is technologically feasible; and

(D) the application of a labeling rule under section 6294 of this title to such type (or class) is not likely to be sufficient to induce manufacturers to produce, and consumers and other persons to purchase, covered products of such type (or class) which achieve the maximum energy efficiency which is technologically feasible and economically justified.

…

…

(r) Inclusion in standards of test procedures and other requirements

Any new or amended energy conservation standard prescribed under this section shall include, where applicable, test procedures prescribed in accordance with section 6293 of this title and may include any requirement which the Secretary determines is necessary to assure that each covered product to which such standard applies meets

A5

the required minimum level of energy efficiency or maximum quantity of energy use specified in such standard.

…

**42 U.S.C. § 6297**

**§ 6297. Effect on other law**

(a) Preemption of testing and labeling requirements

(1) Effective on March 17, 1987, this part supersedes any State regulation insofar as such State regulation provides at any time for the disclosure of information with respect to any measure of energy consumption or water use of any covered product if—

(A) such State regulation requires testing or the use of any measure of energy consumption, water use, or energy descriptor in any manner other than that provided under section 6293 of this title; or

(B) such State regulation requires disclosure of information with respect to the energy use, energy efficiency, or water use of any covered product other than information required under section 6294 of this title.

(2) For purposes of this section, the following definitions apply:

(A) The term "State regulation" means a law, regulation, or other requirement of a State or its political subdivisions. With respect to showerheads, faucets, water closets, and urinals, such term shall also mean a law, regulation, or other requirement of a river basin commission that has jurisdiction within a State.

(B) The term "river basin commission" means—

(i) a commission established by interstate compact to apportion, store, regulate, or otherwise manage or coordinate the management of the waters of a river basin; and

(ii) a commission established under section 1962b(a) of this title.

(b) General rule of preemption for energy conservation standards before Federal standard becomes effective for product

Effective on March 17, 1987, and ending on the effective date of an energy conservation standard established under section 6295 of this title for any covered product, no State regulation, or revision thereof, concerning the energy efficiency, energy use, or water use of the covered product shall be effective with respect to such covered product, unless the State regulation or revision—

(1)(A) was prescribed or enacted before January 8, 1987, and is applicable to products before January 3, 1988, or in the case of any portion of any regulation which establishes requirements for fluorescent lamp ballasts, was prescribed or enacted before June 28, 1988, or in the case of any portion of any regulation which establishes requirements for fluorescent or incandescent lamps, flow rate

A7

requirements for showerheads or faucets, or water use requirements for water closets or urinals, was prescribed or enacted before October 24, 1992; or

(B) in the case of any portion of any regulation that establishes requirements for general service incandescent lamps, intermediate base incandescent lamps, or candelabra base lamps, was enacted or adopted by the State of California or Nevada before December 4, 2007, except that—

(i) the regulation adopted by the California Energy Commission with an effective date of January 1, 2008, shall only be effective until the effective date of the Federal standard for the applicable lamp category under subparagraphs (A), (B), and (C) of section 6295(i)(1) of this title; and

(ii) the States of California and Nevada may, at any time, modify or adopt a State standard for general service lamps to conform with Federal standards with effective dates no earlier than 12 months prior to the Federal effective dates prescribed under subparagraphs (A), (B), and (C) of section 6295(i)(1) of this title, at which time any prior regulations adopted by the State of California or Nevada shall no longer be effective.

(iii) Repealed. Pub.L. 112-210, § 10(a)(9)(C), Dec. 18, 2012, 126 Stat. 1525

(2) is a State procurement regulation described in subsection (e);

(3) is a regulation described in subsection (f)(1) or is prescribed or enacted in a building code for new construction described in subsection (f)(2);

(4) is a regulation prohibiting the use in pool heaters of a constant burning pilot, or is a regulation (or portion thereof) regulating fluorescent lamp ballasts other than those to which paragraph (5) of section 6295(g) of this title is applicable, or is a regulation (or portion thereof) regulating fluorescent or incandescent lamps other than those to which section 6295(i) of this title is applicable, or is a regulation (or portion thereof) regulating showerheads or faucets other than those to which section 6295(j) of this title is applicable or regulating lavatory faucets (other than metering faucets) for installation in public places, or is a regulation (or portion thereof) regulating water closets or urinals other than those to which section 6295(k) of this title is applicable;

(5) is a regulation described in subsection (d)(5)(B) for which a waiver has been granted under subsection (d);

(6) is a regulation effective on or after January 1, 1992, concerning the energy efficiency or energy use of television sets; or

(7) is a regulation (or portion thereof) concerning the water efficiency or water use of low consumption flushometer valve water closets.

