No. 21-16278

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CALIFORNIA RESTAURANT ASSOCIATION,

*Plaintiff-Appellant,*

v.

CITY OF BERKELEY,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the Northern District of California
No. 4:19-cv-07668-YGR
Hon. Yvonne Gonzalez Rogers, District Judge

## PLAINTIFF-APPELLANT'S REPLY BRIEF

Gary J. Toman
WEINBERG WHEELER
HUDGINS GUNN & DIAL
3344 Peachtree Road, NE
Suite 2400
Atlanta, GA 30326
(404) 876-2700
gtoman@wwhgd.com

Kylie Chiseul Kim
KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK, PLLC
1615 M St. NW #400
Washington, DC 20036
(202) 326-7924
kkim@kellogghansen.com

Courtland L. Reichman
Ariel C. Green Anaba
Laura Carwile
Brian C. Baran
REICHMAN JORGENSEN
LEHMAN & FELDBERG LLP
100 Marine Parkway, Suite 300
Redwood Shores, CA 94065
(650) 623-1401
creichman@reichmanjorgensen.com

Sarah Jorgensen
REICHMAN JORGENSEN
LEHMAN & FELDBERG LLP
1201 West Peachtree Street, Suite 2300
Atlanta, GA 30309
(404) 609-1040
sjorgensen@reichmanjorgensen.com

*Attorneys for Plaintiff-Appellant*
*California Restaurant Association*

# **TABLE OF CONTENTS**

INTRODUCTION .......................................................................................... 1

ARGUMENT ............................................................................................... 2

I. The CRA Has Standing to Challenge Berkeley's Ordinance. ............. 2

II. Berkeley's Ordinance Is Preempted. ................................................... 3

    A. Applying the Plain Text of the EPCA's Preemption Provision, the Ordinance Is a Regulation Concerning Energy Use ................ 4

       1. Berkeley forfeited any argument that the EPCA does not preempt bans on appliances or energy sources. ........................ 5

       2. Berkeley's rewrite of the statute to refer to an "affirmative" or "nonzero" quantity is contrary to the text and context ......... 6

       3. EPCA preemption is not, as the Government suggests, limited to regulations that "operate directly" on particular products. .... 10

       4. Berkeley cannot override the plain meaning by resurrecting a rejected presumption against preemption. ........................... 13

    B. The EPCA's Structure and Purpose Support Preemption........... 16

       1. The exemption for local building codes — which Berkeley and the Government ignore — shows that EPCA preemption extends to regulation of buildings' natural gas infrastructure. .. 16

       2. The Government's attempt to revive the 1978 preemption provision defies Congress's decision to expand preemption. .. 17

       3. EPCA preemption is not limited to regulations affecting design choices, but in any event, the Ordinance is such a regulation. .... 20

       4. The CRA's interpretation does not leave a "regulatory gap.". 21

    C. The Natural Gas Act Has No Bearing on EPCA Preemption. ........ 24

    D. The Government's Litigation Position Is Not Entitled to Any Deference............................................................................... 26

III. The CRA's State Law Claims Should Be Considered....................... 29

CONCLUSION ........................................................................................ 30

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Air Conditioning & Refrigeration Institute v. Energy Resources
Conservation & Development Commission,*
410 F.3d 492 (9th Cir. 2005) ...................................................... *passim*

*Benton Cnty. Wind Farm LLC v. Duke Energy Ind., Inc.,*
843 F.3d 298 (7th Cir. 2016) ............................................................ 7

*Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council,*
683 F.3d 1144 (9th Cir. 2012) ......................................................... 16

*Bowen v. Georgetown Univ. Hosp.,*
488 U.S. 204 (1988) ...................................................................... 28

*Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.,*
467 U.S. 837 (1984) ..................................................... 27, 28, 29

*Citizens Exposing Truth About Casinos v. Kempthorne,*
492 F.3d 460 (D.C. Cir. 2007) ........................................................ 28

*City of Auburn v. U.S. Gov't,*
154 F.3d 1025 (9th Cir. 1998) ........................................................ 15

*Connell v. Lima Corp.,*
988 F.3d 1089 (9th Cir. 2021) ........................................ 3, 4, 13, 14

*Coventry Health Care of Mo., Inc. v. Nevils,*
137 S. Ct. 1190 (2017) .................................................................. 11

*CTIA – The Wireless Ass'n v. City of Berkeley,*
928 F.3d 832 (9th Cir. 2019) ........................................................... 5

*Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.,*
554 U.S. 33 (2008) ........................................................................ 12

*Georgia v. Public.Resource.Org, Inc.,*
140 S. Ct. 1498 (2020) .................................................................. 29

*Grand Canyon Tr. v. Provencio,*
26 F.4th 815 (9th Cir. 2022) ........................................................... 29

*Harris v. Mex. Specialty Foods, Inc.*,
  564 F.3d 1301 (11th Cir. 2009)...........................................................2

*L.A. Cnty. Bar Ass'n v. Eu*,
  979 F.2d 697 (9th Cir. 1992)...............................................................2

*La Preferida, Inc. v. Cerveceria Modelo, S.A. de C.V.*,
  914 F.2d 900 (7th Cir. 1990)...............................................................7

*MedImmune, Inc. v. Genentech, Inc.*,
  549 U.S. 118 (2007)...............................................................................3

*Medtronic, Inc. v. Lohr*,
  518 U.S. 470 (1996).............................................................4, 13, 14

*Nat'l Audubon Soc'y, Inc. v. Davis*,
  307 F.3d 835 (9th Cir. 2002)...............................................................3

*Obduskey v. McCarthy & Holthus LLP*,
  139 S. Ct. 1029 (2019)...............................................................12, 20

*Perez–Guzman v. Lynch*,
  835 F.3d 1066 (9th Cir. 2016).....................................................5, 10

*Price v. Stevedoring Servs. of Am., Inc.*,
  697 F.3d 820 (9th Cir. 2012) (en banc)...........................................28

*Puerto Rico v. Franklin Cal. Tax-Free Tr.*,
  136 S. Ct. 1938 (2016)...............................................3, 4, 13, 14

*S. Cal. Gas. Co. v. City of Vernon*,
  48 Cal. Rptr. 2d 661 (Ct. App. 1995)..............................................25

*San Diego County Gun Rights Committee v. Reno*,
  98 F.3d 1121 (9th Cir. 1996)...............................................................3

*Sawyer v. S. Cal. Gas Co.*,
  274 P. 544 (Cal. 1929).......................................................................24

