No. 21-16278

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

————————————

CALIFORNIA RESTAURANT ASSOCIATION,
*Plaintiff-Appellant*,

v.

CITY OF BERKELEY,
*Defendant-Appellee*.

————————————

**On Appeal from the United States District Court
for the Northern District of California**
No. 4:19-cv-07668-YGR
Hon. Yvonne Gonzalez Rogers, District Judge

————————————

**BRIEF OF AMICI CURIAE STATES OF CALIFORNIA, ARIZONA,
HAWAII, MARYLAND, NEW JERSEY, NEW MEXICO, NEW YORK,
OREGON, AND WASHINGTON, THE COMMONWEALTH OF
MASSACHUSETTS, THE DISTRICT OF COLUMBIA, AND THE CITY
OF NEW YORK IN SUPPORT OF REHEARING EN BANC**

————————————

ROB BONTA
Attorney General of California
ROBERT W. BYRNE
EDWARD H. OCHOA
Senior Assistant Attorneys General
MYUNG J. PARK
Supervising Deputy Attorney General

THEODORE A.B. MCCOMBS
M. ELAINE MECKENSTOCK
JONATHAN A. WIENER
Deputy Attorneys General
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA 94102-7004
 (415) 510-3549
 Jonathan.Wiener@doj.ca.gov

*Attorneys for Amicus Curiae State of
California*

*Additional counsel listed on signature page*

June 12, 2023

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF ARGUMENT ......................................1

IDENTITY AND INTERESTS OF AMICI ..............................................4

ARGUMENT ........................................................................4

    I.    The Panel Decided a Question of Exceptional Importance ................4

    II.    The Panel Opinion Rests on Serious Errors ......................................11

           A.    EPCA Preempts Only those State Laws that Concern the Energy Use of Covered Products, Not All State Laws Concerning Covered Products ..................................................11

           B.    The Ordinance Does Not Concern "Energy Use" Because It Does Not Concern the "Quantity" of Energy Appliances Are Designed to Use ............................................14

           C.    Longstanding State and Local Regulation of Natural Gas Infrastructure Further Confirms the Ordinance Is Not Preempted by EPCA .............................................................18

CONCLUSION .....................................................................19

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

*Air Conditioning & Refrig. Inst. v. Energy Res. Conserv. & Dev. Comm'n*
410 F.3d 492, 500 (9th Cir. 2005) .......................................................12

*Cal. Division of Labor Stds. Enforc. v. Dillingham Constr.*
519 U.S. 316 (1997)..........................................................................19

*Panhandle E. Pipe Line Co. v. Pub. Serv. Comm'n of Ind.*
332 U.S. 507 (1974).........................................................................18

*Rivera v. Washington State Building Code Comm'n*
No. 1:23-cv-03070 (E.D. Wash. May 22, 2023) ...................................6

*Sherzai v. LG Electronics USA, Inc.*
No. 2:23-cv-00429 (E.D. Cal., May 13, 2023).....................................6

## FEDERAL STATUTES AND REGULATIONS

10 C.F.R. § 430.32(e)(2)(iii)(B)................................................................16

15 U.S.C.
§ 717(b) ...............................................................................................3, 18
§ 717(c) ...............................................................................................3, 18

ii

# TABLE OF AUTHORITIES
## (continued)

**Page**

42 U.S.C.
§ 6201(5)......................................................................................2
§ 6291(1)(A).................................................................................15
§ 6291(4)..............................................................................3, 5, 14
§ 6291(31)....................................................................................7
§ 6293(b)(3).......................................................................3, 5, 15, 19
§ 6293(b)(4).............................................................................15, 16
§ 6293(e)...................................................................................17
§ 6295.....................................................................................17
§ 6295(gg).................................................................................15
§ 6295(q)(1)(A)............................................................................16
§ 6297(b)..................................................................................12
§ 6297(b)(1)...............................................................................13
§ 6297(b)(4)...............................................................................13
§ 6297(b)(6)...............................................................................13
§ 6297(c)................................................................................*passim*
§ 6297(c)(1)...............................................................................13
§ 6297(d)(3)(C)............................................................................14
§ 6302(a)(5)...............................................................................17
§ 6303....................................................................................17
§ 6307(b)..................................................................................17
§ 6316(a)....................................................................................3