A8

(c) General rule of preemption for energy conservation standards when Federal standard becomes effective for product

Except as provided in section 6295(b)(3)(A)(ii) of this title, subparagraphs (B) and (C) of section 6295(j)(3) of this title, and subparagraphs (B) and (C) of section 6295(k)(3) of this title and effective on the effective date of an energy conservation standard established in or prescribed under section 6295 of this title for any covered product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product unless the regulation—

(1) is a regulation described in paragraph (2) or (4) of subsection (b), except that a State regulation (or portion thereof) regulating fluorescent lamp ballasts other than those to which paragraph (5) of section 6295(g) of this title is applicable shall be effective only until the effective date of a standard that is prescribed by the Secretary under paragraph (7) of such section and is applicable to such ballasts, except that a State regulation (or portion thereof) regulating fluorescent or incandescent lamps other than those for which section 6295(i) of this title is applicable shall be effective only until the effective date of a standard that is prescribed by the Secretary and is applicable to such lamps;

(2) is a regulation which has been granted a waiver under subsection (d);

(3) is in a building code for new construction described in subsection (f)(3);

(4) is a regulation concerning the water use of lavatory faucets adopted by the State of New York or the State of Georgia before October 24, 1992;

(5) is a regulation concerning the water use of lavatory or kitchen faucets adopted by the State of Rhode Island prior to October 24, 1992;

(6) is a regulation (or portion thereof) concerning the water efficiency or water use of gravity tank-type low consumption water closets for installation in public places, except that such a regulation shall be effective only until January 1, 1997; or

(7)(A) is a regulation concerning standards for commercial prerinse spray valves adopted by the California Energy Commission before January 1, 2005; or

(B) is an amendment to a regulation described in subparagraph (A) that was developed to align California regulations with changes in American Society for Testing and Materials Standard F2324;

(8)(A) is a regulation concerning standards for pedestrian modules adopted by the California Energy Commission before January 1, 2005; or

A9

(B) is an amendment to a regulation described in subparagraph (A) that was developed to align California regulations to changes in the Institute for Transportation Engineers standards, entitled "Performance Specification: Pedestrian Traffic Control Signal Indications"; and

(9) is a regulation concerning metal halide lamp fixtures adopted by the California Energy Commission on or before January 1, 2011, except that—

(A) if the Secretary fails to issue a final rule within 180 days after the deadlines for rulemakings in section 6295(hh) of this title, notwithstanding any other provision of this section, preemption shall not apply to a regulation concerning metal halide lamp fixtures adopted by the California Energy Commission—

   (i) on or before July 1, 2015, if the Secretary fails to meet the deadline specified in section 6295(hh)(2) of this title; or

   (ii) on or before July 1, 2022, if the Secretary fails to meet the deadline specified in section 6295(hh)(3) of this title.

(d) Waiver of Federal preemption

(1)(A) Any State or river basin commission with a State regulation which provides for any energy conservation standard or other requirement with respect to energy use, energy efficiency, or water use for any type (or class) of covered product for which there is a Federal energy conservation standard under section 6295 of this title may file a petition with the Secretary requesting a rule that such State regulation become effective with respect to such covered product.

(B) Subject to paragraphs (2) through (5), the Secretary shall, within the period described in paragraph (2) and after consideration of the petition and the comments of interested persons, prescribe such rule if the Secretary finds (and publishes such finding) that the State or river basin commission has established by a preponderance of the evidence that such State regulation is needed to meet unusual and compelling State or local energy or water interests.

(C) For purposes of this subsection, the term "unusual and compelling State or local energy or water interests" means interests which—

   (i) are substantially different in nature or magnitude than those prevailing in the United States generally; and

   (ii) are such that the costs, benefits, burdens, and reliability of energy or water savings resulting from the State regulation make such regulation preferable or necessary when measured against the costs, benefits, burdens, and reliability of alternative approaches to energy or water savings or production, including

reliance on reasonably predictable market-induced improvements in efficiency of all products subject to the State regulation.