*Simmons v. Himmelreich*,
  136 S. Ct. 1843 (2016).......................................................................20

*Skidmore v. Swift & Co.*,
  323 U.S. 134 (1944)............................................................................29

iii

*SolarWorld Ams., Inc. v. United States*,
   962 F.3d 1351 (Fed. Cir. 2020) ............................................................ 7

*Sturgeon v. Frost*,
   136 S. Ct. 1061 (2016) ................................................................... 3, 4

*Thornton v. Tyson Foods, Inc.*,
   28 F.4th 1016 (10th Cir. 2022) ........................................................ 14

*United States v. Everett*,
   601 F.3d 484 (6th Cir. 2010) ............................................................. 7

*United States v. Mead Corp.*,
   533 U.S. 218 (2001) ................................................................ 27, 28

*Van Buren v. United States*,
   141 S. Ct. 1648 (2021) .................................................................... 19

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, &*
   *Prods. Liability Litig.*,
   959 F.3d 1201 (9th Cir. 2020) .......................................................... 13

*Whitman v. Am. Trucking Ass'ns*,
   531 U.S. 457 (2001) ......................................................................... 9

*Wilkins v. United States*,
   13 F.4th 791 (9th Cir. 2021) ............................................................ 15

*Wyeth v. Levine*,
   555 U.S. 555 (2009) ........................................................................ 27

**Constitutional Provisions**

U.S. Const. art. I, § 1 ............................................................................ 22

**Statutes**

1 U.S.C. § 1 ........................................................................................... 8

Energy Policy and Conservation Act,
   42 U.S.C. §§ 6201 *et seq.*, ............................................... *passim*

42 U.S.C. § 6291(4) ............................................................................... 4

42 U.S.C. § 6297(a)(1) .................................................................. 13, 15

iv

42 U.S.C. § 6297(a)(2) (1982) ....................................................... 18

42 U.S.C. § 6297(b) ........................................................................ 12

42 U.S.C. § 6297(b) (1982) ............................................................ 18

42 U.S.C. § 6297(c) ................................................................. *passim*

42 U.S.C. § 6297(d)(1)(A) .................................................. 17, 18, 19

42 U.S.C. § 6297(d)(1)(B) ........................................................... 19

42 U.S.C. § 6297(d)(4) ..................................................... 17, 19, 20, 23

42 U.S.C. § 6297(f)(3) .................................................................. 16

Cal. Pub. Util. Code § 328.2 .......................................................... 25

Cal. Pub. Util. Code § 451 ............................................................. 25

Cal. Pub. Util. Code § 963 ............................................................. 25

Cal. Pub. Util. Code § 963(a)(2) .................................................... 25

Cal. Pub. Util. Code § 963(b)(1) .................................................... 25

## Other Authorities

Energy Conservation Program for Consumer Products,
    47 Fed. Reg. 14,424 (Apr. 2, 1982) (proposed rule) ........................... 26

Energy Conservation Program for Consumer Products,
    47 Fed. Reg. 57,198 (Dec. 22, 1982) ............................................... 26, 27

Energy Conservation Standards for Residential Refrigerators,
    Refrigerator-Freezers, and Freezers,
    75 Fed. Reg. 59,470 (Sept. 27, 2010) (proposed rule) ........................ 27

Energy Conservation Standards for Residential Refrigerators,
    Refrigerator-Freezers, and Freezers,
    76 Fed. Reg. 57,516 (Sept. 15, 2011) ................................................. 27

H.R. Rep. No. 94-340 (1975) ...................................................... 22, 23

*Quantity*, Black's Law Dictionary (11th ed. 2019) .................................... 6

*Quantity*, Merriam-Webster,
   https://www.merriam-webster.com/dictionary/quantity
   (last visited Apr. 14, 2022) ........................................................................ 6

S. Rep. No. 94-516 (1975) (Conf. Rep.) ..................................................... 22

S. Rep. No. 100-6 (1987) .............................................................. 17, 23, 24

## **INTRODUCTION**

The problem with Berkeley's, the Government's, and other amici's positions is that they seek to avoid the plain meaning of the statute Congress wrote. Their scattershot attempts to add language, change language, rely on other statutes, and fall back on policy arguments result from the reality that the statute is unambiguous. If a local ordinance concerns a covered appliance's energy use, it is preempted. Banning the use of energy by a covered appliance necessarily concerns its energy use.

Frustrated with federal policy, Berkeley set out to ban natural gas appliances in new construction. It recognized previously that it could not do so directly (though it seems to walk that view back on appeal), so it instead prohibited the pipes needed to connect those appliances to the existing gas supply. The question in this case is whether that maneuver was enough to evade EPCA preemption.

This case is not about whether Berkeley's Ordinance is good policy. It is about who decides. In our federal system, the answer is Congress. Congress chose to pursue a reduction in the *amount* of energy the nation's appliances use without dictating the *type* of energy or appliances allowed. Congress chose not to let state and local governments pursue different policies on these issues; any variation is subject to a stringent exemption or waiver process. Indeed, events of recent months — much like the oil crisis of the 1970s that inspired the EPCA — highlight energy policy's national strategic and security implications. This Court should respect

the legislative choice reflected in the plain text of the EPCA's preemption provision and reverse the District Court's dismissal of the CRA's claims.

## ARGUMENT

## I. The CRA Has Standing to Challenge Berkeley's Ordinance.

As the District Court determined, the California Restaurant Association has standing to challenge Berkeley's ban on gas appliances in new construction by way of a member that would "open or relocate a restaurant in a new building in Berkeley but for the ban." ER-7. Berkeley claims that the CRA has not shown imminent injury because it does not allege "*how soon*" a member intends to open or relocate a restaurant. Answering Br. 2. This incorrectly assumes that the CRA raises an as-applied challenge. As the District Court correctly held, a facial challenge does not require a member to apply for a permit or an exemption. ER-13-14. "In the context of a facial challenge, a purely legal claim is presumptively ripe for judicial review because it does not require a developed factual record." *Harris v. Mex. Specialty Foods, Inc.*, 564 F.3d 1301, 1308 (11th Cir. 2009); *see also L.A. Cnty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992) (holding that "[f]urther factual development will not assist [the Court's] consideration of" a facial challenge where "[t]he relevant facts are clear"). The CRA need not show that a member applied for and was denied an exemption.