STATE LAWS

CAL. HEALTH & SAFETY CODE § 41986....................................................8

CAL. HEALTH & SAFETY CODE § 109021...................................................9

H.B. 2531 A, 82nd Leg. Assemb., Reg. Sess. (Or. 2023) ......................................10

N.Y. ENERGY LAW § 11-104(6)(b).........................................................6

LOCAL LAWS

BAY AREA AIR QUAL. MGMT. DIST., Rules 9-4, 9-6........................................8

# TABLE OF AUTHORITIES
## (continued)

**Page**

COCHISE COUNTY, AMENDMENTS TO THE INTERNATIONAL PLUMBING CODE 2015 EDITION ............................................. 9

D.C. CODE § 6-1453.01 ................................................. 6

HAWAII COUNTY, HAW., COUNTY CODE § 14-52 ..................................... 9

HENDERSON CODE OF ORDINANCES Ch. 15.24.015 .................................. 9

KETCHUM, IDAHO, CODE OF ORDINANCES Ch. 17.152 ............................... 9

LAS VEGAS VALLEY WATER DIST, NEV., SERVICE RULES Ch. 3.10(i) (Jan. 2023) .................................................. 9

LONG BEACH, CAL., MUN. CODE § 15.40.240 ........................................ 10

LOS ANGELES MUN. CODE § 57.603.10.2 ........................................ 7

LOS ANGELES MUN. CODE § 99.04.106.14 ...................................... 6

LOS ANGELES MUN. CODE § 99.05.106.14 ...................................... 6

MISSOULA, MONT., MUN. CODE § 8.64.060(B)(7) ..................................... 9

MONO COUNTY, CAL., GENERAL PLAN § 23.0707(F) .............................. 9

Montgomery County, Md., Bill No. 13-22 (Nov. 29, 2022) ................................... 6

PIMA COUNTY, ARIZ., OUTDOOR LIGHTING CODE § 105.2 ......................... 9

SACRAMENTO AIR QUAL. MGMT. DIST., Rule 414 .................................... 8

SAN FRANCISCO BLDG. CODE § 106A.1.17 ...................................... 6

SAN JOAQUIN VALLEY AIR POLLUTION CONTROL DIST., Rule 4905 ......................... 8

SAN JOSE MUN. CODE Ch. 17.845 ............................................. 6

SOUTH COAST AIR QUAL. MGMT. DIST., Rules 1121, 1146 ....................................... 8

iv

# TABLE OF AUTHORITIES
## (continued)

Page

TUCSON CODE OF ORDINANCES § 27-95(4) ................................................. 9


**OTHER AUTHORITIES**

51 Fed. Reg. 600 (Jan. 7, 1986) ...................................................... 9

62 Fed. Reg. 26,140 (May 12, 1997) .................................................. 17

74 Fed. Reg. 20,880 (May 6, 2009) .................................................... 9

Ninth Circuit Rule 29-2(a) ............................................................ 4

Federal Rule of Appellate Procedure 29(b)(2) ......................................... 4

S. Rep. 100-6 ......................................................................... 17

## INTRODUCTION AND SUMMARY OF ARGUMENT

The panel opinion adopted a novel and sweeping interpretation of what is in fact an intentionally narrow preemption provision. That opinion invites new challenges to a wide array of critical state and local climate, air-quality, energy, and water laws, notwithstanding that those laws, like Berkeley's Ordinance, do not intrude on the limited sphere of exclusive federal regulation protected by the preemption provision at issue. Indeed, at least two such challenges have already been filed, and more are sure to come absent this Court's intervention.

Challengers can now be expected to claim a right to sell, install, and use any consumer product or piece of commercial or industrial equipment, whenever and wherever they want, just because it is subject to a federal *energy efficiency* standard. Laws addressing such quintessentially local concerns as fire safety and utility service can now face preemption claims under the panel's theory. The same goes for any number of state and local laws regulating covered products due to specific state and local concerns: the dirtiest furnaces in the smoggiest parts of the country; giant water-wasting cooling systems in the desert; high-intensity light bulbs emitting ultraviolet radiation in dark-sky areas. All now face the threat of litigation under a federal energy conservation law that for its entire five-decade existence has never been understood to preempt anything beyond rival state and local energy conservation standards.