The factors described in clause (ii) shall be evaluated within the context of the State's energy plan and forecast, and, with respect to a State regulation for which a petition has been submitted to the Secretary which provides for any energy conservation standard or requirement with respect to water use of a covered product, within the context of the water supply and groundwater management plan, water quality program, and comprehensive plan (if any) of the State or river basin commission for improving, developing, or conserving a waterway affected by water supply development.

(2) The Secretary shall give notice of any petition filed under paragraph (1)(A) and afford interested persons a reasonable opportunity to make written comments, including rebuttal comments, thereon. The Secretary shall, within the 6-month period beginning on the date on which any such petition is filed, deny such petition or prescribe the requested rule, except that the Secretary may publish a notice in the Federal Register extending such period to a date certain but no longer than one year after the date on which the petition was filed. Such notice shall include the reasons for delay. In the case of any denial of a petition under this subsection, the Secretary shall publish in the Federal Register notice of, and the reasons for, such denial.

(3) The Secretary may not prescribe a rule under this subsection if the Secretary finds (and publishes such finding) that interested persons have established, by a preponderance of the evidence, that such State regulation will significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis. In determining whether to make such finding, the Secretary shall evaluate all relevant factors, including—

(A) the extent to which the State regulation will increase manufacturing or distribution costs of manufacturers, distributors, and others;

(B) the extent to which the State regulation will disadvantage smaller manufacturers, distributors, or dealers or lessen competition in the sale of the covered product in the State;

(C) the extent to which the State regulation would cause a burden to manufacturers to redesign and produce the covered product type (or class), taking into consideration the extent to which the regulation would result in a reduction—

(i) in the current models, or in the projected availability of models, that could be shipped on the effective date of the regulation to the State and within the United States; or

A11

(ii) in the current or projected sales volume of the covered product type (or class) in the State and the United States; and

(D) the extent to which the State regulation is likely to contribute significantly to a proliferation of State appliance efficiency requirements and the cumulative impact such requirements would have.

(4) The Secretary may not prescribe a rule under this subsection if the Secretary finds (and publishes such finding) that interested persons have established, by a preponderance of the evidence, that the State regulation is likely to result in the unavailability in the State of any covered product type (or class) of performance characteristics (including reliability), features, sizes, capacities, and volumes that are substantially the same as those generally available in the State at the time of the Secretary's finding, except that the failure of some classes (or types) to meet this criterion shall not affect the Secretary's determination of whether to prescribe a rule for other classes (or types).

(5) No final rule prescribed by the Secretary under this subsection may—

(A) permit any State regulation to become effective with respect to any covered product manufactured within three years after such rule is published in the Federal Register or within five years if the Secretary finds that such additional time is necessary due to the substantial burdens of retooling, redesign, or distribution needed to comply with the State regulation; or

(B) become effective with respect to a covered product manufactured before the earliest possible effective date specified in section 6295 of this title for the initial amendment of the energy conservation standard established in such section for the covered product; except that such rule may become effective before such date if the Secretary finds (and publishes such finding) that, in addition to the other requirements of this subsection the State has established, by a preponderance of the evidence, that—

(i) there exists within the State an energy emergency condition or, if the State regulation provides for an energy conservation standard or other requirement with respect to the water use of a covered product for which there is a Federal energy conservation standard under subsection (j) or (k) of section 6295 of this title, a water emergency condition, which—

(I) imperils the health, safety, and welfare of its residents because of the inability of the State or utilities within the State to provide adequate quantities of gas or electric energy or, in the case of a water emergency condition, water or wastewater treatment, to its residents at less than prohibitive costs; and

(II) cannot be substantially alleviated by the importation of energy or, in the case of a water emergency condition, by the importation of water, or by the use of interconnection agreements; and

(ii) the State regulation is necessary to alleviate substantially such condition.

(6) In any case in which a State is issued a rule under paragraph (1) with respect to a covered product and subsequently a Federal energy conservation standard concerning such product is amended pursuant to section 6295 of this title, any person subject to such State regulation may file a petition with the Secretary requesting the Secretary to withdraw the rule issued under paragraph (1) with respect to such product in such State. The Secretary shall consider such petition in accordance with the requirements of paragraphs (1), (3), and (4), except that the burden shall be on the petitioner to show by a preponderance of the evidence that the rule received by the State under paragraph (1) should be withdrawn as a result of the amendment to the Federal standard. If the Secretary determines that the petitioner has shown that the rule issued by the State should be so withdrawn, the Secretary shall withdraw it.