Moreover, Berkeley misreads the CRA's allegations, which do not state a specific time because they are not about *future* harm. The CRA's

members are injured *now* because they are banned from opening or relocating restaurants in new buildings with gas appliances. That injury "is not a hypothetical risk of prosecution but rather actual, ongoing economic harm resulting from" Berkeley's unlawful ban. *See Nat'l Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 855 (9th Cir. 2002) (distinguishing *San Diego County Gun Rights Committee v. Reno*, 98 F.3d 1121 (9th Cir. 1996)), *amended in other part on denial of reh'g*, 312 F.3d 416 (9th Cir. 2002); *see also MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007) ("[F]ailing to violate the [challenged] law eliminates the imminent threat of prosecution, but nonetheless does not eliminate Article III jurisdiction" because "the threat-eliminating behavior was effectively coerced.").[1]

## II. Berkeley's Ordinance Is Preempted.

The Supreme Court and this Court have held that express preemption is analyzed just like any question of statutory interpretation: by beginning with the text — and ending there if the text is unambiguous. *See Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 136 S. Ct. 1938, 1946 (2016); *Connell v. Lima Corp.*, 988 F.3d 1089, 1097 (9th Cir. 2021). Of course, the text of preemption provisions, like any other statutory text, must be read in context. *See, e.g.*, *Sturgeon v. Frost*, 136 S. Ct. 1061, 1070

---

[1] Accordingly, Berkeley's reliance on *Gun Rights Committee*'s discussion of future harm, Answering Br. 3-4, is misplaced. In any event, unlike here, the plaintiffs there did not allege what prohibited acts they wanted to engage in or had previously engaged in and would continue to engage in. *See Gun Rights Comm.*, 98 F.3d at 1124, 1126-28.

(2016). While that includes reading with a "fair understanding of congressional purpose," the best evidence of that purpose is the text Congress enacted. *Connell*, 988 F.3d at 1097 (9th Cir. 2021) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485-86 (1996)); *accord Franklin Cal.*, 136 S. Ct. at 125.

### A. Applying the Plain Text of the EPCA's Preemption Provision, the Ordinance Is a Regulation Concerning Energy Use.

The plain text of the EPCA is the beginning and end of the preemption inquiry here. The Ordinance is a "State regulation concerning" the "energy use" of "covered product[s]," 42 U.S.C. § 6297(c), because it regulates the quantity of energy used by natural gas appliances. Opening Br. 21-38. The Ordinance sets all appliances' "energy use" — "the quantity of energy directly consumed by a consumer product at point of use," 42 U.S.C. § 6291(4) — at zero natural gas.

Berkeley, the Government, and amici spend most of their time trying to escape the actual language of the statute, which unambiguously preempts Berkeley's Ordinance. Berkeley cannot ban gas appliances, so it banned the pipes connected to them. If "concerning" — which means the same thing as "related to" — is given any meaning, as it must be, it applies to Berkeley's Ordinance, which has the intended and practical effect of banning gas appliances.

To be clear, the CRA is not arguing that the Ordinance requires the creation of magical gas appliances that consume no gas, as Berkeley

suggests. Nor is the CRA suggesting that Berkeley must build gas pipelines that do not already exist. Rather, by preventing appliances from being connected to an existing gas supply, the Ordinance bans real-world gas appliances. And that is what the EPCA preempts.

### 1. Berkeley forfeited any argument that the EPCA does not preempt bans on appliances or energy sources.

For the first time on appeal, Berkeley takes the view that the EPCA does not preempt outright bans on appliances or energy sources. Berkeley never argued in the District Court that it could directly ban gas appliances, not even when the District Court described the Ordinance as "trying to use a backdoor approach to do something that you cannot do through the front door," ER-34 at 11:4-6. Indeed, if Berkeley had thought it could directly ban gas appliances, it never would have had to take its backdoor approach of banning pipes connected to those appliances. Berkeley has therefore forfeited any argument that the EPCA allows it to ban natural gas appliances. *See, e.g.*, *CTIA – The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 850 (9th Cir. 2019) ("Because CTIA conceded the point in the district court and made its argument to the contrary only before us . . . , it is waived."); *Perez–Guzman v. Lynch*, 835 F.3d 1066, 1075 n.4 (9th Cir. 2016) (holding that a statutory construction argument "raised for the first time at oral argument" was forfeited).

**2.** *Berkeley's rewrite of the statute to refer to an "affirmative" or "nonzero" quantity is contrary to the text and context.*

Berkeley appears to agree that if zero is a "quantity" (as used in the EPCA's definition of "energy use") then its Ordinance is preempted. Its sole textual argument is that its Ordinance does not "concern[]" covered products' "energy use" because zero is not a quantity. Answering Br. 19-28, 35-38. The result of eliminating zero as a quantity, Berkeley says, is that a regulation is preempted only "if it has a significant impact on the affirmative amount of energy a real appliance is designed to consume." Answering Br. 19. That is invention, not interpretation.

a. The ordinary meaning of "quantity" includes quantities of zero or none. Quantity means "[t]he amount of something measurable; the ascertainable number of countable things." *Quantity*, Black's Law Dictionary (11th ed. 2019) (def. 1); *accord Quantity*, Merriam-Webster, https://www.merriam-webster.com/dictionary/quantity (last visited Apr. 14, 2022) (defs. 1a-c) (defining "quantity" as "an indefinite amount or number"; "a determinate or estimated amount"; or "total amount or number"). As its definitions indicate, determining "quantity" is a matter of asking "how much?" or "how many?" And in ordinary language, "zero" and "none" are fair answers to those questions.

Suppose Berkeley asked each of its restaurateurs how much beef they served in the past week. There would be no surprise if some answered "none." Nothing changes when the question is rephrased to mirror the statute. Suppose Berkeley adopted an ordinance requiring

6

restaurants to submit reports stating "the quantity of beef directly consumed by diners at the restaurant, determined in accordance with specified test procedures." Berkeley could fairly expect restaurants that did not serve any beef to report "zero."

This understanding is consistent with how "quantity" is used in the legal field. *See, e.g.*, *Benton Cnty. Wind Farm LLC v. Duke Energy Ind., Inc.*, 843 F.3d 298, 301 (7th Cir. 2016) (energy company "need pay only for power delivered to the [point] where it is measured and passes to the local grid; when MISO issues a stop order that quantity is zero").[2]

Indeed, the well-established ordinary meaning of "quantity" is why Berkeley and its amici keep needing to add the adjectives "affirmative" or "nonzero" to produce their desired result. *See, e.g.*, Answering Br. 20 ("affirmative amounts of energy"); States' Br. 8-9 ("It is these non-zero quantities that EPCA precludes the States from regulating, and the Ordinance has nothing to say about such quantities.").

b. Unable to establish that the ordinary meaning of "quantity" excludes zero, Berkeley turns to a variety of contextual arguments.