1

The panel's reasoning was badly flawed. Congress enacted the Energy Policy and Conservation Act of 1975 ("EPCA") during a historic energy crisis, to "provide for improved energy efficiency of … major appliances, and certain other consumer products." 42 U.S.C. § 6201(5). To achieve that goal, EPCA establishes "energy conservation standards" for manufacturers of consumer and industrial appliances, and authorizes the Department of Energy to build on those standards. To avoid exposing manufacturers to a potential patchwork of federal and state standards, Congress specified that once a federal standard takes effect, it provides uniform efficiency requirements for manufacturers and preempts state laws that would interfere with that uniformity.

The panel opinion, however, applied this preemption provision far beyond this congressionally intended scope. The opinion holds that EPCA bars municipalities from prohibiting gas hook-ups in newly constructed buildings, even though such local infrastructure regulation has no effect on how much energy manufacturers design covered products to use. The opinion's language, moreover, invites claims that Congress not only preempted state and local laws that could interfere with the uniformity of federal efficiency standards, but also immunized manufacturers, consumers, and others from compliance with state and local laws addressing public safety, environmental protection, and any number of other topics besides energy efficiency.

2

Nothing in EPCA's text or history indicates Congress intended its appliance-efficiency program to call into question those broader classes of state regulations. EPCA's plain terms preempt only those state or local regulations that concern "the energy efficiency, energy use, or water use" of covered products. 42 U.S.C. §§ 6297(c), 6316(a). "Energy use"—the relevant phrase here—refers to the "quantity of energy directly consumed by" a covered product, as determined by product-specific test procedures. *Id.* §§ 6291(4), 6293(b)(3). Although Congress thus ensured that product manufacturers would be subject to only one set of energy conservation standards, EPCA did not otherwise displace state and local authority to regulate—directly or indirectly—where, when, or whether certain appliances may be used. Nor did EPCA otherwise interfere with traditional exercises of state and local authority over gas distribution, authority reserved exclusively to States by the Natural Gas Act of 1938, 15 U.S.C. § 717(b)-(c).

Whatever may be said of Berkeley's Ordinance as a policy choice, nothing in EPCA prevents Berkeley from making it. The panel's contrary conclusion conflicts with this Court's prior interpretations of preemption under EPCA's appliance-efficiency chapter and with Supreme Court directives to interpret preemption provisions so as not to unduly intrude on state sovereignty. If the panel opinion is left uncorrected, it will continue to work serious harm in important areas of state and local policymaking.

3

## IDENTITY AND INTERESTS OF AMICI

Amici include the States of California, Arizona, Hawaii, Maryland, New Jersey, New Mexico, New York, Oregon, and Washington, the Commonwealth of Massachusetts, the District of Columbia, and the City of New York. They submit this brief pursuant to Federal Rule of Appellate Procedure 29(b)(2) and Ninth Circuit Rule 29-2(a). The City of New York received the consent of all parties to file this brief with amici States. No party's counsel authored any part of this brief, nor did anyone other than amici contribute money to fund its preparation or submission.

## ARGUMENT

### I.    THE PANEL DECIDED A QUESTION OF EXCEPTIONAL IMPORTANCE

Rehearing en banc is warranted because the panel's erroneous interpretation of EPCA's appliance-efficiency preemption provision invites litigation challenging an extraordinarily wide swath of state and local laws affecting where, when, and whether covered products can be used, even though those laws in no way intrude on EPCA's program of uniform federal energy conservation standards for covered products.

42 U.S.C. § 6297(c) establishes a "general rule of preemption for energy conservation standards" for covered products, tied directly to establishment of federal energy conservation standards for those products. This general rule prohibits state laws concerning products' "energy use," *id*. And "energy use" is

defined as the "quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under Section 6293"— that is, the quantity of energy products are designed to use, as measured by Department of Energy test procedures. *Id*. §§ 6291(4), 6293(b)(3). The statute thus protects from state and local regulation the same domain it authorizes the Department of Energy to regulate.

The panel, however, opined that a local regulation that effectively precludes consumers' use of any particular covered product, even in limited locations or circumstances, is a preempted energy conservation standard for that product, because (in the panel's view) such a regulation has the effect of reducing that product's energy use to the quantity "zero." Op. 13-14. The panel thus transformed a provision designed to prevent a patchwork of *energy conservation* standards into one that could potentially override *any* regulations that affect where, when, and whether covered products may be used, even though EPCA does not authorize the Department of Energy to regulate as to those other issues. That dramatic overreading of Section 6297(c) opens the door to litigation threatening a broad range of state and local laws far afield of EPCA's appliance-efficiency program.