(e) Exception for certain State procurement standards

Any State regulation which sets forth procurement standards for a State (or political subdivision thereof) shall not be superseded by the provisions of this part if such standards are more stringent than the corresponding Federal energy conservation standards.

(f) Exception for certain building code requirements

(1) A regulation or other requirement enacted or prescribed before January 8, 1987, that is contained in a State or local building code for new construction concerning the energy efficiency or energy use of a covered product is not superseded by this part until the effective date of the energy conservation standard established in or prescribed under section 6295 of this title for such covered product.

(2) A regulation or other requirement, or revision thereof, enacted or prescribed on or after January 8, 1987, that is contained in a State or local building code for new construction concerning the energy efficiency or energy use of a covered product is not superseded by this part until the effective date of the energy conservation standard established in or prescribed under section 6295 of this title for such covered product if the code does not require that the energy efficiency of such covered product exceed—

(A) the applicable minimum efficiency requirement in a national voluntary consensus standard; or

(B) the minimum energy efficiency level in a regulation or other requirement of the State meeting the requirements of subsection (b)(1) or (b)(5),

whichever is higher.

(3) Effective on the effective date of an energy conservation standard for a covered product established in or prescribed under section 6295 of this title, a regulation or other requirement contained in a State or local building code for new construction concerning the energy efficiency or energy use of such covered product is not superseded by this part if the code complies with all of the following requirements:

(A) The code permits a builder to meet an energy consumption or conservation objective for a building by selecting items whose combined energy efficiencies meet the objective.

(B) The code does not require that the covered product have an energy efficiency exceeding the applicable energy conservation standard established in or prescribed under section 6295 of this title, except that the required efficiency may exceed such standard up to the level required by a regulation of that State for which the Secretary has issued a rule granting a waiver under subsection (d).

(C) The credit to the energy consumption or conservation objective allowed by the code for installing covered products having energy efficiencies exceeding such energy conservation standard established in or prescribed under section 6295 of this title or the efficiency level required in a State regulation referred to in subparagraph (B) is on a one-for-one equivalent energy use or equivalent cost basis.

(D) If the code uses one or more baseline building designs against which all submitted building designs are to be evaluated and such baseline building designs contain a covered product subject to an energy conservation standard established in or prescribed under section 6295 of this title, the baseline building designs are based on the efficiency level for such covered product which meets but does not exceed such standard or the efficiency level required by a regulation of that State for which the Secretary has issued a rule granting a waiver under subsection (d).

(E) If the code sets forth one or more optional combinations of items which meet the energy consumption or conservation objective, for every combination which includes a covered product the efficiency of which exceeds either standard or level referred to in subparagraph (D), there also shall be at least one combination which includes such covered product the efficiency of which does not exceed such standard or level by more than 5 percent, except that at least

A14

one combination shall include such covered product the efficiency of which meets but does not exceed such standard.

(F) The energy consumption or conservation objective is specified in terms of an estimated total consumption of energy (which may be calculated from energy loss- or gain-based codes) utilizing an equivalent amount of energy (which may be specified in units of energy or its equivalent cost).

(G) The estimated energy use of any covered product permitted or required in the code, or used in calculating the objective, is determined using the applicable test procedures prescribed under section 6293 of this title, except that the State may permit the estimated energy use calculation to be adjusted to reflect the conditions of the areas where the code is being applied if such adjustment is based on the use of the applicable test procedures prescribed under section 6293 of this title or other technically accurate documented procedure.

(4)(A) Subject to subparagraph (B), a State or local government is not required to submit a petition to the Secretary in order to enforce or apply its building code or to establish that the code meets the conditions set forth in this subsection.

(B) If a building code requires the installation of covered products with efficiencies exceeding both the applicable Federal standard established in or prescribed under section 6295 of this title and the applicable standard of such State, if any, that has been granted a waiver under subsection (d), such requirement of the building code shall not be applicable unless the Secretary has granted a waiver for such requirement under subsection (d).

(g) No warranty

Any disclosure with respect to energy use, energy efficiency, or estimated annual operating cost which is required to be made under the provisions of this part shall not create an express or implied warranty under State or Federal law that such energy efficiency will be achieved or that such energy use or estimated annual operating cost will not be exceeded under conditions of actual use.

A15