---

[2] *See also, e.g.*, *SolarWorld Ams., Inc. v. United States*, 962 F.3d 1351, 1359 (Fed. Cir. 2020) (discussing the Department of Commerce's use of import data in which "a quantity of zero was recorded"); *United States v. Everett*, 601 F.3d 484, 493 (6th Cir. 2010) ("[H]aving just refused to set a bright line at *zero*, we cannot very well select *another* arbitrary quantity of time . . . ."); *La Preferida, Inc. v. Cerveceria Modelo, S.A. de C.V.*, 914 F.2d 900, 901 (7th Cir. 1990) ("Following execution of the agreement, La Preferida sold the following quantities of Corona's beer: none in 1976; 1750 cases in 1977; 4685 cases in 1978; none after 1978.").

First, Berkeley suggests that the term "consume" means "to destroy, as by fire" and so "requires *some* fuel." Answering Br. 21 (attribution omitted). That cherrypicked definition is far from the most relevant one. As Berkeley notes, "consume" also means "the act or process of using up anything, as food, heat, or time." Answering Br. 21 (cleaned up). Berkeley fails to explain why the EPCA's definition of "energy use" should be read to involve *destroying* "energy" by fire rather than, well, *using* it. Either way, nothing about "consumed" implies a nonzero quantity. Just as the quantity of beef consumed at a restaurant that does not serve it will be zero, the quantity of gas consumed by an appliance that cannot be connected to a gas supply will be zero.

Berkeley next attempts to inject meaning into Congress's use of the singular "product" in the definition of "energy use" rather than the plural "products." Answering Br. 22-23. But Congress has told courts not to read statutes that way. 1 U.S.C. § 1 (providing that "unless the context indicates otherwise," the "plural include[s] the singular," and vice versa). Nothing in the context of the EPCA's preemption provision indicates that Congress understood the singular "product" to refer to "specific appliances as they are designed" and the plural "products" to "lean more in the direction of looking at the energy use of installed appliances." Answering Br. 22 (emphasis omitted).

Nor do the statute's instructions for measuring quantities of energy (*i.e.*, using specified test methods) narrow the ordinary meaning of

8

"quantity" to exclude zero, or limit § 6297(c) preemption to regulations before appliances are sold. Answering Br. 23-24. That it may be unnecessary to test zero gas use does not change the fact that zero is a quantity. Nor does requiring testing suggest that Congress cared only about the amount of energy appliances were designed to consume and not how much they consumed "in the field," Answering Br. 23; presumably, the point of mandating a particular test procedure is to ensure that appliances use about as much energy as stated.

So too for Berkeley's "ratio" argument that it is meaningless to evaluate a banned appliance's "energy efficiency," Answering Br. 26-27. Congress is unlikely to have hidden an exception to preemption in the mathematical implications of dividing zero output by zero input. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions — it does not, one might say, hide elephants in mouseholes.").

Finally, Berkeley contends that recognizing zero as a quantity would produce "absurd" results by allowing the Department to set energy conservation standards that prohibit energy use. Answering Br. 25-26. That argument favors the CRA, not Berkeley. If it is absurd to allow the Department to ban appliances by setting the "maximum quantity of energy use" to "zero," Answering Br. 25 (emphasis omitted), then it is equally absurd to allow state and local governments to do the same thing.

9

Berkeley's construction does not even avoid the purported problem; on its view, the Department permissibly could accomplish the same objective by setting the maximum quantity slightly above zero.

c. Finally, Berkeley's argument would make nonsense of the EPCA's approach to preemption. By Berkeley's logic, the EPCA preempts energy standards more stringent than federal standards but leaves a loophole hidden in the definition of "energy use": States and local governments get free rein to ban types of appliances (*e.g.*, televisions) by prohibiting them from using *any* energy or to ban energy sources by prohibiting any appliance from using that type of energy. Indeed, Berkeley's position appears to be that it has the right to ban the use of energy by any type or category of appliance without running afoul of EPCA preemption. That makes no sense and would render EPCA preemption a nullity. Congress certainly did not intend for localities to so easily end-run preemption.

### 3. EPCA preemption is not, as the Government suggests, limited to regulations that "operate directly" on particular products.

The Government does not endorse Berkeley's rewrite of § 6297(c). Instead, it writes yet another version of the statute — not raised by Berkeley below, *see Perez–Guzman*, 835 F.3d at 1075 n.4 — in which "regulation concerning energy use" refers only to "regulations that prescribe the equivalent of an energy conservation standard." U.S.'s Br. 7-8.

The first problem with the Government's position is its contention that the words "shall be effective with respect to such product" in § 6297(c) "have meaning only if the state regulation operates directly on the product itself in the first place," which therefore allows regulations to indirectly ban covered products. U.S.'s Br. 8.

For starters, limiting preemption to regulations that "operate directly" on covered products would read "concerning" out of the statute. "Concerning" means the same thing as "related to" (a point Berkeley and the Government do not dispute) and likewise "expresses a broad preemptive purpose." *Coventry Health Care of Mo., Inc. v. Nevils,* 137 S. Ct. 1190, 1197 (2017) (cleaned up). If "concerning" means anything beyond direct regulation of the appliance itself — as it must — it must reach the pipes attached to the appliance. Opening Br. 25-38.

Moreover, the Government's argument misconstrues the phrase "shall be effective with respect to such product." Some context is helpful:

> [E]ffective on the effective date of an energy conservation standard established in or prescribed under section 6295 of this title for any covered product, *no State regulation concerning* the energy efficiency, energy use, or water use of such covered product *shall be effective with respect to such product* . . . .

42 U.S.C. § 6297(c) (emphasis added). "[S]uch product" points back to the opening clause's reference to "any covered product" for which there is a federal standard, which determines when § 6297(c) preemption begins. *Compare* 42 U.S.C. § 6297(c) (preemption begins when a federal standard

11

takes effect), *with id.* § 6297(b) (addressing preemption before that date). And by providing that a preempted regulation shall not "be effective with respect to such product," the statute is explaining the *result* of preemption, not adding a requirement for preemption to apply. *Id.* § 6297(c). The statute determines *whether* a regulation is preempted by asking whether it is a "regulation concerning the energy efficiency, energy use, or water use of such covered product." *Id.* Read as a whole, § 6297(c) says that beginning when a federal standard takes effect for a product, "no State regulation" that meets the EPCA's standard for preemption "shall be effective with respect to" the types of appliances the federal standard covers.