The panel's decision has already spawned claims that states cannot limit where or whether particular appliances can be sold or installed, even without regard to the energy efficiency of those appliances. A coalition of gas companies

and others has invoked the panel's decision in challenging provisions of Washington's building code requiring electric heat pumps in some new construction.[1] Elsewhere, a gas-stove manufacturer is relying on the panel opinion to claim that EPCA immunizes it against the use of state tort law to prevent the sale of the manufacturer's products.[2]

These cases are just the start. Laws requiring electrification in new construction are now found in most of California's largest cities, among others. *E.g.*, LOS ANGELES MUN. CODE § 99.04.106.14, 99.05.106.14; SAN JOSE MUN. CODE Ch. 17.845; SAN FRANCISCO BLDG. CODE § 106A.1.17. In the Ninth Circuit alone, nearly 10 million people live in cities and counties where their democratically accountable local officials have prohibited gas connections in new construction. Many jurisdictions outside the Circuit have done the same. *E.g.*, N.Y. ENERGY LAW § 11-104(6)(b); D.C. CODE § 6-1453.01; Montgomery County, Md., Bill No. 13-22 (Nov. 29, 2022).

---

[1] Compl., *Rivera v. Washington State Building Code Comm'n*, No. 1:23-cv-03070 (E.D. Wash. May 22, 2023); *see also* David Iaconangelo, "Washington State hits the brakes on landmark gas ban," E&E News, https://www.eenews.net/articles/washington-state-hits-the-brakes-on-landmark-gas-ban/ (May 25, 2023).

[2] Dkt. 14-1, *Sherzai v. LG Electronics USA, Inc.*, No. 2:23-cv-00429 (E.D. Cal., May 13, 2023).

Beyond these examples, as Berkeley explains, many commonplace fire, electrical, and other building code provisions can limit or prohibit the installation of products subject to federal efficiency standards. Pet. 13-14; *see also, e.g.,* LOS ANGELES MUN. CODE § 57.603.10.2 (prohibiting certain heating and lighting products in industrial buildings containing flammable materials). Cities and water districts throughout the West have also long imposed temporary bans on *water* connections in new construction—because of shortages, drinking water safety concerns, or inability to safely handle effluent—often structured similarly to Berkeley's ban on gas connections.[3] These regulations do not subject appliance manufacturers to any design standards or otherwise intrude on the exclusive federal regulations established by the Department of Energy. But because these state and local regulations can indirectly preclude the use of many types of covered products that need water to operate, courts in this Circuit can anticipate claims that these laws, too, reduce the energy or water use of those products to zero and are therefore preempted.[4]

---

[3] *See, e.g.*, Peter Aleshire, "Water shortage forces new Pine moratorium," Payson Roundup, https://www.paysonroundup.com/ article_eb99d421-1b4a-5cc9-b1ba-36fc25f930f4.html (April 8, 2022).

[4] While EPCA preempts state laws concerning "water use," 42 U.S.C. § 6297(c), that term applies only to showerheads, faucets, toilets, and urinals. *Id*. § 6291(31). Other products that use water may be regulated (and protected from state regulation) only for their energy use.

The panel's decision also invites litigation over product-specific laws that directly prohibit the sale, installation, or use of particular covered products, for a wide variety of reasons having nothing to do with the quantity of energy those products are designed to consume. To take one example, for decades, smog and other local air-pollution problems have led California's air quality management districts to prohibit the sale or installation of furnaces and water heaters unless they meet certain *emission* standards. *E.g.*, BAY AREA AIR QUAL. MGMT. DIST., Rules 9-4, 9-6; SACRAMENTO AIR QUAL. MGMT. DIST., Rule 414; SAN JOAQUIN VALLEY AIR POLLUTION CONTROL DIST., Rule 4905; SOUTH COAST AIR QUAL. MGMT. DIST., Rules 1121, 1146. The districts have relied on those prohibitions to meet their obligations under the federal Clean Air Act to attain National Ambient Air Quality Standards for ground-level ozone and particulate matter. *See, e.g.*, 51 Fed. Reg. 600 (Jan. 7, 1986) (Bay Area); 74 Fed. Reg. 20,880 (May 6, 2009) (South Coast). California also has long protected residents from additional exposure to ozone pollution indoors, for instance, by banning ozone-producing indoor air purifiers. CAL. HEALTH & SAFETY CODE § 41986.