Next, the Government argues that the reference in § 6297(c)'s heading to "energy conservation standards" means that the preemption provision only reaches energy conservation standards. U.S.'s Br. 9. Headings, however, "cannot substitute for the operative text of the statute," as the Government concedes. U.S.'s Br. 9 (quoting *Fla. Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 47 (2008)). Had Congress wanted to preempt "energy conservation standards" or their equivalents, "it could have said so." *Obduskey v. McCarthy & Holthus LLP*, 139 S. Ct. 1029, 1038 (2019). Instead, in a sentence that includes the term "energy conservation standard" as the trigger for preemption, Congress used a different phrase to describe the preempted subject matter. 42 U.S.C. § 6297(c).

12

*4. Berkeley cannot override the plain meaning by resurrecting a rejected presumption against preemption.*

Courts once applied a presumption against preemption even for express preemption provisions. *See Medtronic*, 518 U.S. at 485. The Supreme Court has since rejected that presumption, as this Court has recognized. Opening Br. 18-20; *see Franklin Cal.*, 136 S. Ct. at 1946; *Connell*, 988 F.3d at 1097 (noting that *Franklin California* eliminated "any presumption against pre-emption" in interpreting "an express pre-emption clause" (attribution omitted)); *see also, e.g.*, *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liability Litig.*, 959 F.3d 1201, 1211-12 (9th Cir. 2020) (explaining that express preemption is controlled by the text).

*First*, Berkeley attempts to resurrect the presumption under the guise of a rule requiring the EPCA's preemption provision to be read "narrowly." Answering Br. 11-12, 28-34. Its argument rests on this Court's decision in *Air Conditioning & Refrigeration Institute v. Energy Resources Conservation & Development Commission*, 410 F.3d 492 (9th Cir. 2005), which involved the EPCA's provision preempting state testing and labeling requirements, 42 U.S.C. § 6297(a)(1). *See* 410 F.3d at 496-97. According to Berkeley, *Air Conditioning* requires this Court to "narrowly read EPCA preemption" in this case, even though *Air Conditioning* relied on the now-incorrect presumption against preemption, because *Air Conditioning* was "independently based on the

13

separate rule limiting preemption based on the 'fair understanding of Congressional purpose.'" Answering Br. 30-31.

There is no such separate rule. *Air Conditioning* treated purpose as merely a check on its presumption-based interpretation, rather than asking how Congress's purpose informed the meaning of the preemption provision's text. *See* 410 F.3d at 497-500 (asking whether the presumption-driven meaning was "consistent with" the purpose). That method cannot be reconciled with *Franklin California*. *See* 136 S. Ct. at 125 (holding that the plain text "necessarily contains the best evidence of Congress's preemptive intent" (attribution omitted)). Ninth Circuit cases since *Franklin California* confirm that this Court now uses purpose as the Supreme Court instructed: as a tool of statutory interpretation. *See Connell*, 988 F.3d at 1097.

*Second*, Berkeley attempts to revive *Air Conditioning* through stare decisis, claiming that because *Air Conditioning* cited *Medtronic*, *Franklin California* did not cite *Medtronic*, and this Court has cited *Medtronic* after *Franklin California*, *Air Conditioning*'s presumption against preemption must not be irreconcilable with *Franklin California*. Putting aside that this logic would impermissibly immunize circuit decisions from abrogation by the Supreme Court, this Court and others have already rejected this conclusion. *See Connell*, 988 F.3d at 1097; *see also Thornton v. Tyson Foods, Inc.*, 28 F.4th 1016, 1023 (10th Cir. 2022).

14

*Wilkins v. United States*, 13 F.4th 791 (9th Cir. 2021), *petition for cert. filed*, No. 21-1164 (U.S. Feb. 18, 2022), is not to the contrary. There, this Court applied stare decisis to a particular statutory interpretation where the underlying reasoning was in "some tension" with but not irreconcilable with later Supreme Court decisions. *See id.* at 793-95. Here, by contrast, neither this Court nor the Supreme Court has addressed the specific statutory question presented, but both have rejected a presumption against preemption.

*Third,* Berkeley is wrong to suggest that the scope of preemption under § 6297(c) was already decided by *Air Conditioning*'s general description of the EPCA's legislative history. Answering Br. 28. *Air Conditioning* summarized the history in light of the question there, which involved whether a different preemption provision, § 6297(a)(1), covered regulations requiring reporting to state agencies. *See* 410 F.3d at 497-500. The legislative history does not support Berkeley's view, *see infra* pp. 21-24, and certainly could not override the statute's text. *City of Auburn v. U.S. Gov't*, 154 F.3d 1025, 1029-31 (9th Cir. 1998). *Air Conditioning* thus does not control the question presented here.

\*   \*   \*

Rather than taking the express preemption provision as written and asking whether it covers the Ordinance, Berkeley is conducting what is essentially an implied preemption analysis, adding words to the

15

statute, and passing off the result as statutory interpretation. The plain text of the EPCA's preemption provision captures the Ordinance.

## B. **The EPCA's Structure and Purpose Support Preemption.**

While there is no need to go beyond the EPCA's unambiguous text, the statute's structure and purpose provide further support for preemption.

> *1. The exemption for local building codes — which Berkeley and the Government ignore — shows that EPCA preemption extends to regulation of buildings' natural gas infrastructure.*

The statutory structure here supports the plain-language interpretation of the preemption provision as including state and local regulation of natural gas infrastructure in buildings. Section 6297(f)(3) exempts building codes from preemption when they meet certain requirements (*e.g.*, allowing builders to choose among products to meet a general objective), reflecting Congress's understanding that § 6297(c) can preempt regulations that function as building codes even when they do not impose product-specific requirements. Opening Br. 38-41; *see Bldg. Indus. Ass'n of Wash. v. Wash. State Bldg. Code Council*, 683 F.3d 1144, 1148-53 (9th Cir. 2012) (addressing whether Washington's building code, which was framed in terms of a building's overall energy use, qualified for the exemption). And Congress's use in § 6297(f)(3) of language mirroring § 6297(c)'s reach ("regulation or other requirement . . . concerning") shows that Congress aligned the scope of the preemption and exemption provisions when it wanted to. Berkeley dismisses this

critical provision in a footnote, Answering Br. 36 n.7, and the Government ignores it altogether.