Separately, desert areas facing rapidly depleting water supplies have focused on water-intensive cooling products (which are not subject to federal regulation for "water use" under EPCA, *see supra* note 4). Much of southern Nevada prohibits installation of evaporative-cooling systems in new warehouses and other

commercial and industrial facilities. *See*, *e.g.*, HENDERSON CODE OF ORDINANCES Ch. 15.24.015; LAS VEGAS VALLEY WATER DIST., SERVICE RULES Ch. 3.10(i) (Jan. 2023). Parts of Arizona ban the use or installation of non-recirculating evaporative-cooling systems in all new construction. *See*, *e.g.*, TUCSON CODE OF ORDINANCES § 27-95(4); COCHISE COUNTY AMENDMENTS TO THE INTERNATIONAL PLUMBING CODE 2015 EDITION.[5]

From Kona to Ketchum, dark-sky ordinances protect stargazers and wildlife by prohibiting the nighttime use of many EPCA-covered outdoor lighting products, and often prohibit some EPCA-covered products altogether. *See*, *E.g.*, HAWAII COUNTY, HAW., COUNTY CODE § 14-52; MONO COUNTY, CAL., GENERAL PLAN § 23.0707(F); PIMA COUNTY, ARIZ., OUTDOOR LIGHTING CODE § 105.2; MISSOULA, MONT., MUN. CODE § 8.64.060(B)(7); KETCHUM, IDAHO, CODE OF ORDINANCES Ch. 17.152. Several Ninth Circuit states have also pursued bans on certain fluorescent bulb types that contain hazardous amounts of mercury. *E.g.*, CAL. HEALTH & SAFETY CODE § 109021; H.B. 2531 A, 82nd Leg. Assemb., Reg. Sess. (Or. 2023).

None of these laws can plausibly be mistaken for energy conservation standards. But all of them now face new risk of litigation because of the panel

---

[5] https://www.cochise.az.gov/DocumentCenter/View/168/Local-Amendments-PDF.

decision, to the extent they could be said to "prevent consumers from using covered products," Op. 15. Although the panel suggested its holding may be more limited, that will not deter litigants. For example, the panel suggested EPCA preemption may turn on whether gas service (or, by extension, electricity or water service) is "otherwise available" at the property. Op. 22. But if "a regulation on 'energy use' fairly encompasses an ordinance simply because it effectively eliminates the 'use' of an energy source" in certain buildings, Op. 15, even though it has no effect on any appliance's energy efficiency, the next plaintiff may ask why banning new service lines or refusing to maintain existing ones would not also prevent the use of "otherwise available" fuel. Similarly, future challengers may question why shutting off power lines in response to extreme wildfire risk, other time-of-use restrictions on utility service, or detrimental-usage restrictions on gas service are not also "zero electricity" or "zero gas" standards. *Compare, e.g.*, LONG BEACH, CAL., MUN. CODE § 15.40.240 (disallowing appliance connections threatening system's integrity and safety) *with* Op. 42 & n.7 (Baker, J., concurring).[6]

---

[6] The panel also described preemption as protecting the use of products only at "their intended final destination." Op. 13. But it did not specify to whose intention it was referring, how a gas-powered product could be "intended" for a building with no connection to a gas line, or any statutory basis for that potential limitation.

Many of these ordinary exercises of police powers that a challenger might characterize as "zero-energy standards" are commonplace, while others are specific responses to uniquely local concerns. Some remain hotly debated policy matters. But none were meant to be covered by EPCA's preemptive scope. Rehearing is warranted to ensure States and localities retain the ability to decide which of these policies make sense for their jurisdictions, without the threat of litigation based on the panel's novel and incorrect expansion of EPCA's preemptive reach.

## II. THE PANEL OPINION RESTS ON SERIOUS ERRORS

Berkeley's petition sets out multiple errors in the panel's opinion. This brief addresses three of particular concern to amici States: The panel opinion (1) wrongly expanded EPCA's preempted domain far beyond the federal energy conservation standards the statute imposes on manufacturers; (2) misread textual limits on the preempted domain of "energy use;" and (3) failed to account for the local authority preserved in the Natural Gas Act of 1938.