Instead, the Government focuses solely on the waiver provision, but that too is unavailing. Congress gave the Department only limited authority to waive preemption. *See* 42 U.S.C. § 6297(d)(1)(A) (allowing waiver only for a "regulation which provides for any energy conservation standard or other requirement with respect to energy use . . . for any type (or class) of covered product for which there is a Federal energy conservation standard"). And it prohibited waivers for state regulations that would make any type or category of appliance unavailable. *Id.* § 6297(d)(4) (prohibiting waiver for regulations "likely to result in the unavailability in the State of any covered product type (or class) of performance characteristics (including reliability), features, sizes, capacities, and volumes that are substantially the same as those generally available in the State at the time of the" waiver determination); *see* S. Rep. No. 100-6, at 8-9 (1987). That is what bans on natural gas appliances do, and so regulations like Berkeley's are just the sort of preempted regulation as to which Congress expressly prohibited the Department from granting waivers.

> ### 2. The Government's attempt to revive the 1978 preemption provision defies Congress's decision to expand preemption.

The Government also asserts that the current version of § 6297(c) means the same thing as the 1978 provision that Congress replaced.

U.S.'s Br. 13-14. That position is a return to the Executive Branch defiance that brought about the current EPCA preemption and waiver schemes. More importantly, it finds no support in the statute.

The 1978 preemption provision covered "**any energy efficiency standard** or other requirement with respect to energy efficiency or energy use of a covered product." 42 U.S.C. § 6297(a)(2) (1982) (emphasis added); U.S.'s Br. 13. And the waiver provision at the time allowed the Department to waive preemption for the subset of such standards "respecting energy use or energy efficiency of a type (or class) of covered products" so long as the Department made certain findings. *See* 42 U.S.C. § 6297(b) (1982). After the Department refused Congress's instructions to set federal standards and instead freely granted waivers from preemption, Congress amended the statute to expand preemption and restrict the Department's ability to waive it. *See Air Conditioning*, 410 F.3d at 499-500. Preemption now reaches any "**regulation** concerning the energy efficiency, energy use, or water use of [a] covered product." 42 U.S.C. § 6297(c) (emphasis added). By contrast, the Department's waiver authority is limited to regulations that "provide[] for any **energy conservation standard** or other requirement with respect to energy use, energy efficiency, or water use for any type (or class) of covered product." *Id.* § 6297(d)(1)(A) (emphasis added). Waivers now require additional findings, including that the regulation "is needed to meet unusual and compelling State or local energy or water interests."

18

*Id.* § 6297(d)(1)(B); *see Air Conditioning*, 410 F.3d at 499-500. And as noted, waivers cannot be "likely to result in the unavailability" of types or classes of appliances. 42 U.S.C. § 6297(d)(4).

The Government insists that the amended statute means the same thing as the original statute, and that Congress's use of different words is meaningless. U.S.'s Br. 13-14. The Government has no explanation for why Congress, frustrated with the Department's approach to preemption, would have reenacted the same provision with different words. "When Congress amends legislation, courts must presume it intends the change to have real and substantial effect." *Van Buren v. United States*, 141 S. Ct. 1648, 1660-61 (2021) (attribution omitted) (rejecting government argument that Congress carried forward the meaning of an earlier version of a statute despite changing its language).

The crux of the Government's argument for returning to the 1978 statute is that the Department would otherwise lack authority to waive the full scope of EPCA preemption. *See* U.S.'s Br. 10-12. Just so. Nothing in the statute suggests that Congress entrusted the Department with so much power to waive federal preemption so soon after the Department flouted Congress's commands. Indeed, Congress gave every indication that the Department's waiver authority was narrower than the scope of federal preemption when it used different language in different provisions of the same statute, *compare* 42 U.S.C. § 6297(c), *with id.* § 6297(d)(1)(A), and expressly prohibited waivers in certain

situations, *e.g.*, *id.* § 6297(d)(4). The Department's reading is unsupported by the statutory structure.

### 3. *EPCA preemption is not limited to regulations affecting design choices, but in any event, the Ordinance is such a regulation.*

Berkeley contends that the legislative history of the 1987 amendment to the EPCA limits § 6297(c)'s reach to regulations concerning "appliance manufacturers' design and production of regulated appliances." Answering Br. 17-18. That argument improperly uses legislative history to override the statute's text and in any event does not help Berkeley; the Ordinance does affect design and production.

Nothing in the text of § 6297(c) limits preemption to regulations concerning appliances' design. Rather, § 6297(c) preempts any "regulation concerning" a covered product's "energy use." 42 U.S.C. § 6297(c). "[I]f Congress meant to cover only" design regulations, "it could have said so." *Obduskey*, 139 S. Ct. at 1038; *accord Simmons v. Himmelreich*, 136 S. Ct. 1843, 1848 (2016) ("Absent persuasive indications to the contrary, we presume Congress says what it means and means what it says.").

But even if EPCA preemption were limited to regulations affecting manufacturers' design decisions, the Ordinance would still be preempted. To be sure, once a manufacturer decides to make a gas appliance, the Ordinance has nothing more to say. But the Ordinance's ban on gas appliances kicks in a step earlier, when manufacturers are deciding what

kind(s) of energy their appliances should run on. To sell in Berkeley, manufacturers must design appliances around a prohibition on the use of natural gas, and likewise they must make production decisions based on which appliances they will be able to sell and where. This impact on design and production is exactly the point of Berkeley's Ordinance. *See, e.g.*, ER-34-35 at 11:10-12:6 (Berkeley admitting that "[t]he purpose of the legislation . . . is to transition the City infrastructure away from natural gas" because "natural gas service will be obsolete").

Berkeley insists that the only possible design choice affected by its Ordinance is to design "a gas appliance that works on zero gas," which is not "a real thing." Answering Br. 17-18. Nobody is suggesting that. The only way around Berkeley's Ordinance is the one it wanted: designing and producing appliances that use other forms of energy. The EPCA prohibits Berkeley from forcing manufacturers and builders down that path.