### A. EPCA Preempts Only those State Laws that Concern the Energy Use of Covered Products, Not All State Laws Concerning Covered Products

The panel opinion erroneously treats EPCA's preemption provision as concerned with "*end-users'* ability to *use* installed covered products at their intended final destination." Op. 13 (emphases added); *see id*. 15 ("Congress ensured that States and localities could not prevent consumers from using covered

11

products in their homes, kitchens, and businesses.") But Congress included a preemption provision to eliminate the burden on *manufacturers* that would result from a patchwork of competing state or local energy conservation standards—that is, laws that concern the "energy efficiency [or] energy use" manufacturers design their products to achieve. *Air Conditioning & Refrig. Inst. v. Energy Res. Conserv. & Dev. Comm'n*, 410 F.3d 492, 500 (9th Cir. 2005) ("*ACRI*"). The text conforms to this intent: In the words of the section's title, the preempted domain is not simply covered products, but instead "energy conservation standards" applicable to them. 42 U.S.C. § 6297(c).[7]

That important but limited preemption thus matches the scope of the federal regulatory program it accompanies, protecting *manufacturers*' ability to design products to the uniform national energy standards EPCA authorized. *ACRI*, 410 F.3d at 499-500. Congress aimed "to counteract the systems of separate state appliance standards that had emerged …, which caused appliance manufacturers to be confronted with 'a growing patchwork of differing State regulations which would increasingly complicate their design, production and marketing plans.'" *Id.*

---

[7] A similar rule applies to state and local energy conservation standards applicable to products for which the federal government has begun but not yet completed the process of setting federal energy conservation standards. 42 U.S.C. § 6297(b).

(quoting S. Rep. No. 100-6, at 4). Congress thus created a system that allowed manufacturers to design covered products to a single federal standard.

By contrast, the panel opinion suggests that EPCA's preemptive scope extends to state and local laws that affect when, where, and whether *consumers* can *use* a covered product. That suggestion conflicts both with *ACRI* and the statutory text and overall context. Indeed, the focus on protecting manufacturers from rival energy conservation standards appears in the title of the provision, in which preemption is triggered by the setting of a federal standard. 42 U.S.C. § 6297(c).

The carve-outs from EPCA's preemption provisions further confirm Congress was focused on protecting manufacturers from potentially conflicting energy conservation standards. The various state laws Congress preserved are all themselves energy conservation standards. *E.g.* 42 U.S.C. §§ 6297(b)(1), (4), (6) (design standards for, inter alia, light bulbs, pool heaters, and televisions), § 6297(c)(1) (similar). None bear any resemblance to the multitude of state and local laws otherwise affecting appliance *use* described in Section I, *supra*, at least some of which Congress presumably would have thought to save from preemption, had they been at risk. The statute's preemption waiver provisions likewise reflect Congress's concern with protecting *manufacturers*, restricting the Department's ability to grant waivers for energy conservation standards when doing so would cause a "burden to manufacturers" to "redesign and produce the covered product"

13

to a different energy conservation standard. 42 U.S.C. § 6297(d)(3)(C).[8] The

Ordinance imposes no such burden.

**B. The Ordinance Does Not Concern "Energy Use" Because It Does Not Concern the "Quantity" of Energy Appliances Are Designed to Use**

The panel's reasoning that the Ordinance intrudes on the preempted domain

because it concerns "energy use" cannot be squared with that term's full definition

(rather than the shortened version the panel used) or the surrounding statutory

provisions. EPCA defines "energy use" as the quantity of energy an appliance is

designed to consume when in operation—*i.e.*, the "quantity of energy directly

consumed by a consumer product at point of use, determined in accordance with

test procedures under Section 6293." 42 U.S.C. § 6291(4). Thus, a gas-fueled

furnace's "energy use," *see* Op. 13, is the quantity of gas that it is designed to

consume in operation, determined by federal test procedures, even if no end-user

ever actually installs and operates that furnace. And that quantity—what the

furnace would consume *if* used—remains the same, regardless of the Ordinance.

---

[8] Congress understood this burden on manufacturers could also affect "marketing, distribution, sales, and servicing" of appliances, not just their design and manufacture. Op. 17 (quoting 42 U.S.C. § 6297(d)(3)). Those burdens all follow from the challenge of designing products to a patchwork of standards: building twenty different versions of a product could preclude a single national advertising campaign, for example, or require training repair personnel on twenty different models.