### 4. The CRA's interpretation does not leave a "regulatory gap."

Berkeley and the Government argue that the EPCA's preemption provision *only* stops states from encroaching on the *Department*'s domain, but that the states are free to do anything the Department cannot, such as banning types of appliances or fuel. *E.g.*, U.S.'s Br. 1. That misapprehends the federal policy the EPCA establishes: Congress limited local, state, *and* federal authority. Congress did not want the Department to ban types of appliances any more than it wanted state and

local governments to do so. The Government's objection to this approach is at odds with the Executive Branch's constitutional role; its position suggests that Congress cannot choose a policy that limits the regulatory powers of states and the Executive Branch at the same time. Of course Congress can. Nobody argues that federal energy policy falls outside Congress's Article I powers. Nor could they. One need not look beyond the skyrocketing price of gasoline due to foreign wars and downstream effects from a global pandemic to see that energy policy is a national issue. And the Constitution places such policymaking powers in Congress's bailiwick. *See* U.S. Const. art. I, § 1.

As relevant here, in the 1970s, animated by rising fuel prices and by energy security concerns with dependency on imported oil, Congress set out a sweeping national energy policy that included a policy regarding appliances. That policy was deliberately neutral when it came to the *type* of fuel; Congress instead chose to encourage diverse energy sources and rely on neutral energy consumption and conservation objectives. Opening Br. 10-13, 42-47; *see also* S. Rep. No. 94-516, at 116-18 (1975) (Conf. Rep.); H.R. Rep. No. 94-340, at 1 (1975). Congress wanted appliance manufacturers to focus on cost-effective improvements to energy efficiency using all the diverse types of domestic fuel sources available. Opening Br. 10-13, 42-47. Indeed, diversity of fuel sources was vital to the national policy Congress pursued — that is, one that reduced dependence on imported oil and focused on consuming domestic

resources, even including coal. *Id.*; *see* H.R. Rep. No. 94-340, at 316 (noting that it was "necessary for the government to protect our society from the devastating impact of ever-increasing energy prices, until we can develop alternative energy sources and restore competition to the energy market"); *id.* at 10-11 ("The Committee's bill includes a number of provisions designed to make better use of coal resources.").

Later, the focus shifted from reducing dependence on imported oil to also creating a uniform standard for appliance manufacturers that achieved the nation's energy independence goals. *E.g.*, S. Rep. No. 100-6, at 4. Congress did not want any standards that would "result in the unavailability in the United States in any covered product type (or class) of performance characteristics, such as size or capacity." *Id.* at 8-9. Congress provided the following example: "[The statute], upon a sufficient showing, would forbid a standard for small gas furnaces being set at a level that would increase the price to the point that the product would be noncompetitive and that would result in minimal demand for the product." *Id.* Accordingly, Congress *was* concerned with the unavailability of classes of covered products (like gas furnaces) and curtailed authority even to the Department to permit regulations that would "result in minimal demand" for such covered products. *Id.*; *see* 42 U.S.C. § 6297(d)(4). Moreover, Congress also recognized that regulations in populous states (like California) might carry national weight, S. Rep.

No. 100-6, at 4, and therefore prohibited any state or Department attempt to supplant its policy.

In short, Congress did not give the Department authority to depart from its policy of energy neutrality any more than it gave the states that authority. There is no regulatory gap. Instead, there is a choice — one made by Congress and that Berkeley seeks to supplant (with the Executive's blessing). Accordingly, the Government's argument that state and local governments must be allowed to ban gas appliances because the Department cannot, U.S.'s Br. 23-24, is unsupported.

Nor does the Government's parade of horribles, *see* U.S.'s Br. 21-27, provide any reason to depart from the preemption provision's text, as understood in light of Congress's purpose. Applying the EPCA's preemption provision here would not require concluding that every law that affects energy use in any way, however tenuous, is preempted. *See* Opening Br. 33-38 (explaining the limits to preemption).

### C. The Natural Gas Act Has No Bearing on EPCA Preemption.

Like the District Court, Berkeley (and, at times, amici) emphasizes that the Natural Gas Act does not preempt Berkeley's Ordinance. This is a red herring. Whether a separate federal statute preempts the Ordinance says nothing about whether the EPCA preempts it.

Anyhow, Berkeley's Ordinance has nothing to do with natural gas distribution. Natural gas distribution ends at the meter. *See Sawyer v. S. Cal. Gas Co.*, 274 P. 544, 546 (Cal. 1929) (noting that generally, gas

companies' duty to distribute stops at the meter). Berkeley's Ordinance controls whether building owners can hook their natural gas appliances up to the meter or to preexisting natural gas pipelines. In other words, the Ordinance serves the function of a building code, rather than regulating natural gas distribution.[3]

Indeed, under state law, Berkeley has little authority to control natural gas distribution; franchise agreements address only limited issues and do not meaningfully regulate distribution. *See S. Cal. Gas. Co. v. City of Vernon*, 48 Cal. Rptr. 2d 661, 662 (Ct. App. 1996) (concluding that a city could not "regulate the design and construction of a proposed gas pipeline"); *see also id.* at 666 ("The goal of statewide uniformity in this area would be defeated if a municipality such as Vernon could enlarge upon [state] standards . . . .").[4]

Put simply, Berkeley's Ordinance regulates what happens *after* natural gas has already been distributed, and it does so with the stated intent of banning a class of products covered under the EPCA. Opening

---

[3] In an effort to sidestep state and federal law, Berkeley placed its Ordinance in its Health & Safety Code. ER-87-88 ¶¶ 21-27. This does not change its nature or immunize it from the state law claims. ER-104-108 ¶¶ 106-37.

[4] California distributes natural gas by giving public utilities a duty to serve, and it places regulatory authority in the state public utilities commission. *See* Cal. Pub. Util. Code §§ 328.2, 451, 963. The idea is "to ensure that all core customers of a gas corporation continue to receive safe basic gas service," *id.* § 963(b)(1), including "transmission . . . and distribution of natural gas," *id.* § 963(a)(2). As a result, California does not let individual cities decide whether a particular locale has natural gas service or whether such service should be extended.

Br. 7-8.  That the Natural Gas Act has little to say here is not surprising: This case is not about natural gas distribution.  Opening Br. 48-51.  It is about banning a class of appliances by cutting the pipes to them.

**D. The Government's Litigation Position Is Not Entitled to Any Deference.**

1. The Government claims that the Department "has consistently interpreted the preemption provision in the manner described" in the brief.  U.S.'s Br. 14.  Not so.