The panel opinion reached the opposite conclusion only by truncating the definition of "energy use." Specifically, the key phrase "determined in accordance with federal test procedures" is missing from the panel's opinion. But that phrase is an integral part of the definition, and highlights the limits of preemption. Federal test procedures measure the quantity of energy a particular model of covered product consumes only *while it is being used.* 42 U.S.C. § 6293(b)(3) (requiring that procedures "measure … energy use" during an "average use cycle or period of use"); *see also id.* § 6293(b)(4) ("estimated annual operating costs" determined by measuring "energy use" during "average use cycle"); *id.* § 6291(1)(A) ("consumer product" is one that "*in operation* consumes, or is designed to consume energy") (emphasis added).[9] When a product is uninstalled or disconnected, that measurement—*i.e.*, the product's "energy use"—is unchanged, not "reduced to zero." And because the Ordinance does not affect or address the "energy use" of any appliance, it is not preempted, regardless of whether a disconnected appliance might colloquially be said to "use" zero energy.

Moreover, "energy use" as measured by the relevant test procedures refers only to the *quantity*, not the *kind*, of energy the product consumes. That distinction

---

[9] Test procedures capture the quantity of all energy consumed when a product is connected to an energy source, whether in "active," "standby," and "off" modes. 42 U.S.C. § 6295(gg).

15

follows from EPCA's energy conservation standards themselves, which regulate only quantity and not kind. The standards typically first identify the kind of fuel a product is designed to consume, and then specify the maximum quantity of that energy type the product can consume. *See, e.g.*, 10 C.F.R. § 430.32(e)(2)(iii)(B) (residential boilers). The statute itself requires distinct quantitative standards for products within a given class that "consume a different kind of energy." 42 U.S.C. § 6295(q)(1)(A).[10] Therefore, whether the Ordinance "reduces the energy consumed by natural gas appliances in new buildings to zero," Op. 13, is irrelevant, because the Ordinance does not affect the *quantity* of energy any particular covered product is designed to use.

The panel further misread the definition of "energy use" by construing its phrase "point of use" to mean "EPCA is concerned with the end-user's ability to *use* installed covered products at their intended final destinations." Op. 13; *see also id.* at 15 ("We measure energy use from where consumers use the products.") (cleaned up). But EPCA does not regulate or protect consumers' use of covered

---

[10] Likewise, the annual operating costs EPCA requires be displayed on product labels are calculated by determining two distinct figures: (1) the "measurement[] of energy use"—i.e., the quantity of energy consumed by the appliance during a representative use cycle—and (2) the average unit costs of "the energy needed to operate such product during such cycle." *Id.* § 6293(b)(4). That calculation depends on "energy use" being a positive, non-zero quantity of the relevant type of energy.

products. *See* Pet. 14-16. "Point of use" merely emphasizes the distinction between direct energy consumption (*e.g.*, from a gas pipe) and indirect energy consumption (*e.g.*, from upstream production of gas). *See* 62 Fed. Reg. 26,140, 26,149 (May 12, 1997) (finding "point of use" precluded furnace standards incorporating a measure of such "source energy"). Only the former is measured by federal test procedures or prescribed by federal energy conservation standards. That distinction is consistent with Congress's effort to limit the "regulatory and economic burdens … on the appliance manufacturing industry" to designing more efficient products, S. Rep. 100-6, at 12. Indeed, EPCA's provisions for testing, standard-setting, labeling, and enforcement, are all premised on "energy use" being a fixed quantity determined prior to sale, regardless of how or whether any particular end-user in fact operates the product. *See* 42 U.S.C. §§ 6293(e), 6295, 6302(a)(5), 6303, 6307(b).

Had the panel properly identified these textual and structural limits on EPCA's preemptive scope, it would have recognized that the Ordinance falls outside the preempted domain. The Ordinance affects at most the use of certain covered products, and has nothing to say about the quantity of energy they are designed to consume when operating, *i.e.*, their "energy use."

**C. Longstanding State and Local Regulation of Natural Gas Infrastructure Further Confirms the Ordinance Is Not Preempted by EPCA**

Finally, the panel opinion upsets the federal-state balance Congress struck in the Natural Gas Act of 1938 (NGA). In the NGA, Congress asserted federal authority over interstate gas transportation. 15 U.S.C. § 717(b). But Congress also expressly preserved the historic authority of state and local governments over gas distribution, including not just the siting of gas distribution infrastructure but also the retail sale and delivery of gas to end-users. *Id*. § 717(c). The NGA thus reflects Congress's "meticulous regard for the continued exercise of state power [over natural gas retail]" and intent "not to handicap or dilute it in any way." *Panhandle E. Pipe Line Co. v. Pub. Serv. Comm'n of Ind.*, 332 U.S. 507, 517-18 (1974).