Two of the three Federal Register publications the Government cites were interpreting the 1978 statute that Congress amended precisely because the Department was not interpreting it correctly.  U.S.'s Br. 14-16 (citing 47 Fed. Reg. 14,424, 14,456 (Apr. 2, 1982) (proposed rule); and 47 Fed. Reg. 57,198, 57,215 (Dec. 22, 1982)); *see Air Conditioning*, 410 F.3d at 499-500.  And even those publications in fact support the CRA's reading.  While expressly declining to "attempt to specify or define" which state regulations are preempted, 47 Fed. Reg. at 57,215, the Department notes that the standards should not result in effectively banning a type of appliance, 47 Fed. Reg. at 14,434 (noting the Department's belief that **"[t]he statute is clear . . . in providing that" "effectively ban[ning] appliances using certain types of fuel" "should not be the consequence of standards"** (emphasis added)).  Indeed, the Department suggested that an indirect regulation prohibiting "hook-ups

for appliances with less than a certain efficiency would be subject to preemption." 47 Fed. Reg. at 57,215.

The one publication interpreting the correct statute is a notice of proposed rulemaking from 2010 that makes an unsupported assertion based solely on § 6297(c)'s title (which, as noted, cannot override the text). *See* 75 Fed. Reg. 59,470, 59,530 (Sept. 27, 2010) (proposed rule); U.S.'s Br. 16. That assertion did not even make it into the final rule. *See* 76 Fed. Reg. 57,516, 57,561-62 (Sept. 15, 2011).

Even the Government is forced to acknowledge that these publications "did not offer definitive guidance." U.S.'s Br. 15.

2. Although the Government cannot expressly claim that the Department's purported interpretation warrants deference, it implies as much. *See* U.S.'s Br. 14-16. Citing *Wyeth v. Levine*, 555 U.S. 555, 577 (2009), the Government suggests that agencies' views get special consideration in preemption cases. U.S.'s Br. 14. *Wyeth* deals with conflict preemption, not the express preemption at issue here. 555 U.S. at 563-64. And the Government's quotation is incomplete: The quoted sentence begins by noting that "agencies have no special authority to pronounce on pre-emption absent delegation by Congress." *Id.* at 576-77.

Agency interpretations are eligible for *Chevron* deference only when "Congress delegated authority to the agency generally to make rules carrying the force of law" and "the agency interpretation claiming deference was promulgated in the exercise of that authority." *United*

*States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001); *see Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). Interpretations carrying the force of law typically take the form of "notice-and-comment rulemaking or formal adjudication." *Mead*, 533 U.S. at 230. By contrast, "interpretations contained in policy statements, agency manuals, and enforcement guidelines" are "beyond the *Chevron* pale." *Id.* at 234 (attribution omitted). "[A]gency litigating positions" are rarely, if ever, entitled to deference. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212-13 (1988); *see also Price v. Stevedoring Servs. of Am., Inc.*, 697 F.3d 820, 823-30 (9th Cir. 2012) (en banc) (holding that precedent requiring deference to reasonable litigating positions was irreconcilable with *Mead*).

As for the Federal Register statements, publication there "is not in itself sufficient to constitute an agency's intent that its pronouncement have the force of law." *Citizens Exposing Truth About Casinos v. Kempthorne*, 492 F.3d 460, 466-67 (D.C. Cir. 2007). The statement in the 2010 notice of proposed rulemaking offers nothing more; there is no indication that the Department's unsupported observation "reflects a deliberating agency's self-binding choice." *Id.*; *see Mead*, 533 U.S. at 226-27. And the two statements from 1982, interpreting the 1978 statute, have no bearing here. The Government offers no reason for interpreting the current statute by deferring to an agency's interpretation of a prior

statute — much less a statute Congress amended because the agency was misapplying it, *see Air Conditioning*, 410 F.3d at 499-500.

3. Deference would not save the Government's interpretation. Under *Chevron*, courts defer to an agency's reasonable interpretation of a statute it administers only if, after the court has "first exhaust[ed] the traditional tools of statutory construction," the statute remains "silent or ambiguous." *Grand Canyon Tr. v. Provencio*, 26 F.4th 815, 824 (9th Cir. 2022) (attribution omitted). Here, the EPCA unambiguously preempts the Ordinance. Anyhow, the Government's interpretation is unreasonable and lacks persuasive force because, among other issues, it does not rest on any considered agency interpretation and fails to give meaning to Congress's deliberate differences in language. *See Georgia v. Public.Resource.Org, Inc.*, 140 S. Ct. 1498, 1510 (2020); *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

## III.  The CRA's State Law Claims Should Be Considered.

Berkeley does not dispute that the CRA's state law claims should be considered if this Court reverses the dismissal of the EPCA claim. Answering Br. 38. Accordingly, the District Court's dismissal of the state law claims should be vacated and remanded for consideration on the merits. Opening Br. 51-52.

## <u>CONCLUSION</u>

This Court should reverse the District Court's dismissal of the CRA's federal claim, vacate the dismissal of the state law claims, and remand for further proceedings on the merits.

Dated: April 14, 2022                    Respectfully submitted,

<u>*/s/ Courtland L. Reichman*</u>

Gary J. Toman                            Courtland L. Reichman
WEINBERG WHEELER                         Ariel C. Green Anaba
HUDGINS GUNN & DIAL                      Laura Carwile
3344 Peachtree Road, NE                  Brian C. Baran
Suite 2400                               REICHMAN JORGENSEN
Atlanta, GA 30326                        LEHMAN & FELDBERG LLP
(404) 876-2700                           100 Marine Parkway, Suite 300
gtoman@wwhgd.com                         Redwood Shores, CA 94065
                                         (650) 623-1401
                                         creichman@reichmanjorgensen.com

Kylie Chiseul Kim                        Sarah Jorgensen
KELLOGG, HANSEN, TODD,                   REICHMAN JORGENSEN
FIGEL & FREDERICK, PLLC                  LEHMAN & FELDBERG LLP
1615 M St. NW #400                       1201 West Peachtree Street, Suite 2300
Washington, DC 20036                     Atlanta, GA 30309
(202) 326-7924                           (404) 609-1040
kkim@kellogghansen.com                   sjorgensen@reichmanjorgensen.com

                                         *Attorneys for Plaintiff-Appellant*
                                         *California Restaurant Association*

30

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
### Form 8. Certificate of Compliance for Briefs

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** | 21-16278

I am the attorney or self-represented party.

**This brief contains** | 6,998 | **words**, excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R.

App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

◉ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of Fed. R. App. P.
29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because
*(select only one):*

  ○ it is a joint brief submitted by separately represented parties;

  ○ a party or parties are filing a single brief in response to multiple briefs; or

  ○ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated [          ].

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Courtland L. Reichman | **Date** | Apr 14, 2022

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** | *Rev. 12/01/2018*