EPCA's appliance provisions—which say nothing about natural gas infrastructure—evince no intent to alter Congress's careful balance. Nor does it matter if the panel opinion applies only where gas service already exists, *see* Op. 44-45 (Baker, J., concurring). Usurping state and local authority at the service-delivery point (*i.e., inside the home*), as the panel opinion would, disturbs the federal-state balance no less than would usurping state and local authority over gas distribution lines.

The panel opinion erroneously approached the balance of natural gas jurisdiction as a question of implied repeal, calling its readings of EPCA and the Natural Gas Act not "irreconcilable." Op. 22. But Congress's intent in an earlier,

foundational statute should inform the reading of a later statute, even absent an "implied repeal problem." *Id*. In *Dillingham*, for instance, the Supreme Court relied on an earlier-enacted statute to circumscribe ERISA preemption, despite unanimously acknowledging it was not "inconceivable for the ERISA Congress to intend the pre-emption of state statutes resulting from the pre-existing Fitzgerald Act." *Cal. Division of Labor Stds. Enforc. v. Dillingham Constr.*, 519 U.S. 316, 331 n.7 (1997). Though its interpretation was not necessary to avoid implied repeal, the Court said the earlier law's existence "aid[s] our conclusion that Congress' silence on the pre-emption of state statutes that Congress previously sought to foster counsels against pre-emption." *Id*.

So too here. It is implausible that Congress, in EPCA's appliance-efficiency program, silently blurred the lines of authority it so carefully maintained in the Natural Gas Act decades earlier.

## CONCLUSION

The petition should be granted.

Dated: June 12, 2023            Respectfully submitted,

           *s/ Jonathan A. Wiener*

ROB BONTA
Attorney General of California
ROBERT W. BYRNE
EDWARD H. OCHOA
Senior Assistant Attorneys General
MYUNG J. PARK
Supervising Deputy Attorney General
THEODORE A.B. MCCOMBS
M. ELAINE MECKENSTOCK
JONATHAN A. WIENER
Deputy Attorneys General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-3549
Jonathan.Wiener@doj.ca.gov
*Attorneys for Amicus Curiae State of California*

KRISTIN K. MAYES
  *Attorney General*
  *State of Arizona*
  2005 N Central Ave.
Phoenix, AZ 85004

ANNE E. LOPEZ
  *Attorney General*
  *State of Hawaii*
425 Queen St.
Honolulu, HI 96813

ANTHONY G. BROWN
  *Attorney General*
  *State of Maryland*
200 St. Paul Pl., 20th Fl.
Baltimore, MD 21202

ANDREA JOY CAMPBELL
  *Attorney General*
  *Commonwealth of Massachusetts*
One Ashburton Pl.
Boston, MA 02108

MATTHEW J. PLATKIN
  *Attorney General*
  *State of New Jersey*
  25 Market St., 8th Fl.
Trenton, NJ 08625

RAúL TORREZ
  *Attorney General*
  *State of New Mexico*
408 Galisteo St., Villagra Building
Santa Fe, NM 87501

LETITIA JAMES
  *Attorney General*
  *State of New York*
28 Liberty Street
New York, NY 1000

ELLEN F. ROSENBLUM
  *Attorney General*
  *State of Oregon*
1162 Court St. N.E.
Salem, OR 97301

ROBERT W. FERGUSON
  *Attorney General*
  *State of Washington*
800 Fifth Ave., Ste. 2000
Seattle, WA 98104

BRIAN L. SCHWALB
  *Attorney General*
  *District of Columbia*
400 Sixth St., N.W.
Washington, DC 20001

SYLVIA O. HINDS-RADIX
  *Corporation Counsel*
  *City of New York*
100 Church St.
New York, NY 10007

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number:**  21-16278

I am counsel for *amicus curiae* the State of California.

**This brief contains 4,196 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties;
    [ ] a party or parties are filing a single brief in response to multiple briefs; or
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).


**Signature** */s/ Jonathan A. Wiener*　　　　　　**Date:** June 12, 2023